EXHIBIT F

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 20-F**

☐ **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934**

**OR**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2019**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____.**

**OR**

☐ **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of event requiring this shell company report:

Commission file number: 001-38421

**Golden Bull Limited**
(Exact name of Registrant as Specified in its Charter)

**Cayman Islands**
(Jurisdiction of Incorporation or Organization)

**136-20 38th Avenue, Suite 9A-2, Flushing, NY United States 11354**
(Address of Principal Executive Offices)

**Erke Huang**
**Tel: + (1) 1-347-328-3680; erkehuang@gmail.com**
**136-20 38th Avenue, Suite 9A-2, Flushing, NY United States 11354**
(Name, Telephone, E-mail and/or Facsimile Number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| **Ordinary shares, par value US$0.01 per share** | **NASDAQ Capital Market** |

Securities registered or to be registered pursuant to Section 12(g) of the Act:

<u>None</u>
(Title of Class)

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:

<u>None</u>
(Title of Class)

The number of outstanding shares of each of the issuer's classes of capital or common stock as of December 31, 2019 was: 15,399,185 ordinary shares, par value $0.01 per share.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Yes ☐ No ☒

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.

Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).

Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐     Accelerated filer ☐     Non-accelerated filer ☒     Emerging growth company ☒

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

☒ U.S. GAAP     ☐ International Financial Reporting Standards as issued by the International Accounting Standards Board     ☐ Other

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow: Item 17 ☐ Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ **No** ☒

As of June 28, 2019, the last business day of the registrant's second quarter of most recently completed fiscal year, the aggregate market value of the common stock held by non-affiliates of the registrant was approximately $5.54 million based on the closing price of $3.60 for the registrant's common stock as reported on the NASDAQ Capital Market.

As of July 29, 2020, there were 43,699,185 shares of the Company's common stock issued and outstanding.

**GOLDEN BULL LIMITED**
**FORM 20-F ANNUAL REPORT**

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| | **PART I** | |
| Item 1. | Identity of Directors, Senior Management and Advisers | 1 |
| Item 2. | Offer Statistics and Expected Timetable | 1 |
| Item 3. | Key Information | 2 |
| Item 4. | Information on The Company | 43 |
| Item 4A. | Unresolved Staff Comments | 62 |
| Item 5. | Operating and Financial Review and Prospects | 63 |
| Item 6. | Directors, Senior Management and Employees | 79 |
| Item 7. | Major Shareholders and Related Party Transactions | 85 |
| Item 8. | Financial Information | 86 |
| Item 9. | The Offer and Listing | 86 |
| Item 10. | Additional Information | 86 |
| Item 11. | Quantitative and Qualitative Disclosures About Market Risk | 98 |
| Item 12. | Description of Securities Other Than Equity Securities | 99 |
| | **PART II** | |
| Item 13. | Defaults, Dividend Arrearages and Delinquencies | 100 |
| Item 14. | Material Modifications to The Rights of Security Holders and Use of Proceeds | 100 |
| Item 15. | Controls and Procedures | 101 |
| Item 16. | [Reserved] | 103 |
| Item 16A. | Audit Committee Financial Expert | 103 |
| Item 16B. | Code of Ethics | 103 |
| Item 16C. | Principal Accountant Fees and Services | 104 |
| Item 16D. | Exemptions from The Listing Standards for Audit Committees | 104 |
| Item 16E. | Purchases of Equity Securities by The Issuer and Affiliated Purchasers | 104 |
| Item 16F. | Change in Registrant's Certifying Accountant | 104 |
| Item 16G. | Corporate Governance | 104 |
| Item 16H. | Mine Safety Disclosure | 104 |
| | **PART III** | |
| Item 17. | Financial Statements | 105 |
| Item 18. | Exhibits | 105 |

# PART I

## CERTAIN INFORMATION

In this annual report on Form 20-F, unless otherwise indicated, "we," "us," "our," the "Company" and "Golden Bull" refer to Golden Bull Limited, a company organized in the Cayman Islands, its predecessor entities and its subsidiaries.

Unless the context indicates otherwise, all references to "China" and the "PRC" refer to the People's Republic of China, all references to "Renminbi" or "RMB" are to the legal currency of the People's Republic of China, all references to "U.S. dollars," "dollars" and "$" are to the legal currency of the United States. This annual report contains translations of Renminbi amounts into U.S. dollars at specified rates solely for the convenience of the reader. We make no representation that the Renminbi or U.S. dollar amounts referred to in this report could have been or could be converted into U.S. dollars or Renminbi, as the case may be, at any particular rate or at all. On July 28, 2020, the cash buying rate announced by the People's Bank of China was RMB 6.9895 to $1.00.

## FORWARD-LOOKING STATEMENTS

This report contains "forward-looking statements" for purposes of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995 that represent our beliefs, projections and predictions about future events. All statements other than statements of historical fact are "forward-looking statements," including any projections of earnings, revenue or other financial items, any statements of the plans, strategies and objectives of management for future operations, any statements concerning proposed new projects or other developments, any statements regarding future economic conditions or performance, any statements of management's beliefs, goals, strategies, intentions and objectives, and any statements of assumptions underlying any of the foregoing. Words such as "may", "will", "should", "could", "would", "predicts", "potential", "continue", "expects", "anticipates", "future", "intends", "plans", "believes", "estimates" and similar expressions, as well as statements in the future tense, identify forward-looking statements.

These statements are necessarily subjective and involve known and unknown risks, uncertainties and other important factors that could cause our actual results, performance or achievements, or industry results, to differ materially from any future results, performance or achievements described in or implied by such statements. Actual results may differ materially from expected results described in our forward-looking statements, including with respect to correct measurement and identification of factors affecting our business or the extent of their likely impact, and the accuracy and completeness of the publicly available information with respect to the factors upon which our business strategy is based or the success of our business.

Forward-looking statements should not be read as a guarantee of future performance or results, and will not necessarily be accurate indications of whether, or the times by which, our performance or results may be achieved. Forward-looking statements are based on information available at the time those statements are made and management's belief as of that time with respect to future events and are subject to risks and uncertainties that could cause actual performance or results to differ materially from those expressed in or suggested by the forward-looking statements. Important factors that could cause such differences include, but are not limited to, those factors discussed under the headings "Risk Factors", "Operating and Financial Review and Prospects," and elsewhere in this report.

## ITEM 1. IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS

Not Applicable.

## ITEM 2. OFFER STATISTICS AND EXPECTED TIMETABLE

Not Applicable.

1

**ITEM 3. KEY INFORMATION**

**3.A. Selected Financial Data**

      The following table presents the selected consolidated financial information of our company. The selected consolidated statements of operations data for the years ended December 31, 2019, 2018 and 2017 and the selected consolidated balance sheets data as of December 31, 2019 and 2018 have been derived from our audited consolidated financial statements, which are included in this annual report beginning on page F-1. Our audited consolidated financial statements are prepared and presented in accordance with accounting principles generally accepted in the United States, or U.S. GAAP. Our historical results do not necessarily indicate results expected for any future period. You should read the following selected financial data in conjunction with the consolidated financial statements and related notes and "Item 5. Operating and Financial Review and Prospects" included elsewhere in this report.

**Summary Consolidated Statements of Operations:**

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2018** | **2017** |
| **Total operating revenues, net** | $ 4,572,153 | $ 7,889,201 | $ 6,953,757 |
| **Operating expenses** | | | |
|    Selling | (8,196,151) | (4,940,784) | (3,910,646) |
|    General and administrative | (5,788,918) | (6,685,377) | (3,916,736) |
|    Research and development | (137,423) | (447,884) | (485,852) |
| **Total operating expenses** | (14,122,492) | (12,074,045) | (8,313,234) |
| Other income, net | 680,951 | 186,548 | 91,111 |
| **Loss before income taxes** | **(8,869,388)** | **(3,998,297)** | **(1,268,366)** |
| Income tax (expenses) benefits | (806,803) | 461,171 | 271,541 |
| **Net loss** | (9,676,191) | (3,537,126) | (996,825) |
| Less: Net loss attributable to non-controlling interest | (205,941) | (111,145) | (54,457) |
| **Net loss attributable to Golden Bull Limited** | $ (9,470,250) | $ (3,425,981) | $ (942,368) |

**Summary Consolidated Balance Sheet Data:**

      The following table presents our summary consolidated balance sheet data as of December 31, 2019 and 2018.

| | December 31, 2019 | December 31, 2018 |
| --- | --- | --- |
| Cash and cash equivalents | $ 30,650 | $ 2,334,425 |
| Other assets | 4,485,883 | 10,147,045 |
| Total assets | 4,516,533 | 12,481,470 |
| Total liabilities | (429,593) | (403,219) |
| Total shareholders' equity | $ 4,086,940 | $ 12,078,251 |

**3.B. Capitalization and Indebtedness**

      Not Applicable.

**3.C. Reasons for The Offer and Use of Proceeds**

      Not Applicable.

**3.D. Risk Factors**

*An investment in our ordinary shares involves a high degree of risk. You should carefully consider the risks and uncertainties described below together with all other information contained in this annual report, including the matters discussed under the headings "Forward-Looking Statements" and "Operating and Financial Review and Prospects" before you decide to invest in our* ordinary shares. *We are a holding company with substantial operations in China and are subject to a legal and regulatory environment that in many respects differs from the United States. If any of the following risks, or any other risks and uncertainties that are not presently foreseeable to us, actually occur, our business, financial condition, results of operations, liquidity and our future growth prospects could be materially and adversely affected.*

<u>**General Risks**</u>

*If we are unable to successfully execute our bitcoin mining and car rental business plan, it would adversely affect our financial and business condition and results of operations.*

As a result of a policy change of the Chinese government, the Company temporarily suspended its peer to peer ("P2P") lending business during the fourth quarter of 2019. Our previously announced growth strategy included the expansion of our operations to our upstream and downstream industries. In fiscal 2018, we set new financial targets to grow operating income, accelerate earnings per share growth faster than operating income growth and improve return on invested capital. Our ability to meet these financial targets partially depends on our successful execution of our car leasing business plan, including various related initiatives which commenced in April 2018. In October 2019, we decided to enter the bitcoin mining business. There are various risks related to these efforts, including the risk that these efforts may not provide the expected benefits in our anticipated time frame, if at all, and may prove costlier than expected; and the risk of adverse effects to our business, results of operations and liquidity if past and future undertakings, and the associated changes to our business, do not prove to be cost effective or do not result in the cost savings and other benefits at the levels that we anticipate. Our intentions and expectations with regard to the execution of our business plan, and the timing of any related initiatives, are subject to change at any time based on management's subjective evaluation of our overall business needs. If we are unable to successfully execute our business plan, whether due to failure to realize the anticipated benefits from our various business initiatives in the anticipated time frame or otherwise, we may be unable to achieve our financial targets.

*Failure to manage our liquidity and cash flows may materially and adversely affect our financial conditions and results of operations. As a result, we may need additional capital, and financing may not be available on terms acceptable to us, or at all.*

In March 2018, we raised net proceeds of approximately US$5.2 million in an initial public offering, after deducting its fees and expenses. In May 2020, we obtained gross proceeds of $2.6 million in a private placement. In July 2020, we obtained gross proceeds of $17.2 million in a private place to enable us to implement our new business strategy. However, we have generated negative cash flows from operating activities and net losses of approximately $9.7 million, $3.5 million and $1.0 million during the years ended December 31, 2019, 2018 and 2017. We cannot assure you our business model will allow us to generate positive cash, given our substantial expenses in relation to our revenue at this stage of our Company's development. Our continued inability to offset our expenses with adequate revenue, will adversely affect our liquidity, financial condition and results of operations. Although we believe that our cash on hand and anticipated cash flows from operating activities will be sufficient to meet our anticipated working capital requirements and capital expenditures in the ordinary course of business for the next 12 months, we cannot assure you this will be the case. We expect to need additional cash resources in the future as we wish to pursue opportunities for investment, acquisition, capital expenditure or similar actions in order to implement our business plan. In this regard, we are seeking to issue equity and/or debt securities and may obtain credit facilities. The issuance and sale of additional equity would result in further dilution to our shareholders. The incurrence of indebtedness would result in increased fixed obligations and could result in operating covenants that would restrict our operations. We cannot assure you that financing will be available in amounts or on terms acceptable to us, if at all.

***We may be subject to penalties as a result of the Chinese government temporary suspension of our P2P lending business***

On October 31, 2019, the Pudong Branch of the Shanghai Public Security Bureau (the "Bureau") announced that it had completed its investigation against Shanghai Dianniu Internet Finance Information Service Co. Ltd, the Company's variable interest entity (VIE) for suspected illegal collection of public deposits. The Bureau took criminal enforcement measures against 17 suspects in the case and detained at least six suspects. While the Company has not been subject to any enforcement actions, the Company's current management believes that its former Chief Financial Officer and a Director, as well as members of the VIE's management may have been the subject of these proceedings. The Public Security Bureau also initiated online hunting for the Company's former Chief Executive Officer. As of the date of this report, the final outcome of investigation was still not published and the impact on our financial statements could not be estimated.

The PRC laws and regulations relating to online peer-to-peer lending did not set out the liabilities that will be imposed on the service providers who fail to comply with the principles and requirements contained thereunder, nor do other applicable rules, laws and regulations contain specific liability provisions specially as to the peer-to-peer lending platform or similar online marketplace. As a result of the temporary suspension, if our practice is deemed to have violated any rules, laws or regulations, we may face penalties as determined by the relevant government authorities. In addition, although the Company is not responsible for customers' claimed losses, the filing of any such claims and/or government investigations or proceedings against the Company or any of its affiliates, even if not justified, may create negative publicity and have a material adverse effect on the Company. If such situations occur, our business, financial condition and results of operations may be materially and adversely affected even though our VIE is not currently in the P2P lending business.

***We have a history of operating losses, and we may not be able to achieve or sustain profitability; we have recently shifted our bitcoin mining business, and we may not be successful in this business.***

We are not profitable and have incurred losses since our inception. We expect to continue to incur losses for the foreseeable future, and these losses could increase as we continue to work to develop our business. We were previously engaged in peer to peer ("P2P") online lending business in China prior to temporarily suspending that business in the fourth quarter of 2019. Starting in or about April 2018, we had made a decision to diversify into the bitcoin mining business, as well as car rental business. Currently, our primary operations are focused on our bitcoin mining business located at our bitcoin mining facilities in Wuhai, Zhundong, Xilinhot and Sichuan China. Our current strategy is new and unproven, is in an industry that is itself new and evolving and is subject to the risks discussed below. Even if we achieve profitability in the future, we may not be able to sustain profitability in subsequent periods.

***Our results of operation may fluctuate significantly and may not fully reflect the underlying performance of our business.***

Our results of operations, including the levels of our net revenues, expenses, net loss and other key metrics, may vary significantly in the future due to a variety of factors, some of which are outside of our control, and period-to-period comparisons of our operating results may not be meaningful, especially given our limited operating history. Accordingly, the results for any one quarter are not necessarily an indication of future performance. Fluctuations in quarterly results may adversely affect the market price of our ordinary shares. Factors that may cause fluctuations in our quarterly financial results include:

- the amount and timing of operating expenses related to our new business operations and infrastructure;

- fluctuations in the price of bitcoin; and

- general economic, industry and market conditions.

***We may acquire other businesses, form joint ventures or acquire other companies or businesses that could negatively affect our operating results, dilute our stockholders' ownership, increase our debt or cause us to incur significant expense; notwithstanding the foregoing, our growth may depend on our success in uncovering and completing such transactions.***

We are actively seeking to enter the car rental business in the United States, however, we cannot offer any assurance that acquisitions of businesses, assets and/or entering into strategic alliances or joint ventures will be successful. We may not be able to find suitable partners or acquisition candidates and may not be able to complete such transactions on favorable terms, if at all. If we make any acquisitions, we may not be able to integrate these acquisitions successfully into our existing infrastructure. In addition, in the event we acquire any existing businesses we could assume unknown or contingent liabilities.

Any future acquisitions also could result in the issuance of stock, incurrence of debt, contingent liabilities or future write-offs of intangible assets or goodwill, any of which could have a negative impact on our cash flows, financial condition and results of operations. Integration of an acquired company may also disrupt ongoing operations and require management resources that otherwise would be focused on developing and expanding our existing business. We may experience losses related to potential investments in other companies, which could harm our financial condition and results of operations. Further, we may not realize the anticipated benefits of any acquisition, strategic alliance or joint venture if such investments do not materialize.

To finance any acquisitions or joint ventures, we may choose to issue shares of common stock, preferred stock or a combination of debt and equity as consideration, which could significantly dilute the ownership of our existing stockholders or provide rights to such preferred stock holders in priority over our common stock holders. Additional funds may not be available on terms that are favorable to us, or at all. If the price of our common stock is low or volatile, we may not be able to acquire other companies or fund a joint venture project using stock as consideration.

***From time to time we may evaluate and potentially consummate strategic investments or acquisitions, which could require significant management attention, disrupt our business and adversely affect our financial results.***

We may evaluate and consider strategic investments, combinations, acquisitions or alliances in both the bitcoin mining business and car rental business. These transactions could be material to our financial condition and results of operations if consummated. If we are able to identify an appropriate business opportunity, we may not be able to successfully consummate the transaction and, even if we do consummate such a transaction, we may be unable to obtain the benefits or avoid the difficulties and risks of such transaction.

Strategic investments or acquisitions will involve risks commonly encountered in business relationships, including:

- difficulties in assimilating and integrating the operations, personnel, systems, data, technologies, products and services of the acquired business;

- inability of the acquired technologies, products or businesses to achieve expected levels of revenue, profitability, productivity or other benefits;

- difficulties in retaining, training, motivating and integrating key personnel;

- diversion of management's time and resources from our normal daily operations;

- difficulties in successfully incorporating licensed or acquired technology and rights into our businesses;

- difficulties in maintaining uniform standards, controls, procedures and policies within the combined organizations;

- difficulties in retaining relationships with customers, employees and suppliers of the acquired business;

- risks of entering markets, including the U.S., in which we have limited or no prior experience;

- regulatory risks, including remaining in good standing with existing regulatory bodies or receiving any necessary pre-closing or post-closing approvals, as well as being subject to new regulators with oversight over an acquired business; assumption of contractual obligations that contain terms that are not beneficial to us, require us to license or waive intellectual property rights or increase our risk for liability;

- failure to successfully further develop the acquired technology;

- liability for activities of the acquired business before the acquisition, including intellectual property infringement claims, violations of laws, commercial disputes, tax liabilities and other known and unknown liabilities;

- potential disruptions to our ongoing businesses; and

- unexpected costs and unknown risks and liabilities associated with strategic investments or acquisitions.

We may not make any investments or acquisitions, or any future investments or acquisitions may not be successful, may not benefit our business strategy, may not generate sufficient revenues to offset the associated acquisition costs or may not otherwise result in the intended benefits. In addition, we cannot assure you that any future investment in or acquisition of new businesses or technology will lead to the successful development of new or enhanced loan products and services or that any new or enhanced loan products and services, if developed, will achieve market acceptance or prove to be profitable.

***Our loss of any of our management team, our inability to execute an effective succession plan, or our inability to attract and retain qualified personnel, could adversely affect our business.***

Our success and future growth will depend to a significant degree on the skills and services of our management, including our Chief Executive Officer and Chief Financial Officer. Both of these persons joined the Company concurrent with the temporary suspension of the P2P lending business. We will need to continue to grow our management in order to alleviate pressure on our existing team and in order to continue to develop our business. If our management, including any new hires that we may make, fails to work together effectively and to execute our plans and strategies on a timely basis, our business could be harmed. Furthermore, if we fail to execute an effective contingency or succession plan with the loss of any member of management, the loss of such management personnel may significantly disrupt our business.

The loss of key members of management could inhibit our growth prospects. Our future success also depends in large part on our ability to attract, retain and motivate key management and operating personnel. As we continue to develop and expand our operations, we may require personnel with different skills and experiences, and who have a sound understanding of our business and the bitcoin industry. The market for highly qualified personnel in this industry is very competitive and we may be unable to attract such personnel. If we are unable to attract such personnel, our business could be harmed.

***We incur significant costs and demands upon management and accounting and finance resources as a result of complying with the laws and regulations affecting public companies; if we fail to maintain proper and effective internal controls, our ability to produce accurate and timely financial statements could be impaired, which could harm our operating results, our ability to operate our business and our reputation.***

As a public reporting company, we are required to, among other things, maintain a system of effective internal control over financial reporting. Ensuring that we have adequate internal financial and accounting controls and procedures in place so that we can produce accurate financial statements on a timely basis is a costly and time-consuming effort that needs to be re-evaluated frequently. Substantial work will continue to be required to further implement, document, assess, test and remediate our system of internal controls.

If our internal control over financial reporting is not effective, we may be unable to issue our financial statements in a timely manner, we may be unable to obtain the required audit or review of our financial statements by our independent registered public accounting firm in a timely manner or we may be otherwise unable to comply with the periodic reporting requirements of the SEC, our common stock listing on Nasdaq could be suspended or terminated and our stock price could materially suffer. In addition, we or members of our management could be subject to investigation and sanction by the SEC and other regulatory authorities and to stockholder lawsuits, which could impose significant additional costs on us and divert management attention.

***Because cryptocurrencies may be determined to be investment securities, we may inadvertently violate the Investment Company Act and incur large losses as a result and potentially be required to register as an investment company or terminate operations and we may incur third party liabilities.***

We are engaged in the mining of bitcoins which the SEC said is currency and not securities. We therefore believe that we are not engaged in the business of investing, reinvesting, or trading in securities, and we do not hold ourselves out as being engaged in those activities. However, under the Investment Company Act a company may be deemed an investment company under section 3(a)(1)(C) thereof if the value of its investment securities is more than 40% of its total assets (exclusive of government securities and cash items) on an unconsolidated basis.

As a result of our investments and our mining activities, including investments in which we do not have a controlling interest, the investment securities we hold could exceed 40% of our total assets, exclusive of cash items and, accordingly, we could determine that we have become an inadvertent investment company. The bitcoins we own, acquire or mine may be deemed an investment security by the SEC, although we do not believe any of the cryptocurrencies we own, acquire or mine are securities. An inadvertent investment company can avoid being classified as an investment company if it can rely on one of the exclusions under the Investment Company Act. One such exclusion, Rule 3a-2 under the Investment Company Act, allows an inadvertent investment company a grace period of one year from the earlier of (a) the date on which an issuer owns securities and/or cash having a value exceeding 50% of the issuer's total assets on either a consolidated or unconsolidated basis and (b) the date on which an issuer owns or proposes to acquire investment securities having a value exceeding 40% of the value of such issuer's total assets (exclusive of government securities and cash items) on an unconsolidated basis. We may take actions to cause the investment securities held by us to be less than 40% of our total assets, which may include acquiring assets with our cash and bitcoin on hand or liquidating our investment securities or bitcoin or seeking a no-action letter from the SEC if we are unable to acquire sufficient assets or liquidate sufficient investment securities in a timely manner.

As the Rule 3a-2 exception is available to a company no more than once every three years, and assuming no other exclusion were available to us, we would have to keep within the 40% limit for at least three years after we cease being an inadvertent investment company. This may limit our ability to make certain investments or enter into joint ventures that could otherwise have a positive impact on our earnings. In any event, we do not intend to become an investment company engaged in the business of investing and trading securities.

Classification as an investment company under the Investment Company Act requires registration with the SEC. If an investment company fails to register, it would have to stop doing almost all business, and its contracts would become voidable. Registration is time consuming and restrictive and would require a restructuring of our operations, and we would be very constrained in the kind of business we could do as a registered investment company. Further, we would become subject to substantial regulation concerning management, operations, transactions with affiliated persons and portfolio composition, and would need to file reports under the Investment Company Act regime. The cost of such compliance would result in the Company incurring substantial additional expenses, and the failure to register if required would have a materially adverse impact to conduct our operations.

***We face risks related to the novel Coronavirus (COVID-19) outbreak, which could significantly disrupt our operations and financial results.***

We believe that our results of operations, business and financial condition has been adversely impacted by the effects of the novel Coronavirus (COVID-19). Currently, substantially all of our employees and operations are in China. In addition to global macroeconomic effects, the novel Coronavirus (COVID-19) outbreak and any other related adverse public health developments may cause disruption to our mining activities.

The novel Coronavirus (COVID-19) or other disease outbreak will in the short-term, and may over the longer term, adversely affect the economies and financial markets of many countries, resulting in an economic downturn that may adversely affect demand for bitcoin and impact our operating results. Although the magnitude of the impact of the novel Coronavirus (COVID-19) outbreak on our business and operations remains uncertain, the continued spread of the novel Coronavirus (COVID-19) or the occurrence of other epidemics and the imposition of related public health measures and travel and business restrictions will adversely impact our business, financial condition, operating results and cash flows. In addition, we have experienced and will experience disruptions to our business operations resulting from quarantines, self-isolations, or other movement and restrictions on the ability of our employees to perform their jobs. If we are unable to effectively service our miners, our ability to mine bitcoin will be adversely affected as miners go offline, which would have an adverse effect on our business and the results of our operations.

China has also limited the shipment of products in and out of its borders, which could negatively impact our ability to receive mining equipment from our China-based suppliers. Our third-party manufacturers, suppliers, sub-contractors and customers have been and will continue to be disrupted by worker absenteeism, quarantines, restrictions on employees' ability to work, office and factory closures, disruptions to ports and other shipping infrastructure, border closures, or other travel or health-related restrictions. Depending on the magnitude of such effects on our supply chain, shipments of parts for our existing miners, as well as any new miners we purchase, may be delayed. As our miners require repair or become obsolete and require replacement, our ability to obtain adequate replacements or repair parts from their manufacturer may therefore be hampered. Supply chain disruptions could therefore negatively impact our operations. If not resolved quickly, the impact of the novel Coronavirus (COVID-19) global pandemic could have a material adverse effect on our business.

***The coronavirus pandemic is an emerging serious threat to health and economic wellbeing affecting our employees, investors and our sources of supply.***

On March 11, 2020, the World Health Organization announced that infections of the novel Coronavirus (COVID-19) had become pandemic, and on March 13, the U.S. President announced a National Emergency relating to the disease. There has been and continues to be widespread infection in the United States with a second wave now appearing in China, with the potential for catastrophic impact. Mandatory business closures have had catastrophic impacts on domestic and foreign economies of uncertain duration.

The sweeping nature of the novel Coronavirus (COVID-19) pandemic makes it extremely difficult to predict how the company's business and operations will be affected in the longer run. However, the likely overall economic impact of the pandemic is viewed as highly negative to the general economy.

***Increases in labor costs in the PRC may adversely affect our business and results of operations.***

The economy in China has experienced increases in inflation and labor costs in recent years. As a result, average wages in the PRC are expected to continue to increase. In addition, we are required by PRC laws and regulations to pay various statutory employee benefits, including pension, housing fund, medical insurance, work-related injury insurance, unemployment insurance and maternity insurance to designated government agencies for the benefit of our employees. The relevant government agencies may examine whether an employer has made adequate payments to the statutory employee benefits, and those employers who fail to make adequate payments may be subject to late payment fees, fines and/or other penalties. We expect that our labor costs, including wages and employee benefits, will continue to increase. Unless we are able to control our labor costs or pass on these increased labor costs to our users by increasing the fees of our services, our financial condition and results of operations may be adversely affected.

***If we cannot maintain our corporate culture as we grow, we could lose the innovation, collaboration and focus that contribute to our business.***

We believe that a critical component of our success is our corporate culture, which we believe fosters innovation, encourages teamwork and cultivates creativity. As we develop the infrastructure of a public company and continue to grow, we may find it difficult to maintain these valuable aspects of our corporate culture. Any failure to preserve our culture could negatively impact our future success, including our ability to attract and retain employees, encourage innovation and teamwork and effectively focus on and pursue our corporate objectives.

***We do not have any business insurance coverage.***

Insurance companies in China currently do not offer as extensive an array of insurance products as insurance companies in more developed economies. Currently, we do not have any business liability or disruption insurance to cover our operations. We have determined that the costs of insuring for these risks and the difficulties associated with acquiring such insurance on commercially reasonable terms make it impractical for us to have such insurance. Any uninsured business disruptions may result in our incurring substantial costs and the diversion of resources, which could have an adverse effect on our results of operations and financial condition.

**Bitcoin-Related Risks**

***Our results of operations are expected to continue to be negatively impacted by sharp Bitcoin price decreases***

The price of Bitcoin has experienced significant fluctuations over its relatively short existence and may continue to fluctuate significantly in the future. Bitcoin prices ranged from approximately US$14,166 per coin as of December 31, 2017, US$3,792 per coin as of December 31, 2018 to US$7,220 per coin as of December 31, 2019, according to Blockchain.info. According to the same source, from January 1, 2019 to December 31, 2019, the highest Bitcoin price was approximately US$12,933 per coin and the lowest was US$3,395 per coin.

We expect our results of operations to continue to be affected by the Bitcoin price as most of the revenue is from bitcoin mining production as of the filing date. Any future significant reductions in the price of Bitcoin will likely have a material and adverse effect on our results of operations and financial condition. We cannot assure you that the Bitcoin price will remain high enough to sustain our operation or that the Bitcoin price will not decline significantly in the future. Furthermore, fluctuations in the Bitcoin price can have an immediate impact on the trading price of the ADSs even before our financial performance is affected, if at all.

Various factors, mostly beyond our control, could impact the Bitcoin price. For example, the usage of Bitcoins in the retail and commercial marketplace is relatively low in comparison with the usage for speculation, which contributes to Bitcoin price volatility. Additionally, the reward for Bitcoin mining will decline over time, with the most recent halving event occurred in May 2020 and next one four years later, which may further contribute to Bitcoin price volatility.

***Our mining operating costs outpace our mining revenues, which could seriously harm our business or increase our losses.***

Our mining operations are costly and our expenses may increase in the future. We intend to use funds on hand from our private placement to continue to purchase bitcoin mining machines. This expense increase may not be offset by a corresponding increase in revenue. Our expenses may be greater than we anticipate, and our investments to make our business more efficient may not succeed and may outpace monetization efforts. Increases in our costs without a corresponding increase in our revenue would increase our losses and could seriously harm our business and financial perform

***We have an evolving business model which is subject to various uncertainties.***

As bitcoin assets may become more widely available, we expect the services and products associated with them to evolve. In order to stay current with the industry, our business model may need to evolve as well. From time to time, we may modify aspects of our business model relating to our strategy. We cannot offer any assurance that these or any other modifications will be successful or will not result in harm to our business. We may not be able to manage growth effectively, which could damage our reputation, limit our growth and negatively affect our operating results. Further, we cannot provide any assurance that we will successfully identify all emerging trends and growth opportunities in this business sector and we may lose out on those opportunities. Such circumstances could have a material adverse effect on our business, prospects or operations.

***The properties included in our mining network may experience damages, including damages that are not covered by insurance.***

Our current mining operation in Wuhai, Zhundong, Xilinhot, Sichuan China is, and any future mining site we establish will be, subject to a variety of risks relating to physical condition and operation, including:

- the presence of construction or repair defects or other structural or building damage;

- any noncompliance with or liabilities under applicable environmental, health or safety regulations or requirements or building permit requirements;

- any damage resulting from natural disasters, such as hurricanes, earthquakes, fires, floods and windstorms; and

- claims by employees and others for injuries sustained at our properties.

For example, our mine could be rendered inoperable, temporarily or permanently, as a result of a fire or other natural disaster, the coronavirus, or by a terrorist or other attack on the mine. The security and other measures we take to protect against these risks may not be sufficient. Additionally, our mine could be materially adversely affected by a power outage or loss of access to the electrical grid or loss by the grid of cost-effective sources of electrical power generating capacity. Given the power requirement, it would not be feasible to run miners on back-up power generators in the event of a power outage. Our insurance covers the replacement cost of any lost or damaged miners, but does not cover any interruption of our mining activities; our insurance therefore may not be adequate to cover the losses we suffer as a result of any of these events. In the event of an uninsured loss, including a loss in excess of insured limits, at any of the mines in our network, such mines may not be adequately repaired in a timely manner or at all and we may lose some or all of the future revenues anticipated to be derived from such mines. The potential impact on our business is currently magnified because we are only operating a single mine.

***Regulatory changes or actions may alter the nature of an investment in us or restrict the use of cryptocurrencies in a manner that adversely affects our business, prospects or operations.***

As cryptocurrencies have grown in both popularity and market size, governments around the world have reacted differently to cryptocurrencies; certain governments have deemed them illegal, and others have allowed their use and trade without restriction, while in some jurisdictions, such as in the U.S., subject to extensive, and in some cases overlapping, unclear and evolving regulatory requirements. Ongoing and future regulatory actions may impact our ability to continue to operate, and such actions could affect our ability to continue as a going concern or to pursue our new strategy at all, which could have a material adverse effect on our business, prospects or operations.

***The development and acceptance of cryptographic and algorithmic protocols governing the issuance of and transactions in cryptocurrencies is subject to a variety of factors that are difficult to evaluate.***

The use of cryptocurrencies to, among other things, buy and sell goods and services and complete transactions, is part of a new and rapidly evolving industry that employs bitcoin assets based upon a computer-generated mathematical and/or cryptographic protocol. Large-scale acceptance of cryptocurrencies as a means of payment has not, and may never, occur. The growth of this industry in general, and the use of bitcoin, in particular, is subject to a high degree of uncertainty, and the slowing or stopping of the development or acceptance of developing protocols may occur unpredictably. The factors include, but are not limited to:

- continued worldwide growth in the adoption and use of cryptocurrencies as a medium to exchange;

- governmental and quasi-governmental regulation of cryptocurrencies and their use, or restrictions on or regulation of access to and operation of the network or similar bitcoin systems;

- changes in consumer demographics and public tastes and preferences;

- the maintenance and development of the open-source software protocol of the network;

- the increased consolidation of contributors to the bitcoin blockchain through mining pools;

- the availability and popularity of other forms or methods of buying and selling goods and services, including new means of using fiat currencies;

- the use of the networks supporting cryptocurrencies for developing smart contracts and distributed applications;

- general economic conditions and the regulatory environment relating to cryptocurrencies; and

- negative consumer sentiment and perception of bitcoin specifically and cryptocurrencies generally.

The outcome of these factors could have negative effects on our ability to continue as a going concern or to pursue our business strategy at all, which could have a material adverse effect on our business, prospects or operations as well as potentially negative effect on the value of any bitcoin or other cryptocurrencies we mine or otherwise acquire or hold for our own account, which would harm investors in our securities.

***Banks and financial institutions may not provide banking services, or may cut off services, to businesses that engage in bitcoin-related activities or that accept cryptocurrencies as payment, including financial institutions of investors in our securities.***

A number of companies that engage in bitcoin and/or other bitcoin-related activities have been unable to find banks or financial institutions that are willing to provide them with bank accounts and other services. Similarly, a number of companies and individuals or businesses associated with cryptocurrencies may have had and may continue to have their existing bank accounts closed or services discontinued with financial institutions in response to government action, particularly in China, where regulatory response to cryptocurrencies has been to exclude their use for ordinary consumer transactions within China. We also may be unable to obtain or maintain these services for our business. The difficulty that many businesses that provide bitcoin and/or derivatives on other bitcoin-related activities have and may continue to have in finding banks and financial institutions willing to provide them services may be decreasing the usefulness of cryptocurrencies as a payment system and harming public perception of cryptocurrencies, and could decrease their usefulness and harm their public perception in the future.

The usefulness of cryptocurrencies as a payment system and the public perception of cryptocurrencies could be damaged if banks or financial institutions were to close the accounts of businesses engaging in bitcoin and/or other bitcoin-related activities. This could occur as a result of compliance risk, cost, government regulation or public pressure. The risk applies to securities firms, clearance and settlement firms, national stock and derivatives on commodities exchanges, the over-the-counter market, and the Depository Trust Company, which, if any of such entities adopts or implements similar policies, rules or regulations, could negatively affect our relationships with financial institutions and impede our ability to convert cryptocurrencies to fiat currencies. Such factors could have a material adverse effect on our ability to continue as a going concern or to pursue our new strategy at all, which could have a material adverse effect on our business, prospects or operations and harm investors.

***We may face risks of Internet disruptions, which could have an adverse effect on the price of cryptocurrencies.***

A disruption of the Internet may affect the use of cryptocurrencies and subsequently the value of our securities. Generally, cryptocurrencies and our business of mining cryptocurrencies is dependent upon the Internet. A significant disruption in Internet connectivity could disrupt a currency's network operations until the disruption is resolved and have an adverse effect on the price of cryptocurrencies and our ability to mine cryptocurrencies.

***The impact of geopolitical and economic events on the supply and demand for cryptocurrencies is uncertain.***

Geopolitical crises may motivate large-scale purchases of bitcoin and other cryptocurrencies, which could increase the price of bitcoin and other cryptocurrencies rapidly. This may increase the likelihood of a subsequent price decrease as crisis-driven purchasing behavior dissipates, adversely affecting the value of our inventory following such downward adjustment. Such risks are similar to the risks of purchasing commodities in general uncertain times, such as the risk of purchasing, holding or selling gold. Alternatively, as an emerging asset class with limited acceptance as a payment system or commodity, global crises and general economic downturn may discourage investment in cryptocurrencies as investors focus their investment on less volatile asset classes as a means of hedging their investment risk.

As an alternative to fiat currencies that are backed by central governments, cryptocurrencies, which are relatively new, are subject to supply and demand forces. How such supply and demand will be impacted by geopolitical events is largely uncertain but could be harmful to us and investors in our common stock. Political or economic crises may motivate large-scale acquisitions or sales of cryptocurrencies either globally or locally. Such events could have a material adverse effect on our ability to continue as a going concern or to pursue our new strategy at all, which could have a material adverse effect on our business, prospects or operations and potentially the value of any bitcoin or any other cryptocurrencies we mine or otherwise acquire or hold for our own account.

***Acceptance and/or widespread use of bitcoin is uncertain.***

Currently, there is a relatively limited use of any bitcoin in the retail and commercial marketplace, thus contributing to price volatility that could adversely affect an investment in our securities. Banks and other established financial institutions may refuse to process funds for bitcoin transactions, process wire transfers to or from bitcoin exchanges, bitcoin-related companies or service providers, or maintain accounts for persons or entities transacting in bitcoin. Conversely, a significant portion of bitcoin demand is generated by investors seeking a long-term store of value or speculators seeking to profit from the short- or long-term holding of the asset. Price volatility undermines any bitcoin's role as a medium of exchange, as retailers are much less likely to accept it as a form of payment. Market capitalization for a bitcoin as a medium of exchange and payment method may always be low.

The relative lack of acceptance of bitcoins in the retail and commercial marketplace, or a reduction of such use, limits the ability of end users to use them to pay for goods and services. Such lack of acceptance or decline in acceptances could have a material adverse effect on our ability to continue as a going concern or to pursue our new strategy at all, which could have a material adverse effect on our business, prospects or operations and potentially the value of bitcoins we mine or otherwise acquire or hold for our own account.

***Transactional fees may decrease demand for bitcoin and prevent expansion.***

As the number of bitcoins currency rewards awarded for solving a block in a blockchain decreases, the incentive for miners to continue to contribute to the bitcoin network may transition from a set reward to transaction fees. In order to incentivize miners to continue to contribute to the bitcoin network, the bitcoin network may either formally or informally transition from a set reward to transaction fees earned upon solving a block. This transition could be accomplished by miners independently electing to record in the blocks they solve only those transactions that include payment of a transaction fee. If transaction fees paid for bitcoin transactions become too high, the marketplace may be reluctant to accept bitcoin as a means of payment and existing users may be motivated to switch from bitcoin to another bitcoin or to fiat currency. Either the requirement from miners of higher transaction fees in exchange for recording transactions in a blockchain or a software upgrade that automatically charges fees for all transactions may decrease demand for bitcoin and prevent the expansion of the bitcoin network to retail merchants and commercial businesses, resulting in a reduction in the price of bitcoin that could adversely impact an investment in our securities. Decreased use and demand for bitcoin may adversely affect its value and result in a reduction in the price of bitcoin and the value of our common stock.

***The decentralized nature of bitcoin systems may lead to slow or inadequate responses to crises, which may negatively affect our business***.

The decentralized nature of the governance of bitcoin systems may lead to ineffective decision making that slows development or prevents a network from overcoming emergent obstacles. Governance of many bitcoin systems is by voluntary consensus and open competition with no clear leadership structure or authority. To the extent lack of clarity in corporate governance of bitcoin systems leads to ineffective decision making that slows development and growth of such cryptocurrencies, the value of our common stock may be adversely affected.

***It may be illegal now, or in the future, to acquire, own, hold, sell or use bitcoin, ether, or other cryptocurrencies, participate in blockchains or utilize similar bitcoin assets in one or more countries, the ruling of which would adversely affect us.***

Although currently cryptocurrencies generally are not regulated or are lightly regulated in most countries, one or more countries such as China and Russia, which have taken harsh regulatory action, may take regulatory actions in the future that could severely restrict the right to acquire, own, hold, sell or use these bitcoin assets or to exchange for fiat currency. In many nations, particularly in China and Russia, it is illegal to accept payment in bitcoin and other cryptocurrencies for consumer transactions and banking institutions are barred from accepting deposits of cryptocurrencies. Such restrictions may adversely affect us as the large-scale use of cryptocurrencies as a means of exchange is presently confined to certain regions globally. Such circumstances could have a material adverse effect on our ability to continue as a going concern or to pursue our new strategy at all, which could have a material adverse effect on our business, prospects or operations and potentially the value of any bitcoin or other cryptocurrencies we mine or otherwise acquire or hold for our own account, and harm investors.

***There is a lack of liquid markets, and possible manipulation of blockchain/bitcoin-based assets.***

Cryptocurrencies that are represented and trade on a ledger-based platform may not necessarily benefit from viable trading markets. Stock exchanges have listing requirements and vet issuers; requiring them to be subjected to rigorous listing standards and rules, and monitor investors transacting on such platform for fraud and other improprieties. These conditions may not necessarily be replicated on a distributed ledger platform, depending on the platform's controls and other policies. The laxer a distributed ledger platform is about vetting issuers of bitcoin assets or users that transact on the platform, the higher the potential risk for fraud or the manipulation of the ledger due to a control event. These factors may decrease liquidity or volume or may otherwise increase volatility of investment securities or other assets trading on a ledger-based system, which may adversely affect us. Such circumstances could have a material adverse effect on our ability to continue as a going concern or to pursue our new strategy at all, which could have a material adverse effect on our business, prospects or operations and potentially the value of any bitcoin or other cryptocurrencies we mine or otherwise acquire or hold for our own account, and harm investors.

***Our operations, investment strategies and profitability may be adversely affected by competition from other methods of investing in cryptocurrencies.***

We compete with other users and/or companies that are mining cryptocurrencies and other potential financial vehicles, including securities backed by or linked to cryptocurrencies through entities similar to us. Market and financial conditions, and other conditions beyond our control, may make it more attractive to invest in other financial vehicles, or to invest in cryptocurrencies directly, which could limit the market for our shares and reduce their liquidity. The emergence of other financial vehicles and exchange-traded funds have been scrutinized by regulators and such scrutiny and the negative impressions or conclusions resulting from such scrutiny could be applicable to us and impact our ability to successfully pursue our new strategy or operate at all, or to establish or maintain a public market for our securities. Such circumstances could have a material adverse effect on our ability to continue as a going concern or to pursue our new strategy at all, which could have a material adverse effect on our business, prospects or operations and potentially the value of any bitcoin or other cryptocurrencies we mine or otherwise acquire or hold for our own account, and harm investors.

***The development and acceptance of competing blockchain platforms or technologies may cause consumers to use alternative distributed ledgers or other alternatives.***

The development and acceptance of competing blockchain platforms or technologies may cause consumers to use alternative distributed ledgers or an alternative to distributed ledgers altogether. Our business utilizes presently existent digital ledgers and blockchains and we could face difficulty adapting to emergent digital ledgers, blockchains, or alternatives thereto. This may adversely affect us and our exposure to various blockchain technologies and prevent us from realizing the anticipated profits from our investments. Such circumstances could have a material adverse effect on our ability to continue as a going concern or to pursue our new strategy at all, which could have a material adverse effect on our business, prospects or operations and potentially the value of any bitcoin or other cryptocurrencies we mine or otherwise acquire or hold for our own account, and harm investors.

***Our bitcoins may be subject to loss, theft or restriction on access.***

There is a risk that some or all of our bitcoins could be lost or stolen. Cryptocurrencies are stored in bitcoin sites commonly referred to as "wallets" by holders of bitcoins which may be accessed to exchange a holder's bitcoin assets. Access to our bitcoin assets could also be restricted by cybercrime (such as a denial of service attack) against a service at which we maintain a hosted hot wallet. A hot wallet refers to any bitcoin wallet that is connected to the Internet. Generally, hot wallets are easier to set up and access than wallets in cold storage, but they are also more susceptible to hackers and other technical vulnerabilities. Cold storage refers to any bitcoin wallet that is not connected to the Internet. Cold storage is generally more secure than hot storage, but is not ideal for quick or regular transactions and we may experience lag time in our ability to respond to market fluctuations in the price of our bitcoin assets. We hold all of our cryptocurrencies in cold storage to reduce the risk of malfeasance, but the risk of loss of our bitcoin assets cannot be wholly eliminated.

Hackers or malicious actors may launch attacks to steal, compromise or secure cryptocurrencies, such as by attacking the bitcoin network source code, exchange miners, third-party platforms, cold and hot storage locations or software, or by other means. We may be in control and possession of one of the more substantial holdings of bitcoins. As we increase in size, we may become a more appealing target of hackers, malware, cyber-attacks or other security threats. Any of these events may adversely affect our operations and, consequently, our investments and profitability. The loss or destruction of a private key required to access our digital wallets may be irreversible and we may be denied access for all time to our bitcoin holdings or the holdings of others held in those compromised wallets. Our loss of access to our private keys or our experience of a data loss relating to our digital wallets could adversely affect our investments and assets.

Cryptocurrencies are controllable only by the possessor of both the unique public and private keys relating to the local or online digital wallet in which they are held, which wallet's public key or address is reflected in the network's public blockchain. We will publish the public key relating to digital wallets in use when we verify the receipt of transfers and disseminate such information into the network, but we will need to safeguard the private keys relating to such digital wallets. To the extent such private keys are lost, destroyed or otherwise compromised, we will be unable to access our bitcoin rewards and such private keys may not be capable of being restored by any network. Any loss of private keys relating to digital wallets used to store our cryptocurrencies could have a material adverse effect on our ability to continue as a going concern or to pursue our new strategy at all, which could have a material adverse effect on our business, prospects or operations and potentially the value of any bitcoin or other cryptocurrencies we mine or otherwise acquire or hold for our own account.

***Risks due to hacking or adverse software event.***

In order to minimize risk, we have established processes to manage wallets that are associated with our bitcoin holdings. There can be no assurances that any processes we have adopted or will adopt in the future are or will be secure or effective, and we would suffer significant and immediate adverse effects if we suffered a loss of our bitcoin due to an adverse software or cybersecurity event. We utilize several layers of threat reduction techniques, including: (i) the use of hardware wallets to store sensitive private key information; (ii) performance of transactions offline; and (iii) offline generation storage and use of private keys.

At present, the Company is evaluating several third-party custodial wallet alternatives, but there can be no assurance that such services will be more secure than those the Company presently employs. Human error and the constantly evolving state of cybercrime and hacking techniques may render present security protocols and procedures ineffective in ways which we cannot predict. If our security procedures and protocols are ineffectual and our bitcoin assets are compromised by cybercriminals, we may not have adequate recourse to recover our losses stemming from such compromise and we may lose much of the accumulated value of our bitcoin mining activities. This would have a negative impact on our business and operations.

14

***Incorrect or fraudulent bitcoin transactions may be irreversible.***

Bitcoin transactions are irrevocable and stolen or incorrectly transferred cryptocurrencies may be irretrievable. As a result, any incorrectly executed or fraudulent bitcoin transactions could adversely affect our investments and assets.

Bitcoin transactions are not, from an administrative perspective, reversible without the consent and active participation of the recipient of the cryptocurrencies from the transaction. In theory, bitcoin transactions may be reversible with the control or consent of a majority of processing power on the network, however, we do not now, nor is it feasible that we could in the future, possess sufficient processing power to effect this reversal. Once a transaction has been verified and recorded in a block that is added to a blockchain, an incorrect transfer of a bitcoin or a theft thereof generally will not be reversible and we may not have sufficient recourse to recover our losses from any such transfer or theft. It is possible that, through computer or human error, or through theft or criminal action, our bitcoin rewards could be transferred in incorrect amounts or to unauthorized third parties, or to uncontrolled accounts. Further, according to the SEC, at this time, there is no specifically enumerated U.S. or foreign governmental, regulatory, investigative or prosecutorial authority or mechanism through which to bring an action or complaint regarding missing or stolen bitcoin. We are, therefore, presently reliant on existing private investigative entities, such as Chain analysis and Kroll to investigate any potential loss of our bitcoin assets. These third-party service providers rely on data analysis and compliance of ISPs with traditional court orders to reveal information such as the IP addresses of any attackers who may have target us. To the extent that we are unable to recover our losses from such action, error or theft, such events could have a material adverse effect on our ability to continue as a going concern or to pursue our new strategy at all, which could have a material adverse effect on our business, prospects or operations of and potentially the value of any bitcoin or other cryptocurrencies we mine or otherwise acquire or hold for our own account.

***Our interactions with a blockchain may expose us to SDN or blocked persons or cause us to violate provisions of law that did not contemplate distribute ledger technology.***

The Office of Financial Assets Control of the US Department of Treasury requires us to comply with its sanction program and not conduct business with persons named on its specially designated nationals ("SDN") list. However, because of the pseudonymous nature of blockchain transactions we may inadvertently and without our knowledge engage in transactions with persons named on OFAC's SDN list. Our Company's policy prohibits any transactions with such SDN individuals, but we may not be adequately capable of determining the ultimate identity of the individual with whom we transact with respect to selling bitcoin assets. Moreover, federal law prohibits any US person from knowingly or unknowingly possessing any visual depiction commonly known as child pornography. Recent media reports have suggested that persons have imbedded such depictions on one or more blockchains. Because our business requires us to download and retain one or more blockchains to effectuate our ongoing business, it is possible that such digital ledgers contain prohibited depictions without our knowledge or consent. To the extent government enforcement authorities literally enforce these and other laws and regulations that are impacted by decentralized distributed ledger technology, we may be subject to investigation, administrative or court proceedings, and civil or criminal monetary fines and penalties, all of which could harm our reputation and affect the value of our common stock.

***Cryptocurrencies face significant scaling obstacles that can lead to high fees or slow transaction settlement times.***

Cryptocurrencies face significant scaling obstacles that can lead to high fees or slow transaction settlement times, and attempts to increase the volume of transactions may not be effective. Scaling cryptocurrencies is essential to the widespread acceptance of cryptocurrencies as a means of payment, which widespread acceptance is necessary to the continued growth and development of our business. Many bitcoin networks face significant scaling challenges. For example, cryptocurrencies are limited with respect to how many transactions can occur per second. Participants in the bitcoin ecosystem debate potential approaches to increasing the average number of transactions per second that the network can handle and have implemented mechanisms or are researching ways to increase scale, such as increasing the allowable sizes of blocks, and therefore the number of transactions per block, and sharding (a horizontal partition of data in a database or search engine), which would not require every single transaction to be included in every single miner's or validator's block. However, there is no guarantee that any of the mechanisms in place or being explored for increasing the scale of settlement of bitcoin transactions will be effective, or how long they will take to become effective, which could adversely affect an investment in our securities.

***The price of cryptocurrencies may be affected by the sale of such cryptocurrencies by other vehicles investing in cryptocurrencies or tracking bitcoin markets.***

The global market for bitcoin is characterized by supply constraints that differ from those present in the markets for commodities or other assets such as gold and silver. The mathematical protocols under which certain cryptocurrencies are mined permit the creation of a limited, predetermined amount of currency, while others have no limit established on total supply. To the extent that other vehicles investing in cryptocurrencies or tracking bitcoin markets form and come to represent a significant proportion of the demand for cryptocurrencies, large redemptions of the securities of those vehicles and the subsequent sale of cryptocurrencies by such vehicles could negatively affect bitcoin prices and therefore affect the value of the bitcoin inventory we hold. Such events could have a material adverse effect on our ability to continue as a going concern or to pursue our new strategy at all, which could have a material adverse effect on our business, prospects or operations and potentially the value of any bitcoin or other cryptocurrencies we mine or otherwise acquire or hold for our own account.

***Because there has been limited precedent set for financial accounting of bitcoin and other bitcoin assets, the determination that we have made for how to account for bitcoin assets transactions may be subject to change.***

Because there has been limited precedent set for the financial accounting of cryptocurrencies and related revenue recognition and no official guidance has yet been provided by the Financial Accounting Standards Board or the SEC, it is unclear how companies may in the future be required to account for bitcoin transactions and assets and related revenue recognition. A change in regulatory or financial accounting standards could result in the necessity to change our accounting methods and restate our financial statements. Such a restatement could adversely affect the accounting for our newly mined bitcoin rewards and more generally negatively impact our business, prospects, financial condition and results of operation. Such circumstances would have a material adverse effect on our ability to continue as a going concern or to pursue our new strategy at all, which would have a material adverse effect on our business, prospects or operations as well as and potentially the value of any cryptocurrencies we hold or expects to acquire for our own account and harm investors.

***There are risks related to technological obsolescence, the vulnerability of the global supply chain for bitcoin hardware disruption, and difficulty in obtaining new hardware which may have a negative effect on our business.***

Our mining operations can only be successful and ultimately profitable if the costs, including hardware and electricity costs, associated with mining cryptocurrencies are lower than the price of a bitcoin. As our mining facility operates, our miners experience ordinary wear and tear, and may also face more significant malfunctions caused by a number of extraneous factors beyond our control. The degradation of our miners will require us to, over time, replace those miners which are no longer functional. Additionally, as the technology evolves, we may be required to acquire newer models of miners to remain competitive in the market. Reports have been released which indicate that miner manufacturer or seller adjusts the prices of its miners according to bitcoin prices, so the cost of new machines is unpredictable but could be extremely high. As a result, at times, we may obtain miners and other hardware from third parties at premium prices, to the extent they are available. This upgrading process requires substantial capital investment, and we may face challenges. Further, the global supply chain for bitcoin miners is presently heavily dependent on China, which has been severely affected by the emergence of the COVID-19 coronavirus global pandemic. The global reliance on China as a main supplier of bitcoin miners has been called into question in the wake of the COVID-19 pandemic. Should similar outbreaks or other disruptions to the China-based global supply chain for bitcoin hardware occur, we may not be able to obtain adequate replacement parts for our existing miners or to obtain additional miners from the manufacturer on a timely basis. Such events could have a material adverse effect on our ability to pursue our new strategy, which could have a material adverse effect on our business and the value of our ordinary shares.

***Our reliance primarily on a single model of miner may subject our operations to increased risk of mine failure.***

The performance and reliability of our miners and our technology is critical to our reputation and our operations. Because we currently only use MicroBT miners, if there are issues with those machines, our entire system could be affected. Any system error or failure may significantly delay response times or even cause our system to fail. Any disruption in our ability to continue mining could result in lower yields and harm our reputation and business. Any exploitable weakness, flaw, or error common to MicroBT miners affects all our miners, if a defect other flaw is exploited, our entire mine could go offline simultaneously. Any interruption, delay or system failure could result in financial losses, a decrease in the trading price of our common stock and damage to our reputation.

***The Company's reliance on a third-party mining pool service provider for our mining revenue payouts may have a negative impact on the Company operations.***

We use third–party mining pools to receive our mining rewards from the network. Mining pools allow miners to combine their processing power, increasing their chances of solving a block and getting paid by the network. The rewards are distributed by the pool operator, proportionally to our contribution to the pool's overall mining power, used to generate each block. Should the pool operator's system suffer downtime due to a cyber-attack, software malfunction or other similar issues, it will negatively impact our ability to mine and receive revenue. Furthermore, we are dependent on the accuracy of the mining pool operator's record keeping to accurately record the total processing power provided to the pool for a given bitcoin mining application in order to assess the proportion of that total processing power we provided. While we have internal methods of tracking both our power provided and the total used by the pool, the mining pool operator uses its own record-keeping to determine our proportion of a given reward. We have little means of recourse against the mining pool operator if we determine the proportion of the reward paid out to us by the mining pool operator is incorrect, other than leaving the pool. If we are unable to consistently obtain accurate proportionate rewards from our mining pool operators, we may experience reduced reward for our efforts, which would have an adverse effect on our business and operations.

***The bitcoin for which we mine, bitcoin, is subject to halving; the bitcoin reward for successfully uncovering a block will halve several times in the future and their value may not adjust to compensate us for the reduction in the rewards we receive from our mining efforts.***

Halving is a process designed to control the overall supply and reduce the risk of inflation in cryptocurrencies using a Proof-of-Work consensus algorithm. At a predetermined block, the mining reward is cut in half, hence the term "halving." For bitcoin, the reward was initially set at 50 bitcoin currency rewards per block and this was cut in half to 25 in November 28, 2012 at block 210,000 and again to 12.5 on July 9, 2016 at block 420,000. The next halving for bitcoin is expected in May 2020 at block 630,000 when the reward will reduce to 6.25. This process will reoccur until the total amount of bitcoin currency rewards issued reaches 21 million, which is expected around 2140. While bitcoin prices have had a history of price fluctuations around the halving of its bitcoin rewards, there is no guarantee that the price change will be favorable or would compensate for the reduction in mining reward. If a corresponding and proportionate increase in the trading price of bitcoin does not follow these anticipated halving events, the revenue we earn from our mining operations would see a corresponding decrease, which would have a material adverse effect on our business and operations.

***Our future success will depend in large part upon the value of bitcoin; the value of bitcoin may be subject to pricing risk and has historically been subject to wide swings.***

Our operating results will depend in large part upon the value of bitcoin because it's the primary bitcoin we currently mine. Specifically, our revenues from our bitcoin mining operations are based upon two factors: (1) the number of bitcoin rewards we successfully mine and (2) the value of bitcoin. In addition, our operating results are directly impacted by changes in the value of bitcoin, because under the value measurement model, both realized and unrealized changes will be reflected in our statement of operations (i.e., we will be marking bitcoin to fair value each quarter). This means that our operating results will be subject to swings based upon increases or decreases in the value of bitcoin. Furthermore, our strategy focuses almost entirely on bitcoin (as opposed to other cryptocurrencies). Further, our current application-specific integrated circuit ("ASIC") machines (which we refer to as "miners") are principally utilized for mining bitcoin and bitcoin cash and cannot mine other cryptocurrencies, such as ether, that are not mined utilizing the "SHA-256 algorithm." If other cryptocurrencies were to achieve acceptance at the expense of bitcoin or bitcoin cash causing the value of bitcoin or bitcoin cash to decline, or if bitcoin were to switch its proof of work algorithm from SHA-256 to another algorithm for which our miners are not specialized, or the value of bitcoin or bitcoin cash were to decline for other reasons, particularly if such decline were significant or over an extended period of time, our operating results would be adversely affected, and there could be a material adverse effect on our ability to continue as a going concern or to pursue our new strategy at all, which could have a material adverse effect on our business, prospects or operations, and harm investors.

Bitcoin and other bitcoin market prices, which have historically been volatile and are impacted by a variety of factors (including those discussed below), are determined primarily using data from various exchanges, over-the-counter markets and derivative platforms. Furthermore, such prices may be subject to factors such as those that impact commodities, more so than business activities, which could be subjected to additional influence from fraudulent or illegitimate actors, real or perceived scarcity, and political, economic, regulatory or other conditions. Pricing may be the result of, and may continue to result in, speculation regarding future appreciation in the value of cryptocurrencies, or our share price, inflating and making their market prices more volatile or creating "bubble" type risks for both bitcoin and shares of our ordinary shares.

***We may not be able to realize the benefits of forks.***

To the extent that a significant majority of users and miners on a bitcoin network install software that changes the bitcoin network or properties of a bitcoin, including the irreversibility of transactions and limitations on the mining of new bitcoin, the bitcoin network would be subject to new protocols and software. However, if less than a significant majority of users and miners on the bitcoin network consent to the proposed modification, and the modification is not compatible with the software prior to its modification, the consequence would be what is known as a "fork" of the network, with one prong running the pre-modified software and the other running the modified software. The effect of such a fork would be the existence of two versions of the bitcoin running in parallel, yet lacking interchangeability and necessitating exchange-type transaction to convert currencies between the two forks. Additionally, it may be unclear following a fork which fork represents the original asset and which is the new asset. Different metrics adopted by industry participants to determine which is the original asset include: referring to the wishes of the core developers of a bitcoin, blockchains with the greatest amount of hashing power contributed by miners or validators; or blockchains with the longest chain. A fork in the network of a particular bitcoin could adversely affect an investment in our Company or our ability to operate.

We may not be able to realize the economic benefit of a fork, either immediately or ever, which could adversely affect an investment in our securities. If we hold a bitcoin at the time of a hard fork into two cryptocurrencies, industry standards would dictate that we would be expected to hold an equivalent amount of the old and new assets following the fork. However, we may not be able, or it may not be practical, to secure or realize the economic benefit of the new asset for various reasons. For instance, we may determine that there is no safe or practical way to custody the new asset, that trying to do so may pose an unacceptable risk to our holdings in the old asset, or that the costs of taking possession and/or maintaining ownership of the new bitcoin exceed the benefits of owning the new bitcoin. Additionally, laws, regulation or other factors may prevent us from benefitting from the new asset even if there is a safe and practical way to custody and secure the new asset.

18

***There is a possibility of bitcoin mining algorithms transitioning to proof of stake validation and other mining related risks, which could make us less competitive and ultimately adversely affect our business and the value of our stock.***

Proof of stake is an alternative method in validating bitcoin transactions. Should the algorithm shift from a proof of work validation method to a proof of stake method, mining would require less energy and may render any company that maintains advantages in the current climate (for example, from lower priced electricity, processing, real estate, or hosting) less competitive. We, as a result of our efforts to optimize and improve the efficiency of our bitcoin mining operations, may be exposed to the risk in the future of losing the benefit of our capital investments and the competitive advantage we hope to gain form this as a result, and may be negatively impacted if a switch to proof of stake validation were to occur. This may additionally have an impact on other various investments of ours. Such events could have a material adverse effect on our ability to continue as a going concern or to pursue our business strategy at all, which could have a material adverse effect on our business, prospects or operations and potentially the value of any bitcoin or other cryptocurrencies we mine or otherwise acquire or hold for our own account**.**

***To the extent that the profit margins of bitcoin mining operations are not high, operators of bitcoin mining operations are more likely to immediately sell bitcoin rewards earned by mining in the market, thereby constraining growth of the price of bitcoin that could adversely impact us, and similar actions could affect other cryptocurrencies.***

Over the past two years, bitcoin mining operations have evolved from individual users mining with computer processors, graphics processing units and first-generation ASIC servers. Currently, new processing power is predominantly added by incorporated and unincorporated "professionalized" mining operations. Professionalized mining operations may use proprietary hardware or sophisticated ASIC machines acquired from ASIC manufacturers. They require the investment of significant capital for the acquisition of this hardware, the leasing of operating space (often in data centers or warehousing facilities), incurring of electricity costs and the employment of technicians to operate the mining farms. As a result, professionalized mining operations are of a greater scale than prior miners and have more defined and regular expenses and liabilities. These regular expenses and liabilities require professionalized mining operations to maintain profit margins on the sale of bitcoin. To the extent the price of bitcoin declines and such profit margin is constrained, professionalized miners are incentivized to more immediately sell bitcoin earned from mining operations, whereas it is believed that individual miners in past years were more likely to hold newly mined bitcoin for more extended periods. The immediate selling of newly mined bitcoin greatly increases the trading volume of bitcoin, creating downward pressure on the market price of bitcoin rewards.

The extent to which the value of bitcoin mined by a professionalized mining operation exceeds the allocable capital and operating costs determines the profit margin of such operation. A professionalized mining operation may be more likely to sell a higher percentage of its newly mined bitcoin rapidly if it is operating at a low profit margin and it may partially or completely cease operations if its profit margin is negative. In a low profit margin environment, a higher percentage could be sold more rapidly, thereby potentially depressing bitcoin prices. Lower bitcoin prices could result in further tightening of profit margins for professionalized mining operations creating a network effect that may further reduce the price of bitcoin until mining operations with higher operating costs become unprofitable forcing them to reduce mining power or cease mining operations temporarily.

19

***If a malicious actor or botnet obtains control of more than 50% of the processing power on a bitcoin network, such actor or botnet could manipulate blockchains to adversely affect us, which would adversely affect an investment in us or our ability to operate.***

If a malicious actor or botnet (a volunteer or hacked collection of computers controlled by networked software coordinating the actions of the computers) obtains a majority of the processing power dedicated to mining a bitcoin, it may be able to alter blockchains on which transactions of bitcoin reside and rely by constructing fraudulent blocks or preventing certain transactions from completing in a timely manner, or at all. The malicious actor or botnet could control, exclude or modify the ordering of transactions, though it could not generate new units or transactions using such control. The malicious actor could "double-spend" its own bitcoin (i.e., spend the same bitcoin in more than one transaction) and prevent the confirmation of other users' transactions for as long as it maintained control. To the extent that such malicious actor or botnet does not yield its control of the processing power on the network or the bitcoin community does not reject the fraudulent blocks as malicious, reversing any changes made to blockchains may not be possible. The foregoing description is not the only means by which the entirety of blockchains or cryptocurrencies may be compromised but is only an example.

Although there are no known reports of malicious activity or control of blockchains achieved through controlling over 50% of the processing power on the network, it is believed that certain mining pools may have exceeded the 50% threshold in bitcoin. The possible crossing of the 50% threshold indicates a greater risk that a single mining pool could exert authority over the validation of bitcoin transactions. To the extent that the bitcoin ecosystem, and the administrators of mining pools, do not act to ensure greater decentralization of bitcoin mining processing power, the feasibility of a malicious actor obtaining control of the processing power will increase because the botnet or malicious actor could compromise more than 50% mining pool and thereby gain control of blockchain, whereas if the blockchain remains decentralized it is inherently more difficult for the botnet or malicious actor to aggregate enough processing power to gain control of the blockchain, may adversely affect an investment in our common stock. Such lack of controls and responses to such circumstances could have a material adverse effect on our ability to continue as a going concern or to pursue our new strategy at all, which could have a material adverse effect on our business, prospects or operations and potentially the value of any bitcoin or other cryptocurrencies we mine or otherwise acquire or hold for our own account, and harm investors.

***Cryptocurrencies, including those maintained by or for us, may be exposed to cybersecurity threats and hacks.***

As with any computer code generally, flaws in bitcoin codes may be exposed by malicious actors. Several errors and defects have been found previously, including those that disabled some functionality for users and exposed users' information. Exploitations of flaws in the source code that allow malicious actors to take or create money have previously occurred. Despite our efforts and processes to prevent breaches, our devices, as well as our miners, computer systems and those of third parties that we use in our operations, are vulnerable to cyber security risks, including cyber-attacks such as viruses and worms, phishing attacks, denial-of-service attacks, physical or electronic break-ins, employee theft or misuse, and similar disruptions from unauthorized tampering with our miners and computer systems or those of third parties that we use in our operations. Such events could have a material adverse effect on our ability to continue as a going concern or to pursue our business strategy at all, which could have a material adverse effect on our business, prospects or operations and potentially the value of any bitcoin or other cryptocurrencies we mine or otherwise acquire or hold for our own account.

***We are subject to risks associated with our need for significant electrical power. Government regulators may potentially restrict the ability of electricity suppliers to provide electricity to mining operations, such as ours.***

The operation of a bitcoin or other bitcoin mine can require massive amounts of electrical power. Further, our mining operations can only be successful and ultimately profitable if the costs, including electrical power costs, associated with mining a bitcoin are lower than the price of a bitcoin. As a result, any mine we establish can only be successful if we can obtain sufficient electrical power for that mine on a cost-effective basis, and our establishment of new mines requires us to find locations where that is the case. There may be significant competition for suitable mine locations, and government regulators may potentially restrict the ability of electricity suppliers to provide electricity to mining operations in times of electricity shortage, or may otherwise potentially restrict or prohibit the provision or electricity to mining operations. Additionally, our mines could be materially adversely affected by a power outage. Given the power requirement, it would not be feasible to run miners on back-up power generators in the event of a government restriction on electricity or a power outage. If we are unable to receive adequate power supply and are forced to reduce our operations due to the availability or cost of electrical power, our business would experience materially negative impacts.

***If the award of bitcoin rewards, for us primarily bitcoin for solving blocks and transaction fees are not sufficiently high, we may not have an adequate incentive to continue mining and may cease mining operations, which will likely lead to our failure to achieve profitability.***

As the number of bitcoin rewards awarded for solving a block in a blockchain decreases, our ability to achieve profitability worsens. Decreased use and demand for bitcoin rewards may adversely affect our incentive to expend processing power to solve blocks. If the award of bitcoin rewards for solving blocks and transaction fees are not sufficiently high, we may not have an adequate incentive to continue mining and may cease our mining operations. For instance, the current fixed reward for solving a new block on the bitcoin blockchain is twelve and a half bitcoin currency rewards per block, which decreased from 25 bitcoin in July 2016. It is estimated that it will halve again in about one year. This reduction may result in a reduction in the aggregate hash rate of the bitcoin network as the incentive for miners decreases. Miners ceasing operations would reduce the collective processing power on the network, which would adversely affect the confirmation process for transactions (i.e., temporarily decreasing the speed at which blocks are added to a blockchain until the next scheduled adjustment in difficulty for block solutions) and make bitcoin networks more vulnerable to a malicious actor or botnet obtaining control in excess of 50 percent of the processing power active on a blockchain, potentially permitting such actor or botnet to manipulate a blockchain in a manner that adversely affects our activities. A reduction in confidence in the confirmation process or processing power of the network could result and be irreversible. Such events could have a material adverse effect on our ability to continue to pursue our new strategy at all, which could have a material adverse effect on our business, prospects or operations and potentially the value of any bitcoin or other cryptocurrencies we mine or otherwise acquire or hold for our own account.

***We may not adequately respond to price fluctuations and rapidly changing technology, which may negatively affect our business.***

Competitive conditions within the bitcoin industry require that we use sophisticated technology in the operation of our business. The industry for blockchain technology is characterized by rapid technological changes, new product introductions, enhancements and evolving industry standards. New technologies, techniques or products could emerge that might offer better performance than the software and other technologies we currently utilize, and we may have to manage transitions to these new technologies to remain competitive. We may not be successful, generally or relative to our competitors in the bitcoin industry, in timely implementing new technology into our systems, or doing so in a cost-effective manner. During the course of implementing any such new technology into our operations, we may experience system interruptions and failures during such implementation. Furthermore, there can be no assurances that we will recognize, in a timely manner or at all, the benefits that we may expect as a result of our implementing new technology into our operations. As a result, our business and operations may suffer, and there may be adverse effects on the price of our common stock.

## Risk Related to The Car Rental Business

***Our proposed car rental business is particularly sensitive to reductions in the levels of airline passenger travel, and any lasting reductions in air travel as a result of COVID-19 could materially adversely our business strategy.***

The car rental industry has been severely impacted by reductions in airline passenger traffic as a result of the coronavirus. While we believe that we will be able to implement our business strategy at favorable purchase prices there can be no assurance that the industry will return to anywhere normal conditions in the near future. Further reductions in levels of air travel, whether caused by general economic conditions, airfare increases (such as due to capacity reductions or increases in fuel costs borne by commercial airlines) or other events (such as work stoppages, military conflicts, terrorist incidents, natural disasters, epidemic diseases, or the response of governments to any of these events) could materially adversely affect us in the future.

***We will face intense competition in the car rental business that may lead to downward pricing or an inability to increase prices.***

The car rental market in which we intend to operate is highly competitive. We believe that price is the primary competitive factor in the car rental market and that the Internet has enabled cost-conscious customers, including business travelers, to more easily compare rates available from rental companies. If we try to increase our pricing, our competitors, most of which are expected to have greater resources and better access to capital than us, may seek to compete aggressively on the basis of pricing. In addition, our competitors may reduce prices in order to attempt to gain a competitive advantage or to compensate for declines in rental activity. To the extent we do not match or remain within a reasonable competitive margin of our competitors' pricing, our revenues and results of operations could be materially adversely affected. If competitive pressures lead us to match any of our competitors' downward pricing and we are not able to reduce our operating costs, then our margins, results of operations and cash flows could be materially adversely impacted.

***Our car rental business is expected to be highly seasonal and any occurrence that disrupts rental activity during our peak periods could materially adversely affect our liquidity, cash flows and results of operations.***

Certain significant components of our expenses are fixed in the short-term, including acquisition costs, real estate taxes, rent, insurance, utilities, maintenance and other facility-related expenses, the costs of operating our information technology systems and minimum staffing costs. Seasonal changes in our revenues do not alter those fixed expenses, typically resulting in higher profitability in periods when our revenues are higher. We are seeking to enter the South Florida marketplace first. The winter months of the year have historically been the strongest quarters due to their increased levels of vacation traveling South Florida. If we are able to enter this marketplace, any occurrence that disrupts rental activity during the winter months could have a disproportionately material adverse effect on our liquidity, cash flows and results of operations.

***If we are unable to purchase adequate supplies of competitively priced cars or equipment and the cost of the cars or equipment we purchase increases, our financial condition, results of operations, liquidity and cash flows may be materially adversely affected.***

We do not expect to be a party to any long-term car supply arrangements with manufacturers. The price and other terms at which we can acquire cars thus varies based on market and other conditions. For example, certain car manufacturers have in the past, and may in the future, utilize strategies to de-emphasize sales to the car rental industry, which can negatively impact our ability to obtain cars on competitive terms and conditions. Consequently, there is no guarantee that we can purchase a sufficient number of vehicles at competitive prices and on competitive terms and conditions. Reduced or limited supplies of equipment together with increased prices are risks that we also face in our equipment rental business. If we are unable to obtain an adequate supply of cars or equipment, or if we obtain less favorable pricing and other terms when we acquire cars or equipment and are unable to pass on any increased costs to our customers, then our financial condition, results of operations, liquidity and cash flows may be materially adversely affected.

***Significant increases in fuel prices or reduced supplies of fuel could harm our business.***

Although fuel prices are currently at low prices, significant increases in fuel prices, reduced fuel supplies or the imposition of mandatory allocations or rationing of fuel could negatively impact our car rental business by discouraging consumers from renting cars, changing the types of cars our customers rent from us or the other services they purchase from us or disrupting air travel, any of which could have a material adverse effect on our financial condition and results of operations.

***Manufacturer safety recalls could create risks to our business.***

Our cars may be subject to safety recalls by their manufacturers. A recall may cause us to retrieve cars from renters and decline to rent recalled cars until we can arrange for the steps described in the recall to be taken. We could also face liability claims if a recall affects cars that we have sold. If a large number of cars are the subject of a recall or if needed replacement parts are not in adequate supply, we may not be able to rent recalled cars for a significant period of time. Those types of disruptions could jeopardize our ability to fulfill existing contractual commitments or satisfy demand for our vehicles, and could also result in the loss of business to our competitors. Depending on the severity of any recall, it could materially adversely affect our revenues, create customer service problems, reduce the residual value of the recalled cars and harm our general reputation.

*We face risks related to liabilities and insurance.*

Our proposed business will expose us to claims for personal injury, death and property damage resulting from the use of the cars rented or sold by us, and for employment-related claims by our employees. We cannot assure you that we will not be exposed to uninsured liability at levels in excess of historical levels resulting from multiple payouts or otherwise, that liabilities in respect of existing or future claims will not exceed the level of our insurance, that we will have sufficient capital available to pay any uninsured claims or that insurance with unaffiliated carriers will continue to be available to us on economically reasonable terms or at all.

*Environmental laws and regulations and the costs of complying with them, or any liability or obligation imposed under them, could materially adversely affect our financial position, results of operations or cash flows.*

We will be subject to federal, state, local and foreign environmental laws and regulations in connection with our car rental operations, including with respect to the ownership and operation of tanks for the storage of petroleum products, such as gasoline, diesel fuel and motor and waste oils. We cannot assure you that our tanks will at all times remain free from leaks or that the use of these tanks will not result in significant spills or leakage. If leakage or a spill occurs, it is possible that the resulting costs of cleanup, investigation and remediation, as well as any resulting fines, could be significant. We cannot assure you that compliance with existing or future environmental laws and regulations will not require material expenditures by us or otherwise have a material adverse effect on our consolidated financial position, results of operations or cash flows

The U.S. Congress and other legislative and regulatory authorities in the United States have considered, and will likely continue to consider, numerous measures related to climate change and greenhouse gas emissions. Should rules establishing limitations on greenhouse gas emissions or rules imposing fees on entities deemed to be responsible for greenhouse gas emissions become effective, demand for our services could be affected, our fleet and/or other costs could increase, and our business could be adversely affected.

*Changes in the U.S. legal and regulatory environment that affect our operations, including laws and regulations relating to taxes, automobile-related liability, insurance rates, insurance products, consumer privacy, data security, employment matters, cost and fee recovery and the banking and financing industry could disrupt our proposed businesss, increase our expenses or otherwise have a material adverse effect on our results of operations.*

We expect to be subject to a wide variety of U.S. laws and regulations and changes in the level of government regulation of our business have the potential to materially alter our business practices and materially adversely affect our financial position and results of operations, including our profitability. Those changes may come about through new laws and regulations or changes in the interpretation of existing laws and regulations.

The car rental industry in China is in an early stage of development and legislation concerning the industry continues to evolve. Local government authorities in China have imposed different requirements and regulatory enforcement in not always clear.

**Risks Involving Intellectual Property**

*Bitcoin and bitcoin mining is software related*

We actively use specific hardware and software for our bitcoin mining operation. In certain cases, source code and other software assets may be subject to an open source license, as much technology development underway in this sector is open source. For these works, the company intends to adhere to the terms of any license agreements that may be in place.

We do not currently own, and do not have any current plans to seek, any patents in connection with our existing and planned blockchain and cryptocurrency related operations. We do expect to rely upon trade secrets, trademarks, service marks, trade names, copyrights and other intellectual property rights and expect to license the use of intellectual property rights owned and controlled by others. In addition, we have developed and may further develop certain proprietary software applications for purposes of our cryptocurrency mining operation.

*Our platform may be subject to damage, interruptions or delays that may adversely affect our business, financial conditions and results of operations.*

In the event of a platform outage and physical data loss, our ability to perform our bitcoin mining operations would be materially and adversely affected. The satisfactory performance, reliability and availability of our platform are critical to our operations. Much of our system hardware is hosted in leased facilities located in Wuhai, Zhundong, Xilinhot and Sichuan China that is operated by our IT staff. We also maintain a real-time backup system at a separate facility also located in Wuhai, China. Our operations depend on our ability to protect our systems against damage or interruption from natural disasters, power or telecommunications failures, air quality issues, environmental conditions, computer viruses or attempts to harm our systems, criminal acts and similar events. If there is a lapse in service or damage to our leased Shanghai facilities, we could experience interruptions in our service as well as delays and additional expense in arranging new facilities.

Any interruptions or delays in our service, whether as a result of third-party errors, our errors, natural disasters or security breaches, whether accidental or willful, could harm our operations and/or reputation. Additionally, in the event of damage or interruption, our insurance policies may not adequately compensate us for any losses that we may incur. Our disaster recovery plan has not been tested under actual disaster conditions, and we may not have sufficient capacity to recover all data and services in the event of an outage. These factors could prevent us from mining bitcoins, damage our brand and reputation, divert our employees' attention, subject us to liability, any of which could adversely affect our business, financial condition and results of operations.

***Our platform and internal systems rely on software that is highly technical, and if it contains undetected errors, our business could be adversely affected.***

Our platform and internal systems rely on software that is highly technical and complex. In addition, our platform and internal systems depend on the ability of such software to store, retrieve, process and manage immense amounts of data. The software on which we rely has contained, and may now or in the future contain, undetected errors or bugs. Some errors may only be discovered after the code has been released for external or internal use. Any errors, bugs or defects discovered in the software on which we rely could result in harm to our reputation, or liability for damages, any of which could adversely affect our business, results of operations and financial conditions.

***We may not be able to prevent others from unauthorized use of our intellectual property, which could harm our business and competitive position.***

We regard our trademarks, domain names, know-how, proprietary technologies and similar intellectual property as critical to our success, and we rely on a combination of intellectual property laws and contractual arrangements, including confidentiality and non-compete agreements with our employees and others to protect our proprietary rights. See "Item 4. Information of the Company —Intellectual Property" and "Regulation— Regulation on Intellectual Property Rights." Thus, we cannot assure you that any of our intellectual property rights would not be challenged, invalidated, circumvented or misappropriated, or such intellectual property will be sufficient to provide us with competitive advantages. In addition, because of the rapid pace of technological change in our industry, parts of our business rely on technologies developed or licensed by third parties, and we may not be able to obtain or continue to obtain licenses and technologies from these third parties on reasonable terms, or at all.

It is often difficult to register, maintain and enforce intellectual property rights in China. Statutory laws and regulations are subject to judicial interpretation and enforcement and may not be applied consistently due to the lack of clear guidance on statutory interpretation. Confidentiality, invention assignment and non-compete agreements may be breached by counterparties, and there may not be adequate remedies available to us for any such breach. Accordingly, we may not be able to effectively protect our intellectual property rights or to enforce our contractual rights in China. Preventing any unauthorized use of our intellectual property is difficult and costly and the steps we take may be inadequate to prevent the misappropriation of our intellectual property. In the event that we resort to litigation to enforce our intellectual property rights, such litigation could result in substantial costs and a diversion of our managerial and financial resources. We can provide no assurance that we will prevail in such litigation. In addition, our trade secrets may be leaked or otherwise become available to, or be independently discovered by, our competitors. To the extent that our employees or consultants use intellectual property owned by others in their work for us, disputes may arise as to the rights in related know-how and inventions. Any failure in protecting or enforcing our intellectual property rights could have a material adverse effect on our business, financial condition and results of operations.

***We may be subject to intellectual property infringement claims, which may be expensive to defend and may disrupt our business and operations.***

We cannot be certain that our operations or any aspects of our business do not or will not infringe upon or otherwise violate trademarks, patents, copyrights, know-how or other intellectual property rights held by third parties. We may be from time to time in the future subject to legal proceedings and claims relating to the intellectual property rights of others. In addition, there may be third-party trademarks, patents, copyrights, know-how or other intellectual property rights that are infringed by our products, services or other aspects of our business without our awareness. Holders of such intellectual property rights may seek to enforce such intellectual property rights against us in China, the United States or other jurisdictions. If any third-party infringement claims are brought against us, we may be forced to divert management's time and other resources from our business and operations to defend against these claims, regardless of their merits.

Additionally, the application and interpretation of China's intellectual property right laws and the procedures and standards for granting trademarks, patents, copyrights, know-how or other intellectual property rights in China are still evolving and are uncertain, and we cannot assure you that PRC courts or regulatory authorities would agree with our analysis. If we were found to have violated the intellectual property rights of others, we may be subject to liability for our infringement activities or may be prohibited from using such intellectual property, and we may incur licensing fees or be forced to develop alternatives of our own. As a result, our business and results of operations may be materially and adversely affected.

**Risks Related to Our Corporate Structure**

***If the PRC government deems that the contractual arrangements in relation to our consolidated variable interest entities do not comply with PRC regulatory restrictions on foreign investment in the relevant industries, or if these regulations or the interpretation of existing regulations change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations.***

Foreign ownership of internet-based businesses, such as distribution of online information, is subject to restrictions under current PRC laws and regulations. For example, foreign investors are not allowed to own more than 50% of the equity interests in a value-added telecommunication service provider (except e-commerce) and any such foreign investor must have experience in providing value-added telecommunications services overseas and maintain a good track record in accordance with the Guidance Catalog of Industries for Foreign Investment promulgated in 2007, as amended in 2011, 2015 and 2017, respectively, and other applicable laws and regulations.

We are a Cayman Islands exempted company and our PRC subsidiary is considered a foreign invested enterprise. To comply with PRC laws and regulations, we conduct our operations in China through a series of contractual arrangements entered into among WFOE, our VIEs and the shareholders of our VIEs. As a result of these contractual arrangements, we exert control over our VIEs and consolidate their operating results in our financial statements under U.S. GAAP. For a detailed description of these contractual arrangements, see "Corporate History and Structure."

Our current ownership structure, the ownership structure of our PRC subsidiary and our consolidated VIEs, and the contractual arrangements among WFOE, our VIEs and the shareholders of our VIEs are not in violation of existing PRC laws, rules and regulations; and these contractual arrangements are valid, binding and enforceable in accordance with their terms and applicable PRC laws and regulations currently in effect. However, there are substantial uncertainties regarding the interpretation and application of current or future PRC laws and regulations and there can be no assurance that the PRC government will ultimately take a view that is consistent with the opinion of the Company.

It is uncertain whether any new PRC laws, rules or regulations relating to variable interest entity structures will be adopted or if adopted, what they would provide. In particular, in January 2015, the Ministry of Commerce, or MOFCOM, published a discussion draft of the proposed Foreign Investment Law for public review and comments. Among other things, the draft Foreign Investment Law expands the definition of foreign investment and introduces the principle of "actual control" in determining whether a company is considered a foreign-invested enterprise, or an FIE. Under the draft Foreign Investment Law, variable interest entities would also be deemed as FIEs, if they are ultimately "controlled" by foreign investors, and be subject to restrictions on foreign investments. In December 2018, the Standing Committee of the National People's Congress published a discussion draft of a new proposed Foreign Investment Law, aiming to replace the major existing laws governing foreign direct investment in China. On January 29, 2019, the discussion draft with slight revisions, or the New Draft Foreign Investment Law, was submitted for review. Pursuant to the New Draft Foreign Investment Law, foreign investments shall be subject to the negative list management system. However, the New Draft Foreign Investment Law does not mention "actual control" as regulated in the previous draft and the position to be taken with respect to the existing or future companies with the "variable interest entity" structure. On March 15, 2019, the Foreign Investment Law of the People's Republic of China, or the Final Foreign Investment Law, with slight revision, is finally issued and became effective on January 1, 2020. See "Regulation—Regulations Relating to Foreign Investment—The Draft PRC Foreign Investment Law".

Although variable interest entity structures are not included in the Final Foreign Investment Law, it is uncertain whether any interpretation and implementation of the Final Foreign Investment Law or new PRC laws, rules or regulations relating to variable interest entity structures will be adopted or if adopted, what they would provide. If the ownership structure, contractual arrangements and business of our company, our PRC subsidiary or our consolidated variable interest entities are found to be in violation of any existing or future PRC laws or regulations, or we fail to obtain or maintain any of the required permits or approvals, the relevant governmental authorities would have broad discretion in dealing with such violation, including levying fines, confiscating our income or the income of our PRC subsidiaries or consolidated variable interest entity, revoking the business licenses or operating licenses of our PRC subsidiaries or consolidated variable interest entity, shutting down our servers or blocking our online platform, discontinuing or placing restrictions or onerous conditions on our operations, requiring us to undergo a costly and disruptive restructuring, restricting or prohibiting our use of proceeds from offerings in the U.S. to finance our business and operations in China, and taking other regulatory or enforcement actions that could be harmful to our business. Any of these actions could cause significant disruption to our business operations and severely damage our reputation, which would in turn materially and adversely affect our business, financial condition and results of operations. If any of these occurrences results in our inability to direct the activities of our consolidated variable interest entities, and/or our failure to receive economic benefits from our consolidated variable interest entities, we may not be able to consolidate its results into our consolidated financial statements in accordance with U.S. GAAP.

***We rely on contractual arrangements with our VIEs and the shareholders of our VIEs for our business operations, which may not be as effective as direct ownership in providing operational control.***

We relied on contractual arrangements with Shanghai Dianniu Internet Finance Information Service Co. Ltd. ("Dianniu") and Dianniu Participating shareholders to operate our platform. We have similar contractual arrangements with our VIE, Shanghai Baoxun Advertisement Design Co., Ltd. ("Baoxun") which did not have any meaningful operations in 2019. For a description of these contractual arrangements, see "Corporate History and Structure." These contractual arrangements may not be as effective as direct ownership in providing us with control over our consolidated variable interest entities. For example, our consolidated VIEs and their shareholders could breach their contractual arrangements with us by, among other things, failing to conduct their operations, including maintaining our website and using the domain names and trademarks, in an acceptable manner or taking other actions that are detrimental to our interests.

If we had direct ownership of our VIEs, we would be able to exercise our rights as a shareholder to effect changes in the board of directors of our VIEs, which in turn could implement changes, subject to any applicable fiduciary obligations, at the management and operational level. However, under the current contractual arrangements, we rely on the performance by our consolidated variable interest entities and their shareholders of their obligations under the contracts to exercise control over our consolidated variable interest entities. The shareholders of our consolidated variable interest entities may not act in the best interests of our company or may not perform their obligations under these contracts. Such risks exist throughout the period in which we intend to operate our business through the contractual arrangements with our consolidated variable interest entities. Although we have the right to replace any shareholder of our consolidated variable interest entities under the contractual arrangement, if any shareholder of our consolidated variable interest entities is uncooperative or any dispute relating to these contracts remains unresolved, we will have to enforce our rights under these contracts through the operations of PRC laws and arbitration, litigation and other legal proceedings and therefore will be subject to uncertainties in the PRC legal system. See "— Any failure by our consolidated variable interest entities or its shareholders to perform their obligations under our contractual arrangements with them would have a material adverse effect on our business." Therefore, our contractual arrangements with our consolidated variable interest entities may not be as effective in ensuring our control over the relevant portion of our business operations as direct ownership would be.

***Any failure by our consolidated VIEs or their shareholders to perform their obligations under our contractual arrangements with them would have a material adverse effect on our business.***

If our consolidated VIEs or their shareholders fail to perform their respective obligations under the contractual arrangements, we may have to incur substantial costs and expend additional resources to enforce such arrangements. We may also have to rely on legal remedies under PRC laws, including seeking specific performance or injunctive relief, and claiming damages, which we cannot assure you will be effective under PRC laws. For example, if the shareholders of our VIEs were to refuse to transfer their equity interest in the VIEs to us or our designee if we exercise the purchase option pursuant to these contractual arrangements, or if they were otherwise to act in bad faith toward us, then we may have to take legal actions to compel them to perform their contractual obligations.

All the agreements under our contractual arrangements are governed by PRC laws and provide for the resolution of disputes through arbitration in China. Accordingly, these contracts would be interpreted in accordance with PRC laws and any disputes would be resolved in accordance with PRC legal procedures. The legal system in the PRC is not as developed as in some other jurisdictions, such as the United States. As a result, uncertainties in the PRC legal system could limit our ability to enforce these contractual arrangements. Meanwhile, there are very few precedents and little formal guidance as to how contractual arrangements in the context of a consolidated variable interest entity should be interpreted or enforced under PRC laws. There remain significant uncertainties regarding the ultimate outcome of such arbitration should legal action become necessary. In addition, under PRC laws, rulings by arbitrators are final and parties cannot appeal arbitration results in court unless such rulings are revoked or determined unenforceable by a competent court. If the losing parties fail to carry out the arbitration awards within a prescribed time limit, the prevailing parties may only enforce the arbitration awards in PRC courts through arbitration award recognition proceedings, which would require additional expenses and delay. In the event that we are unable to enforce these contractual arrangements, or if we suffer significant delay or other obstacles in the process of enforcing these contractual arrangements, we may not be able to exert effective control over our consolidated variable interest entities, and our ability to conduct our business may be negatively affected. See "— Risks Related to Doing Business in China— Uncertainties in the interpretation and enforcement of Chinese laws and regulations could limit the legal protections available to you and us."

***The shareholders of our consolidated VIEs may have potential conflicts of interest with us, which may materially and adversely affect our business and financial condition.***

The equity interests of Dianniu are held by Erxin Zeng, Xiaohui Liu and Qian Lai Qian Wang (Shanghai) Equity Investment Fund Management Co., Ltd. and the equity interests of Baoxun are held by Erxin Zeng and Xiaohui Liu. Certain or all of these persons were the subject of criminal enforcement measures by the Shanghai Publioce Security Bureau. Their interests in Dianniu and Baoxun may be the subject of criminal enforcement action which may adversely impact upon our Company as a whole. These shareholders may have caused our consolidated VIEs to breach the existing contractual arrangements we have with them and our consolidated VIEs, which would have a material adverse effect on our ability to effectively control our consolidated VIEs. We cannot assure you that these shareholders have acted in the best interests of our Company. In such event, we can exercise our purchase option under the exclusive option agreements with these shareholders to request them to transfer all of their equity interests in Dianniu and/or Baoxun to a PRC entity or individual designated by us, to the extent permitted by PRC laws.

***Contractual arrangements in relation to our consolidated variable interest entities may be subject to scrutiny by the PRC tax authorities and they may determine that we or our PRC consolidated variable interest entities owe additional taxes, which could negatively affect our financial condition and the value of your investment.***

Under applicable PRC laws and regulations, arrangements and transactions among related parties may be subject to audit or challenge by the PRC tax authorities within ten years after the taxable year when the transactions are conducted. The PRC enterprise income tax law requires every enterprise in China to submit its annual enterprise income tax return together with a report on transactions with its related parties to the relevant tax authorities. The tax authorities may impose reasonable adjustments on taxation if they have identified any related party transactions that are inconsistent with arm's length principles. We may face material and adverse tax consequences if the PRC tax authorities determine that the contractual arrangements between WFOE, our wholly-owned subsidiary in China, our consolidated VIEs in China, and the shareholders of our VIEs were not entered into on an arm's length basis in such a way as to result in an impermissible reduction in taxes under applicable PRC laws, rules and regulations, and adjust our VIEs' income in the form of a transfer pricing adjustment. A transfer pricing adjustment could, among other things, result in a reduction of expense deductions recorded by our VIEs for PRC tax purposes, which could in turn increase its tax liabilities without reducing WFOEs' tax expenses. In addition, if WFOE requests the shareholders of our VIEs to transfer their equity interests in the VIEs at nominal or no value pursuant to these contractual arrangements, such transfer could be viewed as a gift and subject our VIEs to PRC income tax. Furthermore, the PRC tax authorities may impose late payment fees and other penalties on our VIEs for the adjusted but unpaid taxes according to the applicable regulations. Our financial position could be materially and adversely affected if our consolidated variable interest entities' tax liabilities increase or if it is required to pay late payment fees and other penalties.

***We may lose the ability to use and enjoy assets held by our consolidated VIEs that were material to the operation of our business if the entities go bankrupt or becomes subject to a dissolution or liquidation proceeding.***

Our consolidated VIEs holds certain assets that were material to the operation of our former online lending business, including domain names and equipment. Under the contractual arrangements, our consolidated VIEs may not and their shareholders may not cause it to, in any manner, sell, transfer, mortgage or dispose of their assets or their legal or beneficial interests in the business without our prior consent. However, in the event our consolidated VIEs' shareholders breach the these contractual arrangements and voluntarily liquidate our consolidated VIEs or our consolidated VIEs declare bankruptcy, all or part of their assets may become subject to liens or rights of third-party creditors. If our consolidated VIEs undergo a voluntary or involuntary liquidation proceeding, independent third-party creditors may claim rights to some or all of these assets.

### Risks Related to Doing Business in China

***Changes in China's economic, political or social conditions or government policies could have a material adverse effect on our business and results of operations.***

All of our current operations are located in China although we are attempting to enter the car rental business in the United States and our bitcoin mining business is worldwide. Accordingly, our business, prospects, financial condition and results of operations may be influenced to a significant degree by political, economic and social conditions in China generally and by continued economic growth in China as a whole.

The Chinese economy differs from the economies of most developed countries in many respects, including the amount of government involvement, level of development, growth rate, control of foreign exchange and allocation of resources. Although the Chinese government has implemented measures emphasizing the utilization of market forces for economic reform, the reduction of state ownership of productive assets and the establishment of improved corporate governance in business enterprises, a substantial portion of productive assets in China is still owned by the government. In addition, the Chinese government continues to play a significant role in regulating industry development by imposing industrial policies. The Chinese government also exercises significant control over China's economic growth through allocating resources, controlling payment of foreign currency-denominated obligations, setting monetary policy, and providing preferential treatment to particular industries or companies.

While the Chinese economy has experienced significant growth over the past decades, growth has been uneven, both geographically and among various sectors of the economy. The Chinese government has implemented various measures to encourage economic growth and guide the allocation of resources. Some of these measures may benefit the overall Chinese economy but may have a negative effect on us. For example, our financial condition and results of operations may be adversely affected by government control over capital investments or changes in tax regulations. In addition, in the past the Chinese government has implemented certain measures, including interest rate increases, to control the pace of economic growth. These measures may cause decreased economic activity in China, and since 2012, and in particular in 2020 as a result of COVID-19,China's economic growth has slowed down. Any prolonged slowdown in the Chinese economy may reduce the demand for our products and services and materially and adversely affect our business and results of operations.

***Uncertainties in the interpretation and enforcement of Chinese laws and regulations could limit the legal protections available to us.***

The PRC legal system is based on written statutes and prior court decisions have limited value as precedents. Since these laws and regulations are relatively new and the PRC legal system continues to rapidly evolve, the interpretations of many laws, regulations and rules are not always uniform and enforcement of these laws, regulations and rules involves uncertainties.

From time to time, we may have to resort to administrative and court proceedings to enforce our legal rights. However, since PRC administrative and court authorities have significant discretion in interpreting and implementing statutory and contractual terms, it may be more difficult to evaluate the outcome of administrative and court proceedings and the level of legal protection we enjoy than in more developed legal systems. Furthermore, the PRC legal system is based in part on government policies and internal rules (some of which are not published in a timely manner or at all) that may have retroactive effect. This is what, in effect, occurred with regard to our peer to peer lending business. From 2015 to 2019, the guidance for this business from the Chinese government changed from supporting it, to limiting it, to finally shutting it down. As a result, we may not be aware of our violating these policies and rules until sometime after the violation. Such uncertainties, including uncertainty over the scope and effect of our contractual, property (including intellectual property) and procedural rights, could materially and adversely affect our business and impede our ability to continue our operations.

***Substantial uncertainties exist with respect to the enactment timetable, interpretation and implementation of draft PRC Foreign Investment Law and how it may impact the viability of our current corporate structure, corporate governance and business operations.***

The MOFCOM published a discussion draft of the proposed Foreign Investment Law in January 2015 aiming to, upon its enactment, replace the trio of existing laws regulating foreign investment in China, namely, the Sino-foreign Equity Joint Venture Enterprise Law, the Sino-foreign Cooperative Joint Venture Enterprise Law and the Wholly Foreign-invested Enterprise Law, together with their implementation rules and ancillary regulations. The draft Foreign Investment Law embodies an expected PRC regulatory trend to rationalize its foreign investment regulatory regime in line with prevailing international practice and the legislative efforts to unify the corporate legal requirements for both foreign and domestic investments. The MOFCOM is currently soliciting comments on this draft and substantial uncertainties exist with respect to its enactment timetable, interpretation and implementation. The draft Foreign Investment Law, if enacted as proposed, may materially impact the viability of our current corporate structure, corporate governance and business operations in many aspects.

Among other things, the draft Foreign Investment Law expands the definition of foreign investment and introduces the principle of "actual control" in determining whether a company is considered a foreign-invested enterprise, or an FIE. The draft Foreign Investment Law specifically provides that entities established in China but "controlled" by foreign investors will be treated as FIEs. Once an entity is considered to be an FIE, it may be subject to the foreign investment restrictions or prohibitions set forth in a "negative list" to be separately issued by the State Council later. If an FIE proposes to conduct business in an industry subject to foreign investment "restrictions" in the "negative list," the FIE must go through a market entry clearance by the MOFCOM before being established. If an FIE proposes to conduct business in an industry subject to foreign investment "restrictions," upon market entry clearance, may apply in writing for being treated as a PRC domestic investment if it is ultimately "controlled" by PRC government authorities and its affiliates and/or PRC citizens. In this connection, "control" is broadly defined in the draft law to cover the following summarized categories: (i) holding 50% or more of the voting rights of the subject entity; (ii) holding less than 50% of the voting rights of the subject entity but having the power to secure at least 50% of the seats on the board or other equivalent decision making bodies, or having the voting power to exert material influence on the board, the shareholders' meeting or other equivalent decision making bodies; or (iii) having the power to exert decisive influence, via contractual or trust arrangements, over the subject entity's operations, financial matters or other key aspects of business operations. Once an entity is determined to be an FIE, it will be subject to the foreign investment restrictions or prohibitions set forth in a "negative list," to be separately issued by the State Council at a later date, if the FIE is engaged in an industry listed in the negative list. Unless the underlying business of the FIE falls within the negative list, which calls for market entry clearance by the MOFCOM, prior approval from the government authorities as mandated by the existing foreign investment legal regime would no longer be required for establishment of the FIE.

The "variable interest entity" structure, or VIE structure, has been adopted by many PRC-based companies, including us, to obtain necessary licenses and permits in the industries that are currently subject to foreign investment restrictions in China. See "— Risks Related to Our Corporate Structure" and "Our Corporate History and Structure." Under the draft Foreign Investment Law, variable interest entities that are controlled via contractual arrangement would also be deemed as FIEs, if they are ultimately "controlled" by foreign investors. Therefore, for any companies with a VIE structure in an industry category that is included in the "negative list" as restricted industry, the VIE structure may be deemed legitimate only if the ultimate controlling person(s) is/are of PRC nationality (either PRC companies or PRC citizens). Conversely, if the actual controlling person(s) is/are of foreign nationalities, then the variable interest entities will be treated as FIEs and any operation in the industry category on the "negative list" without market entry clearance may be considered as illegal.

The draft Foreign Investment Law has not taken a position on what actions will be taken with respect to the companies currently employing a VIE structure, whether or not these companies are controlled by Chinese parties, while it is soliciting comments from the public on this point. In addition, it is uncertain whether the online consumer finance marketplace industry, in which our variable interest entity operates, will be subject to the foreign investment restrictions or prohibitions set forth in the "negative list" that is to be issued. If the enacted version of the Foreign Investment Law and the final "negative list" mandate further actions, such as MOFCOM market entry clearance or certain restructuring of our corporate structure and operations, to be completed by companies with existing VIE structure like us, there may be substantial uncertainties as to whether we can complete these actions in a timely manner, or at all, and our business and financial condition may be materially and adversely affected.

In December 2018, the Standing Committee of the National People's Congress published a discussion draft of a new proposed Foreign Investment Law, aiming to replace the major existing laws governing foreign direct investment in China. On January 29, 2019, the discussion draft with slight revisions, or the New Draft Foreign Investment Law, was submitted for review. Pursuant to the New Draft Foreign Investment Law, foreign investments shall be subject to the negative list management system. However, the New Draft Foreign Investment Law does not mention "actual control" as regulated in the previous draft and the position to be taken with respect to the existing or future companies with the "variable interest entity" structure. On March 15, 2019, the Foreign Investment Law of the People's Republic of China, or the Final Foreign Investment Law, with slight revision, is finally issued and became effective on January 1, 2020. See "Regulation—Regulations Relating to Foreign Investment—The Draft PRC Foreign Investment Law". Since the PRC Foreign Investment Law is newly published, there is still uncertainties in relation to its interpretation and implementation and it is still possibility that variable interest entities will be deemed as foreign invested enterprises and be subject to restrictions in the future. If the ownership structure, contractual arrangements and business of our company, our PRC subsidiary or our VIEs are found to be in violation of any existing or future PRC laws or regulations, or we fail to obtain or maintain any of the required permits or approvals, the relevant governmental authorities would have broad discretion in dealing with such violation, including levying fines, confiscating our income or the income of our PRC subsidiary shutting down our servers or blocking our online platform, discontinuing or placing restrictions or onerous conditions on our operations, requiring us to undergo a costly and disruptive restructuring, restricting or prohibiting our use of proceeds from our initial public offering to finance our business and operations in China, and taking other regulatory or enforcement actions that could be harmful to our business. Any of these actions could cause significant disruption to our business operations and severely damage our reputation, which would in turn materially and adversely affect our business, financial condition and results of operations. If any of these occurrences results in our inability to direct the activities of our VIEs, we may not be able to consolidate their results into our consolidated financial statements in accordance with U.S. GAAP.

Although variable interest entity structures are not included in the Final Foreign Investment Law, it is uncertain whether any interpretation and implementation of the Final Foreign Investment Law or new PRC laws, rules or regulations relating to variable interest entity structures will be adopted or if adopted, what they would provide. If the ownership structure, contractual arrangements and business of our company, our PRC subsidiary or our consolidated variable interest entities are found to be in violation of any existing or future PRC laws or regulations, or we fail to obtain or maintain any of the required permits or approvals, the relevant governmental authorities would have broad discretion in dealing with such violation, including levying fines, confiscating our income or the income of our PRC subsidiaries or consolidated variable interest entity, revoking the business licenses or operating licenses of our PRC subsidiaries or consolidated variable interest entity, shutting down our servers or blocking our online platform, discontinuing or placing restrictions or onerous conditions on our operations, requiring us to undergo a costly and disruptive restructuring, restricting or prohibiting our use of proceeds from this offering to finance our business and operations in China, and taking other regulatory or enforcement actions that could be harmful to our business. Any of these actions could cause significant disruption to our business operations and severely damage our reputation, which would in turn materially and adversely affect our business, financial condition and results of operations. If any of these occurrences results in our inability to direct the activities of our consolidated variable interest entities, and/or our failure to receive economic benefits from our consolidated variable interest entities, we may not be able to consolidate its results into our consolidated financial statements in accordance with U.S. GAAP.

***We rely on dividends and other distributions on equity paid by our PRC subsidiary to fund any cash and financing requirements we may have, and any limitation on the ability of our PRC subsidiary to make payments to us could have a material adverse effect on our ability to conduct our business.***

We are a holding company, and we rely on dividends and other distributions on equity paid by our PRC subsidiary for our cash and financing requirements, including the funds necessary to pay dividends and other cash distributions to our shareholders and service any debt we may incur. If our PRC subsidiary incur debt on their own behalf in the future, the instruments governing the debt may restrict their ability to pay dividends or make other distributions to us. In addition, the PRC tax authorities may require our PRC subsidiary to adjust its taxable income under the contractual arrangements it currently has in place with our consolidated variable interest entities in a manner that would materially and adversely affect its ability to pay dividends and other distributions to us. See "— Risks Related to Our Corporate Structure — Contractual arrangements in relation to our consolidated variable interest entities may be subject to scrutiny by the PRC tax authorities and they may determine that we or our PRC consolidated variable interest entity owe additional taxes, which could negatively affect our financial condition and the value of your investment."

Under PRC laws and regulations, our PRC subsidiary, as a wholly foreign-owned enterprise in China, may pay dividends only out of their respective accumulated after-tax profits as determined in accordance with PRC accounting standards and regulations. In addition, a wholly foreign-owned enterprise is required to set aside at least 10% of its accumulated after-tax profits each year, if any, to fund certain statutory reserve funds, until the aggregate amount of such funds reaches 50% of its registered capital. At its discretion, a wholly foreign-owned enterprise may allocate a portion of its after-tax profits based on PRC accounting standards to staff welfare and bonus funds. These reserve funds and staff welfare and bonus funds are not distributable as cash dividends.

Any limitation on the ability of our PRC subsidiary to pay dividends or make other distributions to us could materially and adversely limit our ability to grow, make investments or acquisitions that could be beneficial to our business, pay dividends, or otherwise fund and conduct our business. See also "— If we are classified as a PRC resident enterprise for PRC income tax purposes, such classification could result in unfavorable tax consequences to us and our non-PRC shareholders."

***PRC regulation of loans to and direct investment in PRC entities by offshore holding companies and governmental control of currency conversion may delay or prevent us from using offshore funds to make loans to our PRC subsidiary and consolidated affiliated entity and its subsidiaries, or to make additional capital contributions to our PRC subsidiary.***

Under PRC laws and regulations, we are permitted to utilize offshore funds to fund our PRC subsidiary by making loans to or additional capital contributions to our PRC subsidiary, subject to applicable government registration and approval requirements.

Any loans to our PRC subsidiary, which are treated as foreign-invested enterprises under PRC laws, are subject to PRC regulations and foreign exchange loan registrations. For example, loans by us to our PRC subsidiary to finance their activities cannot exceed statutory limits and must be registered with the local counterpart of the State Administration of Foreign Exchange, or SAFE. The statutory limit for the total amount of foreign debts of a foreign-invested company is the difference between the amount of total investment as approved by the MOFCOM or its local counterpart and the amount of registered capital of such foreign-invested company.

We may also decide to finance our PRC subsidiary by means of capital contributions. These capital contributions must be approved by the MOFCOM or its local counterpart. In addition, SAFE issued a circular in September 2008, SAFE Circular 142, regulating the conversion by a foreign-invested enterprise of foreign currency registered capital into RMB by restricting how the converted RMB may be used. SAFE Circular 142 provides that the RMB capital converted from foreign currency registered capital of a foreign-invested enterprise may only be used for purposes within the business scope approved by the applicable government authority and unless otherwise provided by law, may not be used for equity investments within the PRC. Although on July 4, 2014, the SAFE issued the Circular of the SAFE on Relevant Issues Concerning the Pilot Reform in Certain Areas of the Administrative Method of the Conversion of Foreign Exchange Funds by Foreign-invested Enterprises, or SAFE Circular 36, which launched a pilot reform of the administration of the settlement of the foreign exchange capitals of foreign-invested enterprises in certain designated areas from August 4, 2014 and some of the restrictions under SAFE Circular 142 will not apply to the settlement of the foreign exchange capitals of the foreign-invested enterprises established within the designate areas and such enterprises mainly engaging in investment are allowed to use its RMB capital converted from foreign exchange capitals to make equity investment, our PRC subsidiary is not established within the designated areas. On March 30, 2015, SAFE promulgated Circular 19, to expand the reform nationwide. Circular 19 came into force and replaced both Circular 142 and Circular 36 on June 1, 2015. Circular 19 allows foreign-invested enterprises to make equity investments by using RMB fund converted from foreign exchange capital. However, Circular 19 continues to prohibit foreign-invested enterprises from, among other things, using RMB fund converted from its foreign exchange capitals for expenditure beyond its business scope, providing entrusted loans or repaying loans between non-financial enterprises. In addition, SAFE strengthened its oversight of the flow and use of the RMB capital converted from foreign currency registered capital of a foreign-invested company. The use of such RMB capital may not be altered without SAFE's approval, and such RMB capital may not in any case be used to repay RMB loans if the proceeds of such loans have not been used. Violations of these Circulars could result in severe monetary or other penalties. These circulars may significantly limit our ability to use RMB converted from offshore funds to fund the establishment of new entities in China by our PRC subsidiary, to invest in or acquire any other PRC companies through our PRC subsidiary, or to establish new variable interest entities in the PRC.

In light of the various requirements imposed by PRC regulations on loans to and direct investment in PRC entities by offshore holding companies, we cannot assure you that we will be able to complete the necessary government registrations or obtain the necessary government approvals on a timely basis, if at all, with respect to future loans to our PRC subsidiary or future capital contributions by us to our PRC subsidiary. If we fail to complete such registrations or obtain such approvals, our ability to use offshore funds to capitalize or otherwise fund our PRC operations may be negatively affected, which could materially and adversely affect our liquidity and our ability to fund and expand our business.

***Fluctuations in exchange rates could have a material adverse effect on our results of operations and the value of your investment.***

To date, substantially all of our revenues and expenditures have been denominated in RMB, whereas our reporting currency is the U.S. dollar. As a result, fluctuations in the exchange rate between the U.S. dollar and RMB will affect the relative purchasing power in RMB terms of our U.S. dollar assets. Our reporting currency is the U.S. dollar while the functional currency for our PRC subsidiary and consolidated variable interest entity is RMB. Gains and losses from the remeasurement of assets and liabilities that are receivable or payable in RMB are included in our consolidated statements of operations. The remeasurement has caused the U.S. dollar value of our results of operations to vary with exchange rate fluctuations, and the U.S. dollar value of our results of operations will continue to vary with exchange rate fluctuations. A fluctuation in the value of RMB relative to the U.S. dollar could reduce our profits from operations and the translated value of our net assets when reported in U.S. dollars in our financial statements. This could have a negative impact on our business, financial condition or results of operations as reported in U.S. dollars. If we decide to convert our RMB into U.S. dollars for the purpose of making payments for dividends on our ordinary shares or for other business purposes, appreciation of the U.S. dollar against the RMB would have a negative effect on the U.S. dollar amount available to us. In addition, fluctuations in currencies relative to the periods in which the earnings are generated may make it more difficult to perform period-to-period comparisons of our reported results of operations.

There remains significant international pressure on the PRC government to adopt a flexible currency policy. Any significant appreciation or depreciation of the RMB may materially and adversely affect our revenues, earnings and financial position, and the value of, and any dividends payable on, our ordinary shares in U.S. dollars. For example, to the extent that we need to convert U.S. dollars into RMB to pay our operating expenses, appreciation of the RMB against the U.S. dollar would have an adverse effect on the RMB amount we would receive from the conversion. Conversely, a significant depreciation of the RMB against the U.S. dollar may significantly reduce the U.S. dollar equivalent of our earnings, which in turn could adversely affect the market price of our ordinary shares.

Very limited hedging options are available in China to reduce our exposure to exchange rate fluctuations. To date, we have not entered into any hedging transactions in an effort to reduce our exposure to foreign currency exchange risk. While we may decide to enter into hedging transactions in the future, the availability and effectiveness of these hedges may be limited and we may not be able to adequately hedge our exposure or at all. In addition, our currency exchange losses may be magnified by PRC exchange control regulations that restrict our ability to convert RMB into foreign currency. As a result, fluctuations in exchange rates may have a material adverse effect on your investment.

***Governmental control of currency conversion may limit our ability to utilize our net revenues effectively and affect the value of your investment.***

The PRC government imposes controls on the convertibility of the RMB into foreign currencies and, in certain cases, the remittance of currency out of China. We have received substantially all of our net revenues in RMB. Under our current corporate structure, our company in the Cayman Islands may rely on dividend payments from our PRC subsidiary to fund any cash and financing requirements we may have. Under existing PRC foreign exchange regulations, payments of current account items, such as profit distributions and trade and service-related foreign exchange transactions, can be made in foreign currencies without prior approval from SAFE by complying with certain procedural requirements. Therefore, our PRC subsidiary is able to pay dividends in foreign currencies to us without prior approval from SAFE, subject to the condition that the remittance of such dividends outside of the PRC complies with certain procedures under PRC foreign exchange regulation, such as the overseas investment registrations by the beneficial owners of our company who are PRC residents. But approval from or registration with appropriate government authorities is required where RMB is to be converted into foreign currency and remitted out of China to pay capital expenses such as the repayment of loans denominated in foreign currencies. The PRC government may also at its discretion restrict access in the future to foreign currencies for current account transactions. If the foreign exchange control system prevents us from obtaining sufficient foreign currencies to satisfy our foreign currency demands, we may not be able to pay dividends in foreign currencies to our shareholders.

***Failure to make adequate contributions to various employee benefit plans as required by PRC regulations may subject us to penalties.***

We are required under PRC laws and regulations to participate in various government sponsored employee benefit plans, including certain social insurance, housing funds and other welfare-oriented payment obligations, and contribute to the plans in amounts equal to certain percentages of salaries, including bonuses and allowances, of our employees up to a maximum amount specified by the local government from time to time at locations where we operate our businesses. The requirement of employee benefit plans has not been implemented consistently by the local governments in China given the different levels of economic development in different locations. As of the date of this report, we believe that we have made adequate employee benefit payments. If we fail to make adequate payments in the future, we may be required to make up the contributions for these plans in the amount of 110% of the amount in the preceding month. If we fail to make or supplement contributions of social security premiums within the stipulated period, the social security premiums collection agency may enquire into the deposit accounts of the employer with banks and other financial institutions. In an extreme situation, where we failed to contribute social security premiums in full amount and do not provide guarantee, the social security premiums collection agency may apply to a Chinese court for seizure, foreclosure or auction of our properties of value equivalent to the amount of social security premiums payable, and the proceeds from auction shall be used for contribution of social security premiums. If we are subject to deposit, seizure, foreclosure or auction in relation to the underpaid employee benefits, our financial condition and results of operations may be adversely affected.

***The M&A Rules and certain other PRC regulations establish complex procedures for some acquisitions of Chinese companies by foreign investors, which could make it more difficult for us to pursue growth through acquisitions in China.***

The M&A Rules discussed in the preceding risk factor and some other regulations and rules concerning mergers and acquisitions established additional procedures and requirements that could make merger and acquisition activities by foreign investors more time consuming and complex, including requirements in some instances that the MOFCOM be notified in advance of any change-of-control transaction in which a foreign investor takes control of a PRC domestic enterprise. Moreover, the Anti-Monopoly Law requires that the MOFCOM shall be notified in advance of any concentration of undertaking if certain thresholds are triggered. In addition, the security review rules issued by the MOFCOM that became effective in September 2011 specify that mergers and acquisitions by foreign investors that raise "national defense and security" concerns and mergers and acquisitions through which foreign investors may acquire de facto control over domestic enterprises that raise "national security" concerns are subject to strict review by the MOFCOM, and the rules prohibit any activities attempting to bypass a security review, including by structuring the transaction through a proxy or contractual control arrangement. In the future, we may grow our business by acquiring complementary businesses. Complying with the requirements of the above-mentioned regulations and other relevant rules to complete such transactions could be time consuming, and any required approval processes, including obtaining approval from the MOFCOM or its local counterparts may delay or inhibit our ability to complete such transactions, which could affect our ability to expand our business or maintain our market share.

***PRC regulations relating to offshore investment activities by PRC residents may limit our PRC subsidiary' ability to increase their registered capital or distribute profits to us or otherwise expose us or our PRC resident beneficial owners to liability and penalties under PRC law.***

SAFE promulgated the Circular on Relevant Issues Relating to Domestic Resident's Investment and Financing and Roundtrip Investment through Special Purpose Vehicles, or SAFE Circular 37, in July 2014 that requires PRC residents or entities to register with SAFE or its local branch in connection with their establishment or control of an offshore entity established for the purpose of overseas investment or financing. In addition, such PRC residents or entities must update their SAFE registrations when the offshore special purpose vehicle undergoes material events relating to any change of basic information (including change of such PRC citizens or residents, name and operation term), increases or decreases in investment amount, transfers or exchanges of shares, or mergers or divisions. SAFE Circular 37 is issued to replace the Notice on Relevant Issues Concerning Foreign Exchange Administration for PRC Residents Engaging in Financing and Roundtrip Investments via Overseas Special Purpose Vehicles, or SAFE Circular 75. SAFE promulgated the Notice on Further Simplifying and Improving the Administration of the Foreign Exchange Concerning Direct Investment in February 2015, which took effect on June 1, 2015. This notice has amended SAFE Circular 37 requiring PRC residents or entities to register with qualified banks rather than SAFE or its local branch in connection with their establishment or control of an offshore entity established for the purpose of overseas investment or financing.

If our shareholders who are PRC residents or entities do not complete their registration as required, our PRC subsidiary may be prohibited from distributing their profits and proceeds from any reduction in capital, share transfer or liquidation to us, and we may be restricted in our ability to contribute additional capital to our PRC subsidiary. Moreover, failure to comply with the SAFE registration described above could result in liability under PRC laws for evasion of applicable foreign exchange restrictions.

Mr. Erxin Zeng and Mr. Xiaohui Liu, who directly or indirectly hold shares in our company and who were known to us as being PRC residents, have completed the foreign exchange registrations required in connection with our recent corporate restructuring. The remaining shareholders who directly or indirectly hold shares in our Company and who are known to us as being PRC residents are currently processing such registrations.

However, we may not be informed of the identities of all the PRC residents or entities holding direct or indirect interest in our company, nor can we compel our beneficial owners to comply with SAFE registration requirements. As a result, we cannot assure you that all of our shareholders or beneficial owners who are PRC residents or entities have complied with and will in the future make or obtain any applicable registrations or approvals required by, SAFE regulations. Failure by such shareholders or beneficial owners to comply with SAFE regulations, or failure by us to amend the foreign exchange registrations of our PRC subsidiary, could subject us to fines or legal sanctions, restrict our overseas or cross-border investment activities, limit our PRC subsidiary' ability to make distributions or pay dividends to us or affect our ownership structure, which could adversely affect our business and prospects.

***Any failure to comply with PRC regulations regarding the registration requirements for employee stock incentive plans may subject the PRC plan participants or us to fines and other legal or administrative sanctions.***

In February 2012, SAFE promulgated the Notices on Issues Concerning the Foreign Exchange Administration for Domestic Individuals Participating in Stock Incentive Plan of Overseas Publicly-Listed Company, replacing earlier rules promulgated in March 2007. Pursuant to these rules, PRC citizens and non-PRC citizens who reside in China for a continuous period of not less than one year who participate in any stock incentive plan of an overseas publicly listed company, subject to a few exceptions, are required to register with SAFE through a domestic qualified agent, which could be the PRC subsidiary of such overseas listed company, and complete certain other procedures. In addition, an overseas entrusted institution must be retained to handle matters in connection with the exercise or sale of stock options and the purchase or sale of shares and interests. We and our executive officers and other employees who are PRC citizens or who have resided in the PRC for a continuous period of not less than one year and who have been granted options or other awards are subject to these regulations because our company is an overseas listed company. Failure to complete the SAFE registrations may subject them to fines and legal sanctions and may also limit our ability to contribute additional capital into our PRC subsidiary and limit our PRC subsidiary' ability to distribute dividends to us. We also face regulatory uncertainties that could restrict our ability to adopt additional incentive plans for our directors, executive officers and employees under PRC law. See "Regulation — Regulations on Stock Incentive Plans."

*If we are classified as a PRC resident enterprise for PRC income tax purposes, such classification could result in unfavorable tax consequences to us and our non-PRC shareholders.*

Under the PRC Enterprise Income Tax Law and its implementation rules, an enterprise established outside of the PRC with a "de facto management body" within the PRC is considered a resident enterprise and will be subject to the enterprise income tax on its global income at the rate of 25%. The implementation rules define the term "de facto management body" as the body that exercises full and substantial control over and overall management of the business, productions, personnel, accounts and properties of an enterprise. In April 2009, the State Administration of Taxation issued a circular, known as Circular 82, which provides certain specific criteria for determining whether the "de facto management body" of a PRC-controlled enterprise that is incorporated offshore is located in China. Although this circular only applies to offshore enterprises controlled by PRC enterprises or PRC enterprise groups, not those controlled by PRC individuals or foreigners like us, the criteria set forth in the circular may reflect the State Administration of Taxation's general position on how the "de facto management body" test should be applied in determining the tax resident status of all offshore enterprises. According to Circular 82, an offshore incorporated enterprise controlled by a PRC enterprise or a PRC enterprise group will be regarded as a PRC tax resident by virtue of having its "de facto management body" in China and will be subject to PRC enterprise income tax on its global income only if all of the following conditions are met: (i) the primary location of the day-to-day operational management is in the PRC; (ii) decisions relating to the enterprise's financial and human resource matters are made or are subject to approval by organizations or personnel in the PRC; (iii) the enterprise's primary assets, accounting books and records, company seals, and board and shareholder resolutions, are located or maintained in the PRC; and (iv) at least 50% of voting board members or senior executives habitually reside in the PRC.

We believe none of our entities outside of China is a PRC resident enterprise for PRC tax purposes. See "Taxation — People's Republic of China Taxation." However, the tax resident status of an enterprise is subject to determination by the PRC tax authorities and uncertainties remain with respect to the interpretation of the term "de facto management body." As all of our management members are based in China, it remains unclear how the tax residency rule will apply to our case. If the PRC tax authorities determine that we or any of our subsidiaries outside of China is a PRC resident enterprise for PRC enterprise income tax purposes, then we or such subsidiary could be subject to PRC tax at a rate of 25% on its world-wide income, which could materially reduce our net income. In addition, we will also be subject to PRC enterprise income tax reporting obligations. Furthermore, if the PRC tax authorities determine that we are a PRC resident enterprise for enterprise income tax purposes, gains realized on the sale or other disposition of our ordinary shares may be subject to PRC tax, at a rate of 10% in the case of non-PRC enterprises or 20% in the case of non-PRC individuals (in each case, subject to the provisions of any applicable tax treaty) if such gains are deemed to be from PRC sources. It is unclear whether non-PRC shareholders of our company would be able to claim the benefits of any tax treaties between their country of tax residence and the PRC in the event that we are treated as a PRC resident enterprise. Any such tax may reduce the returns on your investment in our ordinary shares.

*Regulatory bodies of the United States may be limited in their ability to conduct investigations or inspections of our operations in China.*

From time to time, the Company may receive requests from certain U.S. agencies to investigate or inspect the Company's operations, or to otherwise provide information. While the Company will be compliant with these requests from these regulators, there is no guarantee that such requests will be honored by those entities who provide services to us or with whom we associate, especially as those entities are located in China. Furthermore, an on-site inspection of our facilities by any of these regulators may be limited or entirely prohibited. Such inspections, though permitted by the Company and its affiliates, are subject to the unpredictability of the Chinese enforcers, and may therefore be impossible to facilitate.

*Enhanced scrutiny over acquisition transactions by the PRC tax authorities may have a negative impact on potential acquisitions we may pursue in the future.*

The PRC tax authorities have enhanced their scrutiny over the direct or indirect transfer of certain taxable assets, including, in particular, equity interests in a PRC resident enterprise, by a non-resident enterprise by promulgating and implementing SAT Circular 59 and Circular 698, which became effective in January 2008, and a Circular 7 in replacement of some of the existing rules in Circular 698, which became effective in February 2015.

Under Circular 698, where a non-resident enterprise conducts an "indirect transfer" by transferring the equity interests of a PRC "resident enterprise" indirectly by disposing of the equity interests of an overseas holding company, the non-resident enterprise, being the transferor, may be subject to PRC enterprise income tax, if the indirect transfer is considered to be an abusive use of company structure without reasonable commercial purposes. As a result, gains derived from such indirect transfer may be subject to PRC tax at a rate of up to 10%. Circular 698 also provides that, where a non-PRC resident enterprise transfers its equity interests in a PRC resident enterprise to its related parties at a price lower than the fair market value, the relevant tax authority has the power to make a reasonable adjustment to the taxable income of the transaction.

In February 2015, the SAT issued Circular 7 to replace the rules relating to indirect transfers in Circular 698. Circular 7 has introduced a new tax regime that is significantly different from that under Circular 698. Circular 7 extends its tax jurisdiction to not only indirect transfers set forth under Circular 698 but also transactions involving transfer of other taxable assets, through the offshore transfer of a foreign intermediate holding company. In addition, Circular 7 provides clearer criteria than Circular 698 on how to assess reasonable commercial purposes and has introduced safe harbors for internal group restructurings and the purchase and sale of equity through a public securities market. Circular 7 also brings challenges to both the foreign transferor and transferee (or other person who is obligated to pay for the transfer) of the taxable assets. Where a non-resident enterprise conducts an "indirect transfer" by transferring the taxable assets indirectly by disposing of the equity interests of an overseas holding company, the non-resident enterprise being the transferor, or the transferee, or the PRC entity which directly owned the taxable assets may report to the relevant tax authority such indirect transfer. Using a "substance over form" principle, the PRC tax authority may disregard the existence of the overseas holding company if it lacks a reasonable commercial purpose and was established for the purpose of reducing, avoiding or deferring PRC tax. As a result, gains derived from such indirect transfer may be subject to PRC enterprise income tax, and the transferee or other person who is obligated to pay for the transfer is obligated to withhold the applicable taxes, currently at a rate of 10% for the transfer of equity interests in a PRC resident enterprise.

We face uncertainties on the reporting and consequences on future private equity financing transactions, share exchange or other transactions involving the transfer of shares in our company by investors that are non-PRC resident enterprises. The PRC tax authorities may pursue such non-resident enterprises with respect to a filing or the transferees with respect to withholding obligation and request our PRC subsidiaries to assist in the filing. As a result, we and non-resident enterprises in such transactions may become at risk of being subject to filing obligations or being taxed, under Circular 59 or Circular 698 and Circular 7, and may be required to expend valuable resources to comply with Circular 59, Circular 698 and Circular 7 or to establish that we and our non-resident enterprises should not be taxed under these circulars, which may have a material adverse effect on our financial condition and results of operations.

The PRC tax authorities have the discretion under SAT Circular 59, Circular 698 and Circular 7 to make adjustments to the taxable capital gains based on the difference between the fair value of the taxable assets transferred and the cost of investment. Although we currently have no plans to pursue any acquisitions in China or elsewhere in the world, we may pursue acquisitions in the future that may involve complex corporate structures. If we are considered a non-resident enterprise under the PRC Enterprise Income Tax Law and if the PRC tax authorities make adjustments to the taxable income of the transactions under SAT Circular 59 or Circular 698 and Circular 7, our income tax costs associated with such potential acquisitions will be increased, which may have an adverse effect on our financial condition and results of operations.

**Risks Related to Our Ordinary Shares**

The trading price of our common stock is subject to arbitrary pricing factors that are not necessarily associated with traditional factors that influence stock prices or the value of non-bitcoin assets such as revenue, cash flows, profitability, growth prospects or business activity levels since the value and price, as determined by the investing public, may be influenced by future anticipated adoption or appreciation in value of cryptocurrencies or blockchains generally, factors over which we have little or no influence or control.

Other factors which could cause volatility in the market price of our common stock include, but are not limited to:

- actual or anticipated fluctuations in our financial condition and operating results or those of companies perceived to be similar to us;

- actual or anticipated changes in our growth rate relative to our competitors;

- commercial success and market acceptance of blockchain and bitcoin and other cryptocurrencies;

- actions by our competitors, such as new business initiatives, acquisitions and divestitures;

- strategic transactions undertaken by us;

- additions or departures of key personnel;

- prevailing economic conditions;

- disputes concerning our intellectual property or other proprietary rights;

- sales of our common stock by our officers, directors or significant stockholders;

- other actions taken by our stockholders;

- future sales or issuances of equity or debt securities by us;

- business disruptions caused by earthquakes, tornadoes or other natural disasters;

- issuance of new or changed securities analysts' reports or recommendations regarding us;

- legal proceedings involving our company, our industry or both;

- changes in market valuations of companies similar to ours;

- the prospects of the industry in which we operate;

- speculation or reports by the press or investment community with respect to us or our industry in general;

- the level of short interest in our stock; and

- other risks, uncertainties and factors described in this annual report.

In addition, the stock markets in general have experienced extreme volatility that has often been unrelated to the operating performance of the issuer. These broad market fluctuations may negatively impact the price or liquidity of our common stock. When the price of a stock has been volatile, holders of that stock have sometimes instituted securities class action litigation against the issuer, and we have been impacted in that way. See Item 3 – Legal Proceedings, "We, and some of our current and former officers and directors, have been named as parties to various lawsuits arising out of, or related to, allegedly false and misleading statements made in prior securities filings, and those lawsuits could adversely affect us, require significant management time and attention, result in significant legal expenses or damages, and cause our business, financial condition, results of operations and cash flows to suffer."

***We may be unable to comply with the applicable continued listing requirements of the Nasdaq Capital Market, which may adversely impact our access to capital markets and may cause us to default certain of our agreements.***

Our common stock is currently traded on the Nasdaq Capital Market. Nasdaq rules require us to maintain a minimum closing bid price of $1.00 per share of our common stock. The closing bid price of our common stock fell below $1.00 per share for 30 consecutive trading days, so we were not in compliance with Nasdaq's rules for listing standards. Although we regained compliance, there can be no assurance we will continue to meet the minimum bid price requirements or any other requirements in the future, in which case our common stock could be delisted.

In the event that our common stock is delisted from Nasdaq and is not eligible for quotation or listing on another market or exchange, trading of our common stock could be conducted only in the over-the-counter market or on an electronic bulletin board established for unlisted securities such as the OTC. In such event, it could become more difficult to dispose of, or obtain accurate price quotations for our common stock and there would likely also be a reduction in our coverage by securities analysts and the news media, which could cause the price of our common stock to decline further. In addition, our ability to raise additional capital may be severely impacted, which may negatively affect our plans and the results of our operations.

***If securities or industry analysts do not publish research or publish unfavorable research about our business, our stock price and trading volume could decline.***

The trading market for our common stock will be influenced by whether industry or securities analysts publish research and reports about us, our business, our market or our competitors and, if any analysts do publish such reports, what they publish in those reports. We may not obtain or maintain analyst coverage in the future. Any analysts that do cover us may make adverse recommendations regarding our stock, adversely change their recommendations from time to time and/or provide more favorable relative recommendations about our competitors. If analysts who may cover us in the future were to cease coverage of our company or fail to regularly publish reports on us, or if analysts fail to cover us or publish reports about us at all, we could lose (or never gain) visibility in the financial markets, which in turn could cause the stock price of our common stock or trading volume to decline. Moreover, if our operating results do not meet the expectations of the investor community, one or more of the analysts who cover our company may change their recommendations regarding our company and our stock price could decline.

***Our ordinary shares may be thinly traded and you may be unable to sell at or near ask prices or at all if you need to sell your shares to raise money or otherwise desire to liquidate your shares.***

Our ordinary shares may be "thinly-traded", meaning that the number of persons interested in purchasing our ordinary shares at or near bid prices at any given time may be relatively small or non-existent. This situation may be attributable to a number of factors, including the fact that we are relatively unknown to stock analysts, stock brokers, institutional investors and others in the investment community that generate or influence sales volume, and that even if we came to the attention of such persons, they tend to be risk-averse and might be reluctant to follow an unproven company such as ours or purchase or recommend the purchase of our shares until such time as we became more seasoned. As a consequence, there may be periods of several days or more when trading activity in our shares is minimal or non-existent, as compared to a seasoned issuer which has a large and steady volume of trading activity that will generally support continuous sales without an adverse effect on share price. Broad or active public trading market for our ordinary shares may not develop or be sustained.

39

***Volatility in our ordinary shares price may subject us to securities litigation.***

The market for our ordinary shares may have, when compared to seasoned issuers, significant price volatility and we expect that our share price may continue to be more volatile than that of a seasoned issuer for the indefinite future. In the past, plaintiffs have often initiated securities class action litigation against a company following periods of volatility in the market price of its securities. We may, in the future, be the target of similar litigation. Securities litigation could result in substantial costs and liabilities and could divert management's attention and resources.

***We are not likely to pay cash dividends in the foreseeable future.***

We currently intend to retain any future earnings for use in the operation and expansion of our business. Accordingly, we do not expect to pay any cash dividends in the foreseeable future but will review this policy as circumstances dictate. Should we determine to pay dividends in the future, our ability to do so will depend upon the receipt of dividends or other payments from WFOE. WFOE may, from time to time, be subject to restrictions on its ability to make distributions to us, including restrictions on the conversion of RMB into U.S. dollars or other hard currency and other regulatory restrictions.

***You may face difficulties in protecting your interests as a shareholder, as Cayman Islands law provides substantially less protection when compared to the laws of the United States and it may be difficult for a shareholder of ours to effect service of process or to enforce judgements obtained in the United States courts.***

Our corporate affairs are governed by our memorandum and articles of association and by the Companies Law (2016 Revision) and common law of the Cayman Islands. The rights of shareholders to take legal action against our directors and us, actions by minority shareholders and the fiduciary responsibilities of our directors to us under Cayman Islands law are to a large extent governed by the common law of the Cayman Islands. The common law of the Cayman Islands is derived in part from comparatively limited judicial precedent in the Cayman Islands as well as from English common law. Decisions of the Privy Council (which is the final court of appeal for British overseas territories such as the Cayman Islands) are binding on a court in the Cayman Islands. Decisions of the English courts, and particularly the Supreme Court of the United Kingdom and the Court of Appeal are generally of persuasive authority but are not binding on the courts of the Cayman Islands. The rights of our shareholders and the fiduciary responsibilities of our directors under Cayman Islands law are not as clearly established as they would be under statutes or judicial precedents in the United States. In particular, the Cayman Islands has a less developed body of securities laws as compared to the United States and provide significantly less protection to investors. In addition, Cayman Islands companies may not have standing to initiate a shareholder derivative action before the United States federal courts. The Cayman Islands courts are also unlikely to impose liabilities against us in original actions brought in the Cayman Islands, based on certain civil liability provisions of United States securities laws.

As of December 31, 2019, all of our operations are conducted outside the United States, and substantially all of our assets are located outside the United States. All of our directors and officers are nationals or residents of jurisdictions other than the United States and a substantial portion of their assets are located outside the United States. As a result, it may be difficult for a shareholder to effect service of process within the United States upon these persons, or to enforce against us or them judgments obtained in United States courts, including judgments predicated upon the civil liability provisions of the securities laws of the United States or any state in the United States.

As a result of all of the above, our shareholders may have more difficulty in protecting their interests through actions against us or our officers, directors or major shareholders than would shareholders of a corporation incorporated in a jurisdiction in the United States.

***We are a foreign private issuer within the meaning of the rules under the Exchange Act, and as such we are exempt from certain provisions applicable to United States domestic public companies.***

We are a foreign private issuer within the meaning of the rules under the Exchange Act. As such, we are exempt from certain provisions applicable to United States domestic public companies. For example:

- we are not required to provide as many Exchange Act reports, or as frequently, as a domestic public company;

- for interim reporting, we are permitted to comply solely with our home country requirements, which are less rigorous than the rules that apply to domestic public companies;

- we are not required to provide the same level of disclosure on certain issues, such as executive compensation;

- we are exempt from provisions of Regulation FD aimed at preventing issuers from making selective disclosures of material information;

- we are not required to comply with the sections of the Exchange Act regulating the solicitation of proxies, consents or authorizations in respect of a security registered under the Exchange Act; and

- we are not required to comply with Section 16 of the Exchange Act requiring insiders to file public reports of their share ownership and trading activities and establishing insider liability for profits realized from any "short-swing" trading transaction.

- We currently intend to file annual reports on Form 20-F and reports on Form 6-K as a foreign private issuer. Accordingly, our shareholders may not have access to certain information they may deem important.

***We are an "emerging growth company" within the meaning of the Securities Act, and if we take advantage of certain exemptions from disclosure requirements available to emerging growth companies, this could make it more difficult to compare our performance with other public companies.***

We are an "emerging growth company" within the meaning of the Securities Act, as modified by the JOBS Act. Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such an election to opt out is irrevocable. We have elected not to opt out of such extended transition period, which means that when a standard is issued or revised and it has different application dates for public or private companies, we, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of our financial statements with another public company which is neither an emerging growth company nor an emerging growth company which has opted out of using the extended transition period difficult or impossible because of the potential differences in accountant standards used.

41

***As an "emerging growth company" under applicable law, we will be subject to lessened disclosure requirements. Such reduced disclosure may make our ordinary shares less attractive to investors.***

For as long as we remain an "emerging growth company", as defined in the JOBS Act, we will elect to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies", including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a non-binding advisory vote on executive compensation and shareholder approval of any golden parachute payments not previously approved. Because of these lessened regulatory requirements, our shareholders would be left without information or rights available to shareholders of more mature companies. If some investors find our ordinary shares less attractive as a result, there may be a less active trading market for our ordinary shares and our share price may be more volatile.

***If we are classified as a passive foreign investment company, United States taxpayers who own our ordinary shares may have adverse United States federal income tax consequences.***

A non-U.S. corporation such as ourselves will be classified as a passive foreign investment company, which is known as a PFIC, for any taxable year if, for such year, either

- at least 75% of our gross income for the year is passive income; or

- the average percentage of our assets (determined at the end of each quarter) during the taxable year which produce passive  income or which are held for the production of passive income is at least 50%.

Passive income generally includes dividends, interest, rents and royalties (other than rents or royalties derived from the active conduct of a trade or business) and gains from the disposition of passive assets.

If we are determined to be a PFIC for any taxable year (or portion thereof) that is included in the holding period of a U.S. taxpayer who holds our ordinary shares, the U.S. taxpayer may be subject to increased U.S. federal income tax liability and may be subject to additional reporting requirements.

Depending on the amount of cash we raise in a public offering completed in March 2018, together with any other assets held for the production of passive income, it is possible that, for our 2018 taxable year or for any subsequent year, more than 50% of our assets may be assets which produce passive income. We will make this determination following the end of any particular tax year. Although the law in this regard is unclear, we treat our consolidated affiliated entities as being owned by us for United States federal income tax purposes, not only because we exercise effective control over the operation of such entities but also because we are entitled to substantially all of their economic benefits, and, as a result, we consolidate their operating results in our consolidated financial statements. For purposes of the PFIC analysis, in general, a non-U.S. corporation is deemed to own its pro rata share of the gross income and assets of any entity in which it is considered to own at least 25% of the equity by value.

For a more detailed discussion of the application of the PFIC rules to us and the consequences to U.S. taxpayers if we were determined to be a PFIC, see "Item 10.E. Taxation — United States Federal Income Taxation — Passive Foreign Investment Company."

*Two former members of our management team have substantial shareholdings in our Company* and their interests may not be aligned with the interests of our other shareholders

Mr. Zeng, our former chief executive officer and chairman and Mr. Liu, a former member of our Board of Directors, own approximately 11.35% and 28.66%, respectively, of our ordinary shares. As a result of their significant shareholdings, Mr. Zeng and Mr. Liu have, and will continue to have, substantial influence over our business, including decisions regarding mergers, consolidations and the sale of all or substantially all of our assets, election of directors, and other significant corporate actions. They may take action that is not in the best interests of us or our other shareholders This concentration of ownership may discourage, delay or prevent a change of control of our Company, which could deprive our shareholders of an opportunity to receive a premium for their shares as part of the sale of our Company and might reduce the market price of our ordinary shares. These actions may be taken even if they are opposed by our other shareholders. For more information regarding our principal shareholders and their affiliated entities see "6E. Share Ownership."

**ITEM 4. INFORMATION ON THE COMPANY**

**History and Development of the Company**

We began our operations in China through Shanghai Dianniu Internet Finance Information Service Co. Ltd. ("Dianniu"), which was formed in November 2015. In early 2017, we incorporated Golden Bull Limited under the laws of the Cayman Islands as our offshore holding company under our former name Point Cattle International Limited. In March 2017, we established our wholly owned Hong Kong subsidiary, Point Cattle Group Company Limited, which formed Shanghai Fuyu Information and Technology Co., Ltd., its wholly owned subsidiary in PRC (the "WFOE"). Through the contractual arrangements between the WFOE, Dianniu and the majority shareholders of Dianniu, we control 93.2% of Dianniu. These contractual arrangements allow us to effectively control and derive 93.2% of the economic interest from Dianniu.

In addition to Dianniu, the WFOE has entered into a series of contracts with Shanghai Baoxun Advertisement Design Co., Ltd. ("Baoxun"), a company formed in February 2017 under the laws of PRC, and Baoxun's shareholders. Baoxun currently does not have any operations.

On June 3, 2019, Golden Bull USA, Inc. ("Golden Bull USA") was incorporated in the State of New York, which is a wholly owned subsidiary of Golden Bull Limited .Golden Bull USA is our principal office and we plan to develop car rental business through Golden Bull USA. We've been actively seeking car rental business opportunities in both the State of New York as well as the State of Florida.

In April 2020, we acquired another entity XMAX Chain Limited in Hong Kong as wholly owned subsidiary, operating the bitcoin mining business and we expect a significant amount of business will be executed under this wholly-owned subsidiary in the future.

We listed our ordinary shares on the Nasdaq Capital Market under the symbol "DNJR" on March 19, 2018 and completed an initial public offering of 1,550,000 ordinary shares on March 22, 2018 ("IPO"), raising approximately US$5.2 million in net proceeds after deducting underwriting commissions and the offering expenses payable by us. On March 28, 2018, ViewTrade Securities, Inc., who acted as the sole underwriter and book-runner of the Company's IPO exercised the full over-allotment option to purchase an additional 232,500 ordinary shares raising approximately US$850,000 in net proceeds after deducting underwriting commissions and the offering expenses payable by us.

Our principal executive offices are located at 136-20 38th Avenue, Suite 9A-2, Flushing, NY United States 11354. Our registered office in the Cayman Islands is located at Corporate Filing Services Ltd., 3rd Floor, Harbour Place, 103 South Church Street, Grand Cayman, KY 1-1002, Cayman Islands.

Our agent for service of process in the United States is Corporation Service Company located at 1180 Avenue of the Americas, Suite 210, New York, New York 10036. Investors should contact us for any inquiries through the address and telephone number of our principal executive offices.

***Capital Expenditures***

For the years ended December 31, 2019, 2018 and 2017, we incurred capital expenditures of approximately $0.87 million, $3.33 million and $0.05 million, respectively, among which we incurred $nil, $0.75 million and $0.05 million for purchases of property and equipment for our daily use, $0.76 million, $2.58 million and $nil for the car rental business, and $0.11 million, $nil and $nil for purchases of computers for our bitcoin mining business. These capital expenditures were financed by cash provided by operating and financing activities.

43

We expect that our capital expenditures in fiscal year 2020 will be incurred primarily in connection with the purchase of bitcoin mining machines, additional computer equipment and IT server to support our services.

**Business Overview**

We were primarily an online finance marketplace, or "peer-to-peer" lending company, in China that provided borrowers access to loans. But on October 24, 2019, the Pudong Branch of the Shanghai Public Security Bureau announced on its website that it has completed its investigations against Shanghai Dianniu Internet Finance Information Service Co., Ltd., which is a variable interest entity of Golden Bull Limited's, for suspected illegal collection of public deposits. As of the report filing date, the final outcome of investigation was still not published and the impact could not be estimated. Hence, the Company's management decided to temporarily suspend the "peer-to-peer" lending business in the fourth quarter of 2019. The board and management is still in consideration of running related financial businesses in different manners consistent with PRC regulation and began to implement operations in the bitcoin mining business and car rental business in 2020.

*Bitcoin Mining*

*Operations of bitcoin mining*

In view of the widespread adoption of blockchain technology and bitcoin worldwide the Company determined to enter the bitcoin mining industry, which is the production of bitcoin. We investigated the business since August 2019 and Management believes that bitcoin mining is profitable and its business plan is viable. In October 2019 the Company decided to implement its business strategy with the temporary suspension of its existing P2P lending business. Mr. Erke Huang then joined the Company as CFO and a director. Prior to joining the Company he served as investment director in a venture capital fund in Shenzhen, China and invested in well-known blockchain technology projects. Mr. Huang brings the resources from miner supply to mining "farm" hosting to execute the Company's bitcoin mining business plan. We believe the Company has a discount which can be achieved by bulk purchase and the Company has also sourced a stable and cheap electricity supply. We have also assembled an experienced operations team to manage and maintain the daily operations of miners for stable and predictable bitcoin production.

The Company operates a recently updated bitcoin mining facility for the sole purpose of mining bitcoin. Our facility and mining platform are operating with the primary intent of accumulating bitcoin which we may sell for fiat currency from time to time depending on market conditions and management's determination of our cash flow needs. Our mining operations are in Wuhai, Zhundong, Xinlinhot and Sichuan China hosting about 21,800 Application Specific Integrated Circuits ("ASIC") miners since May 2020 which have access to approximately 74.5 megawatts of power supplied to our leased facilities. During the second quarter of 2020, the Company purchased 16,817 units next generation MicroBT M21S miner, 2,696 units MicroBT M20S miner, 2,000 units MicroBT M10 Miner, 800 units Innosilicon T3 miner and 256 unites Bitmain T17+ miner, Most of them have now been installed and are currently operating at Wuhai site, Zhundong site, Xilinhot site and Sichuan Site while some are still in transit. The Company is currently evaluating plans to make more purchases to increase the total mining hash, conditioned upon our raising required funds.

*Performance Metrics of bitcoin mining*

The Company operates mining hardware which performs computational operations in support of the blockchain measured in "hash rate" or "hashes per second." A "hash" is the computation run by mining hardware in support of the blockchain; therefore, a miner's "hash rate" refers to the rate at which it is capable of solving such computations. The original equipment used for mining bitcoin utilized the Central Processing Unit (CPU) of a computer to mine various forms of bitcoin. Due to performance limitations, CPU mining was rapidly replaced by the Graphics Processing Unit (GPU), which offers significant performance advantages over CPUs. General purpose chipsets like CPUs and GPUs have since been replaced in the mining industry by Application Specific Integrated Circuits (ASIC) chips like those found in the MicroBT M21S miner currently utilized by the Company at its mining facility. These ASIC chips are designed specifically to maximize the rate of hashing operations.

The Company measures our mining performance and competitive position based on overall hash rate being produced in our mining sites. The latest equipment the MicroBT M21S miner, performs in the range of approximately 50 - 58 terahash per second (TH/s) per unit, M20S performs in the range of 64 - 68 TH/s per unit, M10 performs in the range of 31 – 35 TH/s per unit; Bitmain T17+ performs with a maximum hashrate of 64 TH/s per unit; Innosilicon T3 performs in the range of 41 – 45 TH/s per unit. These mining hardware are on the cutting edge of available mining equipment, however, advances and improvements to the technology are ongoing and may be available in quantities to the market in the near future which may affect our perceived position.

*Halving*

Further affecting the industry, and particularly for the bitcoin blockchain, the cryptocurrency reward for solving a block is subject to periodic incremental halving. Halving is a process designed to control the overall supply and reduce the risk of inflation in cryptocurrencies using a Proof-of-Work consensus algorithm. At a predetermined block, the mining reward is cut in half, hence the term "halving". For bitcoin, the reward was initially set at 50 bitcoin currency rewards per block and this was cut in half to 25 in November 28, 2012 at block 210,000 and again to 12.5 on July 9, 2016 at block 420,000. The next halving for bitcoin is expected in May 2020 at block 630,000 when the reward will reduce to 6.25. This process will reoccur until the total amount of bitcoin currency rewards issued reaches 21 million, which is expected to occur around 2140.

*Network Hash Rate and Difficulty*

In cryptocurrency mining, "hash rate" is a measure of the processing speed by a mining computer for a specific coin. An individual miner, such as Riot has a hash rate total of its miners seeking to mine a specific coin, and system wide there is a total has rate of all miners seeking to mine each specific type of coin. The higher total hash rate of a specific miner, as a percentage of the system wide total hash rate, generally results over time in a corresponding higher success rate in coin rewards as compared to miners with lower hash rates.

*Mining Pools*

A "mining pool" is the pooling of resources by miners, who share their processing power over a network and split rewards according to the amount of work they contributed to the probability of placing a block on the blockchain. Mining pools emerged in response to the growing difficulty and available hashing power that competes to place a block on the bitcoin blockchain.

The Company participates in mining pools wherein groups of miners associate to pool resources and earn cryptocurrency together allocated to each miner according to the "hashing" capacity they contribute to the pool. As additional miners competed for the limited supply of blocks, individuals found that they were working for months without finding a block and receiving any reward for their mining efforts. To address this variance, miners started organizing into pools to share mining rewards more evenly on a pro rata basis based on total hashing capacity contributed to the mining pool.

The mining pool operator provides a service that coordinates the computing power of the independent mining enterprise. Fees are paid to the mining pool operator to cover the costs of maintaining the pool. The pool uses software that coordinates the pool members' hashing power, identifies new block rewards, records how much work all the participants are doing, and assigns block rewards for successful algorithm solutions in-proportion to the individual hash rate that each participant contributed to a given successful mining transaction. While we do not pay pool fees directly, pool fees are deducted from amounts we may otherwise earn. Fees (and payouts) fluctuate and historically have been approximately 2% on average.

Mining pools are subject to various risks such as disruption and down time. Riot has internally created software that monitors its hashing performance and reward rates to monitor credits for our contributed hashing power. In the event that a pool experiences down time or not yielding returns, our results may be impacted.

*Competition*

In bitcoin mining, companies, individuals and groups generate units of bitcoin through mining. Miners can range from individual enthusiasts to professional mining operations with dedicated data centers. Miners may organize themselves in mining pools. The Company competes or may in the future compete with other companies that focus all or a portion of their activities on owning or operating bitcoin exchanges, developing programming for the blockchain, and mining activities. At present, the information concerning the activities of these enterprises is not readily available as the vast majority of the participants in this sector do not publish information publicly or the information may be unreliable. Published sources of information include "bitcoin.org" and "blockchain.info"; however, the reliability of that information and its continued availability cannot be assured.

Several public companies (traded in the U.S. and Internationally), such as the following, may be considered to compete with us, although we believe there is no company, including the following, which engages in the same scope of activities as we do or intend to do:

The competitors we have are Overstock.com Inc; Bitcoin Investment Trust; Blockchain Industries, Inc; (formerly Omni Global Technologies, Inc.); Bitfarms Technologies Ltd. (formerly Blockchain Mining Ltd); DMG Blockchain Solutions Inc; Digihost International, Inc; Hive Blockchain Technologies Inc; Hut 8 Mining Corp; HashChain Technology, Inc; MGT Capital Investments, Inc; DPW Holdings, Inc; Layer1 Technologies, LLC; Northern Data AG; Riot Blockchain, Inc. The bitcoin industry is a highly competitive and evolving industry and new competitors and/or emerging technologies could enter the market and affect our competitiveness in the future. For more information regarding those risk factors known to us, see the section entitled "Risk Factors" herein.

***Car Rental Business***

Direct Rental

We plan to rent our cars to both individual and corporate customers initially from our stores in Shanghai and Zhejiang. The rental price varies based on the rental term which ranges from one day to one month; the longer the rental term, the lower the price. The daily rental price is the highest, while the average weekly rental prices and average monthly rental prices are 10% to 20% and 20% to 30% cheaper, respectively, than that of the daily rental price.

Customers can confirm the time and place for vehicle delivery and rental term via SMS messages, phone calls or face-to-face communication with our sales personnel. Our sales personnel will then deliver the vehicle to the customers as designated. The customer, before signing the car rental agreement, will inspect the vehicle in person and pay the rental fee along with the deposit with their credit card, WeChat Pay or AliPay. The customer is responsible for the gas, tolls, and any other expenses related to the use of the vehicle during the rental term.

Our operations for our Car Rental business consists of the following steps:

1) **Pre- Rental Preparation**: Our asset management personnel are regularly scheduled to conduct comprehensive inspections, repairs, maintenance, and cleaning of the vehicles.

2) **Rental Preparation**: Our sales personnel will introduce to the customer in detail information regarding our car rental conditions, price, distance and time limit, required procedures, the main contents of the rental contract terms, other rental instructions, and related services.

3) **Paperwork Preparation**: Individual customers are required to provide their original identification card, driver's license, and house or land ownership certificate. Corporate customers are required to provide their company's business license, enterprise organization code certificate, and the legal person's power of attorney and driver's license.

4) **Signing the Contract**: Before signing the contract, our personnel will repeat to the customer material terms of the rental contract. After filling in the vehicle's information and other rental terms, the customer will be required to enter their personal information and sign the contract.

5) **Rent and Deposit Prepayment**: The prepayment of rental fees and the deposit must be paid by the customer prior to renting the vehicle. The amount of the prepayment is determined by the rental duration and price of the vehicle.

6) **Delivery Inspection**: When the vehicle is delivered to the customer, the sales personnel will hand over the vehicle key, instructions, and other accessories such as data cables and mobile phone holders. The sales personnel will then guide the customer through a thorough vehicle inspection including the exterior, steering system, braking system, lubrication system, coolant, tires, and lights. After the vehicle inspection is completed, the customer will be asked to fill in an inspection form, of which both the customer and the sales department will retain a copy.

*Rental Service with Cooperative Sites*

In addition to directly renting to customers, we also rent to other auto rental companies in a similar fashion but at a discounted rate. We and our peer companies have formed a vehicle pool consisting of all available pre-owned vehicles. In the scenario where a customer places a rental order with a company which does not currently have the requested vehicle in stock, another company in the vehicle pool possessing the requested vehicle will rent it to the Company at a discounted price upon its request.

The Company has reached agreements with several franchisees for cooperative rental sites in China. The franchise joined our Car Rental business to introduce rental customers. These franchisees were all in the automobile business including Car Rental, Car Repair and Car Sales. They introduced our Car Rental products, prices and procedures to the customers on site. Since January 2020, due to the COVID-19 breakout in mainland China, most of the potential customers stayed home which put a great negative impact on the development of the business. Currently, the situation is still uncertain and it might last longer than we expected.

Starting in the second quarter of 2020, the Golden Bull USA office has established some leads towards Car Rental Business possibly in the State of Florida, United States. Although it is still in the investigation and due diligence process, we may be able to commence Car Rental Operations in the United States in the third quarter of 2020.

### Peer to peer lending business

We provided loan facilitation services on our lending marketplace before October 2019 when the Pudong Branch of the Shanghai Public Security Bureau announced that it has completed its investigations against Shanghai Dianniu Internet Finance Information Service Co., Ltd., for suspected illegal collection of public deposits. As a result, our management determined to temporarily suspend the "peer-to-peer" lending business from the last quarter of 2019. As of the date of this report, the final outcome of investigation was still not published and the impact on our financial statements could not be estimated. Management and board of directors is still in consideration of continuing operation utilizing the existing platform and technology in a different manner consistent with PRC regulation.

We generated revenues primarily from transaction fees and management fees, both of which were charged to borrowers for our services. Our revenues totaled approximately $4.6 million, $7.9 million and $7.0 million for the years ended December 31, 2019, 2018 and 2017.

## Employees

For the year ended December 31, 2019, we decreased our headcount by 28 persons from 91 to 63 headcounts, mostly in our risk management and sales department resulting from temporary suspension of our peer-to-peer lending business.

As of December 31, 2019, we had a total of 63 employees, all of which employees were either based in Shanghai, or located in garages outside of Shanghai for the purpose of administering the automobiles used as collateral for the loans we facilitate. The following table sets forth the breakdown of our employees as of December 31, 2019 by function:

| Function | Number of Employees | % of Total |
|---|---|---|
| Technology and Development | 3 | 4.76% |
| Risk Management | 4 | 6.35% |
| Operations, Sales and Marketing | 47 | 74.60% |
| General and Administrative | 9 | 14.29% |
| Total | 63 | 100% |

As required by PRC regulations, we participate in various government statutory employee benefit plans, including social insurance funds, namely a pension contribution plan, a medical insurance plan, an unemployment insurance plan, a work-related injury insurance plan and a maternity insurance plan, and a housing provident fund. We are required under PRC law to make contributions to employee benefit plans at specified percentages of the salaries, bonuses and certain allowances of our employees, up to a maximum amount specified by the local government from time to time. As of the date of this report, we have made adequate employee benefit payments. However, if we were found by the relevant authorities that we failed to make adequate payment, we may be required to make up the contributions for these plans as well as to pay late fees and fines. See "Item 3.D. Risk Factors — Risks Related to Doing Business in China — Failure to make adequate contributions to various employee benefit plans as required by PRC regulations may subject us to penalties."

We enter into standard labor and confidentiality agreements with our employees. We believe that we maintain a good working relationship with our employees, and we have not experienced any major labor disputes.

**Insurance**

We provide social security insurance including pension insurance, unemployment insurance, work-related injury insurance and medical insurance for our employees. We do not maintain business interruption insurance or general third-party liability insurance, nor do we maintain product liability insurance or key-man insurance. We consider our insurance coverage to be sufficient for our business operations in China.

**Legal Proceedings**

We are currently not a party to any material legal or administrative proceedings. We may from time to time be subject to various legal or administrative claims and proceedings arising in the ordinary course of business. Litigation or any other legal or administrative proceeding, regardless of the outcome, is likely to result in substantial cost and diversion of our resources, including our management's time and attention.

**Regulations**

This section sets forth a summary of the most significant rules and regulations that affect our business activities in China.

**Regulations Relating to Foreign Investment**

*The Draft PRC Foreign Investment Law*

In January 2015, the MOFCOM published a discussion draft of the proposed Foreign Investment Law for public review and comments. The draft law purports to change the existing "case-by-case" approval regime to a "filing or approval" procedure for foreign investments in China. The State Council will determine a list of industry categories that are subject to special administrative measures, which is referred to as a "negative list," consisting of a list of industry categories where foreign investments are strictly prohibited, or the "prohibited list" and a list of industry categories where foreign investments are subject to certain restrictions, or the "restricted list." Foreign investments in business sectors outside of the "negative list" will only be subject to a filing procedure, in contrast to the existing prior approval requirements, whereas foreign investments in any industry categories that are on the "restricted list" must apply for approval from the foreign investment administration authority.

The draft for the first time defines a foreign investor not only based on where it is incorporated or organized, but also by using the standard of "actual control." The draft specifically provides that entities established in China, but "controlled" by foreign investors will be treated as FIEs. Once an entity is considered to be an FIE, it may be subject to the foreign investment restrictions in the "restricted list" or prohibitions set forth in the "prohibited list." If an FIE proposes to conduct business in an industry subject to foreign investment restrictions in the "restricted list," the FIE must go through a market entry clearance by the MOFCOM before being established. If an FIE proposes to conduct business in an industry subject to foreign investment prohibitions in the "prohibited list," it must not engage in the business. However, an FIE that conducts business in an industry that is in the "restricted list," upon market entry clearance, may apply in writing for being treated as a PRC domestic investment if it is ultimately "controlled" by PRC government authorities and its affiliates and/or PRC citizens. In this connection, "control" is broadly defined in the draft law to cover the following summarized categories: (i) holding 50% or more of the voting rights of the subject entity; (ii) holding less than 50% of the voting rights of the subject entity but having the power to secure at least 50% of the seats on the board or other equivalent decision making bodies, or having the voting power to exert material influence on the board, the shareholders' meeting or other equivalent decision making bodies; or (iii) having the power to exert decisive influence, via contractual or trust arrangements, over the subject entity's operations, financial matters or other key aspects of business operations. According to the draft, variable interest entities would also be deemed as FIEs, if they are ultimately "controlled" by foreign investors, and be subject to restrictions on foreign investments. However, the draft law has not taken a position on what actions will be taken with respect to the existing companies with the "variable interest entity" structure, whether or not these companies are controlled by Chinese parties.

The draft emphasizes on the security review requirements, whereby all foreign investments that jeopardize or may jeopardize national security must be reviewed and approved in accordance with the security review procedure. In addition, the draft imposes stringent ad hoc and periodic information reporting requirements on foreign investors and the applicable FIEs. Aside from investment implementation report and investment amendment report that are required at each investment and alteration of investment specifics, an annual report is mandatory, and large foreign investors meeting certain criteria are required to report on a quarterly basis. Any company found to be non-compliant with these information reporting obligations may potentially be subject to fines and/or administrative or criminal liabilities, and the persons directly responsible may be subject to criminal liabilities.

In December 2018, the Standing Committee of the National People's Congress published a discussion draft of a new proposed Foreign Investment Law, aiming to replace the major existing laws governing foreign direct investment in China. On January 29, 2019, the discussion draft with slight revisions, or the New Draft Foreign Investment Law, was submitted for review. Pursuant to the New Draft Foreign Investment Law, foreign investments shall be subject to the negative list management system. The "negative list", which is issued or approved by the State Council, specifies the special management measures for the access of foreign investment in specific areas. If a foreign investor is found to invest in any prohibited industry in the "negative list", such foreign investor may be required to, among other aspects, suspend its investment activities, dispose of its equity interests or assets in the target companies, and forfeit its income. In addition, if a foreign investor is found to invest in any restricted industry in the "negative list", the relevant competent department shall require the foreign investor to take the measures to correct itself.

However, the New Draft Foreign Investment Law does not mention the "actual control" as regulated in the previous draft and the position to be taken with respect to existing or future companies with the "variable interest entity" structure. On March 15, 2019, the Foreign Investment Law of the People's Republic of China, or the Final Foreign Investment Law, with slight revision, is finally issued and will become effective on January 1, 2020. Although variable interest entity structures are not included in the Final Foreign Investment Law, it is uncertain whether any interpretation and implementation of the Final Foreign Investment Law or new PRC laws, rules or regulations relating to variable interest entity structures will be adopted or if adopted, what they would provide.

When the Final Foreign Investment Law becomes effective, the trio of existing laws regulating foreign investment in China, namely, the Sino-foreign Equity Joint Venture Enterprise Law, the Sino-foreign Cooperative Joint Venture Enterprise Law and the Wholly Foreign-invested Enterprise Law, together with their implementation rules and ancillary regulations, will be abolished. The FIEs established in accordance with the Sino-foreign Equity Joint Venture Enterprise Law, the Sino-foreign Cooperative Joint Venture Enterprise Law and the Wholly Foreign-invested Enterprise Law before the Final Foreign Investment Law becomes effective, may keep their original organizational forms for five years after the effectiveness of the Final Foreign Investment Law. See "Risk Factors—Substantial uncertainties exist with respect to the enactment timetable, interpretation and implementation of draft PRC Foreign Investment Law and how it may impact the viability of our current corporate structure, corporate governance and business operations."

### *Industry Catalog Relating to Foreign Investment*

Investment activities in the PRC by foreign investors are principally governed by the Guidance Catalog of Industries for Foreign Investment, or the Catalog, which was promulgated and is amended from time to time by the MOFCOM and the National Development and Reform Commission. Industries listed in the Catalog are divided into three categories: encouraged, restricted and prohibited. Industries not listed in the Catalog are generally deemed as constituting a fourth "permitted" category. Establishment of wholly foreign-owned enterprises is generally allowed in encouraged and permitted industries. Some restricted industries are limited to equity or contractual joint ventures, while in some cases Chinese partners are required to hold the majority interests in such joint ventures. In addition, restricted category projects are subject to higher-level government approvals. Foreign investors are not allowed to invest in industries in the prohibited category. Industries not listed in the Catalog are generally open to foreign investment unless specifically restricted by other PRC regulations.

Our PRC subsidiary is mainly engaged in providing investment and financing consultations and technical services, which fall into the "encouraged" or "permitted" category under the Catalog. Our PRC subsidiary has obtained all material approvals required for its business operations. However, industries such as value-added telecommunication services (except e-commerce), including Internet information services, are restricted from foreign investment. We provide the value-added telecommunication services that are in the "restricted" category through our consolidated variable interest entities.

### *Foreign Investment in Value-Added Telecommunication Services*

The Provisions on Administration of Foreign Invested Telecommunications Enterprises promulgated by the State Council in December 2001 and subsequently amended in September 2008 prohibit a foreign investor from owning more than 50% of the total equity interest in any value-added telecommunications service business in China and require the major foreign investor in any value-added telecommunications service business in China have a good and profitable record and operating experience in this industry. The Guidance Catalog of Industries for Foreign Investment amended in 2017 allows a foreign investor to own more than 50% of the total equity interest in an E-Commerce business.

In July 2006, the Ministry of Information Industry, the predecessor of the MIIT, issued the Circular on Strengthening the Administration of Foreign Investment in the Operation of Value-added Telecommunications Business, pursuant to which a domestic PRC company that holds an operating license for value-added telecommunications business, which we refer to as a VATS License, is prohibited from leasing, transferring or selling the VATS License to foreign investors in any form and from providing any assistance, including resources, sites or facilities, to foreign investors that conduct a value-added telecommunications business illegally in China. Further, the domain names and registered trademarks used by an operating company providing value-added telecommunications services must be legally owned by that company or its shareholders. In addition, the VATS License holder must have the necessary facilities for its approved business operations and to maintain the facilities in the regions covered by its VATS License.

*Regulations on Illegal Fund-Raising*

Raising funds by entities or individuals from the general public must be conducted in strict compliance with applicable PRC laws and regulations to avoid administrative and criminal liabilities. The Measures for the Banning of Illegal Financial Institutions and Illegal Financial Business Operations promulgated by the State Council in July 1998, and the Notice on Relevant Issues Concerning the Penalty on Illegal Fund-Raising issued by the General Office of the State Council in July 2007, explicitly prohibit illegal public fund-raising. The main features of illegal public fund-raising include: (i) illegally soliciting and raising funds from the general public by means of issuing stocks, bonds, lotteries or other securities without obtaining the approval of relevant authorities, (ii) promising a return of interest or profits or investment returns in cash, properties or other forms within a specified period of time, and (iii) using a legitimate form to disguise the unlawful purpose.

To further clarify the criminal charges and punishments relating to illegal public fund-raising, the Supreme People's Court promulgated the Judicial Interpretations to Issues Concerning Applications of Laws for Trial of Criminal Cases on Illegal Fund-Raising, or the Illegal Fund-Raising Judicial Interpretations, which came into force in January 2011. The Illegal Fund-Raising Judicial Interpretations provide that a public fund-raising will constitute a criminal offense related to "illegally soliciting deposits from the public" under the PRC Criminal Law, if it meets all the following four criteria: (i) the fund-raising has not been approved by the relevant authorities or is concealed under the guise of legitimate acts; (ii) the fund-raising employs general solicitation or advertising such as social media, promotion meetings, leafleting and SMS advertising; (iii) the fundraiser promises to repay, after a specified period of time, the capital and interests, or investment returns in cash, properties in kind and other forms; and (iv) the fund-raising targets at the general public as opposed to specific individuals. An illegal fund-raising activity will be fined or prosecuted in the event that it constitutes a criminal offense. Pursuant to the Illegal Fund-Raising Judicial Interpretations, an offender that is an entity will be subject to criminal liabilities, if it illegally solicits deposits from the general public or illegally solicits deposits in disguised form (i) with the amount of deposits involved exceeding RMB1,000,000 (US$157,342), (ii) with over 150 fund-raising targets involved, or (iii) with the direct economic loss caused to fund-raising targets exceeding RMB500,000 (US$78,671), or (iv) the illegal fund-raising activities have caused baneful influences to the public or have led to other severe consequences. An individual offender is also subject to criminal liabilities but with lower thresholds. In addition, an individual or an entity who has aided in illegal fund-raising from the general public and charges fees including but not limited to agent fees, rewards, rebates and commission, constitute an accomplice of the crime of illegal fund-raising. In accordance with the Opinions of the Supreme People's Court, the Supreme People's Procurator and the Ministry of Public Security on Several Issues concerning the Application of Law in the Illegal Fund-Raising Criminal Cases, the administrative proceeding for determining the nature of illegal fund-raising activities is not a prerequisite procedure for the initiation of criminal proceeding concerning the crime of illegal fund-raising, and the administrative departments' failure in determining the nature of illegal fund-raising activities does not affect the investigation, prosecution and trial of cases concerning the crime of illegal fund-raising.

We have taken measures to avoid conducting any activities that are prohibited under the illegal-funding related laws and regulations. We act as a platform for borrowers and lenders and are not a party to the loans facilitated through our platform. In addition, we do not directly receive any funds from lenders in our own accounts as funds loaned through our platform are deposited into and settled by a third-party custody account managed by Bank of Shangrao, a reputable third-party service provider. In November 2018, we finished the transition from the custodian system of Bank of Shanghai to the custodian system of Bank of Shangrao. Since then, we have cooperated only with Bank of Shangrao as our custodian for better compliance, as it was one of the twenty-five banks that passed the test of individual network lending funds depository system, according to a report released by The National Internet Finance Association of China (NIFA) on September 20, 2018.

*Anti-money Laundering Regulations*

The PRC Anti-money Laundering Law, which became effective in January 2007, sets forth the principal anti-money laundering requirements applicable to financial institutions as well as non-financial institutions with anti-money laundering obligations, including the adoption of precautionary and supervisory measures, establishment of various systems for client identification, retention of clients' identification information and transactions records, and reports on large transactions and suspicious transactions. According to the PRC Anti-money Laundering Law, financial institutions subject to the PRC Anti-money Laundering Law include banks, credit unions, trust investment companies, stock brokerage companies, futures brokerage companies, insurance companies and other financial institutions as listed and published by the State Council, while the list of the non-financial institutions with anti-money laundering obligations will be published by the State Council. The PBOC and other governmental authorities issued a series of administrative rules and regulations to specify the anti-money laundering obligations of financial institutions and certain non-financial institutions, such as payment institutions. However, the State Council has not promulgated the list of the non-financial institutions with anti-money laundering obligations.

The Guidelines jointly released by ten PRC regulatory agencies in July 2015, purport, among other things, to require internet finance service providers, including online peer-to-peer lending platforms, to comply with certain anti-money laundering requirements, including the establishment of a customer identification program, the monitoring and reporting of suspicious transactions, the preservation of customer information and transaction records, and the provision of assistance to the public security department and judicial authority in investigations and proceedings in relation to anti-money laundering matters. The PBOC will formulate implementing rules to further specify the anti-money laundering obligations of internet finance service providers.

In cooperation with our partnering custody banks and payment companies, we have adopted various policies and procedures, such as internal controls and "know-your-customer" procedures, for anti-money laundering purposes. However, as the implementing rules of the Guidelines have not been published, there is uncertainty as to how the anti-money laundering requirements in the Guidelines will be interpreted and implemented, and whether online peer-to-peer lending service providers like us must abide by the rules and procedures set forth in the PRC Anti-money Laundering Law that are applicable to non-financial institutions with anti-money laundering obligations. We cannot assure you that our existing anti-money laundering policies and procedures will be deemed to be in full compliance with any anti-money laundering laws and regulations that may become applicable to us in the future.

### Regulations on Internet Information Security

Internet information in China is also regulated and restricted from a national security standpoint. The National People's Congress, China's national legislative body, has enacted the Decisions on Maintaining Internet Security, which may subject violators to criminal punishment in China for any effort to: (i) gain improper entry into a computer or system of strategic importance; (ii) disseminate politically disruptive information; (iii) leak state secrets; (iv) spread false commercial information; or (v) infringe intellectual property rights. The Ministry of Public Security has promulgated measures that prohibit use of the internet in ways which, among other things, result in a leakage of state secrets or a spread of socially destabilizing content. If an internet information service provider violates these measures, the Ministry of Public Security and the local security bureaus may revoke its operating license and temporarily suspend its websites.

In addition, the Guidelines jointly released by ten PRC regulatory agencies in July 2015 purport, among other things, to require internet finance service providers, including peer-to-peer lending platforms, to improve technology security standards, and safeguard customer and transaction information. The PBOC and other relevant regulatory authorities will jointly adopt the implementing rules and technology security standards.

### Regulations on Privacy Protection

In recent years, PRC government authorities have enacted laws and regulations on internet use to protect personal information from any unauthorized disclosure. Under the Several Provisions on Regulating the Market Order of Internet Information Services, issued by the MIIT in December 2011, an Internet information service provider may not collect any user personal information or provide any such information to third parties without the consent of a user. An Internet information service provider must expressly inform the users of the method, content and purpose of the collection and processing of such user personal information and may only collect such information necessary for the provision of its services. An Internet information service provider is also required to properly maintain the user personal information, and in case of any leak or likely leak of the user personal information, the Internet information service provider must take immediate remedial measures and, in severe circumstances, make an immediate report to the telecommunications regulatory authority. In addition, pursuant to the Decision on Strengthening the Protection of Online Information issued by the Standing Committee of the National People's Congress in December 2012 and the Order for the Protection of Telecommunication and Internet User Personal Information issued by the MIIT in July 2013, any collection and use of user personal information must be subject to the consent of the user, abide by the principles of legality, rationality and necessity and be within the specified purposes, methods and scopes. An Internet information service provider must also keep such information strictly confidential, and is further prohibited from divulging, tampering or destroying of any such information, or selling or providing such information to other parties. An Internet information service provider is required to take technical and other measures to prevent the collected personal information from any unauthorized disclosure, damage or loss. Any violation of these laws and regulations may subject the Internet information service provider to warnings, fines, confiscation of illegal gains, revocation of licenses, cancellation of filings, closedown of websites or even criminal liabilities. The Guidelines jointly released by ten PRC regulatory agencies in July 2015 also prohibit internet finance service providers, including online peer-to-peer lending platforms, from illegally selling or disclosing customers' personal information. The PBOC and other relevant regulatory authorities will jointly adopt the implementing rules. Pursuant to the Ninth Amendment to the Criminal Law issued by the Standing Committee of the National People's Congress in August 2015 and becoming effective in November, 2015, any internet service provider that fails to fulfill the obligations related to internet information security administration as required by applicable laws and refuses to rectify upon orders, shall be subject to criminal penalty for the result of (i) any dissemination of illegal information in large scale; (ii) any severe effect due to the leakage of the client's information; (iii) any serious loss of criminal evidence; or (iv) other severe situation, and any individual or entity that (i) sells or provides personal information to others in a way violating the applicable law, or (ii) steals or illegally obtain any personal information, shall be subject to criminal penalty in severe situation.

In operating our online consumer finance marketplace, we collect certain personal information from borrowers and lenders, and also need to share the information with our business partners such as third-party online payment companies and loan collection service providers for the purpose of facilitating loan transactions between borrowers and lenders over our marketplace. We have obtained consent from the borrowers and lenders on our marketplace to collect and use their personal information, and have also established information security systems to protect the user information and privacy. However, as the implementing rules of the Guidelines have not been published, there is uncertainty as to how the requirements for protecting customers' personal information in the Guidelines will be interpreted and implemented. We cannot assure you that our existing policies and procedures will be deemed to be in full compliance with any laws and regulations that may become applicable to us in the future.

### Regulations Relating to Dividend Withholding Tax

Pursuant to the Enterprise Income Tax Law and its implementation rules, if a non-resident enterprise has not set up an organization or establishment in the PRC, or has set up an organization or establishment but the income derived has no actual connection with such organization or establishment, it will be subject to a withholding tax on its PRC-sourced income at a rate of 10%. Pursuant to the Arrangement between Mainland China and the Hong Kong Special Administrative Region for the Avoidance of Double Taxation and Tax Evasion on Income, the withholding tax rate in respect to the payment of dividends by a PRC enterprise to a Hong Kong enterprise is reduced to 5% from a standard rate of 10% if the Hong Kong enterprise directly holds at least 25% of the PRC enterprise. Pursuant to the Notice of the State Administration of Taxation on the Issues concerning the Application of the Dividend Clauses of Tax Agreements, or Circular 81, a Hong Kong resident enterprise must meet the following conditions, among others, in order to enjoy the reduced withholding tax: (i) it must directly own the required percentage of equity interests and voting rights in the PRC resident enterprise; and (ii) it must have directly owned such percentage in the PRC resident enterprise throughout the 12 months prior to receiving the dividends. There are also other conditions for enjoying the reduced withholding tax rate according to other relevant tax rules and regulations. In August 2015, the State Administration of Taxation promulgated the Administrative Measures for Non-Resident Taxpayers to Enjoy Treatments under Tax Treaties, or Circular 60, which became effective on November 1, 2015. Circular 60 provides that non-resident enterprises are not required to obtain pre-approval from the relevant tax authority in order to enjoy the reduced withholding tax rate. Instead, non-resident enterprises and their withholding agents may, by self-assessment and on confirmation that the prescribed criteria to enjoy the tax treaty benefits are met, directly apply the reduced withholding tax rate, and file necessary forms and supporting documents when performing tax filings, which will be subject to post-tax filing examinations by the relevant tax authorities.

### Regulations on Foreign Currency Exchange

The principal regulations governing foreign currency exchange in China are the Foreign Exchange Administration Regulations, most recently amended in August 2008. Under the PRC foreign exchange regulations, payments of current account items, such as profit distributions, interest payments and trade and service-related foreign exchange transactions, can be made in foreign currencies without prior approval from SAFE by complying with certain procedural requirements. By contrast, approval from or registration with appropriate government authorities is required where RMB is to be converted into foreign currency and remitted out of China to pay capital account items, such as direct investments, repayment of foreign currency-denominated loans, repatriation of investments and investments in securities outside of China. On February 28, 2015, the SAFE promulgated the Notice on Further Simplifying and Improving the Administration of the Foreign Exchange Concerning Direct Investment, or SAFE Notice 13. After SAFE Notice 13 became effective on June 1, 2015, instead of applying for approvals regarding foreign exchange registrations of foreign direct investment and overseas direct investment from SAFE, entities and individuals will be required to apply for such foreign exchange registrations from qualified banks. The qualified banks, under the supervision of the SAFE, will directly examine the applications and conduct the registration.

In August 2008, SAFE issued the Circular on the Relevant Operating Issues Concerning the Improvement of the Administration of the Payment and Settlement of Foreign Currency Capital of Foreign-Invested Enterprises, or SAFE Circular 142, regulating the conversion by a foreign-invested enterprise of foreign currency-registered capital into RMB by restricting how the converted RMB may be used. SAFE Circular 142 provides that the RMB capital converted from foreign currency registered capital of a foreign-invested enterprise may only be used for purposes within the business scope approved by the applicable government authority and may not be used for equity investments within the PRC. In addition, SAFE strengthened its oversight of the flow and use of the RMB capital converted from foreign currency registered capital of foreign-invested enterprises. The use of such RMB capital may not be changed without SAFE's approval, and such RMB capital may not in any case be used to repay RMB loans if the proceeds of such loans have not been used. Violations may result in severe monetary or other penalties.

In November 2012, SAFE promulgated the Circular of Further Improving and Adjusting Foreign Exchange Administration Policies on Foreign Direct Investment, which substantially amends and simplifies the current foreign exchange procedure. Pursuant to this circular, the opening of various special purpose foreign exchange accounts, such as pre-establishment expenses accounts, foreign exchange capital accounts and guarantee accounts, the reinvestment of RMB proceeds derived by foreign investors in the PRC, and remittance of foreign exchange profits and dividends by a foreign-invested enterprise to its foreign shareholders no longer require the approval or verification of SAFE, and multiple capital accounts for the same entity may be opened in different provinces, which was not possible previously. In addition, SAFE promulgated another circular in May 2013, which specifies that the administration by SAFE or its local branches over direct investment by foreign investors in the PRC must be conducted by way of registration and banks must process foreign exchange business relating to the direct investment in the PRC based on the registration information provided by SAFE and its branches.

In July 2014, SAFE issued SAFE Circular 36, which purports to reform the administration of settlement of the foreign exchange capitals of foreign-invested enterprises in certain designated areas on a trial basis. Under the pilot program, some of the restrictions under SAFE Circular 142 will not apply to the settlement of the foreign exchange capitals of the foreign-invested enterprises established within the designated areas and the enterprises mainly engaging in investment are allowed to use its RMB capital converted from foreign exchange capitals to make equity investment. However, our PRC subsidiary is not established within the designated areas. On March 30, 2015, the SAFE promulgated Circular 19, to expand the reform nationwide. Circular 19 came into force and replaced both Circular 142 and Circular 36 on June 1, 2015. Circular 19 allows foreign-invested enterprises to make equity investments by using RMB fund converted from foreign exchange capital. However, Circular 19 continues to, prohibit foreign-invested enterprises from, among other things, using RMB fund converted from its foreign exchange capitals for expenditure beyond its business scope, providing entrusted loans or repaying loans between non-financial enterprises.

### Regulations on Foreign Exchange Registration of Overseas Investment by PRC Residents

SAFE issued SAFE Circular on Relevant Issues Relating to Domestic Resident's Investment and Financing and Roundtrip Investment through Special Purpose Vehicles, or SAFE Circular 37, that became effective in July 2014, replacing the previous SAFE Circular 75. SAFE Circular 37 regulates foreign exchange matters in relation to the use of special purpose vehicles, or SPVs, by PRC residents or entities to seek offshore investment and financing or conduct round trip investment in China. Under SAFE Circular 37, a SPV refers to an offshore entity established or controlled, directly or indirectly, by PRC residents or entities for the purpose of seeking offshore financing or making offshore investment, using legitimate onshore or offshore assets or interests, while "round trip investment" refers to direct investment in China by PRC residents or entities through SPVs, namely, establishing foreign-invested enterprises to obtain the ownership, control rights and management rights. SAFE Circular 37 provides that, before making contribution into an SPV, PRC residents or entities are required to complete foreign exchange registration with SAFE or its local branch. SAFE promulgated the Notice on Further Simplifying and Improving the Administration of the Foreign Exchange Concerning Direct Investment in February 2015, which took effect on June 1, 2015. This notice has amended SAFE Circular 37 requiring PRC residents or entities to register with qualified banks rather than SAFE or its local branch in connection with their establishment or control of an offshore entity established for the purpose of overseas investment or financing.

PRC residents or entities who had contributed legitimate onshore or offshore interests or assets to SPVs but had not obtained registration as required before the implementation of the SAFE Circular 37 must register their ownership interests or control in the SPVs with qualified banks. An amendment to the registration is required if there is a material change with respect to the SPV registered, such as any change of basic information (including change of the PRC residents, name and operation term), increases or decreases in investment amount, transfers or exchanges of shares, and mergers or divisions. Failure to comply with the registration procedures set forth in SAFE Circular 37 and the subsequent notice, or making misrepresentation on or failure to disclose controllers of the foreign-invested enterprise that is established through round-trip investment, may result in restrictions being imposed on the foreign exchange activities of the relevant foreign-invested enterprise, including payment of dividends and other distributions, such as proceeds from any reduction in capital, share transfer or liquidation, to its offshore parent or affiliate, and the capital inflow from the offshore parent, and may also subject relevant PRC residents or entities to penalties under PRC foreign exchange administration regulations. We are aware that our PRC resident beneficial owners subject to these registration requirements. Mr. Erxin Zeng and Mr. Xiaohui Liu have all fulfilled the registration relevant SAFE regulations.

***Regulations on Regulations on car rental under PRC Laws***

Regulations applicable to all automotive vehicles generally apply to rental vehicles. According to the Road Traffic Safety Law promulgated by the NPC Standing Committee in October 2003, which was amended in December 2007 and April 2011, respectively, all automotive vehicles are required to be registered with relevant local administration authorities. Vehicle registration certificates, vehicle plates and vehicle licenses shall be obtained from the same authorities, and the compulsory traffic accident insurance shall be purchased for each vehicle.

There are additional requirements for rental vehicles. In most cities, the usage stated in the vehicle licenses of such vehicles shall be registered as rental or operational. Some cities require additional licenses or vehicle plates for such vehicles. For instance, in Shanghai, Nanchang, Suzhou, Wuxi, Shenyang, Dalian, Wuhan and Kunming, a special transport license or passenger rental vehicle license is required for each rental vehicle. In Shanghai, special vehicle plates shall be obtained for rental vehicles. In Beijing, Guangzhou, Hangzhou and Chongqing, filing with relevant local authority is required for rental vehicles. However, local practices differ and some of these requirements are not strictly implemented or may be modified or suspended by the local administration authorities in practice. If we fail to maintain such licenses needed for operation, our business may be adversely affected.

As the car rental industry is at an early stage of development in China, the legislation of the car rental industry continues to evolve. The MOT and the NPC, the predecessor of NDRC, promulgated the Interim Rules on Administration of Car Rental Industry in 1998, which was abolished in 2007. Since then, there have been no national laws and regulations in place to specifically regulate the car rental industry in China except the Notice on Promoting the Healthy Development of Car Rental Industry, or the 2011 MOT Notice, promulgated in April 2011 by MOT. The 2011 MOT Notice sets forth general guidelines for the car rental industry in China and requires local government authorities to (i) establish and improve local rules and regulations on car rental business, (ii) promptly formulate local development plans for the car rental industry, (iii) encourage large and well-managed car rental companies of good reputation to set up branches and establish national or regional networks without any restrictions due to local protectionism, (iv) enhance the administration of the car rental business, including requirements to obtain and carry a valid permit or license for each rental car, and prohibitions of car rental companies from engaging in road transportation businesses without appropriate approval, (v) encourage car rental companies to innovate and develop new types of car rental services, (vi) create a favorable environment for the development of the car rental industry, and (vii) enhance the administration and supervision of the car rental industry.

The Road Transportation Regulation promulgated by the State Council in 2004, and amended in 2012 and 2016, regulates road transportation businesses (including road passenger transportation business and road freight transportation business) and other business operations related to road transportation (including operations of transportation terminals (sites), vehicle maintenance and repair businesses and training of drivers). However, the Road Transport Regulation does not include any provisions relating to car rental businesses.

The Administrative Rules on Urban Taxis promulgated by the Ministry of Construction and the MPS, which became effective in 1998, regulates the planning, operations, administration and services related to urban taxis, which was abolished in March 2016. MOT promulgated the Parade Taxi Management Service Regulations in August 2016, which was implemented on November 1, 2016. According to such regulations, "Taxi" is an integral part of the city's comprehensive transportation system and supplement of urban public transportation and providing personalized transportation services to the public". "Taxi provider" should choose a reasonable route according to the destination specified by the passenger and use metering equipment as required to protect passenger's rights.

The regulatory distinctions between car rental businesses and road transportation businesses or taxi businesses are not clear. As a result, local government authorities in China have imposed different requirements on the operating entities and/or vehicles that are involved in car rental businesses in the respective province or city.

***Regulations on limitation of use and purchase of motor vehicles***

Certain cities in China have issued local regulations or rules to control the number of motor vehicles. For example, Beijing imposes an annual quota on the issuance of new vehicle license plates. Potential motor vehicle purchasers need to meet specific criteria and enter into a monthly draw. Only candidates who have been allocated a plate in the draw can apply to have their motor vehicles registered with the local vehicle administration. Shanghai is implemented an auction system for the issuance of new vehicle license plates. Under this system, each applicant is required to submit a "blind" bid for a vehicle license plate. Only successful bidders can apply to have their motor vehicles registered with the local vehicle administration. There are similar policies that restrict the issuance of new vehicle license plates in Guangzhou, Tianjin, Hangzhou and Guiyang.

In addition, some cities in China such as Beijing, Shanghai, Shijiazhuang, Nanjing, Wuhan, Harbin, Jinan, Nanchang, Chengdu, Guiyang, Hangzhou, Changchun, Lanzhou, Guangzhou, Tianjin, Linfen, Langfang, Baoding and Dalian also have promulgated regulations or rules to prohibit vehicles with certain license plate from driving on road. For instance, in Beijing vehicles with restricted tail number of license plates are not allowed to drive within five rings road (excluding the fifth ring road) during 7:00 am to 20:00 pm each workday, and the vehicles with non-Beijing license plates shall also be subject to such restrictions. In Shanghai vehicles bearing non-Shanghai license plates are not allowed on certain roads during specified rush hours on workdays.

*Regulations on Stock Incentive Plans*

SAFE promulgated the Stock Option Rules in February 2012, replacing the previous rules issued by SAFE in March 2007. Under the Stock Option Rules and other relevant rules and regulations, PRC residents who participate in stock incentive plan in an overseas publicly-listed company are required to register with SAFE or its local branches and complete certain other procedures. Participants of a stock incentive plan who are PRC residents must retain a qualified PRC agent, which could be a PRC subsidiary of the overseas publicly listed company or another qualified institution selected by the PRC subsidiary, to conduct the SAFE registration and other procedures with respect to the stock incentive plan on behalf of the participants. In addition, the PRC agent is required to amend the SAFE registration with respect to the stock incentive plan if there is any material change to the stock incentive plan, the PRC agent or other material changes. The PRC agent must, on behalf of the PRC residents who have the right to exercise the employee share options, apply to SAFE or its local branches for an annual quota for the payment of foreign currencies in connection with the PRC residents' exercise of the employee share options. The foreign exchange proceeds received by the PRC residents from the sale of shares under the stock incentive plans granted and dividends distributed by the overseas listed companies must be remitted into the bank accounts in the PRC opened by the PRC agents before distribution to such PRC residents.

*Regulations on Dividend Distribution*

Under our current corporate structure, we may rely on dividend payments from WFOE, which is a wholly foreign-owned enterprise incorporated in China, to fund any cash and financing requirements we may have. The principal regulations governing distribution of dividends of foreign-invested enterprises include the Foreign-Invested Enterprise Law, as amended in October 2000, and its implementation rules. Under these laws and regulations, wholly foreign-owned enterprises in China may pay dividends only out of their accumulated after-tax profits, if any, determined in accordance with PRC accounting standards and regulations. In addition, wholly foreign-owned enterprises in China are required to allocate at least 10% of their respective accumulated profits each year, if any, to fund certain reserve funds until these reserves have reached 50% of the registered capital of the enterprises. Wholly foreign-owned companies may, at their discretion, allocate a portion of their after-tax profits based on PRC accounting standards to staff welfare and bonus funds. These reserves are not distributable as cash dividends.

*Regulations Relating to Employment*

The PRC Labor Law and the Labor Contract Law require that employers must execute written employment contracts with full-time employees. If an employer fails to enter into a written employment contract with an employee within one year from the date on which the employment relationship is established, the employer must rectify the situation by entering into a written employment contract with the employee and pay the employee twice the employee's salary for the period from the day following the lapse of one month from the date of establishment of the employment relationship to the day prior to the execution of the written employment contract. All employers must compensate their employees with wages equal to at least the local minimum wage standards. Violations of the PRC Labor Law and the Labor Contract Law may result in the imposition of fines and other administrative sanctions, and serious violations may result in criminal liabilities.

Enterprises in China are required by PRC laws and regulations to participate in certain employee benefit plans, including social insurance funds, namely a pension plan, a medical insurance plan, an unemployment insurance plan, a work-related injury insurance plan and a maternity insurance plan, and a housing provident fund, and contribute to the plans or funds in amounts equal to certain percentages of salaries, including bonuses and allowances, of the employees as specified by the local government from time to time at locations where they operate their businesses or where they are located. Dianniu has been participating in employee benefit plans required by PRC laws and regulations and has made adequate contribution to such plans as of the date of this report. If we fail to make adequate contributions to various employee benefit plans in the future, we may be subject to fines and other administrative sanctions under PRC law.

57

**Organizational Structure**

We began our operations in China through Shanghai Dianniu Internet Finance Information Service Co. Ltd., which was formed in November 2015. In early 2017, we incorporated Golden Bull Limited under the laws of the Cayman Islands as our offshore holding company under our former name Point Cattle International Limited. In March 2017, we established our wholly owned Hong Kong subsidiary, Point Cattle Group Company Limited, which formed Shanghai Fuyu Information and Technology Co., Ltd., its wholly owned subsidiary in PRC (the "WFOE"). Through the contractual arrangements between the WFOE, Dianniu and the majority shareholders of Dianniu, we control 93.2% of Dianniu. These contractual arrangements allow us to effectively control and derive 93.2% of the economic interest from Dianniu.

In addition to Dianniu, the WFOE has entered into a series of contracts with Shanghai Baoxun Advertisement Design Co., Ltd. ("Baoxun"), a company formed in February 2017 under the laws of PRC, and Baoxun's shareholders. Baoxun currently does not have any operations.

In 2018, Dianniu formed two wholly owned subsidiaries, Shanghai Youwang Vehicle Rental Limited ("Shanghai Youwang") and Shanghai Xingjiuhao Network Technology Limited ("Shanghai Xingjiuhao" or the "Xingjiuhao") under the laws of PRC. Shanghai Youwang is expected to engage in vehicle sales, vehicle rental, providing consultation and services in the field of automotive technology. Xingjiuhao is expected to engage in production and sales for Internet of Things technology and technical consulting. Neither Shanghai Youwang nor Xingjiuhao currently have any operations as of the date of this report.

On June 3, 2019, Golden Bull USA Inc. was incorporated in the State of New York, which is a wholly- owned subsidiary of Golden Bull Limited. Golden Bull USA is our principal office and we plan to develop our car rental business through Golden Bull USA Inc..

On April 8, 2020, Golden Bull Limited entered into an Instrument of Transfer with Mr. Ching Yeh to acquire his 100% of the ownership interest (10,000 shares) in XMAX Chain Limited ("XMAX") for HKD 10,000 (HKD 1.00 per one share). After the acquisition, XMAX became a wholly owned subsidiary of Golden Bull Limited. XMAX is a Hong Kong company, engaging bitcoin mining business and was incorporated on March 21, 2018.

58

**Organizational Structure Chart**

The following diagram illustrates our corporate structure, including our subsidiaries and consolidated affiliated entities, as of the date of this report:



**Variable Interest Entity Arrangements**

In establishing our business, we have used a variable interest entity, or VIE, structure. In the PRC, investment activities by foreign investors are principally governed by the Guidance Catalog of Industries for Foreign Investment, or the Catalog, which was promulgated and is amended from time to time by the PRC Ministry of Commerce, or MOFCOM, and the PRC National Development and Reform Commission, or NDRC. The Catalog divides industries into three categories: encouraged, restricted and prohibited. Industries not listed in the Catalog are generally open to foreign investment unless specifically restricted by other PRC regulations. Our Company and the WFOE are considered as foreign investors or foreign invested enterprises under PRC law. The provision of internet financing services providing value-add telecommunications business, which we previously conducted through our VIE, is within the category under the Catalog in which foreign investment is currently restricted, which makes a VIE structure necessary. In addition, we intend to centralize our management and operation in the PRC without being restricted to conduct certain business activities which are important for our current or future business but are restricted or might be restricted in the future. As such, we believe the agreements between the WFOE and Dianniu are essential for our business operation. These contractual arrangements with Dianniu and its shareholders enable us to exercise effective control over Dianniu and hence consolidate its financial results as our VIE.

In our case, the WFOE effectively assumed management of the business activities of Dianniu through a series of agreements which are referred to as the VIE Agreements. The VIE Agreements are comprised of a series of agreements and amendments to some of the agreements, including Equity Pledge Agreements and an Amendment, a Technical Consultation and Service Agreement and an Amendment to it, a Business Cooperation Agreement and an Amendment to it, Equity Option Agreements and an Amendment, and Voting Rights Proxy and Finance Supporting Agreements and an Amendment. Through the VIE Agreements, the WFOE has the right to advise, consult, manage and operate Dianniu for an annual consulting service fee in the amount of 93.2% of Dianniu's net profit. Three Shareholders of Dianniu Erxin Zeng, Xiaohui Liu and Qian Lai Qian Wang (Shanghai) Equity Investment Fund Management Co., Ltd. (the "Dianniu Participating Shareholders") have each pledged all of their right, title and equity interests in Dianniu as security for the WFOE to collect consulting services fees provided to Dianniu through the Equity Pledge Agreement. In order to further reinforce the WFOE's rights to control and operate Dianniu, the Dianniu Participating Shareholders have granted the WFOE an exclusive right and option to acquire all of their equity interests in Dianniu through the Equity Option Agreement.

The material terms of the VIE Agreements with Dianniu are as follows:

<u>Technical Consultation and Service Agreement</u>. Pursuant to the Technical Consultation and Service Agreement between WFOE and Dianniu dated June 8, 2017, as amended by the Amendment to Technical Consultation and Service Agreement between WFOE and Dianniu dated December 4, 2017, WFOE has the exclusive right to provide consultation and services to Dianniu in the area of fund, human, technology and intellectual property rights. For such services, Dianniu agrees to pay service fees in the amount of 93.2% of its net income and also has the obligation to absorb 93.2% of Dianniu's losses. WFOE exclusively owns any intellectual property rights arising from the performance of this Technical Consultation and Service Agreement. The amount of service fees and payment term can be amended by the WFOE and Dianniu's consultation and the implementation. The term of the Technical Consultation and Service Agreement is 20 years. WFOE may terminate this agreement at any time by giving 30 day's written notice to Dianniu.

<u>Business Cooperation Agreement</u>. Pursuant to the Business Cooperation Agreement between WFOE and Dianniu dated June 8, 2017, as amended by the Amendment to Business Cooperation Agreement between WFOE and Dianniu dated December 4, 2017, WFOE has the exclusive right to provide Dianniu with technical support, business support and related consulting services, including but not limited to technical services, business consultations, equipment or property leasing, marketing consultancy, system integration, product research and development, and system maintenance. In exchange, WFOE is entitled to a service fee that equals to 93.2% of the net income of Dianniu determined by U.S. GAAP, the service fees may be adjusted based on the services rendered by WFOE in that month and the operational needs of Dianniu. WFOE also exclusively owns any intellectual property rights arising from the performance of the Business Cooperation Agreement. The Business Cooperation Agreement shall remain effective unless it is terminated or is compelled to terminate under applicable PRC laws and regulations. WFOE may terminate this Business Cooperation Agreement at any time by giving 30 days' prior written notice to Dianniu.

<u>Equity Pledge Agreement</u>. Pursuant to the Equity Pledge Agreements among WFOE, Dianniu and Dianniu Participating Shareholders dated June 8, 2017 and the Amendment to Equity Pledge Agreement among WFOE, Dianniu and Xiaohui Liu dated December 4, 2017, Dianniu Participating Shareholders pledged all of their equity interests in Dianniu to WFOE to guarantee Dianniu's performance of relevant obligations and indebtedness under the Technical Consultation and Service Agreement and other control agreements ("Control Agreement"). In addition, Dianniu Participating Shareholders have completed the registration of the equity pledge under the Equity Pledge Agreement with the competent local authority. If Dianniu breaches its obligation under the Control Agreement, WFOE, as pledgee, will be entitled to certain rights, including the right to dispose the pledged equity interests in order to recover these breached amounts. The Pledge shall be continuously valid until all of the Dianniu Participating Shareholders are no longer shareholders of Dianniu or the satisfaction of all its obligations by Dianniu under the Control Agreements.

<u>Equity Option Agreement</u>. Pursuant to the Equity Option Agreements among WFOE, Dianniu and Dianniu Participating Shareholders dated June 8, 2017 and the Amendment to Equity Option Agreement among WFOE, Dianniu and Xiaohui Liu dated December 4, 2017, WFOE has the exclusive right to require each Dianniu Participating Shareholder to fulfill and complete all approval and registration procedures required under PRC laws for WFOE to purchase, or designate one or more persons to purchase, each Dianniu Participating Shareholder's equity interests in Dianniu, once or at multiple times at any time in part or in whole at WFOE's sole and absolute discretion. The purchase price shall be the lowest price allowed by PRC laws. The Equity Option Agreements shall remain effective until all the equity interest owned by each Dianniu Participating Shareholder has been legally transferred to WFOE or its designee(s).

Voting Rights Proxy and Financial Supporting Agreement. Pursuant to the Voting Rights Proxy and Financial Supporting Agreements among WFOE, Dianniu and Dianniu Participating Shareholders dated June 8, 2017 and pursuant to the Amendment to Voting Rights Proxy and Financial Supporting Agreement among WFOE, Dianniu and Xiaohui Liu dated December 4, 2017, each Dianniu Participating Shareholder irrevocably appointed WFOE or WFOE's designee to exercise all his or her rights as Dianniu Participating Shareholders under the Articles of Association of Dianniu, including but not limited to the power to exercise all shareholder's voting rights with respect to all matters to be discussed and voted in the shareholders' meeting of Dianniu. The term of the Voting Rights Proxy and Financial Supporting Agreements is 20 years.

The WFOE has also entered into a series of VIE agreements with Baoxun, and Baoxun's shareholders, upon the same materials terms as described above. Baoxun currently does not have any operations. However, we expect that in the future Baoxun will engage in the design and production of online advertisement and marketing survey services for online marketplaces. Social survey, including marketing survey service, is within the category in which foreign investment is restricted pursuant to the Catalog.

The material terms of the VIE Agreements with Baoxun are as follows:

Technical Consultation and Service Agreement. Pursuant to the Technical Consultation and Service Agreement between WFOE and Baoxun dated June 8, 2017, WFOE has the exclusive right to provide consultation and technology services to Baoxun in the areas of finance, human resource, technology and intellectual property rights. For such services, Baoxun agrees to pay an annual service fee in the amount of 100% of its net income as determined in accordance with U.S. GAAP and a quarterly flowing charge and also has the obligation to absorb 100% of Baoxun's net loss determined in accordance with U.S. GAAP. WFOE exclusively owns any intellectual property rights arising from the performance of this Technical Consultation and Service Agreement. The service fees can be adjusted by the parties upon the request of the WFOE. The term of the Technical Consultation and Service Agreement is 20 years. WFOE may terminate this agreement at any time by giving 30 days' written notice to Baoxun.

Business Cooperation Agreement. Pursuant to the Business Cooperation Agreement between WFOE and Baoxun dated June 8, 2017, WFOE has the exclusive right to provide Baoxun with technical support, business support and related consulting services, including but not limited to technical services, business consultation, equipment and property leasing, marketing consulting, system integration, product research and development, and system maintenance. In exchange, WFOE is entitled to a service fee that equals to 100% of the net income of Baoxun determined by U.S. GAAP and absorb all the losses of Baoxun determined in accordance with U.S. GAAP. The service fees may be adjusted based on the services rendered by WFOE in that month and the operational needs of Baoxun. WFOE also exclusively owns any intellectual property rights arising from the performance of the Business Cooperation Agreement. The Business Cooperation Agreement shall maintain effective unless it is terminated by WFOE upon 30 days' written notice or in accordance with applicable PRC laws and regulations. WFOE may terminate this Business Cooperation Agreement at any time by giving 30 days' prior written notice to Baoxun.

Equity Pledge Agreements. Pursuant to the Equity Pledge Agreements among WFOE, Baoxun and all the shareholders of Baoxun ("Baoxun Shareholders") dated June 8, 2017, Baoxun Shareholders pledged all of their equity interests in Baoxun to WFOE to guarantee Baoxun's performance of its obligations under the Technical Consultation and Service Agreement and other control agreements ("Baoxun Control Agreements"). The equity pledge shall become effective on such date when the pledge has been registered with relevant local authority. Baoxun Shareholders have completed the registration of the equity pledge with the competent local authority. If Baoxun breaches its obligation under the Baoxun Control Agreement, WFOE, as pledgee, will be entitled to certain rights, including the right to dispose the pledged equity interests. The Equity Pledge Agreement is valid until the satisfaction of all its obligations by Baoxun under the Baoxun Control Agreements.

61

Equity Option Agreements. Pursuant to the Equity Option Agreements among WFOE, Baoxun and Baoxun Shareholders dated June 8, 2017, for a consideration of RMB 1, WFOE is granted an option to require each Baoxun Shareholder to fulfill and complete all approval and registration procedures required under PRC laws for WFOE or its designee to purchase Baoxun Shareholders' equity interests in Baoxun, once or at multiple times at any time in part or in whole at WFOE's sole and absolute discretion. The purchase price shall be the lowest price allowed by PRC laws. The Equity Option Agreement shall remain effective until all the equity interest owned by each Baoxun Shareholder has been legally transferred to WFOE or its designee(s).

Voting Rights Proxy and Financial Supporting Agreements. Pursuant to the Voting Rights Proxy and Financial Supporting Agreements among WFOE, Baoxun and Baoxun Shareholders dated June 8, 2017, each Baoxun Shareholder irrevocably appointed WFOE or its designee to exercise all his or her rights as Baoxun Shareholders under the Articles of Association of Baoxun, including but not limited to the power to exercise all shareholder's voting rights with respect to all matters to be discussed and voted in the shareholders' meeting of Baoxun. The Baoxun Shareholders also agree to provide necessary financial support to Baoxun in connection with its operation. The term of the Voting Rights Proxy and Finance Supporting Agreements is 20 years.

We do not expect that the classification of either Dianniu or Baoxun under the Catalog will change or either of our VIE entities will be re-classified to a different industry in the near future.

## Property, Plant and Equipment

The principal executive office is located on leased premise in Flushing, New York, United States. The lease for our principal executive office is effective until June 30, 2020. The Company has ceased the leasing of Shanghai Office in August 2019 and got a total refund of $106,090 (RMB 733,317) including the deposit of $60,623 (RMB 419,039) and one and a half month rent of $45,467 (RMB 314,278). The Company is considering opening an office in Hong Kong before the end of 2020 depending on the COVID-19 situation status. We believe that we will be able to obtain adequate facilities, principally through leasing, to accommodate our future expansion plans.

We believe that our current property rights are sufficient for our current operations.

## ITEM 4A.   UNRESOLVED STAFF COMMENTS

**None**

**ITEM 5.     OPERATING AND FINANCIAL REVIEW AND PROSPECTS**

*The following management's discussion and analysis of financial condition and results of operations contains forward-looking statements which involve risks and uncertainties. Our actual results could differ materially from those anticipated in these forward-looking statements as a result of certain factors, including those set forth under "Risk Factors" and elsewhere in this prospectus. We assume no obligation to update forward-looking statements or the risk factors. You should read the following discussion in conjunction with our consolidated financial statements and related notes included elsewhere in this report.*

**Overview**

We had a limited operating history as an online finance marketplace, or "peer-to-peer" lending company, in China that provides borrowers access to short-term loans. The loans generally ranged from approximately 30 days to 540 days and were secured by borrowers' automobiles. Through our online marketplace, we connected individual lenders with individual and small business borrowers.

We facilitated loans exclusively to borrowers that provide an automobile as security to lenders, and in many instances third-party institutions provided a guarantee to lenders as additional security. The automobiles that were secured must be owned by the borrower and the lien imposed by our lenders must be a first lien. We required that the size of each loan be no more than 70% of the value of the collateral of such loan. However, since none of the loans facilitated through our platform defaulted to date, neither our collateralization standards nor our collection efforts have been tested in practice.

On October 24, 2019, the Pudong Branch of the Shanghai Public Security Bureau announced on its website that it has completed its investigations against Shanghai Dianniu Internet Finance Information Service Co., Ltd., the variable interest entity of Golden Bull Limited's, for suspected illegal collection of public deposits. As of the date of this report, the final outcome of investigation was still not published and the impact on our financial statements could not be estimated. The management determined to temporarily suspend the "peer-to-peer" lending business from October 2019, and seek opportunities in car rental business and bitcoin mining business. The Financials is subject to the outcome of temporary suspension of the "peer-to-peer" lending business. In February 2020, we commenced our operations in bitcoin mining.

We generated revenues primarily from transaction fees and management fees, both of which were charged to borrowers for our services. Our revenues totaled approximately $4.6 million, $7.9 million and $7.0 million for the years ended December 31, 2019, 2018 and 2017.

On March 22, 2018, the Company completed the closing of its initial public offering of 1,550,000 ordinary shares at a public offering price of $4.00 per ordinary share, for total gross proceeds of approximately $6.2 million before underwriting discounts and commissions and offering expenses. In addition, the Company granted the underwriters a 45-day option to purchase up to an additional 232,500 ordinary shares at the public offering price of $4.00 per share. On March 28, 2018, the underwriter exercised the full over-allotment option to purchase an additional 232,500 ordinary shares at the IPO prices of $4.00 per share. The total net proceeds from the over-allotment were approximately $930,000 less underwriting discount and commissions.

The Company also granted the underwriters warrants to purchase up to an additional 178,250 ordinary shares at an exercise price equal to 125% of the public offering price. These warrants were non-exercisable and non-transferable for 180 days following March 19, 2018, the effective date of IPO registration statement. Such warrants provide for cashless exercise in certain circumstances and shall terminate three years and six months after March 19, 2018. On October 23, 2018, those warrants were exercised based on the Volume Weighted Average Price ("VWAP") in September and in a cashless exercise. A total of 63,645 ordinary shares were issued.

On December 17, 2018, the Company issued 53,040 shares of restricted shares on the grant date with a fair value of $238,680 to two individuals pursuant to two consulting agreements. The scope of services primarily includes providing advice on business development, strategic planning and compliance during the two-year service period from November 1, 2018 to October 31, 2020.

**Recent Developments**

On April 8, 2020, Golden Bull Limited entered into an Instrument of Transfer with Mr. Ching Yeh to acquire his 100% of the ownership interest (10,000 shares) in XMAX Chain Limited ("XMAX") for HKD 10,000 (HKD 1.00 per one share). After the acquisition, XMAX became a wholly owned subsidiary of Golden Bull Limited. XMAX is a Hong Kong company, engaging bitcoin mining business and was incorporated on March 21, 2018.

The Company operates a recently updated bitcoin mining facility for the sole purpose of mining bitcoin. Our facility and mining platform are operating with the primary intent of accumulating bitcoin which we may sell for fiat currency from time to time depending on market conditions and management's determination of our cash flow needs. Our mining operations are in Wuhai, Zhundong, Xinlinhot and Sichuan China hosting about 21,800 Application Specific Integrated Circuits ("ASIC") miners since May 2020 which have access to approximately 74.5 megawatts of power supplied to our facilities. During the second quarter of 2020, the Company purchased 16,817 units next generation MicroBT M21S miner, 2,696 units MicroBT M20S miner, 2,000 units MicroBT M10 Miner, 800 units Innosilicon T3 miner and 256 unites Bitmain T17+ miner, Most of them have now been installed and are currently operating in our Wuhai site, Zhundong site and Xilinhot site while some are still in transit. The Company is currently evaluating plans to make more purchases to increase the total mining hash, conditioned upon our raising required funds.

The Company operates mining hardware which performs computational operations in support of the blockchain measured in "hash rate" or "hashes per second." A "hash" is the computation run by mining hardware in support of the blockchain; therefore, a miner's "hash rate" refers to the rate at which it is capable of solving such computations. The original equipment used for mining bitcoin utilized the Central Processing Unit (CPU) of a computer to mine various forms of bitcoin. Due to performance limitations, CPU mining was rapidly replaced by the Graphics Processing Unit (GPU), which offers significant performance advantages over CPUs. General purpose chipsets like CPUs and GPUs have since been replaced in the mining industry by Application Specific Integrated Circuits (ASIC) chips like those found in the MicroBT M21S miner currently utilized by the Company at its mining facility. These ASIC chips are designed specifically to maximize the rate of hashing operations.

The Company measures our mining performance and competitive position based on overall hash rate being produced in our mining sites. The latest equipment the MicroBT M21S miner, performs in the range of approximately 50 - 58 terahash per second (TH/s) per unit. This mining hardware is on the cutting edge of available mining equipment, however, advances and improvements to the technology are ongoing and may be available in quantities to the market in the near future which may affect our perceived position.

*Competition*

In bitcoin mining, companies, individuals and groups generate units of bitcoin through mining. Miners can range from individual enthusiasts to professional mining operations with dedicated data centers. Miners may organize themselves in mining pools. The Company competes or may in the future compete with other companies that focus all or a portion of their activities on owning or operating bitcoin exchanges, developing programming for the blockchain, and mining activities. At present, the information concerning the activities of these enterprises is not readily available as the vast majority of the participants in this sector do not publish information publicly or the information may be unreliable. Published sources of information include "bitcoin.org" and "blockchain.info"; however, the reliability of that information and its continued availability cannot be assured.

Several public companies (traded in the U.S. and Internationally), such as the following, may be considered to compete with us, although we believe there is no company, including the following, which engages in the same scope of activities as we do or intend to do:

The competitors we have are Overstock.com Inc; Bitcoin Investment Trust; Blockchain Industries, Inc; (formerly Omni Global Technologies, Inc.); Bitfarms Technologies Ltd. (formerly Blockchain Mining Ltd); DMG Blockchain Solutions Inc; Digihost International, Inc; Hive Blockchain Technologies Inc; Hut 8 Mining Corp; HashChain Technology, Inc; MGT Capital Investments, Inc; DPW Holdings, Inc; Layer1 Technologies, LLC; Riot Blockchain, Inc. The bitcoin industry is a highly competitive and evolving industry and new competitors and/or emerging technologies could enter the market and affect our competitiveness in the future. For more information regarding those risk factors known to us, see the section entitled "Risk Factors" herein.

**Results of Operations**

The following table sets forth a summary of our consolidated results of operations for the periods presented. This information should be read together with our consolidated financial statements and related notes included elsewhere in this annual report. The results of operations in any period are not necessarily indicative of our future trends.

| | For the years ended December 31, | | |
|---|---|---|---|
| | **2019** | **2018** | **2017** |
| **Total operating revenues, net** | $ 4,572,153 | $ 7,889,201 | $ 6,953,757 |
| **Operating expenses** | | | |
| Selling | (8,196,151) | (4,940,784) | (3,910,646) |
| General and administrative | (5,788,918) | (6,685,377) | (3,916,736) |
| Research and development | (137,423) | (447,884) | (485,852) |
| **Total operating expenses** | (14,122,492) | (12,074,045) | (8,313,234) |
| Other income, net | 680,951 | 186,548 | 91,111 |
| **Loss before income taxes** | **(8,869,388)** | **(3,998,297)** | **(1,268,366)** |
| Income tax (expenses) benefits | (806,803) | 461,171 | 271,541 |
| **Net loss** | (9,676,191) | (3,537,126) | (996,825) |
| Less: Net loss attributable to non-controlling interest | (205,941) | (111,145) | (54,457) |
| **Net loss attributable to Golden Bull Limited** | $ (9,470,250) | $ (3,425,981) | $ (942,368) |

**Year Ended December 31, 2019 Compared to Year Ended December 31, 2018**

***Revenue***

For the years ended December 31, 2019 and 2018, we generated transaction fees and management fees from borrowers for loan facilitation services on our lending marketplace. The breakdown of our revenues consisted of the following:

|  | For the year ended December 31, 2019 | For the year ended December 31, 2018 |
|---|---|---|
| Operating revenues: | | |
| Transaction Fees | $ 2,197,598 | $ 3,994,195 |
| Management Fees | 2,390,440 | 4,399,578 |
| Sales taxes | (15,885) | (504,572) |
| Total operating revenues, net | $ 4,572,153 | $ 7,889,201 |

*Transaction Fees*: Transaction fees are paid by borrowers to the Company for the work the Company performs through its platform. These fees are recognized as a component of operating revenue at the time of loan issuance. The amount of these fees is based upon the loan amount and other terms of the loan, including credit grade, maturity and other factors. These fees are non-refundable upon the issuance of loan.

*Management Fees*: Loan borrowers pay a management fee on each loan payment to compensate us for services provided in connection with facilitation of the loan transactions, including review of a borrower's application with required supporting documentation, evaluation of such borrower's credit, assessing and verification of collaterals as well as the maintenance of profiles in our system. The Company records management fees as a component of operating revenue at the time of loan issuance. The amount of these fees is based upon the loan amount and other terms of the loan, including credit grade, maturity and other factors. These fees are non-refundable upon the issuance of loan.

*Sales Taxes:* Transaction fee, management fee and license fee that are earned and received in the PRC are subject to a Chinese value-added tax ("VAT") at a rate of 6% starting in April 2017 (3% prior to March 2017) of the gross proceed or at a rate approved by the Chinese local government. Transaction fees and management fees that are earned and received in the PRC are also subject to various miscellaneous sales taxes at a rate of 10% of the VAT. and miscellaneous sales taxes are accounted for as reduction of revenue.

*Transaction Fees*

| | For the Year ended December 31, 2019 | For the Year ended December 31, 2018 |
|---|---|---|
| Transaction Fees | $ 2,197,598 | $ 3,994,195 |
| Loan volume facilitated | 64,686,006 | 122,602,499 |
| Average Transaction fee in % (as a percentage of loan principal) | 3.40% | 3.26% |

Transaction fees decreased by $1,796,597, or 45% from $3,994,195 for the year ended December 31, 2018 to $2,197,598 for the year ended December 31, 2019. In 2019, the average transaction fee as a percentage of the initial principal was 3.40% and the loans facilitated through our platform was approximately $64.69 million. In 2018, the average transaction fee as a percentage of the initial principal was 3.26% and the loans facilitated through our platform was approximately $122.6 million. The Company increased its transaction fee rate for the year ended December 31, 2019 as compared to the same period in 2018 to cover the lender acquisition costs.

*Management Fees*

| | For the Year ended December 31, 2019 | For the Year ended December 31, 2018 |
|---|---|---|
| Management fees | $ 2,390,440 | $ 4,399,578 |
| Loan volume facilitated | 64,686,006 | 122,602,499 |
| Average Management fee in % (as a percentage of loan principal) | 3.70% | 3.59% |

Management fees decreased by $2,009,138, or 46% from $4,399,578 for the year ended December 31, 2018 to $2,390,440 for the year ended December 31, 2019. In 2019, the average transaction fee as a percentage of the initial principal was 3.70%, as compared with 3.59% in 2018. The Company increased its management fee rate for the year ended December 31, 2019 as compared to the same period in 2018 to cover the acquisition costs.

## Operating Expenses

Our operating expenses consist of selling, research and development and general and administrative expenses.

| | For the Year ended December 31, 2019 | For the Year ended December 31, 2018 | Change | Change (%) |
|---|---|---|---|---|
| Selling | $ 8,196,151 | $ 4,940,784 | $ 3,255,367 | 65.9% |
| General and administrative | 5,788,918 | 6,685,377 | (896,459) | (13.4)% |
| Research and development | 137,423 | 447,884 | (310,461) | (69.3)% |
| Total operating expenses | $ 14,122,492 | $ 12,074,045 | $ 2,048,447 | 17.0% |

*Selling Expenses*

Selling expenses consist primarily of various marketing expenses, including those related to lender acquisition and retention, general brand and awareness building and salaries and benefits expense related to our sales and marketing team.

Our major selling expenses comprised of the following items during the respective periods as follows:

| | For the Year ended December 31, 2019 | | For the Year ended December 31, 2018 | | Change in $ | | Change (%) |
|---|---|---|---|---|---|---|---|
| Brand promotion | $ | 5,073,107 | $ | 1,663,114 | $ | 3,409,993 | 205.0% |
| Salary | $ | 214,402 | $ | 250,842 | $ | (36,440) | (14.5)% |
| Incentive | $ | 1,119,943 | $ | 2,191,498 | $ | (1,071,555) | (48.9)% |
| Servicing expenses | $ | 187,972 | $ | 134,374 | $ | 53,598 | 39.9% |

Our total selling expenses were $8,196,151 and $4,940,784 for the years ended December 31, 2019 and 2018, respectively, representing an increase of $3,255,367, or 65.9%. The increase was primarily due to an increase of approximately $3,409,993 in brand promotion expenses in connection with implementation of our marketing strategy aiming at promoting brand recognition and attracting more lenders, netting off against a decrease of $1,071,555 in promotional incentives which were offered to our lenders for investment on our marketplace.

*General and Administrative Expenses*

General and administrative expenses consist primarily of salaries and benefits expenses for our accounting and finance, business development, legal, human resources and other personnel, and outside professional services fees and facilities expenses.

Our major general and administrative expenses comprised of the following items during the respective periods as follows:

| | For the Year ended December 31, 2019 | | For the Year ended December 31, 2018 | | Change | | Change (%) |
|---|---|---|---|---|---|---|---|
| Office space rental | $ | 252,337 | $ | 428,346 | $ | (176,009) | (41.1)% |
| Salary | $ | 357,196 | $ | 528,090 | $ | (170,894) | (32.4)% |
| Business consulting | $ | 3,029,823 | $ | 3,763,123 | $ | (733,300) | (19.5)% |
| Professional services | $ | 107,267 | $ | 319,067 | $ | (211,800) | (66.4)% |

Our general and administrative expenses were $5,788,918 and $6,685,377 for the years ended December 31, 2019 and 2018, respectively, representing a decrease of $1,129,542 or 16.9%. The decrease was primarily due to a decrease of $733,300 and $211,800 in business consulting and professional services, and a decrease of $170,894 in salary expenses, which were caused by our temporary suspension of P2P lending business in the fourth quarter in 2019.

*Research and Development Expenses*

Research and development expenses consist primarily of salaries and benefits expenses for engineering and product management teams, and outside contractors who work on the development and maintenance of our platform.

Our research and development expenses were $137,423 and $447,884 for the year ended December 31, 2019 and 2018, respectively, representing a decrease of $310,461 or 69.3%. The decrease was primarily driven by the decrease of $310,461 of deposit function fee for switching the custodian to Bank of Shangrao.

***Income tax (expenses) benefits***

For the year ended December 31, 2019, we incurred income tax expenses of $806,803, representing a change of $1,267,974 from tax benefits of $461,171 for the year ended December 31, 2018.

According to Chinese tax regulations, companies within China should adjust their net operating losses according to the law of enterprise income tax, which can be carried forward to offset operating loss for five years. Adjusted net operating losses of VIEs according to the law of enterprise income tax for the years ended December 31, 2019 and 2018, the Company incurred tax operating losses of $3,298,122 and $2,182,290, respectively, and recorded deferred tax assets of $824,531and $810,863 at December 31, 2019 and 2018, respectively and recognized deferred tax provision of $806,803 and a deferred tax benefit of $545,572 from the net operating losses for the years ended December 31,2019 and 2018 respectively. Due to the temporary suspension of peer to peer lending business in the last quarter 2019, the management believes that it appears more likely than not that the Company will not realize these tax benefits. Accordingly, the Company has provided a 100% valuation allowance on deferred tax asset benefits related to net operating losses carry forward to reduce the assets to zero.

***Net Loss***

As a result of the foregoing, we had a net loss of $9,676,191 for the year ended December 31, 2019, as compared to a net loss of $3,537,126 for the year ended December 31, 2018.

**Year Ended December 31, 2018 Compared to Year Ended December 31, 2017**

*Transaction Fees*

| | For the Year ended December 31, 2018 | For the Year ended December 31, 2017 |
|---|---|---|
| Transaction Fees | $ 3,994,195 | $ 3,307,984 |
| Loans | 122,602,499 | 129,982,103 |
| Average Transaction fee in % (as a percentage of loan principal) | 3.26% | 2.54% |

Transaction fees increased $686,211, or 20.74% in 2018 from 2017. In 2018, the average transaction fee as a percentage of the initial principal was 3.26% and the loans facilitated through our platform was approximately $122.6 million. In 2017, the average transaction fee as a percentage of the initial principal was 2.54% and the loans facilitated through our platform was approximately $130.0 million. The Company increased its transaction fee rate for the year ended December 31, 2018 as compared to the same period in 2017 to cover the lender acquisition costs.

*Management Fees*

| | For the Year ended December 31, 2018 | For the Year ended December 31, 2017 |
|---|---|---|
| Management fees | $ 4,399,578 | $ 4,037,700 |
| Loans | 122,602,499 | 129,982,103 |
| Average Management fee in % (as a percentage of loan principal) | 3.59% | 3.11% |

Management fees increased $361,878, or 8.96%, in 2018 from 2017. In 2018, the average transaction fee as a percentage of the initial principal was 3.59% and the loans facilitated through our platform was approximately $122.6 million. In 2017, the average transaction fee as a percentage of the initial principal was 3.11% and the loans facilitated through our platform was approximately $130.0 million. The Company increased its management fee rate for the year ended December 31, 2018 as compared to the same period in 2017 to cover the acquisition costs.

*Major Borrowers*

For the year ended December 31, 2018, no one borrower paid transaction and management fees accounted for more than 10% of the total operating revenues. For the year ended December 31, 2017, transaction and management fees generated from loans facilitated to one borrower accounted for 16.8% of our total operating revenues.

*Operating Expenses*

Our operating expenses consist of selling, research and development and general and administrative expenses.

| | For the Year ended December 31, 2018 | | For the Year ended December 31, 2017 | | Change | | Change (%) |
|---|---|---|---|---|---|---|---|
| Selling | $ | 4,940,784 | $ | 3,910,646 | $ | 1,030,138 | 26.3% |
| General and administrative | | 6,685,377 | | 3,916,736 | | 2,768,641 | 70.7% |
| Research and development | | 447,884 | | 485,852 | | (37,968) | (7.8)% |
| Total operating expenses | $ | 12,074,045 | $ | 8,313,234 | $ | 3,760,811 | 45.2% |

*Selling Expenses*

Selling expenses consist primarily of various marketing expenses, including those related to lender acquisition and retention, general brand and awareness building and salaries and benefits expense related to our sales and marketing team.

Our major selling expenses comprised of the following items during the respective periods as follows:

| | For the Year ended December 31, 2018 | | For the Year ended December 31, 2017 | | Change | | Change (%) |
|---|---|---|---|---|---|---|---|
| Brand promotion | $ | 1,663,114 | $ | 1,299,450 | $ | 363,664 | 28.0% |
| Salary | $ | 250,842 | $ | 215,516 | $ | 35,326 | 16.4% |
| Incentive | $ | 2,191,498 | $ | 1,497,279 | $ | 694,219 | 46.4% |
| Servicing expenses | $ | 134,374 | $ | 205,604 | $ | (71,230) | (34.6)% |

Our total selling expenses were $4,940,784 and $3,910,646 for the years ended December 31, 2018 and 2017, respectively, an increase of $1,030,138 or 26.3%. The increase was primarily due to approximately $364,000 increase in promotion expenses in connection with implementation of our marketing strategy aiming at promoting brand recognition and attracting more lenders. Additionally, the increase in selling expenses was also attributable to an approximately $694,000 increase in promotional incentive that we offered to our lenders to attract them to invest in our platform, and the increase in salaries of approximately $35,000 for our marketing and sales personnel as we continue to expand our brand which we need more personnel to perform such duty. We expect that our overall sales and marketing expenses, including but not limited to, brand promotion, incentive, and salaries, will continue to increase in the foreseeable future as our business further grows.

*General and Administrative Expenses*

General and administrative expenses consist primarily of salaries and benefits expenses for our accounting and finance, business development, legal, human resources and other personnel, and outside professional services fees and facilities expenses.

Our major general and administrative expenses comprised of the following items during the respective periods as follows:

| | For the Year ended December 31, 2018 | | For the Year ended December 31, 2017 | | Change | | Change (%) |
|---|---|---|---|---|---|---|---|
| Office space rental | $ | 428,346 | $ | 399,569 | $ | 28,777 | 7.2% |
| Salary | $ | 528,090 | $ | 408,133 | $ | 119,957 | 29.4% |
| Business consulting | $ | 3,763,123 | $ | 1,721,932 | $ | 2,041,191 | 118.5% |
| Professional services | $ | 319,067 | $ | 636,866 | $ | (317,799) | (49.9)% |

Our general and administrative expenses were $6,685,377 and $3,916,736 for the years ended December 31, 2018 and 2017, respectively, an increase of $2,768,641 or 70.7%. The increase was primarily due to approximately $120,000 in salary increase as we have hired more senior management personnel due to our operating needs and an approximately $2.04 million increase in business consulting. We have engaged professional teams to monitor and provide business advice on our business in the area of human resource strategic management and business strategic management. Additionally, we have also engaged professional teams to provide investment advice including a feasibly research, economic forecast, evaluation about the related projects and risk management. The external service fee in the current period is approximately $318,000 less than that in the previous period, mainly due to the audit and consulting fees when the enterprise entered the IPO stage in 2017. We expect our general and administrative expenses, including but not limited to, salaries to continue to increase in the foreseeable future as our business further grows and our professional fees will be maintaining at the similar level for being an U.S. publicly listed company.

*Research and Development Expenses*

Research and development expenses consist primarily of salaries and benefits expenses for engineering and product management teams, and outside contractors who work on the development and maintenance of our platform.

Our research and development expenses were $447,884 and $485,852 for the year ended December 31, 2018 and 2017, respectively, a decrease of $37,968 or 7.8%. The decrease was primarily driven by $74,000 of nonrecurring deposit function fee in 2017 for switching the custodian to Bank of Shanghai.

***Income tax benefits***

Tax benefit generated for the year ended December 31, 2018 increased by $189,630 to $461,171 from tax provision of $271,541 for the year ended December 31, 2017. According to Chinese tax regulations, companies within China should adjust their net operating losses according to the law of enterprise income tax, which can be carried forward to offset operating income for five years. Adjusted net operating losses of VIEs according to the law of enterprise income tax for the years ended December 31, 2018 amounted to $2,182,290 and recorded a deferred tax benefit resulting from the adjusted net operating losses totaling $545,572. For the year ended December 31, 2017, the Company had a loss before income taxes of $1,268,366 and recorded a deferred tax benefit resulting from the net operating losses totaling $282,083.

***Net Loss***

As a result of the foregoing, we had a net loss of $3,537,126 for the year ended December 31, 2018, as compared to a net loss of $996,825 for the year ended December 31, 2017.

**Liquidity and Capital Resources**

To date, we have financed our operations primarily through cash flows from operations and proceeds from private placements and our initial public offering.

We incurred a net loss of approximately $9.68 million, $3.54 million and $1.0 million for the years ended December 31, 2019, 2018 and 2017, respectively.

In assessing the Company's liquidity, the Company monitors and analyses its cash and its ability to generate sufficient cash flow in the future to support its operating and capital expenditure commitments. The Company's liquidity needs are to meet its working capital requirements and operating expenses obligations.

As of December 31, 2019, the Company had approximately $0.63 million of cash, cash equivalents and restricted cash. The Company's executive directors pledged to provide continuous financial support to the Company for at least next 12 months from the date of this filing. In October 2019, the Company entered into a private placement agreement with certain private investors to issue 6,500,000 shares of common stock at $0.40 per share, and in return, the Company received the subscription fees of $2,600,000 on May 8, 2020. Subsequently, in May 2020, the Company entered into certain private placement agreement with certain private investors to issue 21,500,000 shares of common stock at $0.80 per share. The Company closed a private offering of approximately $17.2 million on July 6, 2020. Going forward, the Company plans to fund its operations through revenue generated from its bitcoin mining business, funds from its private placements as well as financial support commitments from the Company's executive directors.

The Company's ability to support its operating and capital expenditure commitments will depend on its future performance, which will be subject in part to general economic, competitive and other factors beyond its control. Recent COVID-19 outbreak and spread is causing lockdowns, quarantines, travel restrictions, and closures of businesses and schools. Due to COVID-19 outbreak, the Company's facilities remained closed or had limited business operations after the Chinese New Year holiday until early March 2020. In addition, COVID-19 has caused severe disruptions in transportation, limited access to the Company's facilities and limited support from workforce employed in the Company's operations, and as a result, the Company may experience the inability to lease its luxurious cars to customers or delay the delivery of the commodity products to customers. Although the Company has taken all possible measures to overcome the adverse impact derived from the COVID-19 outbreak and have resumed its normal business activities in early March 2020, it is expected that the Company will generate a lower amount of revenue and profit during the period from February to April 2020. The extent to which the coronavirus impacts the Company's operation results for fiscal year 2020 will depend on certain future developments, including the duration and spread of the outbreak, emerging information concerning the severity of the coronavirus and the actions taken by governments and private businesses to attempt to contain the coronavirus, all of which is uncertain at this point.

All of our revenue is denominated in RMB. Under existing PRC foreign exchange regulations, payments of current account items, including profit distributions, interest payments and trade and service-related foreign exchange transactions, can be made in foreign currencies without prior SAFE approval as long as certain routine procedural requirements are fulfilled. Therefore, our PRC subsidiaries are allowed to pay dividends in foreign currencies to us without prior SAFE approval by following certain routine procedural requirements. However, current PRC regulations permit our PRC subsidiaries to pay dividends to us only out of their accumulated profits, if any, determined in accordance with PRC accounting standards and regulations. Our PRC subsidiaries are required to set aside at least 10% of their after-tax profits after making up previous years' accumulated losses each year, if any, to fund certain reserve funds until the total amount set aside reaches 50% of their registered capital. These reserves are not distributable as cash dividends. Furthermore, capital account transactions, which include foreign direct investment and loans, must be approved by and/or registered with SAFE and its local branches. See "Risk Factors—Risks Relating to Doing Business in China—We rely on dividends and other distributions on equity paid by our PRC subsidiary to fund any cash and financing requirements we may have, and any limitation on the ability of our PRC subsidiary to make payments to us could have a material adverse effect on our ability to conduct our business."

**Cash Flows**

As of December 31, 2019, we had cash, cash equivalents and restricted cash of approximately $0.63 million as compared to $2.9 million as of December 31, 2018 and $5.5 million as of December 31, 2017. The table below sets forth a summary of our cash flows for the periods indicated:

| | For the year ended December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2018** | **2017** |
| Net cash used in operating activities | $ (1,347,482) | $ (5,050,076) | $ (1,908,739) |
| Net cash used in investing activities | $ (916,167) | $ (3,333,725) | $ (31,214) |
| Net cash provided by (used in) financing activities | $ - | $ 5,944,147 | $ (389,635) |

*Operating Activities*

Net cash used in operating activities was approximately $1.3 million for the year ended December 31, 2019, which was attributable primarily to a net loss of approximately $9.7 million, an approximate $5.4 million paid for prepaid advertising cost, marketing promotions and professional services and an approximate $1.4 million of impairment loss.

Net cash used in operating activities was approximately $5.1 million for the year ended December 31, 2018, which was attributable primarily to a net loss of approximately $3.5 million, an approximate $0.5 million of deferred tax benefit, an approximate $0.8 million of amortization of stock compensation expense for services, an approximate $1.9 million paid for prepaid advertising cost, marketing promotions and professional services.

Net cash used in operating activities was approximately $1.9 million for the year ended December 31, 2017, which was attributable primarily to a net loss of approximately $1.0 million, an approximate $0.2 million of employee advances paid to cover business expenses, an approximate $0.7 million paid for prepaid advertising cost, marketing promotions and professional services.

*Investing Activities*

Net cash used in investing activities was approximately $0.9 million for year ended December 31, 2019, which was attributable primarily to an approximate $0.1 million paid for deposit for property and equipment. and an approximate $0.8 million paid for deposit for the rental vehicles.

Net cash used in investing activities was approximately $3.3 million for year ended December 31, 2018, which was attributable primarily to purchases of motor vehicles for daily use and an approximate $2.5 million paid for purchasing automobiles for the new line of business.

Net cash used in investing activities was approximately $31,000 for the year ended December 31, 2017, which was attributable primarily to $49,000 additional purchases of office equipment and leasehold improvements, and $18,000 cash acquired through Baoxun.

*Financing Activities*

Net cash provided by financing activities was nil for the year ended December 31, 2019

Net cash provided by financing activities was approximately $5.9 million for the year ended December 31, 2018, which was attributable to approximately $5.9 million proceeds from issuance of ordinary shares through IPO.

74

Net cash provided by financing activities was approximately $0.4 million in the year ended December 31, 2017, which was attributable to approximately $0.4 million paid for IPO fees.

**Contractual Obligations**

Our contractual obligations as of December 31, 2019 consisted of approximately $30,000 of lease commitments due within one years. We leased our office premise and apartment units under non-cancelable operating lease agreements with expiration dates through June 2020.

| Twelve months ending December 31, | | Minimum lease payment |
|---|---|---|
| 2020 | $ | 30,000 |
| 2021 | | - |
| 2022 | | - |
| Total | $ | 30,000 |

**Off-Balance Sheet Arrangements**

We have not entered into any derivative contracts that are indexed to our shares and classified as shareholders' equity or that are not reflected in our consolidated financial statements. Furthermore, we do not have any retained or contingent interest in assets transferred to an unconsolidated entity that serves as credit, liquidity or market risk support to such entity. We do not have any variable interest in any unconsolidated entity that provides financing, liquidity, market risk or credit support to us or that engages in leasing, hedging or research and development services with us.

**Critical Accounting Policies**

Our management's discussion and analysis of our financial condition and results of operations are based on our consolidated financial statements that have been prepared in accordance with accounting principles generally accepted in the United States ("U.S. GAAP"). The preparation of these financial statements requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements as well as the reported net sales and expenses during the reporting periods. On an ongoing basis, we evaluate our estimates and assumptions. We base our estimates on historical experience and on various other factors that we believe are reasonable under the circumstances, the results of which form the basis for making judgments about the carrying value of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions.

While our significant accounting policies are described in Note 2 to our consolidated financial statements, we believe that the following accounting policies are the most critical to aid you in fully understanding and evaluating our management's discussion and analysis:

Principles of consolidation

The consolidated financial statements include the accounts of the Company, its subsidiaries, and the VIEs. All intercompany transactions and balances between the Company, its subsidiaries and the VIE are eliminated upon consolidation.

Revenue recognition

On January 1, 2018, the Company adopted Accounting Standards Update ("ASU") 2014-09 Revenue from Contracts with Customers (ASC 606) using the modified retrospective method for contracts that were not completed as of January 1, 2018. This did not result in an adjustment to retained earnings upon adoption of this new guidance as the Company's revenue was recognized based on the amount of consideration we expect to receive in exchange for satisfying the performance obligations.

The core principle underlying the revenue recognition ASU is that the Company will recognize revenue to represent the transfer of goods and services to customers in an amount that reflects the consideration to which the Company expects to be entitled in such exchange. This will require the Company to identify contractual performance obligations and determine whether revenue should be recognized at a point in time or over time, based on when control of goods and services transfers to a customer. The Company's revenue streams are primarily recognized at a point in time.

The ASU requires the use of a new five-step model to recognize revenue from customer contracts. The five-step model requires that the Company (i) identify the contract with the customer, (ii) identify the performance obligations in the contract, (iii) determine the transaction price, including variable consideration to the extent that it is probable that a significant future reversal will not occur, (iv) allocate the transaction price to the respective performance obligations in the contract, and (v) recognize revenue when (or as) the Company satisfies the performance obligation. The application of the five-step model to the revenue streams compared to the prior guidance did not result in significant changes in the way the Company records its revenue. Upon adoption, the Company evaluated its revenue recognition policy for all revenue streams within the scope of the ASU under previous standards and using the five-step model under the new guidance and confirmed that there were no differences in the pattern of revenue recognition.

Transaction Fees: Transaction fees are paid by borrowers to the Company for the work the Company performs through its platform. These fees are recognized as a component of operating revenue at the time of loan issuance. The amount of these fees is based upon the loan amount and other terms of the loan, including credit grade, maturity and other factors. These fees are non-refundable upon the issuance of loan.

Management Fees: Loan borrowers pay a management fee on each loan payment to compensate the Company for services provided in connection with facilitation of the loan transactions. The Company records management fees as a component of operating revenue at the time of loan issuance. The amount of these fees is based upon the loan amount and other terms of the loan, including credit grade, maturity and other factors. These fees are non-refundable upon the issuance of loan.

In applying judgment, the Company considered customers' expectations of performance, materiality and the core principles of ASC Topic 606. The aforementioned revenues are recognized and the Company's performance obligations (control of services) are generally transferred to the customers at the time of loan issuance. The Company's contracts with borrowers generally do not include any variable consideration.

*Sales taxes*: Transaction fee, management fee and license fee that are earned and received in the PRC are subject to a Chinese value-added tax ("VAT") at a rate of 3% prior to March 2017 (6% starting in April 2017) of the gross proceed or at a rate approved by the Chinese local government Transaction fee and management fee that are earned and received in the PRC are also subject to various miscellaneous sales taxes at a rate of 10% of the VAT. VAT and miscellaneous sales taxes are accounted for as reduction of revenue.

Incentives

In order to incentivize lenders, the Company provides incentives to marketplace lenders, who commit a certain amount of money for a period of time. During the relevant incentive program period, the Company set certain thresholds for the lender to qualify to enjoy the cash incentive. Such incentives generally consist of a credit to be used by a lender to invest in a future loan. When qualified investment is made by the lenders, the cash payment is provided to the lender as a percentage of investment amount at the time of loan issuance as part of its investment to the specified loan that he/she has invested. The incentive expenses are recognized in our selling expenses in the accompanying consolidated statements of operations and comprehensive loss.

Servicing Expense

Servicing expenses are paid by the Company to a third-party platform provider on each deposit made by the lenders into their respective fund accounts held by the third-party platform fund accounts. The amount of these expenses is based upon the deposit amount. The servicing expenses are recognized in our selling expenses in the accompanying consolidated statements of operations and comprehensive loss

Income taxes

The Company accounts for income taxes in accordance with U.S. GAAP for income taxes. Under the asset and liability method as required by this accounting standard, the recognition of deferred income tax liabilities and assets for the expected future tax consequences of temporary differences between the income tax basis and financial reporting basis of assets and liabilities. Provision for income taxes consists of taxes currently due plus deferred taxes.

The charge for taxation is based on the results for the fiscal year as adjusted for items, which are non-assessable or disallowed. It is calculated using tax rates that have been enacted or substantively enacted by the balance sheet date.

Deferred taxes are accounted for using the asset and liability method in respect of temporary differences arising from differences between the carrying amount of assets and liabilities in the consolidated financial statements and the corresponding tax basis used in the computation of assessable tax profit. In principle, deferred tax liabilities are recognized for all taxable temporary differences. Deferred tax assets are recognized to the extent that it is probable that taxable income will be available against which deductible temporary differences can be utilized. Deferred tax is calculated using tax rates that are expected to apply to the period when the asset is realized or the liability is settled. Deferred tax is charged or credited in the income statement, except when it is related to items credited or charged directly to equity, in which case the deferred tax is also dealt with in equity. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Current income taxes are provided for in accordance with the laws of the relevant taxing authorities.

An uncertain tax position is recognized as a benefit only if it is "more likely than not" that the tax position would be sustained in a tax examination, with a tax examination being presumed to occur. The amount recognized is the largest amount of tax benefit that is greater than 50% likely of being realized on examination. For tax positions not meeting the "more likely than not" test, no tax benefit is recorded. Penalties and interest incurred related to underpayment of income tax are classified as income tax expense in the period incurred. PRC tax returns filed in 2019, 2018 and 2017 are subject to examination by any applicable tax authorities.

<u>Commitments and Contingencies</u>

In the normal course of business, the Company is subject to contingencies, including legal proceedings and claims arising out of the business that relate to a wide range of matters, such as government investigations and tax matters. The Company recognizes a liability for such contingency if it determines it is probable that a loss has occurred and a reasonable estimate of the loss can be made. The Company may consider many factors in making these assessments including historical and the specific facts and circumstances of each matter.

**Quantitative and Qualitative Disclosures about Market Risks**

Liquidity risk

We are exposed to liquidity risk, which is the risk that we will be unable to provide sufficient capital resources and liquidity to meet our commitments and business needs. Liquidity risk is controlled by the application of financial position analysis and monitoring procedures. When necessary, we will turn to other financial institutions to obtain short-term funding to meet the liquidity shortage.

Inflation risk

Inflationary factors, such as increases in raw material and overhead costs, could impair our operating results. Although we do not believe that inflation has had a material impact on our financial position or results of operations to date, a high rate of inflation in the future may have an adverse effect on our ability to maintain current levels of gross margin and operating expenses as a percentage of sales revenue if the selling prices of our products do not increase with such increased costs.

Interest rate risk

Our exposure to interest rate risk primarily relates to the interest rate we are subject to in connection with our short term bank loans, on the one hand, which can vary but not more than 110% of the People's Bank of China benchmark interest rate, and the interest rates we impose on our borrowers or that our deposited cash can earn, on the other hand. We have not used any derivative financial instruments to manage our interest risk exposure. Interest-earning instruments carry a degree of interest rate risk. We have not been exposed to material risks due to changes in interest rates. An increase, however, may raise the cost of any debt we incur in the future.

Foreign currency translation and transaction

The reporting currency of the Company is the U.S. dollar. The Company in China conducts its businesses in the local currency, Renminbi (RMB), as its functional currency. Assets and liabilities are translated at the unified exchange rate as quoted by the People's Bank of China at the end of the period. The statement of income accounts is translated at the average translation rates and the equity accounts are translated at historical rates. Translation adjustments resulting from this process are included in accumulated other comprehensive income (loss). Transaction gains and losses that arise from exchange rate fluctuations on transactions denominated in a currency other than the functional currency are included in the results of operations as incurred.

Recently issued accounting pronouncements

Please see footnote Note 3 – Summary of significant accounting policies – recently issued accounting pronouncements to the consolidated financial statements.

## ITEM 6.    DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES

### 6.A. Directors and Executive Officers

The following table sets forth information regarding our executive officers and directors as of the date of this report.

| Directors and Executive Officers | Age | Position/Title |
| --- | --- | --- |
| Ping Liu | 45 | Chairwoman of the Board |
| Min Hu | 43 | Director and Chief Executive Officer |
| Erke Huang | 31 | Director and Chief Financial Officer |
| Yanjun Cui | 37 | Independent Director |
| Wei Liang | 52 | Independent Director |
| Yan Xiong | 55 | Independent Director |
| Erxin Zeng | 43 | Chief Executive Officer, Chairman of the Board (Removed on October 30, 2019) |
| Jing Leng | 33 | Chief Financial Officer (Removed on October 30,2019) |
| Xiaohui Liu | 37 | Director(Removed on October 30,2019) |
| Hui Shen | 33 | Independent Director (Resigned on October 18,2019) |

**Biographies**

*Ping Liu*

Ms. Liu has served as Chairwoman of the Board since October 30, 2019. Ms. Liu had served as the Deputy General Manager of Shenzhen Qianhai Wanyin Investment Fund Management Co., Ltd. since 2013. From 2006 to 2012, Ms. Liu served as the General Investment Supervisor of First Line Capital. Ms. Liu served as the Deputy General Manager of Chongqing Yahu Information Development Co., Ltd. from 1999 to 2006. Ms. Liu received her bachelor's degree in English from University of International Business and Economics.

***Min Hu***

Mr. Hu has served as Chief Executive Officer of the Company and a Director since October 30, 2019. Mr. Hu had served as the Business Manager of Weihua Liquor Company since 2011. From 2009 to 2011, Mr. Hu served as the General Manager of Xuejiawan Huafeng Wholesale Market Company. Mr. Hu served as a Manager of Eastern Hair Growth Center Company from 2002 to 2009. Mr. Hu received his bachelor's degree in Law from Qingdao Qiushi College of Arts and Sciences in 2000.

***Erke Huang***

Mr. Huang has served as Chief Financial Officer of the Company since October 18, 2019 and as a Director since October 30, 2019. Mr. Huang has served as the Co-Founder and Advisor of Long Soar Technology Limited since August 2019 and as the Founder/CEO of Bitotem Investment Management Limited since May 2018. From June 2016 to May 2018, Mr. Huang served as the Investment Manager of Guojin Capital. From August 2015 to May 2016, Mr. Huang served as an Analyst for Zhengshi Capital. Mr. Huang served as a Program Officer of Southwest Jiaotong University from February 2015 to August 2015. From March 2013 to November 2014, Mr. Huang served as the Engineering Analyst Team Leader of Crowncastle International. Mr. Huang received his bachelor's degree in Environmental Engineering from Southwest Jiaotong University in 2011, and received his master's degree in Civil & Environmental Engineering from Carnegie Mellon University in 2012.

***Yanjun Cui***

Mr. Yanjun Cui has been serving as a director of the Company since our inception. Mr. Cui has been a practicing attorney in the PRC for over 10 years. Since August 2014, he has been a partner at Beijing Yingke Law Firm where his practice focuses on private equity funds, capital markets, and general corporate matters. Mr. Cui also founded Zhejiang Wantong Ruida Assets Management Co., Ltd. in September 2016 and has been serving as the company's legal representative since then. He manages Wantong's daily operations and supervises diligence, deal negotiations and post-investment management of Wantong's investments. From December 2012 to July 2014, Mr. Cui served as General Counsel to Zhejiang Ruiyang Technology Co. Ltd. where he advised on legal issues in connection with the company's operations and managed agreement drafting and review as well as commercial negotiations. From October 2005 to November 2012, Mr. Cui was a practicing attorney at a number of PRC law firms, including Shanxi Jinyi Law Offices, Zhejiang Tianfu Law Offices and Zhejiang Zehou Law Offices. Mr. Cui holds a Bachelor of Law degree from Beifang University of Nationalities in Ninxia, China and a Master of Law from Zhejiang University in Zhejiang, China.

***Wei Liang***

Mr. Wei Liang has been serving as a director of the Company since our inception. Mr. Liang has over 20 years of corporate executive and experience. He has been serving as General Manager and Director of Fuzhou Shijilongmai Information Technology Co., Ltd. since 2011. From 1993 to 2010, Mr. Liang was acting as Deputy General Manager and Director of Alcatel-Lucent (Fujian) Technology Co., Limited. He holds a bachelor's degree in Electronic Engineering from Xiamen University in Fujian, China.

***Yan Xiong***

Mr. Yan Xiong has been serving as a director of the Company since April 19,2020. Mr. Xiong has worked as chairman of the board of directors at Guangzhou Kangsheng Pharmaceutical Technology Limited from 2014 to the present. From 2001 to October 2013, Mr. Xiong worked as chairman of the board of directors at Guangzhou Kangsheng Bio-tech Limited. From 1997 to December 2000, Mr. Xiong worked as the General Manager at Zhuhai Dajiaweikang Wujin Mineral Import and Outport Company. He holds a bachelor's degree in Industrial Accounting from Hunan University Business School, China.

***Erxin Zeng***

Mr. Erxin Zeng founded our Company and served as our chairman and Chief Executive Officer from our inception until October 30, 2019. He has served as manager of Golden Bull U.S.A since April 2020. He has over 12 years of industry and managerial experience in Internet financing, risk management, assets management and lending platform development management. Prior to founding Dianniu in November 2015, Mr. Zeng served as Chief Executive Officer of Shanghai Shangyinledian Internet Financing Information Co. Ltd., an online wealth management company, from December 2013 to November 2015. In such capacity, he managed the company's Internet lending platform maintenance and development, brand promotion and risk management system. Prior to that, Mr. Zeng served as Chief Executive Officer and Chairman of the Board at Shanghai Daxia Internet Financial Information Co. Ltd. from December 2010 to December 2013 where he managed the company's daily operation. From December 2006 to December 2010, Mr. Zeng served as Chairman of Zhejiang Guantao Finance Management Co., Ltd where he managed the firm's daily operations and established its risk management, internal control, assets safety and assets management systems. Mr. Zeng holds a bachelor's degree in finance from Central University of Finance and Economics in Beijing, China.

***Jing Leng***

Ms. Jing Leng had been serving as our Chief Financial Officer since June 25, 2018 and was removed on October 18, 2019. Ms. Leng also serves as the financial manager of China Rapid Finance Limited (NYSE: XRF). Prior to joining XRF, Ms. Leng was the internal audit manager and financial statements manager of Yizhao Weide Fitness Management Co., Ltd. from October 2014 to December 2016. From August 2009 to September 2014, Ms. Leng served as a senior auditor in Ernst & Young Hua Ming LLP. Ms. Leng is a Certified Public Accountant in the PRC and has a bachelor's degree in Accounting from Tongji University in China.

***Xiaohui Liu***

Mr. Xiaohui Liu had been serving as a director of the Company since our inception and was removed on October 18, 2019. He joined Dianniu in November 2015 and has been serving as Supervisor of Dianniu since then. Prior to joining Dianniu, Mr. Liu served as Assistant to Chairman of the Board at Gaotong Shengrong Asset Investment Group Co., Ltd. from February 2014 to August 2015 where he managed coordination of human resources and operations among various entities within the group. Mr. Liu served as human resources manager of Shanghai Oujiang Group Co., Ltd. from March 2012 to December 2013 and human resources manager of a branch of China Postal Logistics Co., Ltd. from August 2008 to January 2012. Mr. Liu holds a bachelor's degree in management science from Wuhan Science and Technology University in Hubei, China.

***Hui Shen***

Ms. Hui Shen had been serving as a director of the Company since our inception and resigned on October 18, 2019. She has extensive experience in finance, accounting and risk management. Since March 2017, Ms. Shen has been serving as Senior Risk Manager at Zhengqi (Shanghai) Investment Co., Ltd. From June 2015 to February 2017, she served as Risk Manager at Huijin Innovation Investment (Shanghai) Co., Ltd. From September 2014 to June 2015, Ms. Shen served as Project Manager at KPMG Advisory (China) Limited. Prior to KPMG, she was a Senior Internal Auditor at Tokio Marine & Nichido Fire Insurance Company (China) from April 2012 to September 2014. Ms. Shen started her career at PricewaterhouseCoopers Zhong Tian LLP where she was an auditor from September 2009 to April 2012. Ms. Shen has obtained a bachelor's degree in management from Jiangxi Finance University. She is a certified accountant in the PRC and holds an ACCA certification.

## 6.B. Compensation

For the fiscal years ended December 31, 2019, 2018 and 2017, we paid an aggregate of approximately $75,785, $54,380 and $51,508, respectively, in cash to our executive officers, and $9,852, $10,469 and $10,657, respectively, to our non-executive directors. We have not set aside or accrued any amount to provide pension, retirement or other similar benefits to our executive officers and directors. Our PRC subsidiaries and consolidated variable interest entities are required by law to make contributions equal to certain percentages of each employee's salary for his or her pension insurance, medical insurance, unemployment insurance and other statutory benefits and a housing provident fund. We contributed an aggregate of $11,063, $14,750 and $7,672 for employee social insurance to our executive officers for the years ended December 31, 2019, 2018 and 2017, respectively.

The Company also entered into two apartment units leases for Messrs. Erxin Zeng and Erqin Zeng, both officers of Dianniu, pursuant to which we made monthly rental payments. The two apartment units have lease terms which expired in May 2019 and November 2019 with monthly rental of approximately $4,400 and $1,000, respectively.

## Employment Agreements

On October 28, 2019, the Company and Erke Huang entered into an employment agreement pursuant to which the Company will pay Mr. Huang US$ 60,000 per annum for serving as Chief Financial Officer of the Company . The Company shall also reimburse Mr. Huang for reasonable and approved expenses incurred by him in connection with the performance of his duties under his employment agreement.

Our operating entity Dianniu has entered into employment agreements with each of our executive officers. Under these agreements, each of our executive officers is employed for a specified time period. Dianniu may terminate employment for cause, at any time, without advance notice or remuneration, for certain acts of the executive officer, such as conviction or plea of guilty to a crime, or misconduct or a failure to perform agreed duties. The executive officer may resign at any time with a three-month advance written notice.

Each executive officer has agreed to hold, both during and after the termination or expiry of his or her employment agreement, in strict confidence and not to use, except as required in the performance of his or her duties in connection with the employment or pursuant to applicable law, any of our confidential information or trade secrets, any confidential information or trade secrets of our clients or prospective clients, or the confidential or proprietary information of any third party received by us and for which we have confidential obligations. The executive officers have also agreed to assign all right, title and interest (including but not limited to patents and trademarks) in all inventions and designs which they conceive, develop or reduce to practice during the executive officer's employment with Dianniu and 2 years thereafter.

In addition, each executive officer has agreed to be bound by non-competition and non-solicitation restrictions during the term of his or her employment. Specifically, each executive officer has agreed not to (i) approach our suppliers, clients, customers or contacts or other persons or entities introduced to the executive officer in his or her capacity as a representative of us for the purpose of doing business with such persons or entities that will harm our business relationships with these persons or entities; (ii) assume employment with or provide services to any of our competitors, or engage, whether as principal, partner, licensor or otherwise, any of our competitors, without our express consent; or (iii) seek directly or indirectly, to solicit the services of any of our employees who is employed by us on or after the date of the executive officer's termination, or in the year preceding such termination, without our express consent.

## 6.C. Board Practices

### Terms of Directors and Officers

Our officers are elected by and serve at the discretion of the Board and the shareholders voting by ordinary resolution. Our directors are not subject to a set term of office and hold office until the next general meeting called for the election of directors and until their successor is duly elected or such time as they die, resign or are removed from office by a shareholders' ordinary resolution or the unanimous written resolution of all shareholders A director will be removed from office automatically if, among other things, the director becomes bankrupt or makes any arrangement or composition with his creditors generally or is found to be or becomes of unsound mind.

*Audit Committee*

Yan Xiong, Wei Liang and Yanjun Cui are members of our Audit Committee, and Yan Xiong serves as the chairman. All members of our Audit Committee satisfy the independence standards promulgated by the SEC and by Nasdaq as such standards apply specifically to members of audit committees.

In accordance with our Audit Committee Charter, our Audit Committee performs several functions, including:

- evaluates the independence and performance of, and assesses the qualifications of, our independent auditor, and engages such independent auditor;

- approves the plan and fees for the annual audit, quarterly reviews, tax and other audit-related services, and approves in advance any non-audit service to be provided by the independent auditor;

- monitors the independence of the independent auditor and the rotation of partners of the independent auditor on our engagement team as required by law;

- reviews the financial statements to be included in our Annual Report on Form 20-F and Current Reports on Form 6-K and reviews with management and the independent auditors the results of the annual audit and reviews of our quarterly financial statements;

- oversees all aspects our systems of internal accounting control and corporate governance functions on behalf of the board;

- reviews and approves in advance any proposed related-party transactions and report to the full Board on any approved transactions; and

- provides oversight assistance in connection with legal, ethical and risk management compliance programs established by management and the Board, including Sarbanes-Oxley Act implementation, and makes recommendations to the Board regarding corporate governance issues and policy decisions.

It is determined that Yan Xiong possesses accounting or related financial management experience that qualifies him as an "audit committee financial expert" as defined by the rules and regulations of the SEC.

*Compensation Committee*

Yanjun Cui, Wei Liang and Yan Xiong are members of our Compensation Committee and Yanjun Cui is the chairman. All members of our Compensation Committee are qualified as independent under the current definition promulgated by Nasdaq. In accordance with the Compensation Committee's Charter, the Compensation Committee is responsible for, among other things:

- reviewing and approving the total compensation package for our senior executives; and

- reviewing periodically, and approving, any long-term incentive compensation or equity plans, programs or similar arrangements, annual bonuses, employee pension and welfare benefit plans.

*Corporate Governance and Nominating Committee*

Yanjun Cui, Wei Liang and Yan Xiong are members of our Nominating and Corporate Governance Committee and Wei Liang is the chairman. All members of our Nominating and Corporate Governance Committee are qualified as independent under the current definition promulgated by Nasdaq. In accordance with its charter, the Nominating and Corporate Governance Committee is responsible for, among other things:

- identifying and recommending to the board qualified candidates to be nominated for the election or re-election to the board of directors and committees of the board of directors, or for appointment to fill any vacancy;

- reviewing annually with the board of directors the current composition of the board of directors with regards to characteristics such as independence, age, skills, experience and availability of service to us; and

- advising the board of directors periodically with regard to significant developments in the law and practice of corporate governance as well as our compliance with these laws and practices and making recommendations to the board of directors on all matters of corporate governance and on any remedial actions to be taken, if needed.

**6.D. Employees**

See the section entitled "Employees" in Item 4 above.

**6.E. Share Ownership**

As of July 7, 2020, 43,699,185 of our ordinary shares were issued and outstanding. Holders of our ordinary shares are entitled to vote together as a single class on all matters submitted to shareholders for approval. No holder of ordinary shares has different voting rights from any other holders of ordinary shares. We are not aware of any arrangement that may, at a subsequent date, result in a change of control of our company.

Beneficial ownership is determined in accordance with the rules and regulations of the SEC. The percentages of shares beneficially owned in the table below are based on 43,699,185 ordinary shares outstanding as of July 7, 2020.

The following table sets forth information with respect to the beneficial ownership of our common shares as of June 29, 2019 by:

- each of our directors and executive officers; and

- each person known to us to beneficially own more than 5% of our outstanding ordinary shares.

| Name of Beneficial Owners | Ordinary Shares Beneficially Owned as of July 7, 2020 | |
|---|---|---|
| | Number | %[1] |
| **Directors and Executive Officers:** | | |
| Ping Liu | — | — |
| Min Hu | — | — |
| Erke Huang | — | — |
| Wei Liang | — | — |
| Yanjun Cui | — | — |
| Yan Xiong | — | — |
| **5% shareholders:** | | |
| Wise Gain Investment Industries Limited[3][4] | 6,276,700 | 14.36% |
| Silver Luck International Holding Group Limited[2][5] | 2,485,500 | 5.69% |
| Shijie Li | 2,446,437 | 5.60% |

(1)  Applicable percentage of ownership is based on 43,699,185 ordinary shares outstanding together with securities exercisable or convertible into ordinary shares within sixty (60) days as of the date hereof for each shareholder.

(2)  Erxin Zeng is deemed to beneficially own 2,485,500 of our ordinary shares through Silver Luck International Holding Group Limited.

(3)  Xiaohui Liu is deemed to beneficially own 6,276,700 of our ordinary shares through Wise Gain Investment Industries Limited.

(4)  Xiaohui Liu, a director of Wise Gain Investment Industries Limited, has voting and dispositive power over the shares held by such entity.

(5)  Erxin Zeng, a director of Silver Luck International Holding Group Limited, has voting and dispositive power over the shares held by such entity.

## ITEM 7.    MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS

### 7.A. Major Shareholders

See Item 6.E., "Share Ownership," for a description of our major shareholders.

### 7.B. Related Party Transactions

Not applicable.

### 7.C. Interests of Experts and Counsel

Not applicable.

**ITEM 8.    FINANCIAL INFORMATION**

**Consolidated Statements and Other Financial Information**

The financial statements required by this item may be found at the end of this report on 20-F, beginning on page F-1.

**Legal Proceedings**

See "Item 4. Information on the Company — B. Business Overview — Legal Proceedings."

**Dividends**

We have never declared or paid any dividend on our ordinary shares and we do not anticipate paying any dividends on our ordinary shares in the future. We currently intend to retain all future earnings to finance our operations and to expand our business.

**No Significant Changes**

Except as disclosed elsewhere in this annual report, no other significant changes to our financial condition have occurred since the date of the annual financial statements contained herein.

**ITEM 9.    THE OFFER AND LISTING**

**9.A. Offer and Listing Details**

Our ordinary shares are listed for trading on the NASDAQ Capital Market under the symbol "DNJR." The shares began trading on March 19, 2018 on the NASDAQ Capital Market.

**9.B. Plan of Distribution**

Not Applicable.

**9.C. Markets**

Our ordinary shares are currently traded on the NASDAQ Capital Market.

**9.D. Selling Shareholders**

Not Applicable.

**9.E. Dilution**

Not Applicable.

**9.F. Expenses of the Issuer**

Not Applicable.

**ITEM 10.    ADDITIONAL INFORMATION**

**10.A. Share Capital**

Not Applicable.

**10.B. Memorandum and Articles of Association**

We are a Cayman Islands exempted company and our affairs are governed by our memorandum and articles of association and the Companies Law (2016 Revision) of the Cayman Islands, which we refer to as the Companies Law below.

*Dividends.* Subject to any rights and restrictions of any other class or series of shares, our board of directors may, from time to time, declare dividends on the shares issued and authorize payment of the dividends out of our lawfully available funds. No dividends shall be declared by the board out of our company except the following:

- profits; or

- "share premium account," which represents the excess of the price paid to our company on issue of its shares over the par or "nominal" value of those shares, which is similar to the U.S. concept of additional paid in capital.

However, no dividend shall bear interest against the Company.

*Voting Rights.* The holders of our ordinary shares are entitled to one vote per share, including the election of directors. Voting at any meeting of shareholders is by show of hands unless a poll is demanded. On a show of hands every shareholder present in person or by proxy shall have one vote. On a poll every shareholder entitled to vote (in person or by proxy) shall have one vote for each share for which he is the holder. A poll may be demanded by the chairman or one or more shareholders present in person or by proxy holding not less than fifteen percent of the paid-up capital of the Company entitled to vote. A quorum required for a meeting of shareholders consists of shareholders who hold at least one-third of our outstanding shares entitled to vote at the meeting present in person or by proxy. While not required by our articles of association, a proxy form will accompany any notice of general meeting convened by the directors to facilitate the ability of shareholders to vote by proxy.

Any ordinary resolution to be made by the shareholders requires the affirmative vote of a simple majority of the votes of the ordinary shares cast in a general meeting, while a special resolution requires the affirmative vote of no less than two-thirds of the votes of the ordinary shares cast. Under Cayman Islands law, some matters, such as amending the memorandum and articles, changing the name or resolving to be registered by way of continuation in a jurisdiction outside the Cayman Islands, require approval of shareholders by a special resolution.

There are no limitations on non-residents or foreign shareholders in the memorandum and articles to hold or exercise voting rights on the ordinary shares imposed by foreign law or by the charter or other constituent document of our company. However, no person will be entitled to vote at any general meeting or at any separate meeting of the holders of the ordinary shares unless the person is registered as of the record date for such meeting and unless all calls or other sums presently payable by the person in respect of ordinary shares in the Company have been paid.

*Winding Up; Liquidation.* Upon the winding up of our company, after the full amount that holders of any issued shares ranking senior to the ordinary shares as to distribution on liquidation or winding up are entitled to receive has been paid or set aside for payment, the holders of our ordinary shares are entitled to receive any remaining assets of the Company available for distribution as determined by the liquidator. The assets received by the holders of our ordinary shares in a liquidation may consist in whole or in part of property, which is not required to be of the same kind for all shareholders.

*Calls on Ordinary Shares and Forfeiture of Ordinary Shares.* Our board of directors may from time to time make calls upon shareholders for any amounts unpaid on their ordinary shares in a notice served to such shareholders at least 14 days prior to the specified time and place of payment. Any ordinary shares that have been called upon and remain unpaid are subject to forfeiture.

*Redemption of Ordinary Shares.* We may issue shares that are, or at its option or at the option of the holders are, subject to redemption on such terms and in such manner as it may, before the issue of the shares, determine. Under the Companies Law, shares of a Cayman Islands exempted company may be redeemed or repurchased out of profits of the company, out of the proceeds of a fresh issue of shares made for that purpose or out of capital, provided the memorandum and articles authorize this and it has the ability to pay its debts as they come due in the ordinary course of business.

*No Preemptive Rights.* Holders of ordinary shares will have no preemptive or preferential right to purchase any securities of our company.

*Variation of Rights Attaching to Shares.* If at any time the share capital is divided into different classes of shares, the rights attaching to any class (unless otherwise provided by the terms of issue of the shares of that class) may, subject to the memorandum and articles, be varied or abrogated with the consent in writing of the holders of three fourths of the issued shares of that class or with the sanction of a special resolution passed at a general meeting of the holders of the shares of that class.

*Anti-Takeover Provisions.* Some provisions of our current memorandum and articles of association may discourage, delay or prevent a change of control of our company or management that shareholders may consider favorable, including provisions that authorize our board of directors to issue preferred shares in one or more series and to designate the price, rights, preferences, privileges and restrictions of such preferred shares without any further vote or action by our shareholders.

*Exempted Company.* We are an exempted company with limited liability under the Companies Law. The Companies Law distinguishes between ordinary resident companies and exempted companies. Any company that is registered in the Cayman Islands but conducts business mainly outside of the Cayman Islands may apply to be registered as an exempted company. The requirements for an exempted company are essentially the same as for an ordinary company except that an exempted company:

- does not have to file an annual return of its shareholders with the Registrar of Companies;

- is not required to open its register of members for inspection;

- does not have to hold an annual general meeting;

- may issue shares with no par value;

- may obtain an undertaking against the imposition of any future taxation (such undertakings are usually given

- for 20 years in the first instance);

- may register by way of continuation in another jurisdiction and be deregistered in the Cayman Islands;

- may register as a limited duration company; and

- may register as a segregated portfolio company.

"Limited liability" means that the liability of each shareholder is limited to the amount unpaid by the shareholder on the shares of the company.

## Material Differences between U.S. Corporate Law and Cayman Islands Corporate Law

The Companies Law is modeled after that of English law but does not follow many recent English law statutory enactments. In addition, the Companies Law differs from laws applicable to United States corporations and their shareholders. Set forth below is a summary of the significant differences between the provisions of the Companies Law applicable to us and the laws applicable to companies incorporated in the State of Delaware.

***Mergers and Similar Arrangements***. A merger of two or more constituent companies under Cayman Islands law requires a plan of merger or consolidation to be approved by the directors of each constituent company and authorization by (a) a special resolution of the shareholders and (b) such other authorization, if any, as may be specified in such constituent company's articles of association.

A merger between a Cayman Islands parent company and its Cayman Islands subsidiary or subsidiaries does not require authorization by a resolution of shareholders of that Cayman Islands subsidiary if a copy of the plan of merger is given to every member of that Cayman Islands subsidiary to be merged unless that member agrees otherwise. For this purpose, a subsidiary is a company of which at least ninety percent (90%) of the issued shares entitled to vote are owned by the parent company.

The consent of each holder of a fixed or floating security interest over a constituent company is required unless this requirement is waived by a court in the Cayman Islands.

Save in certain circumstances, a dissentient shareholder of a Cayman constituent company is entitled to payment of the fair value of his shares upon dissenting to a merger or consolidation. The exercise of appraisal rights will preclude the exercise of any other rights save for the right to seek relief on the grounds that the merger or consolidation is void or unlawful.

In addition, there are statutory provisions that facilitate the reconstruction and amalgamation of companies, provided that the arrangement is approved by a majority in number of each class of shareholders and creditors with whom the arrangement is to be made, and who must in addition represent three-fourths in value of each such class of shareholders or creditors, as the case may be, that are present and voting either in person or by proxy at a meeting, or meetings, convened for that purpose. The convening of the meetings and subsequently the arrangement must be sanctioned by the Grand Court of the Cayman Islands. While a dissenting shareholder has the right to express to the court the view that the transaction ought not to be approved, the court can be expected to approve the arrangement if it determines that:

- the statutory provisions as to the required majority vote have been met;

- the shareholders have been fairly represented at the meeting in question and the statutory majority are acting bona fide without coercion of the minority to promote interests adverse to those of the class;

- the arrangement is such that may be reasonably approved by an intelligent and honest man of that class acting in respect of his interest; and

- the arrangement is not one that would more properly be sanctioned under some other provision of the Companies Law.

When a takeover offer is made and accepted by holders of 90.0% of the shares within four months, the offeror may, within a two-month period commencing on the expiration of such four-month period, require the holders of the remaining shares to transfer such shares on the terms of the offer. An objection can be made to the Grand Court of the Cayman Islands but this is unlikely to succeed in the case of an offer which has been so approved unless there is evidence of fraud, bad faith or collusion.

If an arrangement and reconstruction is thus approved, the dissenting shareholder would have no rights comparable to appraisal rights, which would otherwise ordinarily be available to dissenting shareholders of Delaware corporations, providing rights to receive payment in cash for the judicially determined value of the shares.

***Shareholders' Suits.*** In principle, we will normally be the proper plaintiff and as a general rule a derivative action may not be brought by a minority shareholder. However, based on English authorities, which would in all likelihood be of persuasive authority in the Cayman Islands, there are exceptions to the foregoing principle, including when:

- a company acts or proposes to act illegally or ultra vires;

- the act complained of, although not ultra vires, could only be affected duly if authorized by more than a simple majority vote that has not been obtained; and

- those who control the company are perpetrating a "fraud on the minority."

***Indemnification of Directors and Executive Officers and Limitation of Liability***. Cayman Islands law does not limit the extent to which a company's memorandum and articles of association may provide for indemnification of officers and directors, except to the extent any such provision may be held by the Cayman Islands courts to be contrary to public policy, such as to provide indemnification against civil fraud or the consequences of committing a crime. Our current memorandum and articles of association permit indemnification of officers and directors for losses, damages, costs and expenses incurred in their capacities as such unless such losses or damages arise from dishonesty or fraud of such directors or officers. This standard of conduct is generally the same as permitted under the Delaware General Corporation Law for a Delaware corporation. In addition, we have entered into indemnification agreements with our directors and executive officers that provide such persons with additional indemnification beyond that provided in our current memorandum and articles of association.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to our directors, officers or persons controlling us under the foregoing provisions, we have been informed that in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

***Directors' Fiduciary Duties***. Under Delaware corporate law, a director of a Delaware corporation has a fiduciary duty to the corporation and its shareholders. This duty has two components: the duty of care and the duty of loyalty. The duty of care requires that a director act in good faith, with the care that an ordinarily prudent person would exercise under similar circumstances. Under this duty, a director must inform himself of, and disclose to shareholders, all material information reasonably available regarding a significant transaction. The duty of loyalty requires that a director acts in a manner he reasonably believes to be in the best interests of the corporation. He must not use his corporate position for personal gain or advantage. This duty prohibits self-dealing by a director and mandates that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the shareholders generally. In general, actions of a director are presumed to have been made on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the corporation. However, this presumption may be rebutted by evidence of a breach of one of the fiduciary duties. Should such evidence be presented concerning a transaction by a director, the director must prove the procedural fairness of the transaction, and that the transaction was of fair value to the corporation.

As a matter of Cayman Islands law, a director of a Cayman Islands company is in the position of a fiduciary with respect to the company and therefore it is considered that he or she owes the following duties to the company — a duty to act bona fide in the best interests of the company, a duty not to make a profit based on his or her position as director (unless the company permits him or her to do so) and a duty not to put himself or herself in a position where the interests of the company conflict with his or her personal interest or his or her duty to a third party. A director of a Cayman Islands company owes to the company a duty to act with skill and care. It was previously considered that a director need not exhibit in the performance of his or her duties a greater degree of skill than may reasonably be expected from a person of his or her knowledge and experience. However, English and Commonwealth courts have moved towards an objective standard with regard to the required skill and care and these authorities are likely to be followed in the Cayman Islands.

***Shareholder Action by Written Consent***. Under the Delaware General Corporation Law, a corporation may eliminate the right of shareholders to act by written consent by amendment to its certificate of incorporation. Cayman Islands law and our current articles of association provide that shareholders may approve corporate matters by way of a unanimous written resolution signed by or on behalf of each shareholder who would have been entitled to vote on such matter at a general meeting without a meeting being held.

***Shareholder Proposals***. Under the Delaware General Corporation Law, a shareholder has the right to put any proposal before the annual meeting of shareholders, provided it complies with the notice provisions in the governing documents. A special meeting may be called by the board of directors or any other person authorized to do so in the governing documents, but shareholders may be precluded from calling special meetings.

Cayman Islands law does not provide shareholders any right to put proposals before a meeting or requisition a general meeting. However, these rights may be provided in articles of association. Our current articles of association allow our shareholders holding not less than one-third of all voting power of our share capital in issue to requisition a shareholder's meeting. Other than this right to requisition a shareholders' meeting, our current articles of association do not provide our shareholders other right to put proposal before a meeting. As a Cayman Islands exempted company, we are not obliged by law to call shareholders' annual general meetings.

***Cumulative Voting.*** Under the Delaware General Corporation Law, cumulative voting for elections of directors is not permitted unless the corporation's certificate of incorporation specifically provides for it. Cumulative voting potentially facilitates the representation of minority shareholders on a board of directors since it permits the minority shareholder to cast all the votes to which the shareholder is entitled on a single director, which increases the shareholder's voting power with respect to electing such director. There are no prohibitions in relation to cumulative voting under the laws of the Cayman Islands but our current articles of association do not provide for cumulative voting. As a result, our shareholders are not afforded any less protections or rights on this issue than shareholders of a Delaware corporation.

***Removal of Directors.*** Under the Delaware General Corporation Law, a director of a corporation with a classified board may be removed only for cause with the approval of a majority of the outstanding shares entitled to vote, unless the certificate of incorporation provides otherwise. Under our current articles of association, directors may be removed with or without cause, by an ordinary resolution of our shareholders.

***Transactions with Interested Shareholders.*** The Delaware General Corporation Law contains a business combination statute applicable to Delaware corporations whereby, unless the corporation has specifically elected not to be governed by such statute by amendment to its certificate of incorporation, it is prohibited from engaging in certain business combinations with an "interested shareholder" for three years following the date that such person becomes an interested shareholder. An interested shareholder generally is a person or a group who or which owns or owned 15% or more of the target's outstanding voting share within the past three years. This has the effect of limiting the ability of a potential acquirer to make a two-tiered bid for the target in which all shareholders would not be treated equally. The statute does not apply if, among other things, prior to the date on which such shareholder becomes an interested shareholder, the board of directors approves either the business combination or the transaction which resulted in the person becoming an interested shareholder. This encourages any potential acquirer of a Delaware corporation to negotiate the terms of any acquisition transaction with the target's board of directors.

Cayman Islands law has no comparable statute. As a result, we cannot avail ourselves of the types of protections afforded by the Delaware business combination statute. However, although Cayman Islands law does not regulate transactions between a company and its significant shareholders, it does provide that such transactions must be entered into bona fide in the best interests of the company and not with the effect of constituting a fraud on the minority shareholders.

***Dissolution; Winding up.*** Under the Delaware General Corporation Law, unless the board of directors approves the proposal to dissolve, dissolution must be approved by shareholders holding 100% of the total voting power of the corporation. Only if the dissolution is initiated by the board of directors may it be approved by a simple majority of the corporation's outstanding shares. Delaware law allows a Delaware corporation to include in its certificate of incorporation a supermajority voting requirement in connection with dissolutions initiated by the board. Under Cayman Islands law, a company may be wound up by either an order of the courts of the Cayman Islands or by a special resolution of its members or, if the company is unable to pay its debts as they fall due, by an ordinary resolution of its members. The court has authority to order winding up in a number of specified circumstances including where it is, in the opinion of the court, just and equitable to do so. Under the Companies Law and our current articles of association, our company may be dissolved, liquidated or wound up by a special resolution of our shareholders.

***Variation of Rights of Shares.*** Under the Delaware General Corporation Law, a corporation may vary the rights of a class of shares with the approval of a majority of the outstanding shares of such class, unless the certificate of incorporation provides otherwise. Under Cayman Islands law and our current articles of association, if our share capital is divided into more than one class of shares, we may vary the rights attached to any class with the written consent of the holders of three-fourths of the issued shares of that class or with the sanction of a resolution passed by not less than three-fourths of such holders of the shares of that class as may be present at a general meeting of the holders of the shares of that class.

***Amendment of Governing Documents.*** Under the Delaware General Corporation Law, a corporation's governing documents may be amended with the approval of a majority of the outstanding shares entitled to vote, unless the certificate of incorporation provides otherwise. As permitted by Cayman Islands law, our current memorandum and articles of association may only be amended with a special resolution of our shareholders.

*Rights of Non-resident or Foreign Shareholders.* There are no limitations imposed by our post-offering amended and restated memorandum and articles of association on the rights of non-resident or foreign shareholders to hold or exercise voting rights on our shares. In addition, there are no provisions in our current memorandum and articles of association governing the ownership threshold above which shareholder ownership must be disclosed.

## 10.C. Material Contracts

We have not entered into any material contracts other than in the ordinary course of business and other than those described in this annual report.

## 10.D. Exchange Controls

### *Cayman Islands*

There are currently no exchange control regulations in the Cayman Islands applicable to us or our shareholders.

### *The PRC*

China regulates foreign currency exchanges primarily through the following rules and regulations:

- Foreign Currency Administration Rules of 1996, as amended; and

- Administrative Rules of the Settlement, Sale and Payment of Foreign Exchange of 1996.

As we disclosed in the risk factors above, Renminbi is not a freely convertible currency at present. Under the current PRC regulations, conversion of Renminbi is permitted in China for routine current-account foreign exchange transactions, including trade and service-related foreign exchange transactions, payment of dividends and service of foreign debts. Conversion of Renminbi for most capital-account items, such as direct investments, investments in PRC securities markets and repatriation of investments, however, is still subject to the approval of SAFE.

Pursuant to the above-mentioned administrative rules, foreign-invested enterprises may buy, sell and/or remit foreign currencies for current account transactions at banks in China with authority to conduct foreign exchange business by complying with certain procedural requirements, such as presentment of valid commercial documents. For capital-account transactions involving foreign direct investment, foreign debts and outbound investment in securities and derivatives, approval from SAFE is a pre-condition. Capital investments by foreign-invested enterprises outside China are subject to limitations and requirements in China, such as prior approvals from the PRC Ministry of Commerce or SAFE.

## 10.E. Taxation

The following summary of the material Cayman Islands, PRC and U.S. tax consequences of an investment in our ordinary shares is based upon laws and relevant interpretations thereof in effect as of the date hereof, all of which are subject to change, possibly with retroactive effect. This summary is not intended to be, nor should it be construed as, legal or tax advice and is not exhaustive of all possible tax considerations. This summary also does not deal with all possible tax consequences relating to an investment in our ordinary shares, such as the tax consequences under state, local, non-U.S., non-PRC, and non-Cayman Islands tax laws. Investors should consult their own tax advisors with respect to the tax consequences of the acquisition, ownership and disposition of our ordinary shares.

### *Cayman Islands Taxation*

The Cayman Islands currently levies no taxes on individuals or corporations based upon profits, income, gains or appreciation and there is no taxation in the nature of inheritance tax or estate duty. There are no other taxes levied by the Government of the Cayman Islands that are likely to be material to holders of ordinary shares or ordinary shares. The Cayman Islands is not party to any double tax treaties. There are no exchange control regulations or currency restrictions in the Cayman Islands.

*People's Republic of China Taxation*

Under the EIT Law, an enterprise established outside the PRC with a "de facto management body" within the PRC is considered a PRC resident enterprise for PRC enterprise income tax purposes and is generally subject to a uniform 25% enterprise income tax rate on its worldwide income as well as tax reporting obligations. Under the Implementation Rules, a "de facto management body" is defined as a body that has material and overall management and control over the manufacturing and business operations, personnel and human resources, finances and properties of an enterprise. In addition, SAT Circular 82 issued in April 2009 specifies that certain offshore-incorporated enterprises controlled by PRC enterprises or PRC enterprise groups will be classified as PRC resident enterprises if all of the following conditions are met: (a) senior management personnel and core management departments in charge of the daily operations of the enterprises have their presence mainly in the PRC; (b) their financial and human resources decisions are subject to determination or approval by persons or bodies in the PRC; (c) major assets, accounting books and company seals of the enterprises, and minutes and files of their board's and shareholders' meetings are located or kept in the PRC; and (d) half or more of the enterprises' directors or senior management personnel with voting rights habitually reside in the PRC. Further to SAT Circular 82, the SAT issued SAT Bulletin 45, which took effect in September 2011, to provide more guidance on the implementation of SAT Circular 82. SAT Bulletin 45 provides for procedures and administration details of determination on PRC resident enterprise status and administration on post-determination matters. If the PRC tax authorities determine that Golden Bull Limited is a PRC resident enterprise for PRC enterprise income tax purposes, a number of unfavorable PRC tax consequences could follow. For example, Dianniu may be subject to enterprise income tax at a rate of 25% with respect to its worldwide taxable income. Also, a 10% withholding tax would be imposed on dividends we pay to our non-PRC enterprise shareholders and with respect to gains derived by our non-PRC enterprise shareholders from transferring our shares or ordinary shares and potentially a 20% of withholding tax would be imposed on dividends we pay to our non-PRC individual shareholders and with respect to gains derived by our non-PRC individual shareholders from transferring our shares or ordinary shares.

It is unclear whether, if we are considered a PRC resident enterprise, holders of our shares or ordinary shares would be able to claim the benefit of income tax treaties or agreements entered into between China and other countries or areas. See "Risk Factors — Risk Factors Relating to Doing Business in China — Under the PRC Enterprise Income Tax Law, we may be classified as a PRC resident enterprise for PRC enterprise income tax purposes. Such classification would likely result in unfavorable tax consequences to us and our non-PRC Shareholders and have a material adverse effect on our results of operations and the value of your investment".

The SAT issued SAT Circular 59 together with the Ministry of Finance in April 2009 and SAT Circular 698 in December 2009. Both SAT Circular 59 and SAT Circular 698 became effective retroactively as of January 1, 2008. By promulgating and implementing these two circulars, the PRC tax authorities have enhanced their scrutiny over the direct or indirect transfer of equity interests in a PRC resident enterprise by a non-PRC resident enterprise. Under SAT Circular 698, where a non-PRC resident enterprise transfers the equity interests of a PRC resident enterprise indirectly by disposition of the equity interests of an overseas holding company, and the overseas holding company is located in a tax jurisdiction that: (1) has an effective tax rate of less than 12.5% or (2) does not impose tax on foreign income of its residents, the non-PRC resident enterprise, being the transferor, must report to the relevant tax authority of the PRC resident enterprise this Indirect Transfer. Using a "substance over form" principle, the PRC tax authority may disregard the existence of the overseas holding company if it lacks a reasonable commercial purpose and was established for the purpose of reducing, avoiding or deferring PRC tax. As a result, gains derived from such Indirect Transfer may be subject to PRC tax at a rate of up to 10%. Although it appears that SAT Circular 698 was not intended to apply to share transfers of publicly traded companies, there is uncertainty as to the application of SAT Circular 698 and we and our non-PRC resident investors may be at risk of being required to file a return and being taxed under SAT Circular 698 and we may be required to expend valuable resources to comply with SAT Circular 698 or to establish that we should not be taxed under SAT Circular 698. See "Risk Factors — Risk Factors Relating to Doing Business in China — We face uncertainty regarding the PRC tax reporting obligations and consequences for certain indirect transfers of our operating company's equity interests. Enhanced scrutiny over acquisition transactions by the PRC tax authorities may have a negative impact on potential acquisitions we may pursue in the future."

Pursuant to the Arrangement between the Mainland China and the Hong Kong Special Administrative Region for the Avoidance of Double Taxation and Tax Evasion on Income, or the Tax Arrangement, where a Hong Kong resident enterprise which is considered a non-PRC tax resident enterprise directly holds at least 25% of a PRC enterprise, the withholding tax rate in respect of the payment of dividends by such PRC enterprise to such Hong Kong resident enterprise is reduced to 5% from a standard rate of 10%, subject to approval of the PRC local tax authority. Pursuant to the Notice of the State Administration of Taxation on the Issues concerning the Application of the Dividend Clauses of Tax Agreements, or Circular 81, a resident enterprise of the counter-party to such Tax Arrangement should meet the following conditions, among others, in order to enjoy the reduced withholding tax under the Tax Arrangement: (i) it must directly own the required percentage of equity interests and voting rights in such PRC resident enterprise; and (ii) it should directly own such percentage in the PRC resident enterprise anytime in the 12 months prior to receiving the dividends. Furthermore, the Administrative Measures for Non-Resident Enterprises to Enjoy Treatments under Tax Treaties (For Trial Implementation), or the Administrative Measures, which became effective in October 2009, requires that the non-resident enterprises must obtain the approval from the relevant tax authority in order to enjoy the reduced withholding tax rate under the tax treaties. There are also other conditions for enjoying such reduced withholding tax rate according to other relevant tax rules and regulations. Accordingly, Dianniu HK may be able to enjoy the 5% withholding tax rate for the dividends it receives from the WFOE, if it satisfies the conditions prescribed under Circular 81 and other relevant tax rules and regulations, and obtains the approvals as required under the Administrative Measures. However, according to Circular 81, if the relevant tax authorities consider the transactions or arrangements we have for the primary purpose of enjoying a favorable tax treatment, the relevant tax authorities may adjust the favorable withholding tax in the future.

*United States Federal Income Taxation*

The following is a discussion of United States federal income tax considerations relating to the acquisition, ownership, and disposition of our ordinary shares by a U.S. Holder, as defined below, that acquires our ordinary shares and holds our ordinary shares as "capital assets" (generally, property held for investment) under the United States Internal Revenue Code of 1986, as amended (the "Code"). This discussion is based upon existing United States federal income tax law, which is subject to differing interpretations or change, possibly with retroactive effect. No ruling has been sought from the Internal Revenue Service (the "IRS") with respect to any United States federal income tax consequences described below, and there can be no assurance that the IRS or a court will not take a contrary position. This discussion does not address all aspects of United States federal income taxation that may be important to particular investors in light of their individual circumstances, including investors subject to special tax rules (such as, for example, certain financial institutions, insurance companies, regulated investment companies, real estate investment trusts, broker-dealers, traders in securities that elect mark-to-market treatment, partnerships and their partners, tax-exempt organizations (including private foundations)), investors who are not U.S. Holders, investors that own (directly, indirectly, or constructively) 10% or more of our voting stock, investors that hold their ordinary shares as part of a straddle, hedge, conversion, constructive sale or other integrated transaction), or investors that have a functional currency other than the U.S. dollar, all of whom may be subject to tax rules that differ significantly from those summarized below. In addition, this discussion does not address any tax laws other than the United States federal income tax laws, including any state, local, alternative minimum tax or non-United States tax considerations, or the Medicare tax. Each potential investor is urged to consult its tax advisor regarding the United States federal, state, local and non-United States income and other tax considerations of an investment in our ordinary shares.

## General

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of our ordinary shares that is, for United States federal income tax purposes, (i) an individual who is a citizen or resident of the United States, (ii) a corporation (or other entity treated as a corporation for United States federal income tax purposes) created in, or organized under the laws of, the United States or any state thereof or the District of Columbia, (iii) an estate the income of which is includible in gross income for United States federal income tax purposes regardless of its source, or (iv) a trust (A) the administration of which is subject to the primary supervision of a United States court and which has one or more United States persons who have the authority to control all substantial decisions of the trust or (B) that has otherwise elected to be treated as a United States person under the Code.

If a partnership (or other entity treated as a partnership for United States federal income tax purposes) is a beneficial owner of our ordinary shares, the tax treatment of a partner in the partnership will depend upon the status of the partner and the activities of the partnership. Partnerships and partners of a partnership holding our ordinary shares are urged to consult their tax advisors regarding an investment in our ordinary shares.

The discussion set forth below is addressed only to U.S. Holders that purchase ordinary shares. Prospective purchasers are urged to consult their own tax advisors about the application of the U.S. federal income tax rules to their particular circumstances as well as the state, local, foreign and other tax consequences to them of the purchase, ownership and disposition of our ordinary shares.

### *Taxation of Dividends and Other Distributions on our Ordinary Shares*

Subject to the passive foreign investment company rules discussed below, the gross amount of distributions made by us to you with respect to the ordinary shares (including the amount of any taxes withheld therefrom) will generally be includable in your gross income as dividend income on the date of receipt by you, but only to the extent that the distribution is paid out of our current or accumulated earnings and profits (as determined under U.S. federal income tax principles). With respect to corporate U.S. Holders, the dividends will not be eligible for the dividends-received deduction allowed to corporations in respect of dividends received from other U.S. corporations.

With respect to non-corporate U.S. Holders, including individual U.S. Holders, dividends will be taxed at the lower capital gains rate applicable to qualified dividend income, provided that (1) the ordinary shares are readily tradable on an established securities market in the United States, or we are eligible for the benefits of an approved qualifying income tax treaty with the United States that includes an exchange of information program, (2) we are not a passive foreign investment company (as discussed below) for either our taxable year in which the dividend is paid or the preceding taxable year, and (3) certain holding period requirements are met. Because there is no income tax treaty between the United States and the Cayman Islands, clause (1) above can be satisfied only if the ordinary shares are readily tradable on an established securities market in the United States. Under U.S. Internal Revenue Service authority, ordinary shares are considered for purpose of clause (1) above to be readily tradable on an established securities market in the United States if they are listed on Nasdaq. You are urged to consult your tax advisors regarding the availability of the lower rate for dividends paid with respect to our ordinary shares, including the effects of any change in law after the date of this report.

To the extent that the amount of the distribution exceeds our current and accumulated earnings and profits (as determined under U.S. federal income tax principles), it will be treated first as a tax-free return of your tax basis in your ordinary shares, and to the extent the amount of the distribution exceeds your tax basis, the excess will be taxed as capital gain. We do not intend to calculate our earnings and profits under U.S. federal income tax principles. Therefore, a U.S. Holder should expect that a distribution will be treated as a dividend even if that distribution would otherwise be treated as a non-taxable return of capital or as capital gain under the rules described above.

### *Taxation of Dispositions of Ordinary Shares*

Subject to the passive foreign investment company rules discussed below, you will recognize taxable gain or loss on any sale, exchange or other taxable disposition of a share equal to the difference between the amount realized (in U.S. dollars) for the share and your tax basis (in U.S. dollars) in the ordinary shares. The gain or loss will be capital gain or loss. If you are a non-corporate U.S. Holder, including an individual U.S. Holder, who has held the ordinary shares for more than one year, you may be eligible for reduced tax rates on any such capital gains. The deductibility of capital losses is subject to limitations.

### *Passive Foreign Investment Company*

A non-U.S. corporation is considered a PFIC for any taxable year if either:

- at least 75% of its gross income for such taxable year is passive income; or

- at least 50% of the value of its assets (based on an average of the quarterly values of the assets during a taxable year) is attributable to assets that produce or are held for the production of passive income (the "asset test").

Passive income generally includes dividends, interest, rents and royalties (other than rents or royalties derived from the active conduct of a trade or business) and gains from the disposition of passive assets. We will be treated as owning our proportionate share of the assets and earning our proportionate share of the income of any other corporation in which we own, directly or indirectly, at least 25% (by value) of the stock. In determining the value and composition of our assets for purposes of the PFIC asset test, (1) the cash we hold will generally be considered to be held for the production of passive income and (2) the value of our assets must be determined based on the market value of our ordinary shares from time to time, which could cause the value of our non-passive assets to be less than 50% of the value of all of our assets (including the cash raised in any offering) on any particular quarterly testing date for purposes of the asset test.

We must make a separate determination each year as to whether we are a PFIC. Depending on the amount of cash we hold, together with any other assets held for the production of passive income, it is possible that, for our 2018 taxable year or for any subsequent taxable year, more than 50% of our assets may be assets held for the production of passive income. We will make this determination following the end of any particular tax year. Although the law in this regard is unclear, we treat our consolidated affiliated entities, as being owned by us for United States federal income tax purposes, not only because we exercise effective control over the operation of such entities but also because we are entitled to substantially all of their economic benefits, and, as a result, we consolidate their operating results in our consolidated financial statements. In particular, because the value of our assets for purposes of the asset test will generally be determined based on the market price of our ordinary shares and because cash is generally considered to be an asset held for the production of passive income, our PFIC status will depend in large part on the market price of our ordinary shares and the amount of cash we hold. Accordingly, fluctuations in the market price of the ordinary shares may cause us to become a PFIC. In addition, the application of the PFIC rules is subject to uncertainty in several respects. We are under no obligation to take steps to reduce the risk of our being classified as a PFIC, and as stated above, the determination of the value of our assets will depend upon material facts (including the market price of our ordinary shares from time to time that may not be within our control. If we are a PFIC for any year during which you hold ordinary shares, we will continue to be treated as a PFIC for all succeeding years during which you hold ordinary shares. However, if we cease to be a PFIC and you did not previously make a timely "mark-to-market" election as described below, you may avoid some of the adverse effects of the PFIC regime by making a "purging election" (as described below) with respect to the ordinary shares.

If we are a PFIC for your taxable year(s) during which you hold ordinary shares, you will be subject to special tax rules with respect to any "excess distribution" that you receive and any gain you realize from a sale or other disposition (including a pledge) of the ordinary shares, unless you make a "mark-to-market" election as discussed below. Distributions you receive in a taxable year that are greater than 125% of the average annual distributions you received during the shorter of the three preceding taxable years or your holding period for the ordinary shares will be treated as an excess distribution. Under these special tax rules:

- the excess distribution or gain will be allocated ratably over your holding period for the ordinary shares;

- the amount allocated to your current taxable year, and any amount allocated to any of your taxable year(s) prior to the first taxable year in which we were a PFIC, will be treated as ordinary income, and

- the amount allocated to each of your other taxable year(s) will be subject to the highest tax rate in effect for that year and the interest charge generally applicable to underpayments of tax will be imposed on the resulting tax attributable to each such year.

The tax liability for amounts allocated to years prior to the year of disposition or "excess distribution" cannot be offset by any net operating losses for such years, and gains (but not losses) realized on the sale of the ordinary shares cannot be treated as capital, even if you hold the ordinary shares as capital assets.

A U.S. Holder of "marketable stock" (as defined below) in a PFIC may make a mark-to-market election for such stock to elect out of the tax treatment discussed above. If you make a mark-to-market election for first taxable year which you hold (or are deemed to hold) ordinary shares and for which we are determined to be a PFIC, you will include in your income each year an amount equal to the excess, if any, of the fair market value of the ordinary shares as of the close of such taxable year over your adjusted basis in such ordinary shares, which excess will be treated as ordinary income and not capital gain. You are allowed an ordinary loss for the excess, if any, of the adjusted basis of the ordinary shares over their fair market value as of the close of the taxable year. However, such ordinary loss is allowable only to the extent of any net mark-to-market gains on the ordinary shares included in your income for prior taxable years. Amounts included in your income under a mark-to-market election, as well as gain on the actual sale or other disposition of the ordinary shares, are treated as ordinary income. Ordinary loss treatment also applies to any loss realized on the actual sale or disposition of the ordinary shares, to the extent that the amount of such loss does not exceed the net mark-to-market gains previously included for such ordinary shares. Your basis in the ordinary shares will be adjusted to reflect any such income or loss amounts. If you make a valid mark-to-market election, the tax rules that apply to distributions by corporations which are not PFICs would apply to distributions by us, except that the lower applicable capital gains rate for qualified dividend income discussed above under "— Taxation of Dividends and Other Distributions on our ordinary shares" generally would not apply.

The mark-to-market election is available only for "marketable stock", which is stock that is traded in other than de minimis quantities on at least 15 days during each calendar quarter ("regularly traded") on a qualified exchange or other market (as defined in applicable U.S. Treasury regulations), including Nasdaq. If the ordinary shares are regularly traded on Nasdaq and if you are a holder of ordinary shares, the mark-to-market election would be available to you were we to be or become a PFIC.

Alternatively, a U.S. Holder of stock in a PFIC may make a "qualified electing fund" election with respect to such PFIC to elect out of the tax treatment discussed above. A U.S. Holder who makes a valid qualified electing fund election with respect to a PFIC will generally include in gross income for a taxable year such holder's pro rata share of the corporation's earnings and profits for the taxable year. However, the qualified electing fund election is available only if such PFIC provides such U.S. Holder with certain information regarding its earnings and profits as required under applicable U.S. Treasury regulations. We do not currently intend to prepare or provide the information that would enable you to make a qualified electing fund election. If you hold ordinary shares in any taxable year in which we are a PFIC, you will be required to file U.S. Internal Revenue Service Form 8621 in each such year and provide certain annual information regarding such ordinary shares, including regarding distributions received on the ordinary shares and any gain realized on the disposition of the ordinary shares.

If you do not make a timely "mark-to-market" election (as described above), and if we were a PFIC at any time during the period you hold our ordinary shares, then such ordinary shares will continue to be treated as stock of a PFIC with respect to you even if we cease to be a PFIC in a future year, unless you make a "purging election" for the year we cease to be a PFIC. A "purging election" creates a deemed sale of such ordinary shares at their fair market value on the last day of the last year in which we are treated as a PFIC. The gain recognized by the purging election will be subject to the special tax and interest charge rules treating the gain as an excess distribution, as described above. As a result of the purging election, you will have a new basis (equal to the fair market value of the ordinary shares on the last day of the last year in which we are treated as a PFIC) and holding period (which new holding period will begin the day after such last day) in your ordinary shares for tax purposes.

You are urged to consult your tax advisors regarding the application of the PFIC rules to your investment in our ordinary shares and the elections discussed above.

***Information Reporting and Backup Withholding***

Dividend payments with respect to our ordinary shares and proceeds from the sale, exchange or redemption of our ordinary shares may be subject to information reporting to the U.S. Internal Revenue Service and possible U.S. backup withholding at a current rate of 24%. Backup withholding will not apply, however, to a U.S. Holder who furnishes a correct taxpayer identification number and makes any other required certification on U.S. Internal Revenue Service Form W-9 or who is otherwise exempt from backup withholding. U.S. Holders who are required to establish their exempt status generally must provide such certification on U.S. Internal Revenue Service Form W-9. U.S. Holders are urged to consult their tax advisors regarding the application of the U.S. information reporting and backup withholding rules.

Backup withholding is not an additional tax. Amounts withheld as backup withholding may be credited against your U.S. federal income tax liability, and you may obtain a refund of any excess amounts withheld under the backup withholding rules by filing the appropriate claim for refund with the U.S. Internal Revenue Service and furnishing any required information. We do not intend to withhold taxes for individual shareholders. However, transactions effected through certain brokers or other intermediaries may be subject to withholding taxes (including backup withholding), and such brokers or intermediaries may be required by law to withhold such taxes.

Under the Hiring Incentives to Restore Employment Act of 2010, certain U.S. Holders are required to report information relating to our ordinary shares, subject to certain exceptions (including an exception for ordinary shares held in accounts maintained by certain financial institutions), by attaching a complete Internal Revenue Service Form 8938, Statement of Specified Foreign Financial Assets, with their tax return for each year in which they hold ordinary shares.

**10.F. Dividends and Paying Agents**

Not Applicable.

**10.G. Statement by Experts**

Not Applicable.

**10.H. Documents on Display**

The Company is subject to the informational requirements of the Securities Exchange Act of 1934, as amended, and will file reports, registration statements and other information with the SEC. The Company's reports, registration statements and other information can be inspected on the SEC's website at www.sec.gov and such information can also be inspected and copies ordered at the public reference facilities maintained by the SEC at the following location: 100 F Street NE, Washington, D.C. 20549. However, information contained on our website does not constitute a part of this annual report.

**10.I. Subsidiary Information**

Not Applicable.

## ITEM 11. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Financial instruments that expose us to concentrations of credit risk primarily consist of cash and accounts receivables. The maximum amount of loss due to credit risk in the event of other parties failing to perform their obligations is represented by the carrying amount of each financial asset as stated in our consolidated balance sheets.

As of December 31, 2019, 2018, and 2017, substantially all of our cash included bank deposits in accounts maintained within the PRC where there is currently no rule or regulation in place for obligatory insurance to cover bank deposits in the event of bank failure. However, we have not experienced any losses in such accounts and we believe we are not exposed to any significant risks on our cash in bank accounts.

We are exposed to various types of market risks, including changes in foreign exchange rates, commodity prices and inflation in the normal course of business.

*Interest rate risk*

We are subject to risks resulting from fluctuations in interest rates on our bank balances. A substantial portion of our cash is held in China in interest bearing bank deposits and denominated in RMB. To the extent that we may need to raise debt financing in the future, upward fluctuations in interest rates would increase the cost of new debt. We do not currently use any derivative instruments to manage our interest rate risk.

*Commodity price risk*

Certain raw materials used by us are subject to price volatility caused by supply conditions, political and economic variables and other unpredictable factors. The primary purpose of our commodity price management activities is to manage the volatility associated with purchases of commodities in the normal course of business. We do not speculate on commodity prices.

*Foreign exchange risk*

The RMB is not a freely convertible currency. The PRC government may take actions that could cause future exchange rates to vary significantly from current or historical exchange rates. Fluctuations in exchange rates may adversely affect the value of any dividends we declare.

Very limited hedging transactions are available in China to reduce our exposure to exchange rate fluctuations. To date, we have not entered into any hedging transactions in an effort to reduce our exposure to foreign currency exchange risk. While we may enter into hedging transactions in the future, the availability and effectiveness of these transactions may be limited, and we may not be able to successfully hedge our exposure at all. In addition, our foreign currency exchange losses may be magnified by PRC exchange control regulations that restrict our ability to convert RMB into foreign currencies.

*Inflation risk*

Inflationary factors such as increases in the cost of our products and overhead costs may adversely affect our operating results. A high rate of inflation may have an adverse effect on our ability to maintain current levels of gross margin and selling, general and administrative expenses as a percentage of net revenues if the selling prices of our products do not increase proportionately with these increased costs.

## ITEM 12. DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES

Not applicable.

**PART II**

**ITEM 13. DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES**

Not Applicable.

**ITEM 14. MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS**

The following "Use of Proceeds" information relates to the registration statement on Form F-1, as amended (File Number: 333-222269), or the Form F-1, in relation to our IPO of 1,550,000 ordinary shares, including 232,500 shares sold pursuant to the full exercise of over-allotment option by the underwriter, at an initial offering price of US$4.00 per share. The Form F-1 was declared effective by the SEC on March 19, 2018. Our IPO closed in March 22, 2018. ViewTrade Securities, Inc. acted as the sole underwriter and book-runner for the offering.

The total expenses incurred for our company's account in connection with our IPO, including the over-allotment option, were approximately US$1.7 million, including underwriting discounts and commissions of approximately US$600,000 and other expenses of approximately US$1.1 million. None of the fees and expenses were directly or indirectly paid to the directors, officers, general partners of our company or their associates, persons owning 10% or more of our ordinary shares, or our affiliates.

After deducting the total expenses, we received net proceeds of approximately US$4.5 million from our IPO and approximately US$850,000 from the closing of over-allotment option.

None of the net proceeds from our initial public offering were directly or indirectly paid to the directors, officers, general partners of our company or their associates, persons owning 10% or more of our ordinary shares, or our affiliates.

100

**ITEM 15. CONTROLS AND PROCEDURES**

(a)  *Disclosure Controls and Procedures*

Our management, with the participation of our chief executive officer (CEO) and chief financial officer (CFO), has performed an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(c) under the Securities Exchange Act of 1934 (the "Exchange Act") as of the end of the period covered by this report, as required by Rule 13a-15(b) under the Exchange Act.

Based upon that evaluation, our management has concluded that, as of December 31, 2019, our disclosure controls and procedures were not effective in ensuring that the information required to be disclosed by us in the reports that we file and furnish under the Exchange Act was recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure.

(b)  *Management's Report on Internal Control Over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with international financial reporting standards ("IFRSs"). Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or because the degree of compliance with policies or procedures may deteriorate. Under the supervision and with the participation of our management, including our CEO and CFO, we conducted an assessment of the effectiveness of our internal control over financial reporting as of December 31, 2019. The assessment was based on criteria established in the framework Internal Control – Integrated Framework (2013), issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management determined that, as of December 31, 2019, we did not maintain effective internal control over financial reporting due to the existence of the following significant deficiencies and material weaknesses:

- Lack of sufficient full-time personnel with appropriate levels of accounting knowledge and experience to monitor the daily recording of transactions, address complex United States Generally Accepted Accounting Principles ("U.S. GAAP") accounting issues, and prepare and review financial statements and related disclosures under U.S. GAAP and, as a result, the Company may not be able to identify and monitor significant accounting issues appropriately on a timely basis;

- Lack of a functional internal audit department or personnel that monitors the consistencies of the preventive internal control procedures and, as a result, the Company may not be able to discover the existence of problems and prevent the problematic behavior  in internal control;

- Lack of adequate policies and procedures in internal audit function to ensure that the Company's policies and procedures have been carried out as planned;

- Lack of reviewed documentation for management's approval on aging analysis and, as a result, the Company may not be able to accrue provision for bad debt appropriately on a timely basis;

- Lack of sufficient monitoring of the employee resignation procedure, which may result in an inaccurate number of employees in the annual report;

- Lack of well-structured IT general control policies and procedures for documentation of program changes, periodic transaction log reviews; control quality evaluations, backup restoration tests and centralized anti-virus detections, which may result in failure to accurately collect operational data to prepare the financial statements;

- Lack of proper segregation of duties within accounting functions;

- Significant deficiencies were also detected at Dianniu, one of our VIEs, which in the aggregate, constitute a material weakness and create a reasonable likelihood that a material misstatement of our annual and interim financial statements will not be prevented or detected on a timely basis. Such deficiencies include: (i) lack of reviewed documentation for management's approval on aging analysis and, as a result, the Company may not be able to accrue provision for bad debt appropriately on a timely basis; and (ii) lack of sufficient monitoring of the employee resignation procedure, which may result in an inaccurate number of employees on the annual report.

As a company with limited resources, the Company does not have the resources to fund sufficient staff to ensure a complete segregation of responsibilities within the accounting function. However, management has carried out and is planning to undertake the following actions to remediate the material weakness described above:

- Recruiting qualified consultants with appropriate levels of knowledge and experience in U.S. GAAP reporting to assist in resolving accounting issues in non-routine or complex transactions;

- Set up an Internal Audit department and establish formal internal control policies and procedures. Implementation of an ongoing initiative and training in the Company to ensure the importance of internal controls and compliance with established policies and procedures are fully understood throughout the organization. To provide continuous U.S. GAAP knowledge trainings to relevant employees to ensure the procedures and policies are properly followed;

- Make quarterly aging analyses, which will be reviewed and confirmed by the CFO, and paying attention to the recoverable risk of long-term receivables, and accrue the bad debts provision if necessary;

- To further standardize the process of resignation, the resignation report of employees above manager level (including managers) shall be approved by the CEO with approval records/signature;

- The Company will set up IT strategic plans, annual plan and budget for it to be consistent with business development. The Company will maintain IT meeting minutes and communicate through emails with relevant departments. The Company will set up IT Best Practice Standards and evaluate the IT department performance annually. The Company will maintain records for IT change authorizations. The user access rights will be terminated the same day for any employees that leave the Company. The anti-virus software will be standardized and managed by specific designated personnel. The logs will be reviewed periodically to identify any unusual transactions. Restoration tests for backups will be performed regularly. Third-party services will be evaluated annually and the ones with bad performance will be terminated.

(c) *Changes in Internal Control over Financial Reporting*

The management is committed to improving the internal controls over financial reporting and will undertake consistent improvements or enhancements on an ongoing basis. Except as described above, there were no changes in our internal controls over financial reporting during our twelve months ended December 31, 2019 that have materially affected, or are reasonably likely to material affect, our internal control over financial reporting.

## ITEM 16. RESERVED

## ITEM 16A. AUDIT COMMITTEE FINANCIAL EXPERT

Our audit committee consists of Yan Xiong, Wei Liang and Yanjun Cui. Our board of directors has determined Yan Xiong, Wei Liang and Yanjun Cui are "independent directors" within the meaning of NASDAQ Stock Market Rule 5605(a)(2) and meet the criteria for independence set forth in Rule 10A−3(b) of the Exchange Act. Yan Xiong meets the criteria of an audit committee financial expert as set forth under the applicable rules of the SEC.

## ITEM 16B. CODE OF ETHICS

Our board of directors has adopted a code of business conduct and ethics. The purpose of the code is to promote ethical conduct and deter wrongdoing. The policies outlined in the Code are designed to ensure that our directors, executive officers and employees act in accordance with not only the letter but also the spirit of the laws and regulations that apply to our business. We expect our directors, executive officers and employees to exercise good judgment, to uphold these standards in their day-to-day activities, and to comply with all applicable policies and procedures in the course of their relationship with the company. During fiscal year 2019, no amendments to or waivers from the Code were made or given for any of our executive officers.

Our code of business conduct and ethics are publicly available on our website at http://www.dianniu98.com.

**ITEM 16C. PRINCIPAL ACCOUNTANT FEES AND SERVICES**

The following table sets forth the aggregate fees by categories specified below in connection with certain professional services rendered by our principal external auditors, for the periods indicated.

|  | Year Ended December 31, 2019 | Year Ended December 31, 2018 |
|---|---|---|
| Audit fees(1) | $ 85,000 | $ 155,000 |
| Audit related fees(2) | - | - |
| Tax fees(3) | - | - |
| All other fees(4) | - | - |
| TOTAL | $ 85,000 | $ 155,000 |

(1) "Audit fees" means the aggregate fees billed for each of the fiscal years for professional services rendered by our principal accountant for the audit of our annual financial statements or services that are normally provided by the accountant in connection with statutory and regulatory filings or engagements for those fiscal years.

(2) "Audit related fees" means the aggregate fees billed for each of the fiscal years for assurance and related services by our principal accountant that are reasonably related to the performance of the audit or review of our financial statements and are not reported under paragraph (1).

(3) "Tax Fees" represents the aggregate fees billed in each of the fiscal years listed for the professional tax services rendered by our principal auditors.

(4) "All Other Fees" represents the aggregate fees billed in each of the fiscal years listed for services rendered by our principal auditors other than services reported under "Audit fees," "Audit-related fees" and "Tax fees."

The policy of our audit committee and our board of directors is to pre-approve all audit and non-audit services provided by our principal auditors, including audit services, audit-related services, and other services as described above, other than those for de minimis services which are approved by the audit committee or our board of directors prior to the completion of the services.

**ITEM 16D. EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEES**

Not Applicable.

**ITEM 16E. PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS**

Not Applicable.

**ITEM 16F. CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT**

None.

**ITEM 16G. CORPORATE GOVERNANCE**

Our ordinary shares are listed on the NASDAQ Capital Market, or NASDAQ. As such, we are subject to corporate governance requirements imposed by NASDAQ. Under NASDAQ rules, listed non-US companies such as ourselves may, in general, follow their home country corporate governance practices in lieu of some of the NASDAQ corporate governance requirements. A NASDAQ -listed non-US company is required to provide a general summary of the significant differences to its US investors either on the company website or in its annual report distributed to its US investors. We are committed to a high standard of corporate governance. As such, we endeavor to comply with the NASDAQ corporate governance practices and there is no significant difference between our corporate governance practices and what the NASDAQ requires of domestic U.S. companies.

**ITEM 16H. MINE SAFETY DISCLOSURE**

Not applicable.

# PART III

## ITEM 17. FINANCIAL STATEMENTS

The consolidated financial statements and related notes required by this item are contained on pages F-1 through F-28.

## ITEM 18. EXHIBITS

| Exhibit Number | Description of Documents |
| --- | --- |
| 1.1 | Amended and Restated Memorandum of Association [1] |
| 1.2 | Amended and Restated Articles of Association [1] |
| 4.1 | Business Cooperation Agreement, dated June 8, 2017, by and between Shanghai Fuyu Information and Technology Co., Ltd. and Shanghai Dianniu Internet Finance Information Service Co., Ltd. [1] |
| 4.2 | Technical Consulting and Service Agreement, dated June 8, 2017, by and between Shanghai Fuyu Information and Technology Co., Ltd. and Shanghai Dianniu Internet Finance Information Service Co., Ltd. [1] |
| 4.3 | Form of Equity Pledge Agreement, by and among Shanghai Fuyu Information and Technology Co., Ltd., Shanghai Dianniu Internet Finance Information Service Co., Ltd. and equity holders of Shanghai Dianniu Internet Finance Information Service Co., Ltd. [1] |
| 4.4 | Form of Equity Option Agreement, by and among Shanghai Fuyu Information and Technology Co., Ltd., Shanghai Dianniu Internet Finance Information Service Co., Ltd. and equity holders of Shanghai Dianniu Internet Finance Information Service Co., Ltd. [1] |
| 4.5 | Form of Voting Rights Proxy and Finance Supporting Agreement by and among Shanghai Fuyu Information and Technology Co., Ltd., Shanghai Dianniu Internet Finance Information Service Co., Ltd. and equity holders of Shanghai Dianniu Internet Finance Information Service Co., Ltd. [1] |
| 4.6 | Business Cooperation Agreement, dated June 8, 2017, by and between Shanghai Fuyu Information and Technology Co., Ltd. and Shanghai Baoxun Advertisement Design Co., Ltd. [1] |
| 4.7 | Technical Consulting and Service Agreement, dated June 8, 2017, by and between Shanghai Fuyu Information and Technology Co., Ltd. and Shanghai Baoxun Advertisement Design Co., Ltd. [1] |
| 4.8 | Form of Equity Pledge Agreement by and among Shanghai Fuyu Information and Technology Co., Ltd., Shanghai Baoxun Advertisement Design Co., Ltd. and equity holders of Shanghai Baoxun Advertisement Design Co., Ltd. [1] |
| 4.9 | Form of Equity Option Agreement by and among Shanghai Fuyu Information and Technology Co., Ltd., Shanghai Baoxun Advertisement Design Co., Ltd. and equity holders of Shanghai Baoxun Advertisement Design Co., Ltd. [1] |
| 4.10 | Form of Voting Rights Proxy and Finance Supporting Agreement by and among Shanghai Fuyu Information and Technology Co., Ltd., Shanghai Baoxun Advertisement Design Co., Ltd. and equity holders of Shanghai Baoxun Advertisement Design Co., Ltd. [1] |
| 4.11 | Supplement Account and System Custodian Agreement, dated March 30, 2017, by and between Shanghai Dianniu Internet Finance Information Service Co., Ltd. and ChinaPnR Co., Ltd. [1] |
| 4.12 | Lease Agreement, dated November 11, 2015, by and between Shanghai Dianniu Internet Finance Information Service Co., Ltd. and Xinjiang Dushanzi Tianli Technology Co. Ltd. [1] |
| 4.13 | Form of Intermediary Service Agreement by and between Shanghai Dianniu Internet Finance Information Service Co., Ltd. and Borrowers on its lending platform [1] |
| 4.14 | Depository Cooperative Agreement, dated June 15, 2017, by and between Shanghai Dianniu Internet Finance Information Service Co., Ltd. and Bank of Shanghai Co., Ltd. [1] |
| 4.15 | Form of Indemnification Escrow Agreement [3] |
| 4.16 | Form of Lock-Up Agreement [2] |

4.17       Form of Subscription Agreement <u>(2)</u>

4.18       Form of Securities Purchase Agreement <u>(5)</u>

| Exhibit Number | Description of Documents |
|---|---|
| 4.19 | Employment Agreement entered into between the Registrant and Erke Huang [6] |
| 4.20 | Director Agreement entered into between the Registrant and Erke Huang [6] |
| 4.21 | Employment Agreement entered into between the Registrant and Min Hu [6] |
| 4.22 | Director Agreement entered into between the Registrant and Min Hu [6] |
| 4.23 | Director Agreement entered into between the Registrant and Ping Liu [6] |
| 4.24 | Form of Securities Purchase Agreement [6] |
| 4.25 | Employment Agreement entered into between the Registrant and Hong Yu [7] |
| 4.26 | Director Agreement entered into between the Registrant and Hong Yu [7] |
| 4.27 | Independent Director Agreement entered into between the Registrant and Yan Xiong [7] |
| 4.28 | Form of Hosting Service Contract * |
| 4.29 | Letter of Friedman dated Sept. 23, 2019 regarding change in auditor [8] |
| 4.30 | Letter of Wei, Wei & Co. LLP regarding change in auditor [9] |
| 8.1 | List of Subsidiaries and Consolidated Variable Interest Entities * |
| 11.1 | Contracted of Business Conduct and Ethics [4] |
| 12.1 | CEO Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 * |
| 12.2 | CFO Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 * |
| 13.1 | CEO Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 * |
| 13.2 | CFO Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 * |
| 99.1 | Statement for audit work delay of JKLZ CPA LLP [7] |
| 101.INS | XBRL Instance Document * |
| 101.SCH | XBRL Taxonomy Extension Schema Document * |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document * |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document * |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document * |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document * |

\*    Filed as an exhibit hereto.
\*\*   Furnished as an exhibit hereto.
(1)   Incorporated by reference to our Registration Statement on Form F-1, filed on December 22, 2017.
(2)   Incorporated by reference to our Registration Statement on Form F-1/A, filed on January 12, 2018.
(3)   Incorporated by reference to our Registration Statement on Form F-1/A, filed on March 9, 2018.
(4)   Incorporated by reference to our Annual Report on Form 20-F, filed on April 30, 2018.
(5)   Incorporated by reference to our Form 6-K, filed on May 28, 2020

(6)  Incorporated by reference to our Form 6-K, filed on October 31, 2019
(7)  Incorporated by reference to our Form 6-K, filed on April 24, 2020
(8)  Incorporated by reference to our Form 6-K, filed on September 23, 2019
(9)  Incorporated by reference to our Form 6-K, filed on January 9, 2020

## SIGNATURES

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and that it has duly caused and authorized the undersigned to sign this annual report on its behalf.

**GOLDEN BULL LIMITED**

/s/ Erke Huang

Name: Erke Huang
Title:   Chief Financial Officer

Date: July 29, 2020

107

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

Reports of Independent Public Accounting Firms                                        F-2
Audited Consolidated Financial Statements
Consolidated Balance Sheets                                                           F-4
Consolidated Statement of Operations and Comprehensive Loss                          F-5
Consolidated Statements of Shareholders' Equity                                      F-6
Consolidated Statements of Cash Flows                                                F-7
Notes to Consolidated Financial Statements                                           F-8

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and
Shareholders of Golden Bull Limited

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheet of Golden Bull Limited (the "Company") as of December 31, 2019, and the related consolidated statements of operations, comprehensive loss, shareholders' equity, and cash flows for the year ended December 31, 2019, and the related notes and schedules (collectively referred to as the financial statements). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2019, and the results of its operations and its cash flows the year in the ended December 31, 2019, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, and audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audit included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ JLKZ CPA LLP

We have served as the Company's auditor since 2020.

Flushing, New York
July 29, 2020

# FRIEDMAN LLP®

## ACCOUNTANTS AND ADVISORS

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors
and Shareholders of Golden Bull Limited

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Golden Bull Limited (the "Company") as of December 31, 2018 and 2017, and the related consolidated statements of operations, comprehensive loss, shareholders' equity, and cash flows for each of the years in the three year period ended December 31, 2018, and the related notes and schedules (collectively referred to as the financial statements). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2017, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2018, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, and audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Friedman LLP

We have served as the Company's auditor since 2017.

New York, New York
April 30, 2019

One Liberty Plaza, 165 Broadway, 21ˢᵗ Floor, New York, NY 10006  p 212.842.7000          friedmanllp.com

Your livelihood, empowered.                      An Independent Member Firm of DFK with offices worldwide. 

GOLDEN BULL LIMITED AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

| | December 31, 2019 | December 31, 2018 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS** | | |
| Cash and cash equivalents | $ 30,650 | $ 2,334,425 |
| Other receivables | 529,606 | 142,255 |
| Prepaid costs and expenses | - | 3,187,052 |
| Total current assets | 560,256 | 5,663,732 |
| **PROPERTY AND EQUIPMENT, NET** | - | 723,777 |
| **OTHER ASSETS** | | |
| Restricted cash | 600,000 | 600,000 |
| Deposits for rental vehicles | 3,246,277 | 2,482,592 |
| Deposits for property and equipment | 110,000 | - |
| Prepaid expenses | - | 2,200,506 |
| Deferred tax assets | - | 810,863 |
| Total other assets | 3,956,277 | 6,093,961 |
| Total assets | $ 4,516,533 | $ 12,481,470 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES** | | |
| Other payables and accrued liabilities | $ 429,593 | $ 355,434 |
| Taxes payable | - | 47,785 |
| Total current liabilities | 429,593 | 403,219 |
| Total liabilities | 429,593 | 403,219 |
| **COMMITMENTS AND CONTINGENCIES** | | |
| **SHAREHOLDERS' EQUITY** | | |
| Common shares, $0.01 par value, 50,000,000 shares authorized, 15,399,185 and 14,899,185 shares issued and outstanding of December 31, 2019 and December 31, 2018 | 153,992 | 148,992 |
| Shares subscription receivables | (45,457) | (45,457) |
| Additional paid-in capital | 17,610,220 | 15,855,220 |
| Statutory reserves | 6,189 | 6,189 |
| Accumulated deficit | (13,790,152) | (4,319,902) |
| Accumulated other comprehensive loss | (100,186) | (33,947) |
| Total shareholders' equity | 3,834,607 | 11,611,095 |
| **NONCONTROLLING INTEREST** | 252,333 | 467,156 |
| Total shareholders' equity | 4,086,940 | 12,078,251 |
| Total liabilities and shareholders' equity | $ 4,516,533 | $ 12,481,470 |

The accompanying notes are an integral part of these consolidated financial statements.

GOLDEN BULL LIMITED AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE LOSS

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2018 | 2017 |
| OPERATING REVENUES | | | |
| Transaction Fees | $ 2,197,598 | $ 3,994,195 | $ 3,307,984 |
| Management Fees | 2,390,440 | 4,399,578 | 4,037,700 |
| Sales taxes | (15,885) | (504,572) | (391,927) |
| Total operating revenues, net | 4,572,153 | 7,889,201 | 6,953,757 |
| OPERATING EXPENSES | | | |
| Selling | (8,196,151) | (4,940,784) | (3,910,646) |
| General and administrative | (5,788,918) | (6,685,377) | (3,916,736) |
| Research and development | (137,423) | (447,884) | (485,852) |
| Total operating expenses | (14,122,492) | (12,074,045) | (8,313,234) |
| LOSS FROM OPERATIONS | (9,550,339) | (4,184,844) | (1,359,477) |
| OTHER INCOME (EXPENSE) | | | |
| Interest income | - | 24,530 | 17,166 |
| Other finance expenses | (1,937) | (9,064) | (1,703) |
| Other income | 682,888 | 171,082 | 75,648 |
| Total other income, net | 680,951 | 186,548 | 91,111 |
| LOSS BEFORE INCOME TAXES (BENEFITS) | (8,869,388) | (3,998,297) | (1,268,366) |
| PROVISION (BENEFIT) FOR INCOME TAXES | | | |
| Current | - | 84,401 | 10,542 |
| Deferred | 806,803 | (545,572) | (282,083) |
| Total provision (benefit) for income taxes | 806,803 | (461,171) | (271,541) |
| NET LOSS | (9,676,191) | (3,537,126) | (996,825) |
| Less: Net loss attributable to noncontrolling interest | (205,941) | (111,145) | (54,457) |
| NET LOSS ATTRIBUTABLE TO GOLDEN BULL LIMITED | $ (9,470,250) | $ (3,425,981) | $ (942,368) |
| NET LOSS | $ (9,676,191) | $ (3,537,126) | $ (996,825) |
| OTHER COMPREHENSIVE INCOME (LOSS) | | | |
| Foreign currency translation adjustment | (75,120) | (391,463) | 574,628 |
| COMPREHENSIVE LOSS | (9,751,312) | (3,928,588) | (422,197) |
| Less: Comprehensive loss attributable to noncontrolling interest | (214,823) | (137,955) | (6,622) |
| COMPREHENSIVE LOSS ATTRIBUTABLE TO GOLDEN BULL LIMITED | $ (9,536,488) | $ (3,790,633) | $ (415,575) |
| WEIGHTED AVERAGE NUMBER OF COMMON SHARES | | | |
| Basic and diluted* | 15,197,815 | 14,392,001 | 6,815,134 |
| LOSS PER SHARE | | | |
| Basic and diluted* | $ (0.62) | $ (0.24) | $ (0.14) |

The accompanying notes are an integral part of these consolidated financial statements.

F-5

GOLDEN BULL LIMITED AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY

| | Ordinary Shares | | Shares Subscription Receivables | Additional paid-in capital | Retained earnings (accumulated deficit) | | Accumulated other comprehensive loss | Noncontrolling interest | Total |
| | Shares* | Par Value | | | Statutory reserves | Unrestricted | | | |
|---|---|---|---|---|---|---|---|---|---|
| BALANCE, December 31, 2017 | 13,000,000 | 130,000 | (45,457) | 12,312,828 | 6,189 | (893,921) | 330,706 | 605,111 | 12,445,456 |
| Issuance of original ordinary shares through Initial public offering, net | 1,550,000 | 15,500 | - | 2,465,554 | - | - | - | - | 2,481,054 |
| Issuance of over-allotment ordinary shares | 232,500 | 2,325 | - | 839,325 | | - | - | - | 841,650 |
| Issuance of exercised warrants shares | 63,645 | 636 | - | (636) | | - | - | - | - |
| Issuance of ordinary shares to service consultants | 53,040 | 530 | - | 238,150 | | - | - | - | 238,680 |
| Net loss attributable to Golden Bull Limited | - | - | - | - | - | (3,425,981) | - | | (3,425,981) |
| Net loss attributable to noncontrolling interest | - | - | - | - | - | - | - | (111,145) | (111,145) |
| Foreign currency translation | - | - | - | - | - | - | (364,653) | (26,810) | (391,463) |
| BALANCE, December 31, 2018 | 14,899,185 | 148,992 | (45,457) | 15,855,220 | 6,189 | (4,319,902) | (33,947) | 467,156 | 12,078,251 |
| Issuance of original ordinary shares through Initial public offering, net | - | - | - | - | - | - | - | - | - |
| Issuance of over-allotment ordinary shares | 500,000 | 5,000 | - | 1,755,000 | - | - | - | - | 1,760,000 |
| Issuance of exercised warrants shares | - | - | - | - | - | - | - | - | - |
| Issuance of ordinary shares to | - | - | - | - | - | - | - | - | - |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| service consultants | | | | | | | | |
| Net loss attributable to Golden Bull Limited | - | - | - | - | - | (9,470,250) | - | - | (9,470,250) |
| Net loss attributable to noncontrolling interest | - | - | - | - | - | - | - | (205,941) | (205,941) |
| Foreign currency translation | - | - | - | - | - | - | (66,238) | (8,882) | (75,120) |
| BALANCE, December 31, 2019 | 15,399,185 | $ 153,992 | $ (45,457) | $17,610,220 | $ 6,189 | $(13,790,152) | $ (100,185) | $ 252,333 | $ 4,086,940 |

The accompanying notes are an integral part of these consolidated financial statements.

F-6

GOLDEN BULL LIMITED AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS

| | For the years ended December 31, | | |
|---|---|---|---|
| | **2019** | **2018** | **2017** |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | |
| Net loss | $ (9,676,191) | $ (3,537,126) | $ (996,825) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation and amortization | 30,199 | 82,872 | 57,603 |
| Loss on disposal of equipment | - | - | 144 |
| Deferred tax benefits | 806,803 | (545,572) | (282,083) |
| Impairment loss/Write-downs on non-investments | 1,409,681 | - | - |
| Amortization of stock compensation expenses for services | 1,760,000 | 758,750 | 488,334 |
| Change in operating assets and liabilities | | | |
| Other receivables | (895,219) | 47,043 | (208,266) |
| Prepaid costs and expenses | 5,392,359 | (1,872,945) | (1,184,885) |
| Security deposits | - | - | 55,876 |
| Other payables and accrued liabilities | 89,631 | 2,287 | 238,913 |
| Deferred revenues | - | - | (13,651) |
| Deferred rent liabilities | - | - | (13,410) |
| Taxes payable | (264,745) | 14,615 | (50,489) |
| Net cash used in operating activities | (1,347,482) | (5,050,076) | (1,908,739) |
| | | | |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | | |
| Purchases of property and equipment | - | (753,094) | (49,082) |
| Deposits for property and equipment | (110,000) | - | - |
| Deposits for rental vehicles | (806,167) | (2,580,632) | - |
| Cash acquired through variable interest entity | - | - | 17,868 |
| Net cash used in investing activities | (916,167) | (3,333,726) | (31,214) |
| | | | |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | |
| Proceeds from issuance of ordinary shares through initial public offerings, net | - | 5,944,147 | - |
| Prepaid initial public offerings costs | - | - | (389,635) |
| Net cash provided by (used in) financing activities | - | 5,944,147 | (389,635) |
| | | | |
| EFFECT OF EXCHANGE RATE ON CASH, CASH EQUIVALENT AND RESTRICTED CASH | (40,126) | (82,699) | 407,446 |
| | | | |
| DECREASE IN CASH, CASH EQUIVALENT AND RESTRICTED CASH | (2,303,775) | (2,522,354) | (1,922,142) |
| | | | |
| CASH, CASH EQUIVALENT AND RESTRICTED CASH, beginning of year | 2,934,425 | 5,456,778 | 7,378,920 |
| | | | |
| CASH, CASH EQUIVALENT AND RESTRICTED CASH, end of year | $ 630,650 | $ 2,934,425 | $ 5,456,778 |
| | | | |
| SUPPLEMENTAL CASH FLOW INFORMATION: | | | |
| Cash paid for income tax | $ - | $ 84,402 | $ 10,542 |
| | | | |
| Cash and cash equivalents | $ 30,650 | $ 2,334,425 | $ 5,456,778 |
| Restricted cash | 600,000 | 600,000 | - |
| CASH, CASH EQUIVALENTS AND RESTRICTED CASH, end of year | 630,650 | 2,934,425 | 5,456,778 |
| NON-CASH TRANSACTIONS OF INVESTING AND FINANCING ACTIVITIES | | | |
| Capital contribution on shares subscription receivables | $ - | $ - | $ - |
| Noncontrolling interests acquired and contributed by shareholders | $ - | $ - | $ 348,323 |
| Issuance of ordinary shares to consultants and service providers | $ 1,760,000 | $ 238,680 | $ 4,030,000 |
| Prepaid initial public offerings costs offset against initial public offerings proceeds | $ - | $ 2,382,763 | $ - |

The accompanying notes are an integral part of these consolidated financial statements.

GOLDEN BULL LIMITED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Note 1 – Nature of business and organization**

Golden Bull Limited ("Golden Bull Cayman" or the "Company") is a holding company incorporated on February 17, 2017, under the laws of the Cayman Islands. The Company has no substantial operations other than holding all of the outstanding share capital of Point Cattle Holdings Limited ("Golden Bull BVI"). Golden Bull BVI is also a holding company holding all of the outstanding share capital of Point Cattle Group Company Limited ("Golden Bull HK"). Golden Bull HK is also a holding company holding all of the outstanding equity of Shanghai Fuyu Information and Technology Co., Ltd. ("Golden Bull WFOE").

The Company, through its variable interest entity ("VIE"), Shanghai Dianniu Internet Finance Information Service Co. Ltd. ("Shanghai Dianniu"), is engaged in providing services for online marketplace connecting borrowers and lenders, and, through its VIE, Shanghai Baoxun Advertisement Design Co. Ltd. ("Shanghai Baoxun"), intends to engage in design and production of online advertisement and marketing survey services for online marketplace. The Company's headquarter is located in the city of Shanghai, in the People's Republic of China (the "PRC" or "China"). All of the Company's business activities are carried out by Shanghai Dianniu. Shanghai Baoxun currently does not have any operations as of the date hereof.

In 2018, Shanghai Youwang Vehicle Rental Limited ("Shanghai Youwang") and Shanghai Xingjiuhao Network Technology Limited ("Shanghai Xingjiuhao" or the "Xingjiuhao") were established as subsidiaries of Shanghai Dianniu. Shanghai Youwang intends to engage in vehicle sales, vehicle rental, providing consultation and services in the field of automotive technology. Xingjiuhao is going to engage in production and sales for Internet of Things ("IoT") technology and technical consulting. Both Shanghai Youwang and Xingjiuhao do not have any operations as of the date hereof since their incorporations.

On June 8, 2017, Golden Bull Cayman completed its reorganization of entities under the common control of three shareholders, who collectively owned a majority of the equity interests of Golden Bull Cayman prior to the reorganization. Golden Bull Cayman, Golden Bull BVI, and Golden Bull HK, were established as the holding companies of Golden Bull WFOE. Golden Bull WFOE is the primary beneficiary of Shanghai Dianniu and Shanghai Baoxun, and all of these entities included in Golden Bull Cayman are under common control, which results in the consolidation of Shanghai Dianniu and Shanghai Baoxun which have been accounted for as a reorganization of entities under common control at carrying value. The financial statements are prepared on the basis as if the reorganization became effective as of the beginning of the first period presented in the accompanying consolidated financial statements of Golden Bull Cayman.

On June 3, 2019, Golden Bull USA was incorporated in the State of New York, which is a wholly owned subsidiary of Golden Bull Limited. Golden Bull USA is our principal office and we plan to develop car rental business through Golden Bull USA.

On April 8, 2020, Golden Bull Limited entered into an Instrument of Transfer with Mr. Ching Yeh to acquire his 100% of the ownership interest (10,000 shares) in XMAX Chain Limited ("XMAX") for HKD 10,000 (HKD 1.00 per one share). After the acquisition, XMAX became a wholly owned subsidiary of Golden Bull Limited. XMAX is a Hong Kong company, engaging bitcoin mining business and was incorporated on March 21, 2018.

**<u>Contractual Arrangements</u>**

Foreign ownership of internet-based businesses, including distribution of online information (such as an online marketplace connecting borrowers and lenders) and marketing survey services for online marketplace, is subject to restrictions under current PRC laws and regulations. For example, foreign investors are not allowed to own more than 50% of the equity interests in internet-based businesses, subject to certain exceptions, and any such foreign investor must have experience in providing internet-based businesses services overseas and maintain a good track record in accordance with the Guidance Catalog of Industries for Foreign Investment promulgated in 2007, as amended in 2011, 2015 and 2017, respectively, and other applicable laws and regulations. The Company is a Cayman Islands company and Golden Bull WFOE (its PRC subsidiary) is considered a foreign invested enterprise. To comply with these regulations, the Company conducts the majority of its activities in PRC through Shanghai Dianniu and Shanghai Baoxun (its consolidated VIEs). As such, Shanghai Dianniu and Shanghai Baoxun are controlled through contractual arrangements in lieu of direct equity ownership by the Company or any of its subsidiaries. Such contractual arrangements are a series of five agreements (collectively the "Contractual Arrangements") which significant terms are as follows:

<u>Contractual Agreements with Shanghai Dianniu</u>

*Technical Consultation and Services Agreement*

Pursuant to the technical consultation and services agreement between Golden Bull WFOE and Shanghai Dianniu, as amended, Golden Bull WFOE is engaged as exclusive provider of management consulting services to Shanghai Dianniu. For such services, the Shanghai Dianniu agrees to pay service fees determined based on 93.2% of its net income to Golden Bull WFOE or Golden Bull WFOE has obligation to absorb 93.2% of Shanghai Dianniu's losses.

GOLDEN BULL LIMITED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The technical consultation and services agreement, as amended, remains in effect for 20 years until June 7, 2037. The agreement can be extended only if Golden Bull WFOE gives its written consent of extension of the agreement before the expiration of the agreement and Shanghai Dianniu shall agree to the extension without reserve.

*Business Cooperation Agreement*

Pursuant to the business cooperation agreement between Golden Bull WFOE and Shanghai Dianniu, as amended, Golden Bull WFOE has the exclusive right to provide Shanghai Dianniu with technical support, business support and related consulting services, including but not limited to technical services, business consultations, equipment or property leasing, marketing consultancy, system integration, product research and development, and system maintenance. In exchange, Golden Bull WFOE is entitled to a service fee that equals to 93.2% of the net income of Shanghai Dianniu determined by U.S. GAAP. The service fees may be adjusted based on the services rendered by Golden Bull WFOE in that month and the operational needs of Shanghai Dianniu.

The business cooperation agreement, as amended, remains in effect until and unless Golden Bull WFOE commits gross negligence, or a fraudulent act, against Shanghai Dianniu. Nevertheless, Golden Bull WFOE shall have the right to terminate this agreement upon giving 30 days' prior written notice to Shanghai Dianniu at any time.

*Equity Option Agreements*

Pursuant to the equity option agreements, as amended, among the shareholders who collectively own 93.2% of Shanghai Dianniu (the "Participating Shareholders"), Shanghai Dianniu and Golden Bull WFOE, Shanghai Dianniu Participating Shareholders jointly and severally grant Golden Bull WFOE an option to purchase their equity interests in Shanghai Dianniu. The purchase price shall be the lowest price then permitted under applicable PRC laws. If the purchase price is greater than the registered capital of Shanghai Dianniu, the Participating Shareholders of Shanghai Dianniu are required to immediately return any amount in excess of the registered capital to Golden Bull WFOE or its designee of Golden Bull WFOE. Golden Bull WOFE may exercise such option at any time until it has acquired all equity interests of Shanghai Dianniu, and freely transfer the option to any third party. The agreements will terminate at the date on which all of the Participating Shareholders' equity interests of Shanghai Dianniu has been transferred to Golden Bull WFOE or its designee.

F-9

GOLDEN BULL LIMITED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Equity Pledge Agreements*

Pursuant to the equity pledge agreements, as amended, among the Participating Shareholders of Shanghai Dianniu and Golden Bull WFOE, such Participating shareholders pledge 93.2% of the equity interests in Shanghai Dianniu to Golden Bull WFOE as collateral to secure the obligations of Shanghai Dianniu under the exclusive consulting services and operating agreement. The Participating Shareholders may not transfer or assign transfer or assign the pledged equity interests, or incur or allow any encumbrance that would jeopardize Golden Bull WFOE's interests, without Golden Bull WFOE's prior approval. In the event of default, Golden Bull WFOE as the pledgee will be entitled to certain rights and entitlements, including the priority in receiving payments by the evaluation or proceeds from the auction or sale of whole or part of the pledged equity interests of Shanghai Dianniu. The agreement will terminate at the date the Participating Shareholders have transferred all of their pledged equity interests pursuant to the equity option agreement.

*Voting Rights Proxy and Financial Supporting Agreements*

Pursuant to the voting rights proxy and financial supporting agreements, as amended, among the Participating Shareholders of Shanghai Dianniu and Golden Bull WFOE, Shanghai Dianniu's Participating Shareholders have given Golden Bull WFOE an irrevocable proxy to act on their behalf on all matters pertaining to Shanghai Dianniu and to exercise all of their rights as shareholders of Shanghai Dianniu, including the right to attend shareholders meeting, to exercise voting rights and to transfer all or a part of their equity interests in Shanghai Dianniu. In consideration of such granted rights, Golden Bull WFOE agrees to provide the necessary financial support to Shanghai Dianniu whether or not Shanghai Dianniu incurs loss and agrees not to request repayment if Shanghai Dianniu is unable to do so. The agreements shall remain in effect for 20 years until June 7, 2037.

<u>Contractual Agreements with Shanghai Baoxun</u>

*Technical Consultation and Services Agreement*

Pursuant to the technical consultation and services agreement and the business cooperation agreement between Golden Bull WFOE and Shanghai Baoxun, Golden Bull WFOE is engaged as exclusive provider of management consulting services to Shanghai Baoxun. For such services, the Shanghai Baoxun agrees to pay service fees determined based on all of its net income to Golden Bull WFOE or Golden Bull WFOE has obligation to absorb all of Shanghai Baoxun's losses.

The technical consultation and services agreement remain in effect for 20 years until June 7, 2037. The technical consultation and services agreement can be extended only if Golden Bull WFOE gives its written consent of extension of the agreement before the expiration of the agreement and Shanghai Baoxun shall agree to the extension without reserve.

*Business Cooperation Agreement*

Pursuant to the business cooperation agreement between Golden Bull WFOE and Shanghai Baoxun, Golden Bull WFOE has the exclusive right to provide Shanghai Baoxun with technical support, business support and related consulting services, including but not limited to technical services, business consultations, equipment or property leasing, marketing consultancy, system integration, product research and development, and system maintenance. In exchange, Golden Bull WFOE will be entitled to a service fee that equals to 100% of the net income of Shanghai Baoxun determined by U.S. GAAP. The service fees may be adjusted based on the services rendered by Golden Bull WFOE in that month and the operational needs of Shanghai Baoxun.

The business cooperation agreement remains in effect until and unless Golden Bull WFOE commits gross negligence, or a fraudulent act, against Shanghai Baoxun. Nevertheless, Golden Bull WFOE shall have the right to terminate this agreement upon giving 30 days' prior written notice to Shanghai Baoxun at any time.

GOLDEN BULL LIMITED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Equity Option Agreements*

Pursuant to the equity option agreement between the shareholders of Shanghai Baoxun and Golden Bull WFOE, Shanghai Baoxun shareholders jointly and severally grant Golden Bull WFOE an option to purchase their equity interests in Shanghai Baoxun. The purchase price shall be the lowest price then permitted under applicable PRC laws. If the purchase price is greater than the registered capital of Shanghai Baoxun, the shareholders of Shanghai Baoxun are required to immediately return any amount in excess of the registered capital to Golden Bull WFOE or its designee of Golden Bull WFOE. Golden Bull WOFE may exercise such option at any time until it has acquired all equity interests of Shanghai Baoxun, and freely transfer the option to any third party. The agreement will terminate at the date on which all of the shareholders' equity interests of Shanghai Baoxun has been transferred to Golden Bull WFOE or its designee.

*Equity Pledge Agreements*

Pursuant to the equity pledge agreement between the shareholders of Shanghai Baoxun and Golden Bull WFOE, such shareholders pledge all of their equity interests in Shanghai Baoxun to Golden Bull WFOE as collateral to secure the obligations of Shanghai Baoxun under the exclusive consulting services and operating agreement. The shareholders may not transfer or assign transfer or assign the pledged equity interests or incur or allow any encumbrance that would jeopardize Golden Bull WFOE's interests, without Golden Bull WFOE's prior approval. In the event of default, Golden Bull WFOE as the pledgee will be entitled to certain rights and entitlements, including the priority in receiving payments by the evaluation or proceeds from the auction or sale of whole or part of the pledged equity interests of Shanghai Baoxun. The agreement will terminate at the date the shareholders have transferred all of their pledged equity interests pursuant to the equity option agreement.

*Voting Rights Proxy and Financial Supporting Agreements*

Pursuant to the voting rights proxy and financial supporting agreement between the shareholders of Shanghai Baoxun and Golden Bull WFOE, Shanghai Baoxun's shareholders have given Golden Bull WFOE an irrevocable proxy to act on their behalf on all matters pertaining to Shanghai Baoxun and to exercise all of their rights as shareholders of Shanghai Baoxun, including the right to attend shareholders meeting, to exercise voting rights and to transfer all or a part of their equity interests in Shanghai Baoxun. In consideration of such granted rights, Golden Bull WFOE agrees to provide the necessary financial support to Shanghai Baoxun whether or not Shanghai Baoxun incurs loss and agrees not to request repayment if Shanghai Baoxun is unable to do so. The agreement shall remain in effect for 20 years until June 7, 2037.

Based on the foregoing contractual arrangements, which grant Golden Bull WFOE effective control of Shanghai Dianniu obligate Golden Bull WFOE to absorb 93.2% of the risk of loss from their activities, enable Golden Bull WFOE to receive 93.2% of their expected residual returns, and grant Golden Bull WFOE effective control of Shanghai Baoxun obligate Golden Bull WFOE to absorb all of the risk of loss from their activities, and enable Golden Bull WFOE to receive all of their expected residual returns, the Company accounts for Shanghai Dianniu and Shanghai Baoxun as a VIEs. Accordingly, the Company consolidates the accounts of Shanghai Dianniu for the periods presented herein and Shanghai Baoxun from February 22, 2017, the date of which Shanghai Baoxun becomes under common control, in accordance with Regulation S-X-3A-02 promulgated by the Securities Exchange Commission ("SEC"), and Accounting Standards Codification ("ASC") 810-10, Consolidation.

GOLDEN BULL LIMITED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The accompanying consolidated financial statements reflect the activities of Golden Bull Cayman and each of the following entities:

| Name | Background | Ownership |
|---|---|---|
| Golden Bull BVI | ● A British Virgin Islands company<br>● Incorporated on February 27, 2017 | 100% |
| Golden Bull HK | ● A Hong Kong company<br>● Incorporated on January 24, 2017 | 100% owned by Golden Bull BVI |
| Golden Bull USA | ● A USA company<br>● Incorporated on June 3, 2019 | 100% owned by Golden Bull Limited |
| Golden Bull WFOE | ● A PRC limited liability company and deemed a wholly foreign owned enterprise ("WFOE")<br>● Incorporated on June 8, 2017 | 100% owned by Golden Bull HK |
| Shanghai Dianniu | ● A PRC limited liability company<br>● Incorporated on November 17, 2015<br>● Services for online marketplace connecting borrowers and lenders. | VIE of Golden Bull WFOE |
| Shanghai Baoxun | ● A PRC limited liability company<br>● Incorporated on January 22, 2016<br>● Design and production of online advertisement and marketing survey services for online marketplace. | VIE of Golden Bull WOFE |
| Shanghai Youwang | ● A PRC limited liability company<br>● Incorporated on April 4, 2018<br>● Vehicle sales, vehicle rental, providing consultation and services in the field of automotive technology. | 100% owned by Dianniu |
| Shanghai Xingjiuhao | ● A PRC limited liability company<br>● Incorporated on October 22, 2018<br>● Production and sales for Internet of Things technology and technical consulting. | 100% owned by Dianniu |
| XMAX Chain Limited | ● A Hong Kong company<br>● Acquired on April 8, 2020 | 100% owned by Golden Bull Limited |

Peer to peer lending business

In October 2019, the Company temporarily suspended operation of Shanghai Dianniu, which provides services for online marketplace connecting borrowers and lenders. With the policy change of PRC government, it becomes more difficult to restart the business in its original form. The Company is still considering its finance related business in different manners consistent with the PRC regulation.

Shanghai Dianniu is the only operating entity of the group during 2017 to 2019, contributing to all the revenue of the Company. Other than Shanghai Dianniu, the Company's van rental and bitcoin mining businesses placed deposits for purchase of fixed assets. As of December 31, 2019, 2018 and 2017 the relevant deposits for fixed assets amounted to US$3,356,277, US$2,482,592, US$nil, respectively. Related cash flows (investing activities) for the years ended December 31, 2019, 2018 and 2017 are payments for deposits for fixed assets of US$916,167, US$2,580,632 and US$nil, respectively.

The peer to peer lending business was the sole operation of the Company for the years 2017 to 2019 and cannot be distinguished from the rest of the Company. As such, the Company's only operation does not meet the definition of a component of an entity as contemplated in ASC 205-20, and cannot be reported in discontinued operations in the Company's financial statements. However, the Company already applied the measurement requirements in ASC 360-10 Impairment and Disposal of Long-Lived Assets to write-off and impair assets related to the peer to peer lending business.

**Note 2 – Summary of significant accounting policies**

Liquidity

As of December 31, 2019, the Company had approximately $0.63 million of cash, cash equivalents and restricted cash. The Company's executive directors pledged to provide continuous financial support to the Company for at least next 12 months from the date of this filing. During the year ended December 31, 2019, the Company was able to entered into additional private placement agreement with certain private investors and issued 6,500,000 shares of common stock at $0.40 per share in October 2019 and received the subscription from shareholders of $2,600,000 on May 8,2020. Subsequently, in May 2020, the Company entered into certain private placement agreement with certain private investors and is offering 21,500,000 shares of common stock at $0.80 per share. On July 6, 2020, the Company closed a private offering and received gross proceeds of approximately $17.2 million. Going forward, the Company plans to fund its operations through revenue generated from its bitcoin mining business, funds from its private placements as well as financial support commitments from the Company's executive directors.

Basis of presentation

The accompanying consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") and pursuant to the rules and regulations of the Securities Exchange Commission ("SEC").

F-12

GOLDEN BULL LIMITED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Principles of consolidation

The consolidated financial statements include the accounts of the Company, its subsidiaries, and their VIEs. All intercompany transactions and balances are eliminated upon consolidation.

Use of estimates and assumptions

The preparation of consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities as of the date of the consolidated financial statements and the reported amounts of revenues and expenses during the periods presented. Significant estimates required to be made by management include, but are not limited to, useful lives of property, plant and equipment, deferred income tax and share based compensation. Actual results could differ from these estimates.

Foreign currency translation and transaction

The reporting currency of the Company is the U.S. dollar. The Company in China conducts its businesses in the local currency, Renminbi (RMB), as its functional currency. Assets and liabilities are translated at the unified exchange rate as quoted by the People's Bank of China at the end of the period. The statement of income accounts is translated at the average translation rates and the equity accounts are translated at historical rates. Translation adjustments resulting from this process are included in accumulated other comprehensive income (loss). Transaction gains and losses that arise from exchange rate fluctuations on transactions denominated in a currency other than the functional currency are included in the results of operations as incurred.

Translation adjustments were included in accumulated other comprehensive income (loss). The balance sheet amounts, with the exception of shareholders' equity at December 31, 2019 and 2018 were translated at 6.9762 RMB and 6.8776 RMB to $1.00, respectively. The shareholder's equity accounts were stated at their historical rate. The average translation rates applied to the consolidated statements of operations for the years ended December 31, 2019, 2018 and 2017 were 6.9122 RMB, 6.6163 RMB and 6.7563 RMB to $1.00, respectively. Cash flows were also translated at average translation rates for the periods, therefore, amounts reported on the statement of cash flows will not necessarily agree with changes in the corresponding balances on the consolidated balance sheets.

Fair value measurement

The accounting standard regarding fair value of financial instruments and related fair value measurements defines financial instruments and requires disclosure of the fair value of financial instruments held by the Company.

The accounting standards define fair value, establish a three-level valuation hierarchy for disclosures of fair value measurement and enhance disclosure requirements for fair value measures. The three levels are defined as follow:

● Level 1 inputs to the valuation methodology are quoted prices (unadjusted) for identical assets or liabilities in active markets.

● Level 2 inputs to the valuation methodology include quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the assets or liability, either directly or indirectly, for substantially the full term of the financial instruments.

● Level 3 inputs to the valuation methodology are unobservable and significant to the fair value.

The carrying amounts included in current assets and current liabilities are reported in the consolidated balance sheets as approximate fair value because of the short period of time between the origination of such instruments and their expected realization and their current market rates of interest. The long-term prepaid expense is approximate to its carrying value.

Revenue recognition

On January 1, 2018, the Company adopted Accounting Standards Update ("ASU") 2014-09 Revenue from Contracts with Customers (ASC 606) using the modified retrospective method for contracts that were not completed as of January 1, 2018. This did not result in an adjustment to retained earnings upon adoption of this new guidance as the Company's revenue was recognized based on the amount of consideration we expect to receive in exchange for satisfying the performance obligations.

GOLDEN BULL LIMITED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The core principle underlying the revenue recognition ASU is that the Company will recognize revenue to represent the transfer of goods and services to customers in an amount that reflects the consideration to which the Company expects to be entitled in such exchange. This will require the Company to identify contractual performance obligations and determine whether revenue should be recognized at a point in time or over time, based on when control of goods and services transfers to a customer. The Company's revenue streams are primarily recognized at a point in time.

The ASU requires the use of a new five-step model to recognize revenue from customer contracts. The five-step model requires that the Company (i) identify the contract with the customer, (ii) identify the performance obligations in the contract, (iii) determine the transaction price, including variable consideration to the extent that it is probable that a significant future reversal will not occur, (iv) allocate the transaction price to the respective performance obligations in the contract, and (v) recognize revenue when (or as) the Company satisfies the performance obligation. The application of the five-step model to the revenue streams compared to the prior guidance did not result in significant changes in the way the Company records its revenue. Upon adoption, the Company evaluated its revenue recognition policy for all revenue streams within the scope of the ASU under previous standards and using the five-step model under the new guidance and confirmed that there were no differences in the pattern of revenue recognition.

*Transaction Fees*: Transaction fees are paid by borrowers to the Company for the work performed through its platform. These fees are recognized as a component of operating revenue at the time of loan issuance. The amount of these fees is based upon the loan amount and other terms of the loan, including credit grade, maturity and other factors. These fees are non-refundable upon the issuance of loan.

*Management Fees*: Loan borrowers pay a management fee on each loan payment to compensate the Company for services provided in connection with facilitation of the loan transactions. The Company records management fees as a component of operating revenue at the time of loan issuance. The amount of these fees is based upon the loan amount and other terms of the loan, including credit grade, maturity and other factors. These fees are non-refundable upon the issuance of loan.

In applying judgment, the Company considered customers' expectations of performance, materiality and the core principles of ASC Topic 606. The aforementioned revenues are recognized and the Company's performance obligations (control of services) are generally transferred to the customers at the time of loan issuance. The Company's contracts with borrowers generally do not include any variable consideration.

*Sales taxes*: Transaction fee, management fee and license fee that are earned and received in the PRC are subject to a Chinese value-added tax ("VAT") at a rate of 6% starting in April 2017 (3% prior to March 2017) of the gross proceed or at a rate approved by the Chinese local government Transaction fee and management fee that are earned and received in the PRC are also subject to various miscellaneous sales taxes at a rate of 6% of the VAT in 2019 and 10% of VAT in 2018 and 2017. VAT and miscellaneous sales taxes are presented as reduction of revenue.

<u>Incentives</u>

In order to incentivize lenders, the Company provides incentives to marketplace lenders, who commit a certain amount of money for a period of time. During the relevant incentive program period, the Company set certain thresholds for the lenders to qualify for the cash incentive. When a qualified investment is made by a lender, the incentive payment is paid to the lender as a percentage of investment amount at the time of loan issuance as part of its investment to the specified loan that he/she has invested. The incentive expenses are recognized in our selling expenses in the accompanying consolidated statements of operations and comprehensive loss. These expenses amounted to $1,119,943, $2,191,498 and $1,497,279 for the years ended December 31, 2019, 2018 and 2017, respectively.

GOLDEN BULL LIMITED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

<u>Servicing Expense</u>

Servicing expenses are paid by the Company to a third-party platform provider on each deposit made by the lenders into their respective fund accounts held by the third-party platform fund accounts. The amount of these expenses is based upon the deposit amount. The servicing expenses are recognized in our selling expenses in the accompanying consolidated statements of operations and comprehensive loss. These expenses amounted to $187,972, $134,374 and $205,604 for the years ended December 31, 2019, 2018 and 2017, respectively.

<u>Verification, credit assessment and the decision-making processes costs</u>

Costs related to verification and credit assessment are recognized in the selling expenses in our accompanying consolidated statements of operations. Costs related to the decision-making processes are recognized in the general and administration expenses in our accompanying consolidated statements of operations. These expenses are immaterial to our consolidated statements of operations for the years ended December 31, 2019, 2018 and 2017.

<u>Cash, cash equivalents and restricted cash</u>

Cash, cash equivalents and restricted cash consist of cash on hand, demand deposits, short-term investment placed with banks or other financial institutions and have original maturities of less than six months and restricted cash, deposit of $600,000 was to fund an escrow account established for purpose of indemnifying the underwriter of the initial public offering in March 2018 as restricted cash for 30 months, which was classified as non-current assets as of December 31, 2019 and 2018. Cash and cash equivalents also consist of funds earned from the Company's operating revenues which were held at a third-party platform fund accounts which are unrestricted as to immediate withdrawal and use.

<u>Property and equipment</u>

Property and equipment are stated at cost less accumulated depreciation and amortization. Depreciation and amortization are computed using the straight-line method after consideration of the estimated useful lives and estimated residual value. The estimated useful lives are as follows:

| | Useful Life | Estimated Residual Value |
|---|---|---|
| Office equipment and furnishing | 3-5 years | 5% |
| Leasehold improvements | Shorter of the remaining lease terms or estimated useful lives | - |

The cost and related accumulated depreciation and amortization of assets sold or otherwise retired are eliminated from the accounts and any gain or loss is included in the consolidated statements of operations and comprehensive loss. Expenditures for maintenance and repairs are charged to earnings as incurred, while additions, renewals and betterments, which are expected to extend the useful life of assets, are capitalized. The Company also re-evaluates the periods of depreciation and amortization to determine whether subsequent events and circumstances warrant revised estimates of useful lives.

<u>Impairment for long-lived assets</u>

Long-lived assets, including property and equipment with finite lives are reviewed for impairment whenever events or changes in circumstances (such as a significant adverse change to market conditions that will impact the future use of the assets) indicate that the carrying value of an asset may not be recoverable. The Company assesses the recoverability of the assets based on the undiscounted future cash flows the assets are expected to generate and recognize an impairment loss when estimated discounted future cash flows expected to result from the use of the asset plus net proceeds expected from disposition of the asset, if any, are less than the carrying value of the asset. If an impairment is identified, the Company would reduce the carrying amount of the asset to its estimated fair value based on a discounted cash flows approach or, when available and appropriate, to comparable market values. As of December 31, 2019, $683,627 of property and equipment was recognized. As of December 2018, no impairment of long-lived asset was recognized.

GOLDEN BULL LIMITED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Deferred rent

The Company leases office space and apartment units under operating lease agreements. Certain lease agreements contain scheduled rent increases, tenant improvement allowances or free rent clauses during the term of the lease which are recorded as deferred rent liabilities. Deferred rent liabilities represent the cumulative amount charged to operations under these leases in excess of the amounts paid and was included in prepaid expenses. Rent expense is amortized on a straight-line basis to operating expense over the applicable lease term.

Research and development

Research and development costs, which include the salary of the Company's research and development department and benefit and website development cost, are expensed as incurred.

Advertising costs

Advertising costs are expensed as incurred and included in selling expenses. These expenses amounted to $758,942, $431,734 and $460,351 for the years ended December 31, 2019, 2018 and 2017, respectively.

Income taxes

The Company accounts for income taxes in accordance with U.S. GAAP for income taxes. Under the asset and liability method as required by this accounting standard, the recognition of deferred income tax liabilities and assets for the expected future tax consequences of temporary differences between the income tax basis and financial reporting basis of assets and liabilities. Provision for income taxes consists of taxes currently due plus deferred taxes.

The charge for taxation is based on the results for the fiscal year as adjusted for items, which are non-assessable or disallowed. It is calculated using tax rates that have been enacted or substantively enacted by the balance sheet date.

Deferred taxes are accounted for using the asset and liability method in respect of temporary differences arising from differences between the carrying amount of assets and liabilities in the consolidated financial statements and the corresponding tax basis used in the computation of assessable tax profit. Deferred tax liabilities are recognized for all future taxable temporary differences. Deferred tax assets are recognized to the extent that it is probable that taxable income will be available against which deductible temporary differences can be utilized. Deferred tax is calculated using tax rates that are expected to apply to the period when the asset is realized or the liability is settled.

Deferred tax is charged or credited in the operations of statement, except when it is related to items credited or charged directly to equity. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Current income taxes are provided for in accordance with the laws of the relevant taxing authorities.

An uncertain tax position is recognized as a benefit only if it is "more likely than not" that the tax position would be sustained in a tax examination, with a tax examination being presumed to occur. The amount recognized is the largest amount of tax benefit that is greater than 50% likely of being realized on examination. For tax positions not meeting the "more likely than not" test, no tax benefit is recorded. Penalties and interest incurred related to underpayment of income tax are classified as income tax expense in the period incurred. PRC tax returns filed in the year ended December 31, 2019 and 2018 are subject to examination by any applicable tax authorities.

Non-controlling Interest

Non-controlling interest mainly consists of an aggregate of 6.8% (amended from 10.8% on December 4, 2017 as a result of a former Shareholder of Shanghai Dianniu transferred its 4.0625% equity interest to a Shanghai Dianniu Participating Shareholder) of the equity interests of Shanghai Dianniu held by two entities. The non-controlling interests are presented in the consolidated balance sheets, separately from equity attributable to the shareholders of the Company. Non-controlling interests in the results of the Company are presented on the face of the consolidated statements of operations as an allocation of the total income or loss for the year between non-controlling interest holders and the shareholders of the Company.

GOLDEN BULL LIMITED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Earnings (loss) per share

Basic earnings (loss) per share are computed by dividing income (loss) available to ordinary shareholders of the Company by the weighted average common shares outstanding during the period. Diluted earnings (loss) per share takes into account the potential dilution that could occur if securities or other contracts to issue common shares were exercised and converted into common shares. As of December 31, 2019 and 2018, there were no dilutive shares.

Employee benefits

The full-time employees of the Company are entitled to staff welfare benefits including medical care, housing fund, pension benefits, unemployment insurance and other welfare, which are government mandated defined contribution plans. The Company is required to accrue for these benefits based on certain percentages of the employees' respective salaries, subject to certain ceilings, in accordance with the relevant PRC regulations, and make cash contributions to the state-sponsored plans out of the amounts accrued. Total expenses for the plans were $285,771, $325,086 and $260,451 for the years ended December 31, 2019, 2018 and 2017.

Non-employees stock-based compensation

Share-based payment transactions with non-employees shall be measured at the fair value of the consideration received or the fair value of the equity instruments issued, whichever is more reliably measurable.

Recently issued accounting pronouncements

In September 2017, the FASB issued ASU No. 2017-13, to clarify the effective dates that public business entities and other entities were required to adopt ASC Topic 842 for annual reporting. A public business entity that otherwise would not meet the definition of a public business entity except for a requirement to include or the inclusion of its financial statements or financial information in another entity's filing with the SEC adopting ASC Topic 842 for annual reporting periods beginning after December 15, 2019, and interim reporting periods within annual reporting periods beginning after December 15, 2020. ASU No. 2017-13 also amended that all components of a leveraged lease be recalculated from inception of the lease based on the revised after tax cash flows arising from the change in the tax law, including revised tax rates. The difference between the amounts originally recorded and the recalculated amounts must be included in income of the year in which the tax law is enacted. The Company has not early adopted this update and it will become effective on January 1, 2020.

In June 2016, the FASB issued ASU No. 2016-13, *Financial Instruments – Credit Losses* (Topic 326): *Measurement of Credit Losses on Financial Instruments*. This ASU is intended to improve financial reporting by requiring timelier recording of credit losses on loans and other financial instruments held by financial institutions and other organizations. This ASU requires the measurement of all expected credit losses for financial assets held at the reporting date based on historical experience, current conditions, and reasonable and supportable forecasts. This ASU requires enhanced disclosures to help investors and other financial statement users better understand significant estimates and judgments used in estimating credit losses, as well as the credit quality and underwriting standards of the Company's portfolio. These disclosures include qualitative and quantitative requirements that provide additional information about the amounts recorded in the financial statements. Its mandatory effective dates are as follows: 1. Public business entities that meet the definition of an SEC filer for fiscal years beginning after December 15, 2019, including interim periods within those fiscal years; 2. All other public business entities for fiscal years beginning after December 15, 2020, including interim periods within those fiscal years; and 3. All other entities (private companies, not-for-profit organizations, and employee benefit plans) for fiscal years beginning after December 15, 2021, including interim periods within those fiscal years. On November 15, 2019, FASB issued ASU 2019-10 which provides a framework to stagger effective dates for future major accounting standards (including ASC 326 Financial instrument-credit losses) and amends the effective dates to give implementation relief to certain type of entities: 1. Public business entities that meet the definition of an SEC filer, excluding entities eligible to be Smaller Reporting Companies, or SRC, as defined by the SEC, for fiscal years beginning after December 15, 2019, including interim periods within those fiscal years; and 2. All other entities for fiscal years beginning after December 15, 2022, including interim periods within those fiscal years. As an "emerging growth company," or EGC, the Company has elected to take advantage of the extended transition period provided in the Securities Act Section 7(a)(2)(B) for complying with new or revised accounting standards applicable to private companies. The Company will adopt ASU 2016-13 and its related amendments effective January 1, 2023, and the Company is in the process of evaluating the potential effect on its consolidated financial statements.

GOLDEN BULL LIMITED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

In August 2018, the FASB issued ASU 2018-13, "Fair Value Measurement (Topic 820): Disclosure Framework – Changes to the Disclosure Requirements for Fair Value Measurement," to improve the effectiveness of disclosures in the notes to financial statements related to recurring or nonrecurring fair value measurements by removing amounts and reasons for transfers between Level 1 and Level 2 of the fair value hierarchy, policies for timing of transfers between different levels for fair value measurements, and the valuation processes for Level 3 fair value measurements. The new standard requires disclosure of the range and weighted average of significant unobservable inputs used to develop Level 3 fair value measurements. The amendments in this update are effective for all entities for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2019. The Company does not expect that the adoption of this ASU will have a material impact on its financial statements.

In October 2018, the FASB issued ASU2018-17, Consolidation (Topic 810): Targeted Improvements to Related Party Guidance for Variable Interest Entities. ASU 2018-17 expands the accounting alternative that allows private companies the election not to apply the variable interest entity guidance to qualifying common control leasing arrangements. ASU 2018-17 broadens the scope of the private company alternative to include all common control arrangements that meet specific criteria (not just leasing arrangements). ASU 2018-17 also eliminates the requirement that entities consider indirect interests held through related parties under common control in their entirety when assessing whether a decision-making fee is a variable interest. Instead, the reporting entity will consider such indirect interests on a proportionate basis. The amendments are effective for public business entities for fiscal years ending after December 15, 2019. Early adoption is permitted. The Company is currently assessing the timing and impact of adoption of this ASU to its consolidated financial statements.

In April 2019, the FASB issued ASU 2019-04 "Codification Improvements to Topic 326, Financial Instruments-Credit Losses, Topic 815, Derivatives and Hedging, and Topic 825, Financial Instruments." Apart from the amendments to ASU 2016-13 as mentioned below, the ASU also included subsequent amendments to ASU 2016-01, which we adopted in January 1, 2018. The guidance in relation to the amendments to ASU 2016-01 is effective for us for the year ending December 31, 2020 and interim reporting periods during the year ending December 31, 2020. Early adoption is permitted. The Company does not expect that the adoption of this ASU will have a material impact on its financial statements.

In December 2019, the FASB issued ASU 2019-12 to simplify the accounting in ASC 740, Income Taxes. This guidance removes certain exceptions related to the approach for intraperiod tax allocation, the methodology for calculating income taxes in an interim period, and the recognition of deferred tax liabilities for outside basis differences. This guidance also clarifies and simplifies other areas of ASC 740. This ASU will be effective beginning on January 1, 2021. Early adoption is permitted. Certain amendments in this update must be applied on a prospective basis, certain amendments must be applied on a retrospective basis, and certain amendments must be applied on a modified retrospective basis through a cumulative-effect adjustment to retained earnings/(deficit) in the period of adoption. The Company does not believe the adoption of this ASU would have a material effect on the Company's consolidated financial statements.

The Company does not believe other recently issued but not yet effective accounting standards, if currently adopted, would have a material effect on the Company's consolidated balance sheets, statements of operations and comprehensive loss and statements of cash flows.

GOLDEN BULL LIMITED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Note 3 – Variable interest entity**

On June 8, 2017, Golden Bull WFOE entered into Contractual Arrangements with Shanghai Dianniu and Shanghai Baoxun and its Participating Shareholders. On December 4, 2017, Shanxi Xifeng Investment Co., Ltd., a former Shareholder of Shanghai Dianniu, transferred its 4.0625% equity interest in Shanghai Dianniu to Xiaohui Liu, a Participating Shareholder. As a result, Golden Bull WFOE, Shanghai Dianniu, and Shanghai Dianniu Participating Shareholders amended the Contractual Arrangements and the equity interest of Shanghai Dianniu Participating Shareholders increased from 89.2% to 93.2% in the Contractual Arrangements. The significant terms of these Contractual Arrangements are summarized in "Note 1 - Nature of business and organization" above. As a result, the Company classifies Shanghai Dianniu and Shanghai Baoxun as VIE's.

On November 1, 2019, the Board of Directors decided to temporarily suspend the current platform of P2P business and utilize the existing platform and technology in a different manner consistent with PRC regulation.

A VIE is an entity that has either a total equity investment that is insufficient to permit the entity to finance its activities without additional subordinated financial support, or whose equity investors lack the characteristics of a controlling financial interest, such as through voting rights, right to receive the expected residual returns of the entity or obligation to absorb the expected losses of the entity. The variable interest holder, if any, that has a controlling financial interest in a VIE is deemed to be the primary beneficiary and must consolidate the VIE. Golden Bull WFOE is deemed to have a controlling financial interest and be the primary beneficiary of Shanghai Dianniu because it has both of the following characteristics:

(1) The power to direct activities at Shanghai Dianniu and Shanghai Baoxun that most significantly impact such entity's economic performance, and

(2) The obligation to absorb losses of, and the right to receive benefits from Shanghai Dianniu and Shanghai Baoxun that could potentially be significant to such entity.

Accordingly, the accounts of Shanghai Dianniu and Shanghai Baoxun are consolidated in the accompanying financial statements pursuant to ASC 810-10, Consolidation. In addition, their financial positions and results of operations are included in the Company's consolidated financial statements.

The carrying amounts of the VIEs' consolidated assets and liabilities are as follows:

|  | December 31, 2019 | | December 31, 2018 | |
| --- | ---: | --- | ---: | --- |
| Current assets | $ | 1,997,990 | $ | 3,721,696 |
| Property and equipment, net |  | - |  | 723,777 |
| Other non-current assets |  | 3,246,277 |  | 4,322,847 |
| Total assets |  | 5,244,267 |  | 8,768,320 |
| Total liabilities |  | 1,481,347 |  | 1,902,732 |
| Net assets | $ | 3,762,920 | $ | 6,865,588 |

|  | December 31, 2019 | | December 31, 2018 | |
| --- | ---: | --- | ---: | --- |
| Current liabilities: |  |  |  |  |
| Other payables and accrued liabilities | $ | 1,481,347 | $ | 1,854,947 |
| Taxes payable |  | - |  | 47,785 |
| Total liabilities | $ | 1,481,347 | $ | 1,902,732 |

GOLDEN BULL LIMITED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The summarized operating results of the VIEs' are as follows:

| | For the year ended December 31, 2019 | For the year ended December 31, 2018 | For the year ended December 31, 2017 |
|---|---|---|---|
| Operating revenues | $ 4,572,153 | $ 7,889,201 | $ 6,953,757 |
| Loss from operations | $ (2,690,906) | $ (2,298,290) | $ (871,143) |
| Net loss | $ (3,041,595) | $ (1,641,580) | $ (508,491) |

**Note 4 – Prepaid costs and expenses**

Prepaid costs and expenses consist of the following:

| | December 31, 2019 | December 31, 2018 |
|---|---|---|
| Cloud services | $ - | $ 2,785 |
| Rental | - | 5,835 |
| Advertising | - | 396,191 |
| Marketing and promotion | - | 3,802,469 |
| Professional services | - | 1,155,122 |
| Others | - | 25,156 |
| Subtotal | - | 5,387,558 |
| Less: long term prepaid expenses | - | (2,200,506) |
| Total | $ - | $ 3,187,052 |

For the years ended December 31, 2019, prepaid costs and expenses are expected not to generate any revenue or economic benefits in the following years. So the Company already applied the measurement requirements in ASC 360-10 Impairment and Disposal of Long-Lived Assets to write-off and impair prepaid costs and expenses in the year ended December 31, 2019.

**Note 5 – Deposits for rental vehicles**

Deposits for rental vehicles consist of the following:

| | December 31, 2019 | December 31, 2018 |
|---|---|---|
| Deposits for rental vehicles | 3,246,277 | 2,482,592 |
| Total | $ 3,246,277 | $ 2,482,592 |

The delivery of the vehicles was delayed due to the policy change in PRC regarding vehicle emission standard change. The deposits for rental vehicles are for developing the Company's car rental business expected to occur in fiscal 2020.

**Note 6 – Property and equipment, net**

Property and equipment consist of the following:

| | December 31, 2019 | December 31, 2018 |
|---|---|---|
| Office equipment and furniture | $ 126,738 | $ 128,555 |
| Vehicle | 709,514 | 719,685 |
| Leasehold improvement | 48,675 | 49,373 |
| Subtotal | 884,927 | 897,613 |
| Less: accumulated depreciation and amortization | (201,300) | (173,836) |

| | | |
|---|---|---|
| Impairment | (683,627) | - |
| Total | - | $ 723,777 |

Depreciation and amortization expense for the years ended December 31, 2019, 2018 and 2017 amounted to $30,199, $82,872 and $57,603, respectively.

GOLDEN BULL LIMITED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Note 7 – Related Party Balances and Transaction**

*Other payables- related party*

| Name of Related Party | Relationship | Nature | December 31, 2019 | December 31, 2018 |
|---|---|---|---|---|
| Erxin Zeng | Chief Executive Office of the Company prior to October 30, 2019 | Loan | $ 82,200 | $ - |

**Note 8 – Taxes**

<u>Income tax</u>

Loss before income tax expense (benefits) consist of the following:

| | For the year ended December 31, 2019 | For the year ended December 31, 2018 | For the year ended December 31, 2017 |
|---|---|---|---|
| PRC | $ (3,416,358) | $ (2,107,084) | $ (780,032) |
| Foreign | (5,453,030) | (1,891,213) | (488,334) |
| | $ (8,869,388) | $ (3,998,297) | $ (1,268,366) |

<u>*Cayman Islands*</u>

Under the current laws of the Cayman Islands, the Company is not subject to tax on income or capital gain. Additionally, upon payments of dividends to the shareholders, no Cayman Islands withholding tax will be imposed.

<u>*PRC*</u>

Under the Income Tax Laws of the PRC, companies are subject to income tax at a rate of 25%.

The following table reconciles China statutory rates to the Company's effective tax rate:

| | For the year ended December 31, 2019 | For the year ended December 31, 2018 | For the year ended December 31, 2017 |
|---|---|---|---|
| China income tax rate | 25.0% | 25.0% | 25.0% |
| IPO costs | 0.0% | 0.0% | 7.7% |
| PRC – non-deductible expense | (0.3)% | (1.7)% | (1.7)% |
| Valuation allowance | (18.4)% | - | - |
| Cayman – non-deductible expense-consulting fee | (5.5)% | (8.1)% | (9.6)% |
| Cayman – non-deductible expense-external service fee | (9.9)% | (3.7)% | 0.0% |
| Effective tax rate | (9.1)% | 11.5% | 21.4% |

GOLDEN BULL LIMITED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Deferred tax assets – China

According to Chinese tax regulations, companies within China should adjust their net operating losses according to the law of enterprise income tax, which can be carried forward to offset operating income for five years. Significant components of deferred tax assets were as follows:

|  | December 31, 2019 | December 31, 2018 |
|---|---|---|
| Net operating losses carried forward | $ 1,635,394 | $ 810,863 |
| Less: valuation allowance | (1,635,394) | - |
| Total | $ - | $ 810,863 |

For the years ended December 31, 2019 and 2018, the Company incurred tax operating losses of $3,298,122 and $2,182,290, respectively, and recorded deferred tax assets of $824,531 and $810,863 at December 31, 2019 and 2018. Due to the temporary suspension of peer to peer lending business in the last quarter of 2019, the management believes that it appears more likely than not that the Company will not realize these tax benefits. Accordingly, the Company has provided a 100% valuation allowance on deferred tax asset benefits related to net operating losses carry forward to reduce the assets to zero.

Uncertain tax positions

The Company evaluates each uncertain tax position (including the potential application of interest and penalties) based on the technical merits, and measure the unrecognized benefits associated with the tax positions. As of December 31, 2019 and 2018, the Company did not have any significant unrecognized uncertain tax positions.

Taxes payable consisted of the following:

|  | December 31, 2019 | December 31, 2018 |
|---|---|---|
| VAT taxes payable | $ - | $ 42,860 |
| Other taxes payable | - | 4,925 |
| Total | $ - | $ 47,785 |

**Note 9 – Concentration of Risk**

**Credit Risk**

Financial instruments that potentially subject the Company to significant concentrations of credit risk consist primarily of cash and cash equivalents. As of December 31, 2019 and 2018, $16,118 and $2,196,799 were deposited with a bank located in the PRC, respectively. As of December 31, 2019 and 2018, nil and $122,825 were deposited with a third-party platform fund account located in the PRC, respectively. These balances are not covered by insurance. While management believes that these financial institutions and third-party fund holder are of high credit quality, it also continually monitors their credit worthiness.

Customer concentration risk

For the year ended December 31, 2019 and 2018, no borrowers paid transaction and management fees accounted for more than 10% of the Company's total operating revenues. For the year ended December 31, 2017, one borrower paid transaction and management fees which accounted for 16.8% of the Company's total operating revenues.

**Note 10 – Equity**

Restricted net assets

The Company's ability to pay dividends is primarily dependent on the Company receiving distributions of funds from its subsidiary. Relevant PRC statutory laws and regulations permit payments of dividends by Golden Bull WFOE, Shanghai Dianniu and Shanghai Baoxun only out of its retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. The results of operations reflected in the accompanying consolidated financial statements prepared in accordance with U.S. GAAP differ from those reflected in the statutory financial statements of Golden Bull WFOE, Shanghai Dianniu and Shanghai Baoxun's

GOLDEN BULL LIMITED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Golden Bull WFOE, Shanghai Dianniu and Shanghai Baoxun are required to set aside at least 10% of their after-tax profits each year, if any, to fund certain statutory reserve funds until such reserve funds reach 50% of its registered capital. In addition, Golden Bull WFOE, Shanghai Dianniu and Shanghai Baoxun may allocate a portion of its after-tax profits based on PRC accounting standards to enterprise expansion fund and staff bonus and welfare fund at its discretion. The statutory reserve funds and the discretionary funds are not distributable as cash dividends. Remittance of dividends by a wholly foreign-owned company out of China is subject to examination by the banks designated by State Administration of Foreign Exchange.

As of December 31, 2019 and 2018, Golden Bull WFOE, Shanghai Dianniu and Shanghai Baoxun collectively attributed $0 and $0 of retained earnings for their statutory reserves, respectively.

As a result of the foregoing restrictions, Golden Bull WFOE, Shanghai Dianniu and Shanghai Baoxun are restricted in their ability to transfer their net assets to the Company. Foreign exchange and other regulation in the PRC may further restrict Golden Bull WFOE, Shanghai Dianniu and Shanghai Baoxun from transferring funds to the Company in the form of dividends, loans and advances. As of December 31, 2019 and 2018, amounts restricted are the net assets of Golden Bull WFOE, Shanghai Dianniu and Shanghai Baoxun, which amounted to $3,762,970 and $6,865,638 respectively.

F-23

GOLDEN BULL LIMITED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Note 11 – Commitments and Contingencies**

Commitments and Contingencies

In the normal course of business, the Company is subject to contingencies, including legal proceedings and claims arising out of the business that relate to a wide range of matters, such as government investigations and tax matters. The Company recognizes a liability for such contingency if it determines it is probable that a loss has occurred and a reasonable estimate of the loss can be made. The Company may consider many factors in making these assessments including historical and the specific facts and circumstances of each matter. As of December 31,2019 and 2018, the company was not aware of any material contingencies that required special attention.

Contingencies

From time to time, the Company may be subject to certain legal proceedings, claims and disputes that arise in the ordinary course of business. Although the outcomes of these legal proceedings cannot be predicted, the Company does not believe these actions, in the aggregate, will have a material adverse impact on its financial position, results of operations or liquidity.

Risk, Uncertainties, and Contingencies on P2P Business

Although the Company is not responsible for claimed losses, however the filing of a claim or commencement of any governmental investigation or proceeding against the Company or any of its affiliates, even if not justified, may create negative publicity and have a material adverse impact on the Company's operation. Should any of the allegations or claims arise, the Company operation may be adversely affected.

**Note 12 – Subsequent Event**

*(1) Entry into Share Purchase Agreement for Private Placement*

On May 27, 2020, the Company entered into certain securities purchase agreements (the "**SPA**") with certain "Non-U.S. Persons" (the "**Purchasers**") as defined in Regulation S of the Securities Act of 1933, as amended (the "**Securities Act**") in connection with a private placement (the "**Offering**"). Pursuant to the SPA, the Company agreed to sell up to an aggregate of 21,500,000 ordinary shares (the "**Shares**"), par value $0.01 per share, at a per share purchase price of $0.80. The Company has received $17.2 million proceeds by July 2, 2020 and the offering was closed on July 6, 2020,

F-24

GOLDEN BULL LIMITED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*(2) Change of the Number of Board of Directors and Appointment of Directors.*

Effective April 19, 2020, the Company's board of directors (the "Board") increased the number of directors serving on the Board to 7, appointed Mr. Hong Yu as an executive director and Chief Strategy Officer (the "CSO")of the Company, and appointed Mr. Yan Xiong as an independent director of the Company to fill the two vacancies on the Board.

*(3) Acquisition of XMAX Chain Limited for Bitcoin Mining Business*

On April 8, 2020, Golden Bull Limited entered into an Instrument of Transfer with Mr. Ching Yeh to acquire his 100% of the ownership interest (10,000 shares) in XMAX Chain Limited for HKD 10,000 (HKD 1.00 per one share). After the acquisition, XMAX became a wholly owned subsidiary of Golden Bull Limited. This office is for our Bitcoin Mining business operations in Asia.

*(4) The impact of Coronavirus (COVID-19)*

In December 2019, a novel strain of coronavirus was reported in Wuhan, China. On March 11, 2020, the World Health Organization categorized it as a pandemic. The COVID-19 outbreak is causing lockdowns, quarantines, travel restrictions, and closures of businesses and schools. The potential impact which may be caused by the outbreak is uncertain; however it may result in a material adverse impact on the Company's financial position, operations and cash flows for fiscal year 2020.

Based on the Company's operating results from January 1, 2020 through the date of this report, due to the suspension of peer to peer lending business, limited support from our workforce, and restrictions on the car rental services and the start-up stage of bitcoin mining business stage, the Company expects a lower amount of revenue and net income during February to April 2020 period. However, the extent of the impact of COVID-19 on the Company's results of operations and financial condition for fiscal year 2020 will depend on certain developments, including the duration and spread of the outbreak, impact on its customers, all of which are uncertain and cannot be predicted at this point.

**Note 13 – Condensed financial information of the parent company**

The Company performed a test on the restricted net assets of consolidated subsidiary in accordance with Securities and Exchange Commission Regulation S-X Rule 4-08 (e) (3), "General Notes to Financial Statements" and concluded that it was applicable for the Company to disclose the financial statements for the parent company.

The subsidiary did not pay any dividend to the Company for the periods presented. For the purpose of presenting parent only financial information, the Company records its investment in its subsidiary under the equity method of accounting. Such investment is presented on the separate condensed balance sheets of the Company as "Investment in subsidiary" and the income (loss) of the subsidiary is presented as "share of income (loss) of subsidiary". Certain information and footnote disclosures generally included in financial statements prepared in accordance with U.S. GAAP have been condensed and omitted.

The Company did not have significant capital and other commitments, long-term obligations, or guarantees as of December 31, 2019 and 2018, respectively.

GOLDEN BULL LIMITED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

PARENT COMPANY BALANCE SHEETS

| | December 31, 2019 | December 31, 2018 |
|---|---|---|
| **ASSETS** | | |
| CURRENT ASSETS | | |
| Cash | $ 16,118 | $ 268,399 |
| Prepaid costs and expenses | - | 1,982,674 |
| Other receivable | 29,606 | - |
| Total current assets | 45,724 | 2,251,073 |
| | | |
| OTHER ASSETS | | |
| Investment in subsidiaries | 6,110,152 | 10,127,371 |
| Restricted cash | 600,000 | 600,000 |
| Deposits for property and equipment | 110,000 | |
| Long-term Deferred Asset | - | 1,171,114 |
| Total other assets | 6,820,152 | 11,898,485 |
| | | |
| Total assets | $ 6,865,876 | $ 14,149,558 |
| | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| CURRENT LIABILITIES | | |
| Other payable | $ 426,567 | $ - |
| Intercompany payable - Dianniu | 570,350 | 570,350 |
| | | |
| Total current liabilities | 996,917 | 570,350 |
| | | |
| Total liabilities | $ 996,917 | $ 570,350 |
| | | |
| COMMITMENTS AND CONTINGENCIES | | |
| | | |
| SHAREHOLDERS' EQUITY | | |
| Common shares, $0.01 par value, 50,000,000 shares authorized, 15,399,185 and 14,899,185 shares issued and outstanding as of December 31, 2019 and 2018, respectively* | 153,992 | 148,992 |
| Shares subscription receivables | (45,457) | (45,457) |
| Additional paid-in capital | 17,610,220 | 15,855,220 |
| Statutory reserves | - | - |
| Accumulated deficit | (11,849,796) | (2,379,547) |
| Accumulated other comprehensive income | - | - |
| Total shareholders' equity | 5,868,959 | 13,579,208 |
| | | |
| Total liabilities and shareholders' equity | $ 6,865,876 | $ 14,149,558 |

\* Giving retroactive effect to the 260 for 1 split effected on November 3, 2017.

GOLDEN BULL LIMITED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

PARENT COMPANY STATEMENTS OF OPERATIONS AND COMPREHENSIVE LOSS

|  | For the Year Ended December 31, 2019 | For the Year Ended December 31, 2018 | For the Year Ended December 31, 2017 |
|---|---|---|---|
| SELLING EXPENSES | $ (3,366,933) | $ (1,891,213) | $ (488,334) |
| GENERAL AND ADMINISTRATIVE EXPENSES | (2,083,936) | - | - |
| | | | |
| OTHER FINANCE EXPENSE | (2,161) | - | - |
| EQUITY OF LOSS OF SUBSIDIARY | (4,017,220) | (1,534,768) | (454,034) |
| NET LOSS | (9,470,250) | (3,425,981) | (942,368) |
| FOREIGN CURRENCY TRANSLATION ADJUSTMENTS | - | (364,652) | 526,793 |
| COMPREHENSIVE LOSS | $ (9,470,250) | $ (3,790,633) | $ (415,575) |

F-27

GOLDEN BULL LIMITED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

PARENT COMPANY STATEMENTS OF CASH FLOWS

| | For the Year Ended December 31, 2019 | For the Year Ended December 31, 2018 | For the Year Ended December 31, 2017 |
|---|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | |
| Net loss | $ (9,470,250) | $ (3,425,981) | $ (942,368) |
| Adjustments to reconcile net loss to cash used in operating activities: | - | | |
| Equity loss of subsidiary | 4,017,220 | 1,534,768 | 454,034 |
| Other receivables | (29,606) | - | |
| Amortization of stock compensation expenses for services | 1,760,000 | 758,750 | 488,334 |
| Changes in operating assets and liabilities: | | | |
| Prepaid costs and expenses | 3,153,788 | (2,370,872) | - |
| Other payables and accrued liabilities | 426,567 | - | - |
| Inter-company | - | 187,587 | - |
| Net cash used in operating activities | (142,281) | (3,315,748) | - |
| | | | |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | | |
| Deposits for property and equipment | (110,000) | - | |
| Capital contribution to affiliated entity | - | (1,760,000) | - |
| Net cash used in investing activities | (110,000) | (1,760,000) | - |
| | | | |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | |
| Registered capital | - | 18,992 | - |
| APIC | - | 5,925,155 | - |
| Net cash provided by financing activities | - | 5,944,147 | - |
| | | | |
| CHANGES IN CASH AND RESTRICTED CASH | (252,281) | 868,399 | - |
| | | | |
| CASH, CASH EQUIVALENTS AND RESTRICTED CASH, beginning of year | 868,399 | - | - |
| | | | |
| CASH, CASH EQUIVALENTS AND RESTRICTED CASH, end of year | $ 616,118 | $ 868,399 | $ - |
| | | | |
| SUPPLEMENTAL CASH FLOW INFORMATION: | | | |
| Cash and cash equivalents | $ 16,118 | $ 268,399 | $ - |
| Restricted cash | 600,000 | 600,000 | - |
| CASH, CASH EQUIVALENTS AND RESTRICTED CASH, end of year | 616,118 | 868,399 | - |
| | | | |
| NON-CASH TRANSACTIONS OF FINANCING ACTIVITIES | | | |
| Issuance of ordinary shares to consultants and service providers for IPO services | $ - | $ - | $ 2,000,000 |
| Issuance of ordinary shares to service providers and consulting services | $ 1,760,000 | $ 238,680 | $ 2,030,000 |

F-28