**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re Bit Digital, Inc. Securities Litigation*<br><br>This document relates to:<br><br>All Actions | Lead Case No. 1:21-cv-00515-ALC |

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS LEAD PLAINTIFF'S**
**CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ...............................................................................................................1

FACTS..............................................................................................................................2

    A.   Bit Digital's Origins: P2P Fraud ...........................................................2

    B.   Lack of Internal Controls.......................................................................3

    C.   Bit Digital Enters the Bitcoin Mining Business ...................................4

    D.   Defendants' Class Period Statements ...................................................5

    E.   The JCAP Report Reveals the Truth to the Market...............................6

    F.   Resignations .........................................................................................8

ARGUMENT ....................................................................................................................9

  I.    PLEADING STANDARDS ...................................................................9

  II.   DEFENDANTS MADE FALSE STATEMENTS  AND OMITTED MATERIAL FACTS.....................................................................................10

    A.   The allegations arising out of the JCAP Report are actionable......................10

    B.   Defendants made actionable misstatements about Bit Digital's purported operations in China.....................................................................................13

    C.   Defendants made actionable misstatements about Bit Digital's purchase of bitcoin mining machines.........................................................................15

    D.   Defendants' omissions about the XMAX acquisition were materially false and misleading.....................................................................................16

  III.  PLAINTIFF ADEQUATELY PLEADS FACTS GIVING RISE TO A  STRONG INFERENCE THAT DEFENDANTS ACTED WITH SCIENTER. ..............................17

    A.   Defendants' knowledge and reckless disregard of the false statements supports scienter....................................................................................18

B.    Plaintiff adequately alleges that Defendants had both the motive and opportunity to commit the fraud alleged. ............................................................................................23

CONCLUSION ........................................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Acticon AG v. China Ne. Petroleum Holdings Ltd.,*
615 F. App'x 44 (2d Cir. 2015) ................................................................................ 24

*Adams v. Kinder-Morgan, Inc.,*
340 F.3d 1083 (10th Cir. 2003) ............................................................................... 11

*Aldridge v. A.T. Cross Corp.,*
284 F.3d 72 (1st Cir. 2002) ...................................................................................... 19

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) .................................................................................................. 9

*Bernstein v. Seeman,*
601 F. Supp. 2d 555 (S.D.N.Y. 2009) ...................................................................... 17

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.,*
553 F.3d 187 (2d Cir. 2009) ...................................................................................... 9

*Ganem v. InVivo Therapeutics Holdings Corp,*
845 F.3d 447 (1st Cir. 2017) .................................................................................... 11

*Ganino v. Citizens Utils. Co.,*
228 F.3d 154 (2d Cir. 2000) .................................................................................... 10

*Ho v. Duoyuan Global Water, Inc.,*
887 F. Supp. 2d 547 (S.D.N.Y. 2012) ...................................................................... 12

*In re Alstom SA Sec. Litig.,*
406 F. Supp. 2d 433 (S.D.N.Y. 2005) ...................................................................... 18

*In re CenturyLink Sales Practices and Sec. Litig.,*
403 F. Supp. 3d 712 (D. Minn. 2019) ...................................................................... 19

*In re China Educ. Alliance, Inc. Sec. Litig.,*
2011 WL 4978483 (C.D. Cal. Oct. 11, 2011) .......................................................... 12

*In re Citigroup Inc. Sec. Litig.,*
753 F. Supp. 2d 206 (S.D.N.Y. 2010) ...................................................................... 25

*In re EZCorp, Inc. Sec. Litig.,*
181 F. Supp. 3d 197 (S.D.N.Y. 2016) ............................................................ 9, 10, 18

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
2014 WL 285103 (S.D.N.Y. Jan. 27, 2014) ............................................................11

*In re Navarre Corp. Sec. Litig.*,
299 F.3d 735 (8th Cir. 2002) ........................................................................19

*In re Northern Telecom Ltd. Sec. Litig.*,
116 F. Supp. 2d 446 (S.D.N.Y. 2000) ..............................................................24

*In re Refco, Inc. Sec. Litig.*,
503 F. Supp. 2d 611 (S.D.N.Y. 2007) ..............................................................19

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001) ...........................................................................9

*In re Scottish Re Grp. Sec. Litig.*,
524 F. Supp. 2d 370 n.176 (S.D.N.Y. 2007) ......................................................23

*In re Synchrony Fin. Sec. Litig.*,
988 F.3d 157 (2d Cir. 2021) ..........................................................................9

*In re Top Tankers, Inc. Sec. Litig.*,
528 F. Supp. 2d 408 (S.D.N.Y. 2007) ..............................................................18

*In re Veeco Instruments, Inc. Sec. Litig.*,
235, F.R.D. 220 (S.D.N.Y. 2006)....................................................................23

*In re Winstar Commc'ns v. Rouhana*,
2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) ......................................................20

*Lewy v. SkyPeople Fruit Juice, Inc.*,
2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012) ................................................11, 12

*Liberty Ridge LLC v. RealTech Sys. Corp.*,
173 F. Supp. 2d 129 (S.D.N.Y. 2001) ..............................................................10

*McIntire v. China MediaExpress Holdings, Inc.*,
927 F. Supp. 2d 105 (S.D.N.Y. 2013) .........................................................passim

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) .....................................................................18, 19

*SEC v. Iannazzo*,
2006 WL 8461454 (S.D.N.Y. Jan. 27, 2006) ......................................................21

iv

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ................................................................................................................17

*Varghese v. China Shenghou Pharm. Holdings, Inc.*,
672 F. Supp. 2d 596 (S.D.N.Y. 2009) ..............................................................................22, 23

**Other Authorities**

Ljungqvist & Qian, *How Constraining Are Limits to Arbitrage?*, (Mar. 5, 2016) .......................12

## INTRODUCTION

Fresh off the heels of a criminal investigation that saw Chinese authorities shutter its online peer-to-peer ("P2P") lending business and charge seventeen of its former executives, including its two controlling shareholders, Bit Digital, Inc. ("Bit Digital" or the "Company") sought to reinvent itself as a bitcoin mining company. By the end of 2019, the Company had essentially no operations. By the end of 2020, however, Bit Digital went from having virtually no value to a market capitalization of well over $1 billion. The Company's new-found success was short lived. On January 11, 2021, J Capital Research ("J Capital" or "JCAP") released a 25-page report based on an in-depth investigation involving interviews with local Chinese officials and employees of major bitcoin mining equipment manufacturers, as well as a thorough examination of Bit Digital's SEC filings, Chinese legal filings, and other online sources. Like the P2P lending business, J Capital alleged, among other things, Bit Digital's bitcoin mining business was a fraud as evidenced by the Company's false statements about the circumstances under which it entered the industry, the legality of its operations, and the extent of its operations. The day the report was released, Bit Digital's share price fell 25%.

Defendants now move to dismiss, but their motion fails. Defendants' motion rests almost entirely on the erroneous contention that the allegations based on J Capital's Report are all inherently unreliable because J Capital is a short seller and its report contains standard disclaimers and relies on unnamed sources. Courts in this District, however, have routinely rejected these precise arguments. Besides relying on inapposite authorities, Defendants do not even attempt to address the specific allegations in the Complaint. Instead, Defendants resort to baseless attacks on the integrity of Plaintiff's Counsel—wrongly claiming that "Plaintiffs conducted no independent investigation of the claims in the report, choosing instead to take at face value the claims made by a market participant with significant incentive to harm the Company." Def. Br. at 2. Defendants

simply ignore that the Complaint establishes J Capital's credentials as experts in the Chinese market, and that the majority of the allegations are not based on unnamed sources but are easily verified by reviewing Bit Digital's SEC filings, reviewing the links to sources in J Capital's Report, and reviewing underlying sources. Plaintiff's Counsel did just that. There is no requirement that a plaintiff must plead all of the evidence and proof supporting a claim. Defendants' scienter argument suffers from the same infirmity—it is dependent entirely on the Court's outright rejection of J Capital's Report.

Because the Complaint states a claim for securities fraud, Defendants' motion should be denied.

## FACTS

Bit Digital is a Cayman Islands holding company that purports to engage in a bitcoin mining business. ¶ 2.

### A.      Bit Digital's Origins: P2P Fraud

Bit Digital's predecessor, Golden Bull Ltd., first operated as an online peer-to-peer ("P2P") lending company. ¶ 23. The Company assured investors that the P2P business complied with Chinese laws regulating illegal fundraising, explaining that the Company acted only as an intermediary and did "not take control of funds that pass between such lenders and borrowers." ¶¶ 28-30. On August 13, 2019 the Company disclosed that some borrowers had "maliciously defaulted on their debt" to the tune of $13.5 million and that because of threats from lenders, the Company moved its offices in late July to "avoid further disruption" to operations. ¶ 35. On September 23, 2019, the Company reported the resignation of its independent registered public accounting firm, Friedman LLP. ¶ 37.

On October 31, 2019, the Company disclosed that: (1) Chinese authorities had completed a criminal investigation into Dianniu;[1] (2) seventeen of the Company's executives were suspects; (3) six had been arrested; and (4) CEO Erxin Zeng had been removed the day before and was now a fugitive. ¶ 38. The Company also disclosed that it planned to exit the P2P business and, in addition to Erxin Zeng, had removed its CFO Jing Leng, and director Xiaohui Liu as "the Company was not able to reach Mr. Liu for an extended period of time." ¶¶ 41-42.

The October 31, 2019 disclosure also announced replacements for the Company's recently departed executives. The new appointments included: Ping Liu as Chairwoman of the Board; Min Hu, who purportedly had a law degree, as a director and CEO; and Defendant Erke Huang, who had no accounting experience, as a director and CFO. ¶¶ 46-51.

On December 5, 2019, the Company disclosed that trading in its securities had been suspended as a result of the October 2019 disclosure of the criminal investigation. ¶ 43. On September 8, 2020, in order to distance itself from the P2P fraud, the Company sold all of its Chinese subsidiaries and VIEs for "US$10 and other good valuable consideration." ¶ 44.

### B.   Lack of Internal Controls

On April 30, 2019, the Company filed its 2018 Annual Report on Form 20-F in which it disclosed that the Company did not maintain effective internal control over financial reporting and identified a series of material weaknesses. ¶ 32. Fifteen months later, on July 29, 2020, Defendants issued their 2019 Annual Report. As with the year before, the Company disclosed that it still did not maintain effective control over financial reporting. ¶ 62.

---

[1] Dianniu was the Company's variable interest entity ("VIE") that allowed the Company to operate in China. ¶¶ 24-27.

### C.      Bit Digital Enters the Bitcoin Mining Business

On December 5, 2019, in the wake of the P2P fraud, Defendants announced plans to enter the bitcoin mining business. ¶ 52. Under the heading "The Company's expertise in bitcoin business," Defendants stated that the Company explored the bitcoin mining business in August 2019 and decided to enter the business in October 2019. *Id*. The Company also touted Defendant Huang's expertise in bitcoin and bitcoin mining, stating that Huang "will support our planned operations and goals set for the bitcoin mining business." *Id*. Notably, the detailed description accompanying Huang's announcement as CFO in October 2019 did not mention his purported expertise in the bitcoin mining business. ¶ 53.

On January 9, 2020, Defendants reported the resignation of Bit Digital's second independent registered public accounting firm as the auditor purportedly stated that "after substantial deliberation, it was not familiar with bitcoin mining[.]" ¶ 54. This marked the second auditor to resign in just a two-month period. ¶ 55.

On April 24, 2020, Defendants announced the appointment of Hong Yu as an executive director and Chief Strategy Officer ("CSO"). The announcement included a biography highlighting Yu's extensive experience in the bitcoin industry. ¶ 56. Defendants also stated that there "have been no transactions in the past two years to which the Company or any of its subsidiaries was or is to be a party, in which Mr. Yu had, or will have, a direct or indirect material interest." ¶ 57.

The Company's 2019 20-F, filed July 29, 2020, disclosed that it had acquired XMAX Chain Limited ("XMAX") to enter the bitcoin mining business, explaining:

> On April 8, 2020, Golden Bull Limited entered into an Instrument of Transfer with Mr. Ching Yeh to acquire his 100% of the ownership interest (10,000) shares in XMAX Chain Limited for HKD, 10,000 . . . . After the acquisition, XMAX became a wholly owned subsidiary of Golden Bull Limited. This office is for our Bitcoin Mining business operations in Asia. ¶ 59.

On August 6, 2020, Defendants filed a Proxy Statement in which the Company stated that it "operates a recently updated bitcoin mining facility for the sole purpose of mining bitcoin. . . . Our mining operations are in Wuhai, Zhundong, Xinlinhot and Sichuan, China." ¶ 63.

On December 16, 2020, Bit Digital disclosed the resignation of its third independent registered public accounting firm in just a fifteen-month period. Like the previous auditor, the firm resigned because it could not audit Bit Digital's bitcoin mining business. ¶¶ 68-69.

### D.   Defendants' Class Period Statements

The Class Period begins on December 21, 2020, when Bit Digital issued a press release filed with the SEC on Form 6-K/A, announcing the Company's revised third quarter 2020 financial results (the "3Q20 Press Release"). ¶ 71. The 3Q20 Press Release, signed by Defendant Huang, contained materially false and misleading statements and omitted to disclose information necessary in order to make the statements made not misleading. The alleged misstatements include: (1) statements about Bit Digital's operations in China, including that "Our mining operations are distributed in Xinjiang, Inner Mongolia and Sichuan Provinces PRC"; (2) statements about Bit Digital's bitcoin mining machines, including that "The number of miners [in the Third Quarter 2020] was 22,960, with 16,865 miners acquired in the third quarter of 2020," and "As of the date of this Report, we had a total of 40,865 miners"; and (3) statements about the acquisition of XMAX, including that "On April 8, 2020, the Company entered into an Instrument of Transfer with Mr. Ching Yeh to acquire his 100% of the ownership interest (10,000 shares) in [XMAX] . . . . After the acquisition, XMAX became a wholly owned subsidiary of the Company. XMAX is a Hong Kong company, engaged in bitcoin mining business[.]" ¶¶ 71-77, 121-128. As discussed below and in the Complaint, Defendants' statements misled investors as to its bitcoin

mining operations, including, among other things, the circumstances under which the Company entered the industry, the legality of its operations, and the extent of its operations.

### E.      The JCAP Report Reveals the Truth to the Market

On January 11, 2021, J Capital, a U.S. based company that focuses on uncovering over-valued companies with a noted expertise in the Chinese market, ¶¶ 78-79, published a 25-page report based on an in-depth investigation of Bit Digital and detailing the grounds for JCAP's belief that the Company operated "a fake crypto currency business" "designed to steal funds from investors." ¶ 80. JCAP's findings were based, in part, on interviews of government officials in the locales where Bit Digital claimed to operate mining facilities, as well as employees of the major bitcoin mining machine manufacturers that Bit Digital purportedly acquired its equipment from. ¶¶ 83-84, 101, 105. JCAP's investigation also examined Bit Digital's filings with the SEC, the review of several Chinese civil and criminal legal filings, and Chinese online information sources. ¶¶ 90-100, 102-103, 106, 109-119.

JCAP's investigation revealed that Defendants failed to disclose material adverse facts about the XMAX acquisition. In the Company's April 24, 2020 announcement of the appointment of Yu as executive director and CSO, Bit Digital did not disclose that Yu was a founder of XMAX, which Bit Digital had acquired just two weeks earlier. ¶¶ 89-90. In fact, Bit Digital did not even disclose the XMAX acquisition until July 29, 2020, months after the acquisition and appointment of Yu. ¶ 91. JCAP also found that "[m]ultiple stories in the Hong Kong and U.S. press indicate that XMAX is a fraud, as is its crypto currency, XMX," and that XMAX's crypto currency "has been flagged as a fraud by numerous analysts." ¶ 93. JCAP found that:

> XMAX was reported to have halted its mining operations last May and had its miners confiscated in China. A November 23, 2020 article in The Paper reads: "In May 2020, Yu Hong announced that, due to the impact of the macro economy and the halving of Bitcoin production, all mining machines were suspended and the repurchase plan [of XMAX's crypto currency, XMX] was suspended. Yu Hong

revealed on Weibo on June 1 that the mining was suspended because the XMX
mining machines in Lanzhou mine were confiscated and a lawsuit was being filed."
¶ 94.

JCAP's investigation also uncovered seven lawsuits against Yu in China by disgruntled investors

in his various other companies. ¶ 92. The investigation also found that XMAX did not mention Bit

Digital anywhere on its website and that the "Hong Kong corporate documents for XMAX do not

show ownership by [Bit Digital]." ¶ 95.

As to Bit Digital's claimed mining operations in China, J Capital noted that the Company

disposed of all its Chinese subsidiaries and VIEs in September 2020 (¶¶ 98-99), and that "without

a Chinese-registered entity, that would not be legal. Companies are required to show a registration

document from a domestic legal entity before they can sign a lease or a hosting contract. Yet the

company clearly claims that it both operates and leases mining facilities in China[.]" ¶ 96. As Bit

Digital's 2019 20-F disclosed, "The Company operates a recently updated bitcoin facility for the

sole purpose of mining bitcoin[,]" and also references electrical power supplied "to our leased

facilities." ¶ 97. JCAP supported its allegation that Bit Digital's purported mining operations were

fabricated by speaking with government officials in the locales Bit Digital claimed to operate.

¶ 101 (explaining that "In China, you have to register with the government to have a data center,

and local governments have records of all data centers and bitcoin mining operations."). The

officials denied that there were bitcoin mining facilities in their locales and none had heard of Bit

Digital. ¶ 101. Moreover, Bit Digital's disclosures provided zero information "for leased assets,

leasehold improvements, basic furniture or even everyday non-mining IT equipment[.]" ¶ 102.

Bit Digital claimed to have bought over 40,000 bitcoin mining machines in 2020. Yet when

JCAP spoke with employees from MicroBT and Bitmain – the major manufacturers of bitcoin

mining equipment that the Company claimed to have acquired machines from – none had even

heard of Bit Digital or its former VIE. ¶ 105. JCAP's Report included a photo of a server rack from Bit Digital's own website. The image appears to show about 100 mining machines in an otherwise empty warehouse. As JCAP noted, the "miners are very sparse compared with the 41,000 machines the company claims." ¶ 106. Referencing Bit Digital's 3Q20 Press Release, JCAP observed that under the section "Property and Equipment, Net," the Company simply lists all $18 million of its property assets as "Miners" with no further description. ¶ 103. All of this supports JCAP's conclusion that the "capex spent in the first nine months of 2020--$18.8 mln—was simply stolen." ¶ 107.

Citing Chinese legal documents and press releases, JCAP's investigation also revealed the true extent of the P2P fraud, which Bit Digital vastly understated and misled investors in its disclosures on the matter. ¶¶ 108-112. In addition, JCAP uncovered that Defendants overstated the qualifications and omitted material adverse facts about the Company's officers and directors. ¶¶ 113-120.

Upon the publication of the JCAP Report, Bit Digital's stock price fell $6.27 per share, or 25%, to close at $18.76 per share on January 11, 2021. ¶ 149. The initial complaint was filed on January 20, 2021. (ECF No. 1).

### F. Resignations

On February 3, 2021, just three weeks after the publication of the JCAP Report and two weeks after the initial complaint was filed, Bit Digital issued a press release announcing the resignation and removal of members of the Company's top-level management. These included: the resignation of Ping Liu as Chairwoman of the Board; the removal of Min Hu as CEO as "he was not participating in the Company's bitcoin mining operations"; and the resignation of Chief Strategy Officer and Director, Hong Yu as he "decided it was in the best interests of the Company to pursue his other opportunities." ¶¶ 9, 135-138.

## ARGUMENT

### I.    PLEADING STANDARDS

"On a motion to dismiss, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in the plaintiff's favor." *In re EZCorp, Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 205 (S.D.N.Y. 2016) (Carter Jr., J.). A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Securities fraud claims are subject to the heightened pleading standards of Fed. R. Civ. P. 9(b) and the PSLRA. *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). This requires a complaint to "'specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading,' and 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id*. (citations omitted). Despite the heightened pleading standards, courts "do not require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001). Indeed, the Second Circuit recently cautioned that courts "must be careful not to mistake heightened pleading standards for impossible ones." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 161 (2d Cir. 2021).

To state a claim under Section 10(b), a complaint must allege that defendants "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *Id*. at 167 (quotations and citation omitted). Defendants only challenge the falsity and scienter elements. Both challenges fail.

## II.    DEFENDANTS MADE FALSE STATEMENTS
##         AND OMITTED MATERIAL FACTS

To plead a false statement, a plaintiff must: "(1) specify the statement that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *EZCorp*, 181 F. Supp. 3d at 205 (quotations and citation omitted). "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161-62 (2d Cir. 2000). Defendants do not dispute that the Complaint identifies who made the alleged misstatements, what those statements were about, when the statements were made, where the statements were made, and how the statements were materially false and misleading. Instead, Defendants' entire falsity argument rests on the erroneous assertion that "the challenged statements are based entirely on an unreliable source and non-actionable." Def. Br. at 10-13. The Court should reject Defendants' argument.

### A.    The allegations arising out of the JCAP Report are actionable.

Recognizing the futility of trying to refute the Complaint's specific allegations of material misstatements and omissions, Defendants instead devote their entire falsity argument to attacking the JCAP Report. Def. Br. at 11-13. What Defendants truly seek, however, is to improperly impose a burden on Plaintiff to plead evidence—something that is required by neither Rule 9(a) nor the PSLRA. *See McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 125 (S.D.N.Y. 2013) ("Defendants conflate pleading and proof at this stage of the litigation. In the complaint, Plaintiffs are not required to 'prove' the falsity of the alleged misrepresentations,"); *Liberty Ridge LLC v. RealTech Sys. Corp.*, 173 F. Supp. 2d 129, 137 (S.D.N.Y. 2001) ("Courts should not

demand a level of specificity in fraud pleadings that can only be achieved through discovery.").[2]

Baldly asserting that "Plaintiffs conducted no independent investigation of the claims in the report, choosing instead to take at face value the claims made by a market participant with significant incentive to harm the Company[,]" (Def. Br. at 2), Defendants falsely portray the JCAP Report as just a clumsy collection of quotes from anonymous sources. As a result, Defendants contend that "all of the Complaint's allegations based upon the JCAP Report are unreliable and cannot form the basis of a securities fraud claim." Def. Br. at 13. But Defendants' attempt is both legally and factually incorrect.

First, courts in this District routinely accept allegations based on short seller reports as well-pleaded facts sufficient to satisfy the particularity requirements imposed by the PSLRA. In doing so, courts reject the argument, presented by Bit Digital here, that such reports are unreliable because of the presence of disclaimers and the fact that the short seller stands to profit from a decline in stock value. *See In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, 2014 WL 285103, at *4 (S.D.N.Y. Jan. 27, 2014) (rejecting claim of short seller's unreliability "because it is a known short-seller, and had an incentive to magnify Longwei's financial distress."); *McIntire*, 927 F. Supp. 2d at 124 (rejecting argument that short reports "are inherently unreliable" because authors "may hold short positions in [company's] stock" and noting "this contention has been repeatedly rejected in prior cases."); *Lewy v. SkyPeople Fruit Juice, Inc.*, 2012 WL 3957916, at *13 (S.D.N.Y. Sept. 10, 2012) (explaining that "[a] motion to dismiss is not the proper vehicle to

---

[2] *See also Ganem v. InVivo Therapeutics Holdings Corp*, 845 F.3d 447, 455 (1st Cir. 2017) ("the PSLRA does not require plaintiffs to plead evidence . . ."); *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1101 (10th Cir. 2003) ("If Congress had intended in securities fraud lawsuits to abolish the concept of notice pleading . . . Congress would have done so explicitly. . . Clearly the Reform Act requires some precision in alleging facts, however, it does not require pleading all of the evidence and proof thereunder supporting a plaintiff's claim.")

test the credibility of witnesses or the manner in which the plaintiffs will attempt to prove their allegations" in response to claim that reports were "'unreliable' because they contain disclaimers and because their authors intended to short SPU stock."). Contrary to Defendants' assertion, short sellers like JCAP have every incentive to provide reliable information in their reports as their ability to profit is dependent on maintaining a credible reputation among investors. *See, e.g.*, Ljungqvist & Qian, *How Constraining Are Limits to Arbitrage?*, (Mar. 5, 2016) at 46 ("Credibility is key: as our evidence shows, [short sellers] who lack (or lose) a track record of producing reliable evidence are ignored by investors and so cannot move prices by publishing their reports.").[3]

Equally unavailing is Defendants' attempt to liken the JCAP Report to traditional instances of confidential witnesses and anonymous sources. *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105 (S.D.N.Y. 2013) is on point. There, defendants argued that short reports "constitute functionally confidential witnesses and the allegations contained in their respective reports must, therefore, be examined under the heightened particularity standards for confidential sources applied under the PSLRA." *Id*. at 123. The court rejected the argument outright, explaining that "[t]he majority of courts that have addressed the issue have held that a short-seller report, . . . 'does not implicate the same skepticism as a "traditional" anonymous source.'" *Id*. at 123-24 (quoting *Ho v. Duoyuan Global Water, Inc.,* 887 F. Supp. 2d 547, 564 (S.D.N.Y. 2012) (quoting *In re China Educ. Alliance, Inc. Sec. Litig.*, 2011 WL 4978483, at *4 (C.D. Cal. Oct. 11, 2011)). Even so, the primary source the Complaint relies on, J Capital and its co-founder Anne Stevenson-Yang, are not anonymous at all. ¶¶ 78-79. *See Lewy*, 2012 WL 3957916, at *13 ("neither the Absaroka Report authored by Kevin Barnes, nor the GeoInvesting Alert attributed to the 'GeoTeam' is—or relies upon—a 'confidential' source to a degree that undermines [the]

---

[3] Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2384293.

particularity of plaintiffs' pleadings."). For these reasons, Defendants' falsity argument, which relies on inapposite caselaw about traditional uses of confidential witnesses and anonymous sources, must be rejected.

Along with getting the law wrong, Defendants address none of the underlying factual allegations supporting the reliability of the JCAP Report and the resulting adequacy of Plaintiff's falsity allegations. First, Plaintiff highlights the extensive experience of J Capital's co-founders in the Chinese market. ¶ 78. As to co-founder Anne Stevenson-Yang—the JCAP Report's author— the Complaint quotes an article in the Wall Street Journal publication *Barron's* in which the author writes, "Few foreigners know China as intimately as Anne Stevenson-Yang does." ¶ 79. Stevenson-Yang's expertise and credibility is evident from the article, which explains:

> Among other things, J Capital conducts trips for hedge fund managers, U.S. corporate executives, and bankers all over the Middle Kingdom, relying on Stevenson-Yang's roster of government officials, Communist Party leaders, financiers, small-business operators, and ordinary citizens to take the pulse of economic and political developments.

Far from being anonymous or hiding behind a pseudonym, Stevenson-Yang stands behind her work by including her name, email address, and telephone number at the bottom of every page of the JCAP Report. Bit Digital's claim—that "[t]he Company . . . [is] simply left to guess" who provided the information to JCAP because of the Report's use of anonymous sources—rings hollow. Def. Br. at 2. As discussed below, the falsity allegations are based on more than the unnamed sources in the JCAP Report. Defendants' choice to ignore these facts dooms their motion.

### B. Defendants made actionable misstatements about Bit Digital's purported operations in China.

Defendants' statements about Bit Digital's operations in China, including the statement that "Our mining operations are distributed in Xinjiang, Inner Mongolia and Sichuan Provinces PRC," were materially false and misleading. Defendants' disclosures show that in the wake of the

P2P fraud, the Company disposed of all its Chinese subsidiaries and VIEs by selling the Company's subsidiary, Point Cattle Holdings Limited. ¶¶ 44, 64, 98.[4] Thus, the Company did not purport to operate any bitcoin mining operations through any mainland Chinse subsidiary or VIE. Rather, the bitcoin mining operations purportedly ran through XMAX, a Hong Kong entity. ¶ 99.

Bit Digital's own disclosures state that "The Company operates a recently updated bitcoin mining facility for the sole purpose of mining bitcoin[,] and also references electrical power supplied "to our leased facilities." ¶ 97. But, as the JCAP Report explains, in China, "[c]ompanies are required to show a registration document from a domestic legal entity before they can sign a lease or a hosting contract," and "In China, you have to register with the government to have a data center, and local governments have records of all data centers and bitcoin mining operations." ¶¶ 96, 101. As JCAP stated, "[w]ith no subsidiary in China, that would be illegal and the machines subject to confiscation." ¶ 83. None of these allegations are based on unnamed sources. Rather, they are based on the Company's own SEC filings and Stevenson-Yang's own expertise in the Chinse markets.[5]

Moreover, Bit Digital's disclosures provided zero information "for leased assets, leasehold

---

[4] *See also* ¶ 26 (diagram illustrating that all Chinese subsidiaries and VIE's fell under Point Cattle).

[5] Defendants state that "according to the third-party JCAP Report, Chinese law requires companies to register with the government in order to maintain a data center or bitcoin mining operations[.]" Def. Br. at 11. Elsewhere, Defendants complain that "Plaintiff makes claims concerning the Company's failure to register its business in China, but provide no detail concerning who provided the information[.]" Def Br. at 1-2. Defendants' grievance makes no sense. In the summary preceding Defendants' falsity argument, Defendants state, "even if those anonymously sourced statements in the JCAP Report were credited, they relate to statements of opinion concerning legal requirements in China that are not actionable under prevailing law." Def. Br. at 10-11. Defendants never mention this again and provide no authority for their baseless claim. Moreover, Plaintiff's Counsel was able to easily verify these registration requirements through a simple google search. The law does not require a plaintiff to plead every single redundant fact in support of a claim. *See McIntire*, 927 F. Supp. 2d at 125.

improvements, basic furniture or even everyday non-mining IT equipment[.]" ¶ 102.[6] These independent facts help corroborate the statements of the unnamed government officials in the locales Bit Digital purported to operate in – all of whom stated that there were no registered bitcoin mining centers in their locales and had not heard of Bit Digital. ¶ 101. Thus, the Complaint adequately alleges that Bit Digital's statements about its mining operations were fabricated. At best, the statements were materially false and misleading because the operations in China, if any existed at all, were illegal and the Company's equipment subject to confiscation by Chinese authorities. ¶ 126.

### C. Defendants made actionable misstatements about Bit Digital's purchase of bitcoin mining machines.

Bit Digital's statements about the number of bitcoin mining machines it had bought, including that "As of the date of this Report, we had a total of 40,856 miners" were also false. Defendants never address these allegations, instead relying on the blanket assertion that all allegations based on the JCAP Report cannot form the basis of a securities fraud claim. Def. Br. 11-13. For the reasons discussed above, Defendants are wrong. Along with no Chinese government officials having heard of Bit Digital or having any knowledge of any bitcoin mining operations in their jurisdictions, JCAP spoke with employees from each of the bitcoin mining equipment manufacturers Bit Digital claimed to have purchase machines from. The employees of MicroBT and Bitmain stated that they had never heard of Bit Digital or the name of the Company's former

---

[6] Defendants appear to suggest that Plaintiff's Counsel should be faulted for not hiring an investigator to go to China to speak with local officials and conduct an independent search on the ground to confirm the existence or non-existence of Bit Digital's claimed mining facilities. When Defendants' disclosures provide no specific information at all about the location of their claimed mining facilities and the Complaint was drafted in the midst of the global pandemic, it was more than reasonable to rely on J Capital's interviews with unnamed sources, particularly where those allegations are corroborated by other facts.

VIE. ¶ 105. The falsity of Bit Digital's claim to having over 40,000 bitcoin mining machines is corroborated by the photograph of the sever rack taken from Bit Digital's own website. ¶ 106. The image shows about 100 bitcoin mining machines in a large, otherwise empty warehouse, which the JCAP Report notes "are very sparse compared with the 41,000 machines the company claims." Referencing Bit Digital's 3Q20 Press Release, JCAP observed that under the section "Property and Equipment, Net," the Company simply lists all $18 million of its property assets as "Miners" with no further description. ¶ 103. All of this supports JCAP's finding that the "capex spent in the first nine months of 2020--$18.8 mln—was simply stolen." ¶ 107.

### D. Defendants' omissions about the XMAX acquisition were materially false and misleading.

Here too, Defendants address none of the allegations of material omissions relating to the XMAX acquisition. Not one of the allegations relating to the XMAX acquisition is based on JCAP's interviews with unnamed sources. Rather, they stem from JCAP's detailed investigation and from the review of public sources. The Complaint alleges that Bit Digital's statements about the acquisition of XMAX were materially false and misleading because the Company failed to disclose: (1) that Hong Yu, who the Company appointed as executive director and Chief Strategy Officer just two weeks after the acquisition, was an original investor in XMAX and continued to control the entity; (2) that Yu and XMAX were the subject of several fraud allegations, including seven lawsuits against Yu by disgruntled investors in China; and (3) that Yu had stated that he ended XMAX's crypto currency, XMX's, mining operations because the mining machines were confiscated and that a lawsuit was being filed as a result. ¶¶ 89-95, 128.

Besides the lawsuits, news articles, and Yu's own statements cited in the JCAP Report, the XMAX allegations are corroborated by Bit Digital's own SEC filings. Bit Digital announced Yu's appointment as CSO on April 24, 2020. ¶ 56. The Company stated that there "have been no

transactions in the past two years to which the Company or any of its subsidiaries was or is to be a party, in which Mr. Yu had, or will have, a direct or indirect material interest." ¶ 57. Despite acquiring XMAX weeks prior, the Company did not disclose the acquisition until July 29, 2020. ¶ 59. Less than one month after JCAP exposed Yu's relationship to XMAX, Bit Digital announced that Yu had resigned his role as CSO and director. ¶ 138. These allegations, detailed in the JCAP Report and the Complaint, are sufficiently reliable to plead falsity at the motion to dismiss stage. *See McIntire*, 927 F. Supp. 2d at 124 ("at this stage of the proceedings, the Court must accept the factual allegations contained in the [short reports] as sufficiently reliable as a factual source for Plaintiffs' allegations.") (citing *Bernstein v. Seeman*, 601 F. Supp. 2d 555, 556 (S.D.N.Y. 2009) ("[A] motion to dismiss is not the proper stage at which to resolve factual disputes.")).[7]

## III.   PLAINTIFF ADEQUATELY PLEADS FACTS GIVING RISE TO A STRONG INFERENCE THAT DEFENDANTS ACTED WITH SCIENTER.

In evaluating whether Defendants acted with scienter, the Court is to conduct an "inherently comparative" inquiry, "accept all factual allegations in the complaint as true" and must evaluate "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, *Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Id.* at 324 (quotations and citation omitted). Plaintiff must plead facts that would allow "a reasonable person [to] deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* This

---

[7] Once again, Defendants' attacks on Plaintiff's Counsel are nonsense. The allegations about Yu and XMAX are supported with links to documentary sources relied on by JCAP, which Plaintiff's Counsel reviewed. Furthermore, a simple google search for Yu and XMAX returns a plethora of results establishing the veracity of the connection reported by JCAP.

inference may be established by either (a) "motive and opportunity to commit fraud," or (b) "strong circumstantial evidence of conscious misbehavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). Strong circumstantial evidence includes a showing that defendants "(1) benefitted in a concrete and personal way from the purported fraud"; (2) "engaged in deliberately illegal behavior"; (3) "knew facts or had access to information suggesting that their public statements were not accurate"; or (4) "failed to check information that they had a duty to monitor." *EZCorp*, 181 F. Supp. 3d at 209. In conducting the scienter analysis, a "tie . . . goes to the plaintiff." *In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 414-15 (S.D.N.Y. 2007). Plaintiff has pled a strong inference of scienter based on the allegations about both Defendants' knowledge of the undisclosed facts about Bit Digital's bitcoin mining operations and the Defendants' motive and opportunity to commit the fraud.

### A. Defendants' knowledge and reckless disregard of the false statements supports scienter.

Pleading scienter based on conscious misbehavior or recklessness requires a plaintiff to allege conduct that "is highly unreasonable' and . . . represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Novak*, 216 F.3d at 308. Where, as here, a complaint alleges that Defendants made knowingly false statements, "the scienter analysis is closely aligned with the analysis as to misleading statements." *In re Alstom SA Sec. Litig.,* 406 F. Supp. 2d 433, 456 (S.D.N.Y. 2005). As discussed above, Plaintiff alleges that Defendants misrepresented: (1) the existence of Bit Digital's bitcoin mining facilities in China, and that if any existed at all, such operations were illegal and the Company's equipment was subject to confiscation by Chinese authorities; (2) the claimed purchase of 40,000-plus bitcoin mining machines; and (3) the circumstances of the XMAX acquisition and appointment of Hong Yu.

18

If the Court finds that Plaintiff has adequately pled these misrepresentations, then the finding of falsity dictates that scienter is also satisfied. *See Novak*, 216 F.3d at 308 ("[S]ecurities fraud claims . . . have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements."). "[T]he fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002); *see also In re CenturyLink Sales Practices and Sec. Litig.*, 403 F. Supp. 3d 712, 730 (D. Minn. 2019) ("One 'classic' fact pattern giving rise to a strong inference of scienter is that defendants made statements when they had access to information suggesting these public statements to be materially inaccurate.") (quoting *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 746 (8th Cir. 2002)).

Defendants ignore this, and misleadingly focus on a specific isolated section of the Complaint. Defendants falsely contend that the Complaint simply "alleges six facts that it says constitute circumstantial evidence of fraud." Def. Br. at 16. But as the heading in the Complaint makes clear, these allegations are merely "Additional Allegations of Scienter," they are not the entire scienter story. Defendants' scienter argument fails because the allegations of falsity are sufficient on their own, and because, taken together, rather than in isolation, the additional allegations only strengthen the inference of scienter.[8]

What is more, the additional allegations of scienter are damning, and include: (1) Huang's position as a director and CFO; (2) overstating the qualifications of officers and directors and

---

[8] "Because '[i]t is elementary that, on a motion to dismiss, the Complaint must be read as a whole,' . . . defendants 'cannot secure dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder.'" *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 658 (S.D.N.Y. 2007) (citations omitted).

omitting adverse information; (3) the resignation of three auditors in just a fifteen-month period; (4) Bit Digital knowingly operated with material weaknesses in internal controls that would not detect or correct the misstatements alleged; (5) the prior fraud of former executives who continued to exert substantial influence over the Company; and (6) the string of resignations and removals of executives in the immediate wake of the JCAP Report's revelations.

The inference of scienter which arises from Huang's position as a director and CFO is based on more than his title. In announcing its entry into the bitcoin mining business in December 2019, the Company described Huang as "very experienced in bitcoin and bitcoin mining industry," explained that Huang's expertise "will support our planned operations and goals set for the bitcoin mining business," and that Huang was responsible for the "preparation of the business and operation team." ¶ 52. As the Company's purported bitcoin mining czar it is more than plausible that Huang had knowledge of, or recklessly disregarded, the misstatements about Bit Digital's bitcoin mining operations in the Form 6-K that Huang alone signed. This is particularly true where the Company had no other operations.[9] Given that no auditor independently reviewed the statements about Bit Digital's operations and that then-CEO Hu was apparently "not participating in the Company's bitcoin mining operations," it is inconceivable that Huang was unaware of the alleged misstatements. The Company did not include Huang's supposed expertise in bitcoin when it announced his appointment in October 2019, despite claims that the Company had decided to enter the bitcoin mining business. ¶ 53. If Huang's bitcoin expertise was exaggerated, then he was at least reckless in signing statements that he was not qualified to confirm.

In the wake of the arrests related to the P2P fraud, and following the JCAP Report, the

---

[9] *See In re Winstar Commc'ns v. Rouhana*, 2006 WL 473885, at *7 (S.D.N.Y. Feb. 27, 2006) ("High level corporate officers . . . have a duty to familiarize themselves with the facts relevant to the core operations of the company").

Company announced a slate of new directors and officers. The qualifications of these new members were vastly overstated and omitted key facts. These misleading descriptions included:

- Hu, the new CEO, received a law degree from Qingdao Qiushi College of Arts and Sciences, which actually "targets 14- to 15-year-olds who cannot pass an entrance exam for high school[,]" and "does not offer studies in law."

- Yu, the new executive director and Chief Strategy Officer, who as discussed above, the Company omitted to disclose Yu's relationship to XMAX and the related fraud.

- Deng, a new director, had an accounting degree, but "like CEO Hu's institution, is a high-school level institution whose matriculating students are young teenagers."

- Shih, a new director, who JCAP reported "handled 'due diligence' for fraud promoter firm Brean Murray" and was "CFO of China Valves Technology (CCVT) during the period for which the CEO identified serious fraud at the company."

These misleading descriptions contribute to the overall inference of scienter because of the context —trying to rehabilitate the Company's image – in which the statements were made.

Defendants' reliance on *SEC v. Iannazzo*, 2006 WL 8461454 (S.D.N.Y. Jan. 27, 2006) actually proves Plaintiff's point. There, the Court explained that the failure of an individual to disclose a 1986 larceny conviction did not render statements about his "college and law school credentials" misleading, as "no reasonable investor could conclude that the . . . limited description of Iannazzo's educational credentials meant that Iannazzo had no criminal history." *Id*. at 1. For example, unlike *Iannazzo*, a reasonable investor *would* believe that an individual claiming to have a law degree from a particular institution, *would*, in fact, have a law degree. That Hu's "college" was for teenagers and did not even "offer studies in the law," renders the description misleading. In any event, the Complaint does not allege the misdescriptions as actionable misstatements,[10] but as additional circumstantial evidence of scienter.

---

[10] Except for the omissions related to Hong Yu and XMAX, which are described above.

That Bit Digital had three independent accounting firms resign in just a 15-month period—the last two of which attributed their resignations to their inability to audit the Company's bitcoin mining business—also contributes to scienter. That Bit Digital's purported mining operations were never audited during the Class Period means no one outside the Company had ever verified its claims. Combined with the Company's opaque financial filings and JCAP's findings, the lack of any independent audit supports the inference that Bit Digital's claims were fabricated.

Bit Digital's prolonged failure to maintain effective internal controls provides more evidence of scienter. Defendants' falsely state the Complaint alleges "the Company disclosed material weaknesses in its internal controls in 2018 Annual Report on Form 20-F, filed on April 30, 2019. . . . There are no further allegations of fact to support the conclusory claim that those weaknesses were not rectified before Bit Digital issued the 3Q2020 Press Release twenty months later, on December 21, 2020." Def. Br. at 20-21. Not so. The Complaint alleges that the "2019 20-F also disclosed that, like fiscal 2018, the Company's disclosure controls and procedures were not effective and the Company did not maintain effective internal control over financial reporting." ¶ 62. The 2019 20-F was filed on July 29, 2020 (¶ 59), *less than five months* before Defendants issued the 3Q20 Press Release. Nor did the 3Q20 Press Release claim to have rectified these material weaknesses.[11] This is far from "conclusory." The allegations that Bit Digital suffered from material weaknesses because of its failure to maintain effective internal controls for about two years, and that Defendants failed to rectify these issues prior to issuing the alleged misstatements support a strong inference of scienter. *See Varghese v. China Shenghou Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 608 (S.D.N.Y. 2009) ("Plaintiffs allege that (1) CSP had weak internal

---

[11] Plus, Bit Digital had not had its financials audited by an independent accounting firm for roughly two years, and its CEO was not participating in the Company's only business operations – bitcoin mining.

controls and (2) that the CSP Defendants were aware of the problems. Both these allegations support a strong inference of scienter."); *In re Veeco Instruments, Inc. Sec. Litig.*, 235, F.R.D. 220, 232 (S.D.N.Y. 2006) ("[A]s this court has recognized, a failure to maintain sufficient internal controls to avoid fraud is sufficiently indicative of scienter.").

The slate of resignations and removals of officers and directors in the immediate aftermath of the JCAP Report provide even more evidence of scienter. On February 3, 2021, Bit Digital issued a press release announcing that Ping Liu had resigned as Chairwoman of the Board. The Board also announced the removal of Min Hu as CEO as "he was not participating in the Company's bitcoin mining operations." Given that the Company had no other operations, it is reasonable to infer to that Hu abandoned his duties and did not verify the Company's statements in the 3Q20 Press Release – statements that were already unaudited. Finally, Hong Yu resigned as role as a Director and Chief Strategy Officer as "Mr. Yu decided it was in the Company's best interests for him to pursue his other opportunities." Yu's sudden departure just weeks after the JCAP Report revealed his role in and relationship to XMAX strongly suggests that his resignation was linked to JCAP's allegations. These three major resignations and firings so close in time to the publication of the JCAP Report support a strong inference of scienter. *See In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007) ("the resignations of [the defendants], although not sufficient in and of themselves, add to the overall pleading of circumstantial evidence of fraud"); *China Shenghuo*, 672 F. Supp. 2d at 608 (removal of CEO "contributes to a strong inference of scienter").

**B.     Plaintiff adequately alleges that Defendants had both the motive and opportunity to commit the fraud alleged.**

While unnecessary to plead scienter, the Complaint also alleges both motive and opportunity to commit the alleged fraud. The Complaint alleges that Bit Digital's "bitcoin mining

business was fraudulent," "was designed to steal funds from investors" and that the "$18.8 [million]" the Company claimed to have spent purchasing bitcoin mining machines in the first nine months of 2020 "was simply stolen." ¶¶ 7, 80, 84, 107. Along with the allegations that Bit Digital lied about its mining operations in China and the purchase of bitcoin mining machines, scienter is bolstered by the allegations that the Company's former executives – who were charged with stealing millions of dollars from investors relating to the Company's P2P business – continued to control the Company. ¶¶ 108-112. As the Company itself reported, Liu and Erxin "have, and will continue to have, substantial influence over our business."[12] ¶¶ 87, 120, 134. Along with Liu and Erxin's continued control over Bit Digital's business, opportunity is pled by the allegations: that the Company's new officers and directors were underqualified and put in place to allow the former executives' continued control; that the Company's financials were not audited by an independent registered accounting firm; and that the Company continued to have material weaknesses in internal controls over financial reporting. ¶¶ 32, 62, 70, 113-120. Thus, motive and opportunity are adequately alleged. *See, e.g.*, *Acticon AG v. China Ne. Petroleum Holdings Ltd.,* 615 F. App'x 44, 45 (2d Cir. 2015) (finding that personal gain from alleged "looting" of company funds established motive and opportunity to commit fraud).[13]

Moreover, Defendants' claim that "prior, extensive public disclosures" of Liu and Erxin's continued control suggests the "absence of scienter" is not based in reality. Def. Br. at 22. Other

---

[12] This disclosure stands in direct contradiction to Defendants' claim that there "is no allegation of fact that either Liu or [Erxin] Zeng . . . have any involvement in the Company operations or financial reporting." Def. Br. at 21-22.

[13] Contrary to Defendants' assertion, allegations of insider trading are unnecessary to allege motive. *See e.g.*, *In re Northern Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000) (motive may established by showing "stock sales by insiders, or *any other evidence of pecuniary gain by company insiders at shareholders' expense*[.]") (emphasis added).

than admitting that Liu and Erxin would continue to have a substantial influence, Defendants' prior disclosures were anything but extensive. The Company's August 13, 2019 Form 6-K stated that some borrowers on its P2P platform had "maliciously" defaulted on loans in previous months and that because of threats, the Company "decided to move its offices in late July." ¶ 35. But as JCAP revealed through the review of Chinese legal documents linked in the Report, Chinese authorities had already shut down the P2P business and initiated legal cases against the Company's former subsidiary and executives. This included the arrest of seventeen former executives in July 2019, including Liu and Erxin. ¶ 109. The obfuscating disclosures did not end there. On October 31, 2019, the Company first disclosed the existence of the criminal investigations and arrests. ¶¶ 38-39. The Company stated that it expected to end its P2P business "in the near future," but the business had already been shuttered by authorities. Defendants also stated that Liu had been removed since the Company was "not able to reach Mr. Liu for an extended period of time." ¶ 42. Defendants left it to JCAP to reveal that Liu could not be "reached" because he was in jail. JCAP also revealed the true extent of the P2P fraud. ¶¶ 109-112. The Company never disclosed any of this information, which raised serious red flags about Liu and Erxin's continued control. Thus, the Company's prior disclosures fall far short of negating scienter. JCAP's thorough investigation, however, shines light on Defendants' shady dealings and provides a strong basis for finding scienter.[14]

## CONCLUSION

Lead Plaintiff asks the Court to deny the motion to dismiss.

---

[14] The Complaint alleges Section 20(a) control person liability against Huang. ¶¶ 155-156. Because Plaintiff adequately alleges primary liability under Section 10(b), Plaintiff also alleges a Section 20(a) claim against Huang. *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 249 (S.D.N.Y. 2010).

December 10, 2021                        Respectfully submitted,

                                         /s/ Jacob A. Walker
                                         Jeffrey C. Block
                                         Jacob A. Walker, *pro hac vice*
                                         Nathaniel Silver
                                         **Block & Leviton LLP**
                                         260 Franklin Street, Suite 1860
                                         Boston, MA 02110
                                         (617) 398-5600 phone
                                         jeff@blockleviton.com
                                         jake@blockleviton.com
                                         nate@blockleviton.com

                                         *Counsel to Lead Plaintiff and*
                                         *Lead Counsel for the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 10, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the Court's Electronic Mail Notice List.

/s/ Jacob A. Walker
Jacob A. Walker