**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE: BIT DIGITAL, INC. SECURITIES LITIGATION<br><br>This document relates to:<br><br>All Actions | Lead Case No. 1:21-cv-00515-ALC |

**DECLARATION OF JACOB A. WALKER IN SUPPORT OF MOTIONS FOR: (1) FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (2) AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND AN AWARD TO LEAD PLAINTIFF PURSUANT TO 15 U.S.C. §78u-4(a)(4)**

I, JACOB A. WALKER, declare as follows:

1.      I am an attorney duly licensed to practice before the courts of the Commonwealth of Massachusetts and the state of California, and I am admitted pro hac vice in this action. I am a partner of Block & Leviton LLP ("Block & Leviton" or "Lead Counsel"), and counsel for Lead Plaintiff Joseph Franklin Monkam Nitcheu ("Lead Plaintiff") and the Class.[1]  I have been actively involved in the prosecution and resolution of this action (the "Litigation"), am familiar with its proceedings and have personal knowledge of the matters set forth herein based upon my active supervision and participation in all material aspects of the Litigation.

2.      I submit this declaration pursuant to Rule 23 of the Federal Rules of Civil Procedure in support of: (a) Lead Plaintiff's motion for final approval of the all-cash settlement of $2,100,000 (the "Settlement Amount") and approval of the proposed Plan of Allocation; and (b) Lead Counsel's application for an award of attorneys' fees and expenses and an award to Lead Plaintiff pursuant to 15 U.S.C. §78u-4(a)(4).

3.      Attached as Exhibit 1 is a true and correct copy of the Declaration of Lead Plaintiff Joseph Franklin Monkam Nitcheu.

4.      Attached as Exhibit 2 is a true and correct copy of the Declaration of Justin R. Hughes Regarding Notice Dissemination, Publication, and Requests for Exclusion and Objections Received to Date.

5.      Attached as Exhibit 3 is a true and correct copy of the Declaration of Jacob A. Walker In Support of Motion for Award of Attorneys' Fees and Expenses.

---

[1] Unless otherwise defined, all capitalized terms herein have the same meanings as set forth in the Stipulation and Agreement of Class Action Settlement dated October 12, 2022, which is attached to the Declaration of Jacob A. Walker, dated October 24, 2022, as Exhibit 1.  ECF No 68.  Internal citations are omitted and emphasis is added throughout unless otherwise noted.

# I.   PRELIMINARY STATEMENT

6.     This case has been vigorously litigated from its commencement in January 2021 through settlement.  At every stage of the Litigation, Defendants aggressively litigated the matter and asserted that they had winning defenses.   The Settlement was achieved only after Lead Counsel, among other things: (a) undertook an extensive investigation of the facts alleged in the Consolidated Class Action Complaint for Violations of the Federal Securities Laws filed on July 6, 2021 (ECF No. 24) (the "Amended Complaint"); (b) opposed Defendants' motion to dismiss; (c) filed detailed briefing in support of Lead Plaintiff's motion to strike certain exhibits attached to Defendants' reply in support of their motion to dismiss; and (d) engaged in vigorous settlement negotiations with Defendants' counsel.

7.     The Settlement is the product of hard-fought litigation and takes the significant risks specific to the case into consideration.  Furthermore, the Settlement is the result of arm's-length negotiations between the Settling Parties, which began after the Court raised the possibility of settlement discussions to the parties at a pre-motion conference on November 15, 2021.  *See* ECF No. 37 at 2-6.  These negotiations were conducted by experienced counsel with a full understanding of both the strengths and weaknesses of the case.

8.     Lead Plaintiff believes that the Settlement is a great result under the circumstances. The substantial research, factual investigation, and motion practice outlined herein informed Lead Plaintiff that, while its case had strengths, it also had weaknesses, which were carefully evaluated in determining which course of action was in the best interest of the Class.  As set forth below, despite the fact that Lead Plaintiff believes his claims are meritorious, numerous uncertainties remained if the case proceeded past the motion to dismiss stage to class certification, summary judgment, and trial.  In evaluating the proposed Settlement, Lead Plaintiff considered that even if

the Class were to win at trial, it faced the risk of a potentially multi-year appeal process, during which time the Class would be denied any recovery.  While the time for objecting to the Settlement or Lead Counsel's fees has not yet expired, to date not a single objection has been filed.  Any objections will be addressed in Lead Counsel's reply brief.

9.      Lead Counsel has prosecuted the Litigation on a wholly contingent basis and has advanced or incurred substantial litigation expenses. In doing so, Lead Counsel shouldered the substantial risk of an unfavorable result. Lead Counsel has not yet received any compensation for its effort.  The fee application for 25% of the Settlement Amount is fair and within the range of fee percentages frequently awarded in this type of action and in this District.  Under the particular facts of this case, the percentage is justified considering the substantial benefits conferred on the Class, the risks undertaken, the quality of representation and the nature and extent of legal services performed.

10.     Lead Counsel also seeks payment for expenses totaling $15,902.41 that were reasonably and necessarily committed to the prosecution of the Litigation.  These expenses include, for example, the costs of hiring a damages expert and consultants, travel, computerized research, and printing.  These expenses were reasonable and necessary to obtain the successful result.  In addition, Lead Counsel requests an award of $5,000 to compensate Lead Plaintiff for time and expenses related to his active participation in the Litigation.

## II.    SUMMARY OF LEAD PLAINTIFF'S ALLEGATIONS

11.     The gravamen of the Amended Complaint is that, in violation of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, Defendants made materially false and misleading statements regarding the Company's business and operations, specifically: 1) statements about Bit Digital's operations in China, including that

"Our mining operations are distributed in Xinjiang, Inner Mongolia and Sichuan Provinces PRC";
(2) statements about Bit Digital's bitcoin mining machines, including that "The number of miners
[in the Third Quarter 2020] was 22,960, with 16,865 miners acquired in the third quarter of 2020,"
and "As of the date of this Report, we had a total of 40,865 miners"; and (3) statements about the
acquisition of XMAX, including that "On April 8, 2020, the Company entered into an Instrument
of Transfer with Mr. Ching Yeh to acquire his 100% of the ownership interest (10,000 shares) in
[XMAX] . . . . After the acquisition, XMAX became a wholly owned subsidiary of the Company.
XMAX is a Hong Kong company, engaged in bitcoin mining business[.]" ¶¶ 71-77, 121-128.[2]

12.     Lead Plaintiff alleged that, as a result of Defendants' false statements and/or
omissions, Bit Digital common stock traded at artificially inflated prices, and that when the true
facts regarding Bit Digital's bitcoin mining business, XMAX acquisition, and appointment of
Hong Yu were revealed, the price of the Company's stock dropped, causing damage to Class
Members.

13.     Lead Plaintiff alleged that, prior to entering the bitcoin mining business, Bit Digital
claimed to operate a peer-to-peer lending business and had planned to operate a car rental business.
¶6.  However, Chinese authorities shut down the peer-to-peer business for illegal fundraising and
criminally charged 17 members of the Company's top management, including its former CEO and
Chairman.  *Id.*  Lead Plaintiff alleged that by the end of 2019, the Company had essentially no
operations, but proceeded to rebrand itself as a bitcoin mining operation, seeking to capitalize on
the significant increase in the value of bitcoin.  *Id.*  By the end of 2020, Bit Digital went from
having virtually no value to a market capitalization of well over $1 billion.  *Id.*

---

[2] Citations to "¶__" refer to paragraphs of the Amended Complaint.

14.     On January 11, 2021, J Capital, a U.S. based company that focuses on uncovering over-valued companies with a noted expertise in the Chinese market, published a 25-page report based on an in-depth investigation of Bit Digital and detailing the grounds for JCAP's belief that, among other things, the Company operated "a fake crypto currency business" "designed to steal funds from investors." ¶¶78-80.  These findings were based, in part, on interviews of government officials in the locales where Bit Digital claimed to operate mining facilities, as well as employees of the major bitcoin mining machine manufacturers that Bit Digital purportedly acquired its equipment from.  ¶¶83-84, 101, 105.  J Capital's investigation also examined Bit Digital's filings with the SEC, the review of several Chinese civil and criminal legal filings, and Chinese online information sources.  ¶¶90-100, 102-103, 106, 109-119.

15.     Lead Plaintiff alleged that Defendants' knowledge of the undisclosed facts about Bit Digital's business and operations, and Defendants' motive and opportunity to commit the fraud, were sufficient to adequately plead scienter.  Lead Plaintiff also alleged various additional indicia of scienter, including: (1) Defendant Huang's position as a director and CFO; (2) Bit Digital overstating the qualifications of officers and directors and omitting adverse information; (3) the resignation of three auditors in just a fifteen-month period; (4) Bit Digital knowingly operating with material weaknesses in internal controls that would not detect or correct the misstatements alleged; (5) the prior fraud of former executives who continued to exert substantial influence over the Company; and (6) the string of resignations and removals of executives in the immediate wake of the J Capital Report's revelations.  As a result, Lead Plaintiff alleged that Defendants knew, or recklessly disregarded, the truth about Bit Digital's business and operations, but misrepresented: (1) Bit Digital's bitcoin mining operations, including, among other things, the circumstances under which the Company entered the industry, the legality of its operations, and the extent of its

operations; (2) the claimed purchase of 40,000-plus bitcoin mining machines; and (3) the circumstances of the XMAX acquisition and appointment of Hong Yu.

16.     Upon the publication of the J Capital Report, Bit Digital's stock price fell $6.27 per share, or 25%, to close at $18.76 per share on January 11, 2021.  ¶149.  A more detailed description of Lead Plaintiff's allegations is set forth in the Second Amended Complaint.  ECF No. 24.

17.     In opting to settle the Litigation, Lead Plaintiff considered the risks associated with proving the claims alleged in the Amended Complaint.  For example, it was Defendants' position that their alleged misstatements concerning Bit Digital's bitcoin mining business were not materially misleading and not made with scienter. Although Lead Plaintiff disputes Defendants' assertions, there was a substantial risk of recovering limited or no damages if the Court had granted Defendants' motion to dismiss, or if a jury ultimately agreed in whole or in part with Defendants' arguments.

## III.   THE LITIGATION

### A.  The Commencement of the Litigation

18.     On January 20, 2021, the initial complaint in this class action was filed on behalf of purchasers of Bit Digital common stock alleging violations of §§10(b) and 20(a) of the Exchange Act and United States Securities and Exchange Commission ("SEC") Rule 10b-5.  ECF No. 1.  Lead Plaintiff filed a motion to be appointed lead plaintiff and have his selection of counsel approved as lead counsel on March 22, 2021.  ECF Nos. 13-15.  On April 29, 2021 the Court appointed Joseph Franklin Monkam Nitcheu as Lead Plaintiff and Block & Leviton LLP as Lead Counsel.  ECF No 21.

### B.  Lead Counsel's Investigation and Amended Complaint

19.     Lead Counsel conducted an extensive investigation of the alleged securities law violations.  This investigation included, but was not limited to, a review and analysis of: (i) Bit Digital's public filings with the SEC; (ii) transcripts of Bit Digital's public conference calls; (iii) Bit Digital's press releases; (iv) reports of securities analysts following Bit Digital; (v) independent media reports regarding Bit Digital; (vi) publicly available information concerning the bitcoin mining market; (vii) economic analyses of Bit Digital's stock price movement and pricing and volume data; and (viii) other publicly available material and data.

20.     Based on this investigation, Lead Counsel prepared a detailed Amended Complaint on behalf of all investors who purchased or otherwise acquired Bit Digital common stock between December 21, 2020 and January 11, 2021, inclusive.  The Amended Complaint was filed on July 6, 2021 and alleged claims pursuant to §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  ECF No. 24.

### C.  Defendants' Motion to Dismiss the Amended Complaint

21.     Defendants moved to dismiss the Amended Complaint on December 10, 2021. ECF Nos. 40-42.  In accordance with the PSLRA, formal discovery in the case was stayed until the Court ruled on the motion to dismiss.  In support of their motion to dismiss, Defendants primarily argued that Lead Plaintiff impermissibly relied on the J Capital Report to support his allegations.  *See* ECF No. 41 at 8-13.  Defendants also argued that the Amended Complaint did not give rise to a strong inference of either motive and opportunity, or knowledge or recklessness sufficient to plead an intent to commit fraud and, thus, did not adequately plead the element of scienter.  *See id*. at 13-23.

22.     Specifically, Defendants argued that the J Capital Report was "admittedly biased[,]" "[l]acking the necessary indicia of reliability," and "not a reliable source of information

on which to base a claim." ECF No. 41 at 10.  Defendants further argued that even if the J Capital Report could be credited, its content "relate[s] to statements of opinion concerning legal requirements in China that are not actionable under prevailing law." *Id.* at 11.  In addition, Defendants argued that the Amended Complaint: (i) did not adequately allege that Defendant Huang or the Company had any motive to commit fraud (*id.* at 15); (ii) failed to provide the requisite strong circumstantial evidence necessary to support an inference of conscious misbehavior (*id.* at 16); (iii) did not plead any non-speculative facts linking the auditor resignations to the alleged fraud (*id.* at 19); (iv) made conclusory allegations about the Company's alleged failure to correct the internal controls before issuing the 3Q2020 Press Release (*id.* at 20); and (v) made insufficient allegations based on the timing of removal or resignation of officers and directors following publication of the J Capital Report (*id.* at 22).

23.     Lead Plaintiff filed his opposition to Defendants' motion to dismiss on December 10, 2021.  ECF No. 43.  In the opposition, Lead Plaintiff rebutted Defendants' arguments that the Amended Complaint failed to adequately plead a strong inference of scienter, false or misleading statements, or loss causation, and argued that the Amended Complaint adequately alleged: (i) that Defendants failed to disclose material information and made materially false and misleading statements regarding Bit Digital's purported operations in China, purchase of bitcoin mining machines, and the XMAX acquisition; (ii) a strong, cogent, and compelling inference of scienter, including through Defendant Huang's knowledge of the facts that rendered Defendants' statements false and misleading, based in part on Huang's expertise in bitcoin and involvement in preparation of the business operation team; (iii) a strong, cogent, and compelling inference of scienter based on Defendants' motive and opportunity to commit fraud, including through Liu and Erxin's alleged control over the business and material weaknesses in the Company's internal controls; and (iv)

that Defendants made a corrective disclosure directly related to the alleged fraud and that Bit Digital's stock price dropped immediately following that disclosure. Lead Counsel spent significant time and resources performing the legal and factual research necessary to address Defendants' arguments and draft an effective opposition that demonstrated the Amended Complaint satisfied the strict pleading burden imposed by the PSLRA.

24.     Defendants filed a reply in further support of the motion to dismiss on December 17, 2021 (ECF No. 45) and an amended reply in further support of the motion to dismiss on January 7, 2022 (ECF No. 50).   Defendants further argued that reliance on the J Capital Report was improper, that the report itself admits it "does not contain facts enabling Plaintiff to contradict [Bit Digital's] statement about operations in these three large regions of China" (ECF No. 50 at 5), and that Lead Plaintiff failed to allege any concrete benefits flowing to any alleged speaker and failed to show conscious misbehavior (*id.* at 11-12).

25.     On March 4, 2022, Lead Plaintiff filed a motion to strike four exhibits attached to Defendants' reply in further support of their motion to dismiss.  ECF No. 57-58.  Specifically, Lead Plaintiff asked the Court to strike documents concerning the XMAX acquisition and a link to a blank form of a Host Services Contract, which Lead Plaintiff argued were included for the first time on reply.  Lead Plaintiff argued that Defendants improperly included extrinsic facts and evidence and attempted to dispute the Amended Complaint's factual allegations before the parties could engage in discovery.  Defendants filed an opposition to the motion to strike on March 18, 2022.  ECF No. 59.  In their opposition, Defendants argued that Lead Plaintiff failed to show that the exhibits at issue were redundant, immaterial, impertinent, or scandalous, and that judicial notice of the exhibits would be proper.  *See id.* at 1-6.  Defendants further argued that their arguments regarding the reliability of the J Capital Report's allegations regarding the XMAX

acquisition were not made for the first time on reply. *See id.* at 7-8. Lead Plaintiff filed his reply on April 1, 2022. ECF No. 60.

26.     The parties began discussing the possibility of settling the Litigation after the Court asked the parties about their respective positions and willingness to engage in such discussions in a pre-motion conference. *See* ECF No. 37 at 2-6. The parties began serious settlement discussions in June 2022, which were ultimately concluded following multiple exchanges in August 2022. On August 12, 2022, while Defendants' motion to dismiss was still pending, the Settling Parties filed a letter informing the Court that they reached an agreement in principle to settle the claims in the Litigation on a class-wide basis. ECF No. 61. In response, the Court entered an order denying the motion to dismiss without prejudice as a result of parties' agreement to settle the case. ECF No. 62.

## IV.   SETTLEMENT NEGOTIATIONS AND TERMS

27.     While Defendants' motion to dismiss was pending, the parties began settlement discussions. Lead Counsel conducted arm's-length negotiations with Defendants with a view to achieving the best relief possible consistent with the interests of the Class. The settlement discussions were led by counsel with extensive experience in litigating and resolving complex cases in federal courts. The lead negotiators on the defense side from Kagan, Caspersen & Bogart PLLC had similar substantial experience in resolving complex litigation. The parties disagreed on the value of Lead Plaintiff's claims and Lead Counsel was prepared to continue to litigate the case if a favorable settlement could not be reached at that time. During the course of the negotiations, the parties reached an agreement-in-principle to resolve the Litigation, subject to the negotiation of mutually acceptable terms of a settlement agreement.

28.     The Settling Parties then negotiated, drafted, finalized, and signed the formal settlement agreement detailing the terms of the proposed Settlement, which was filed on October 24, 2022, along with Plaintiff's Unopposed Motion for (1) Preliminary Approval of Class Action Settlement; and (2) Approval of Notice to the Class. *See* ECF No. 67.  On November 22, 2022, the Court granted preliminary approval of the Settlement, including the form and manner of notice of the Settlement to the Class.  ECF No. 69.

29.     The Settlement set forth in the Stipulation resolves the claims of the Class against all Defendants for $2,100,000 in cash, inclusive of attorneys' fees and costs.  The recovery to individual Class Members will depend on variables, including the number of shares of Bit Digital common stock the Class Member purchased or acquired and when and at what price such purchases or acquisitions were made.

### D.  The Settlement is in the Best Interests of the Class and Warrants Approval

30.     Lead Plaintiff believes it would have prevailed on the merits at trial.  Defendants were just as adamant that Lead Plaintiff would have failed.  There was a very real risk that Lead Plaintiff would not have prevailed at the motion to dismiss stage, class certification, summary judgment, or, finally, that Lead Plaintiff would not have convinced a jury that Defendants acted with scienter or that the alleged misstatements and omissions were materially false and misleading when made.

31.     Having considered the foregoing, and evaluated Defendants' arguments, it is the informed judgment of Lead Counsel, based on all proceedings to date and its extensive experience litigating class actions under the federal securities laws, that the proposed Settlement is fair, reasonable, and adequate, and in the best interests of the Class.

## V.     THE RISKS OF LITIGATION

32.     Lead Plaintiff, by and through Lead Counsel, vigorously litigated this case, and the Settlement in this Litigation was reached only after Lead Counsel had a thorough understanding of the strengths and potential weaknesses of the claims alleged in the Amended Complaint.  At the time of Settlement, Lead Plaintiff and Lead Counsel had conducted an extensive fact investigation, filed the Amended Complaint, filed an opposition to Defendants' motion to dismiss, and participated in vigorous, arm's-length settlement negotiations.  Accordingly, Lead Plaintiff and Lead Counsel firmly understood the strengths of their claims, the strengths of Defendants' defenses, and the potential damages suffered by the Class.

33.     The Settlement represents a very favorable result for the Class.  The Settlement Amount reflects a recovery of approximately 1.7% of Lead Plaintiff's expert's estimate of maximum possible recoverable damages, an amount roughly equivalent to the median ratios of settlement amounts to investor losses recorded in the past three years.  *See* Janeen McIntosh and Svetlana Starykh, Recent Trends in Securities Class Action Litigation: 2021 Full-Year Review (NERA Jan. 25, 2022) at 24, figure 22 (recording median percentages of 1.6 in 2019 and 1.8 in 2020 and 2021).[3]

34.     While Lead Counsel believes that substantial evidence exists to support a jury verdict in favor of the Class, it recognizes that there were considerable risks and uncertainties if the case had proceeded to trial. Lead Counsel carefully considered these risks throughout the Litigation and in recommending that Lead Plaintiff settle this matter.

---

[3] Available at: https://www.nera.com/content/dam/nera/publications/2022/PUB_2021_Full-Year_Trends_012022.pdf.

35.     For example, Defendants' motion to dismiss was pending at the time the Settlement was reached.  Even if the Court had denied the motion, there was always the risk that the Court would not maintain the Litigation, or particular claims, on a class-wide basis through trial.

36.     Moreover, motions important to Lead Plaintiff's ability to obtain a verdict in the Class's favor at trial likely would have been filed, including motions that would determine the extent of the evidence that could be presented at trial and the issues upon which liability could be premised.  These would include disputes over the admissibility of expert testimony, specific trial exhibits, objections to deposition testimony and others.  This created additional uncertainty as to what evidence would ultimately be permitted to be shown to the jury and for what purposes. Depending on their outcome, such motions could seriously undermine or altogether preclude Lead Plaintiff from proving his case.

37.     Lead Plaintiff understands, that even if he firmly believes that documentary and testimonial evidence would fully support his claims at trial, there is no way of predicting which interpretations, inferences, or testimony the jury would have accepted at trial.  Defendants have adamantly denied any culpability throughout the Litigation and were prepared to mount defenses that could potentially bar a Class recovery.  If the jury sided with Defendants on even one of their defenses, or the Court granted Defendants' summary judgment, the Class would recover nothing.

**E.  Falsity**

38.     Lead Plaintiff alleged that Defendants made false and misleading statements regarding: (1) the existence of Bit Digital's bitcoin mining facilities in China, and that if any existed at all, such operations were illegal and the Company's equipment was subject to confiscation by Chinese authorities; (2) the claimed purchase of 40,000-plus bitcoin mining machines; and (3) the circumstances of the XMAX acquisition and appointment of Hong Yu.

Defendants, on the other hand, maintained that the statements could not be shown to be verifiably false or misleading. Defendants primarily asserted that Lead Plaintiff could not rely on the J Capital Report, largely because of J Capital's status as a short-seller and the use of anonymous and unspecified sources of information. While the Settling Parties disagreed about the merits of these arguments, Lead Plaintiff recognized that if a jury found these arguments compelling, or if the Court found them compelling at the motion to dismiss stage, there was a significant risk that the Class would recover nothing.

## F. Scienter

39.    In addition to the risks Lead Plaintiff faced establishing falsity, Defendants were also prepared to mount a defense asserting that Lead Plaintiff could not establish that Defendants made any false or misleading statements with the requisite intent. Defendants asserted that merely "alleging a speaker was an officer and director does not show conscious misbehavior." ECF No. 50 at 12. Defendants would likely have argued that Plaintiff would be unable to provide any evidence that they did not actually believe the statements made or that the statements were made recklessly. Defendants further asserted that motive cannot be shown by allegations that directors were underqualified, that auditing was insufficient, or that the company had material weaknesses in internal controls. *Id.* Were the Court, or a jury at trial, to find these arguments persuasive, there would be a significant risk that the Class would recover nothing.

## G. Loss Causation and Damages

40.    Even if a jury found that Lead Plaintiff succeeded in proving falsity and scienter, there remained a risk related to Lead Plaintiff's ability to prove loss causation and damages.

Defendants would likely argue that loss causation could not be established because it was their position that the J Capital Report was entirely unreliable.

41.     Defendants were also expected to argue that Lead Plaintiff could not disaggregate non-fraud related factors from the declines in Bit Digital's stock price and that the methodology Lead Plaintiff's expert would use to prove damages at trial was unreliable and should be excluded. While Lead Plaintiff would have had the burden of identifying and isolating the fraud-related damages suffered by Class Members, Defendants only had to identify a flaw with the methodology utilized by Lead Plaintiff's experts and prevail on a *Daubert* motion, or win the inevitable, and inherently unpredictable, "battle of the experts" between the parties' loss causation and damages experts before the jury. Defendants would have argued that the case either should not reach a jury or that the jury had no choice but to determine that there were little or no cognizable damages.

42.     Even assuming Lead Plaintiff prevailed at trial, Defendants would likely file post-trial motions and appeals to limit or overturn any verdict in Lead Plaintiff's favor.  The post-trial motion and appeals process could span several years, during which time the Class would receive no payment.  In addition, an appeal of any verdict would carry with it the risk of reversal, in which case the Class would receive no payment despite having prevailed on the claims at trial.

43.     Finally, even assuming Lead Plaintiff prevailed at trial and succeeded on appeal, there was a significant risk of actually recovering on behalf of the Class in this Action. As part of the settlement process, Bit Digital represented that it did not have applicable directors and officers liability insurance, making recovery highly risky.

44.     In short, the parties disagreed on the merits of this case, including whether damages were suffered and recoverable. Defendants strongly defended this lawsuit with experienced attorneys from Kagan, Caspersen & Bogart PLLC and consistently denied that they were liable in

any respect.  Although Lead Plaintiff is confident that he would have been able to support his claims with qualified and persuasive expert testimony, jury reactions to competing experts are difficult to predict, and Defendants would have presented highly experienced experts to support their various defenses to liability.  Recovery of any amount was far from certain.

45.     Based on all these factors, as well as the extensive experience of Lead Counsel in the litigation of securities class actions, Lead Counsel submits that the Settlement, which provides a very substantial recovery to Class Members, outweighs the risks of continued litigation.

## VI.     THE PLAN OF ALLOCATION

46.     If approved, the Plan of Allocation will govern how the proceeds of the Net Settlement Fund will be distributed.  The proposed Plan of Allocation provides that, to qualify for payment, a claimant must be, among other things, an eligible Class Member and must submit a valid Proof of Claim form that provides all of the requested information. The Plan of Allocation is set forth in the Notice.

47.     For purposes of determining the amount an Authorized Claimant may recover under the Plan of Allocation, Lead Counsel conferred with its economics and damages expert, Global Economics Group. The plan is premised on the out-of-pocket measure of damages and is designed to measure the difference between what Class Members paid for Bit Digital common stock during the Class Period and what the price of Bit Digital stock would have been had the allegedly omitted and misstated information been accurately disclosed.  The proposed Plan of Allocation is designed to fairly and rationally allocate the proceeds of this Settlement among the Class.

## VII.    LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE

48.     The successful prosecution of this action required Lead Counsel, investigators, paraprofessionals, and staff to perform over 520 hours of work and incur $15,902.41 in expenses. *See* Declaration of Jacob A. Walker in Support of Motion for Award of Attorneys' Fees and Expenses ("Fee Decl."), Exs. A-B, submitted herewith.  Based on the extensive efforts on behalf of the Class, as described above, Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis, and has requested a fee in the amount of 25% of the Settlement Amount, plus interest.

### H.  The Requested Fee is Reasonable

49.     In light of the nature and extent of the Litigation, the diligent prosecution of the action, the complexity of the factual and legal issues presented, and the other factors described above and in the accompanying application for attorneys' fees and expenses, Lead Counsel believes that the requested fee of 25% of the Settlement Amount, plus interest, is fair and reasonable.

50.     A 25% fee award is consistent with percentages awarded by courts in this District and across the country (*See generally* Fee Memorandum), and is justified by the specific facts and circumstances in this case and the substantial risks that Lead Counsel had or in the future would have had to overcome at the pleadings, class certification, discovery, summary judgment, and trial phases of the Litigation.

### I.  The Requested Fee is Supported by Lead Plaintiff

51.     Lead Plaintiff spent considerable time and effort fulfilling his duties and responsibilities in this case, including reviewing documents and consulting with Lead Counsel

concerning the merits of the Litigation.   Throughout the Litigation, Lead Plaintiff actively monitored Lead Counsel and supports its requested fee.

**J.   The Requested Fee is Supported by the Effort Expended and the Result Achieved**

52.     As set forth herein, the $2.1 million cash Settlement was achieved as a result of extensive prosecutorial and investigative efforts, complicated motion practice, and arm's-length negotiations between experienced counsel.

53.     As discussed in greater detail above, this case was fraught with significant risks concerning liability and damages. Lead Plaintiff's success was by no means assured. Defendants disputed whether the alleged misstatements and omissions were even actionable, asserted that the statements at issue were neither false nor misleading and that Bit Digital had no duty to disclose the information Lead Plaintiff claims was omitted and sought to attribute any harm suffered to factors unrelated to the alleged fraud.  Were this Settlement not achieved, and even if Lead Plaintiff prevailed at trial, Lead Plaintiff potentially faced years of costly and risky appellate litigation, with ultimate success far from certain.  It is also possible that a jury could have found no liability or no damages.

54.     As a result of this Settlement, Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery in the absence of a settlement. These factors also support Lead Counsel's request for an award of attorneys' fees of 25% of the Settlement Amount, plus interest.

**K.   The Risk of Contingent Class Action Litigation Supports the Requested Fee Award**

55.     As set forth in the accompanying application for attorneys' fees and expenses, a determination of a fair fee should include consideration of the contingent nature of the fee, the

financial burden carried by Lead Counsel and the difficulties that were overcome in obtaining the Settlement.

56.     This action was prosecuted by Lead Counsel on a contingent fee basis.  Lead Counsel committed over 520 hours of attorney and professional time and incurred $15,902.41 in expenses in the prosecution of the Litigation, as set forth in the accompanying Fee Declaration. Lead Counsel fully assumed the risk of an unsuccessful result.  Lead Counsel have received no compensation for their services during the course of this Litigation and have incurred very significant expenses in litigating for the benefit of the Class. Any fees or expenses awarded to Lead Counsel have always been at risk and are completely contingent on the result achieved. Because the fee to be awarded in this matter is entirely contingent, the only certainty from the outset was that there would be no fee without a successful result, and that such a result would be realized only after a lengthy and difficult effort.

57.     Lead Counsel's efforts were performed on a wholly contingent basis, despite significant risk and in the face of determined opposition.  Under these circumstances, Lead Counsel is justly entitled to the award of a reasonable percentage fee based on the benefit conferred and the common fund obtained for the Class.  A 25% fee, plus expenses and interest, is fair and reasonable under the circumstances present here.

58.     There are numerous cases, including cases handled by Block & Leviton, where class counsel in contingent fee cases such as this, after expenditure of thousands of hours of time and incurring significant costs, have received no compensation whatsoever.  Class counsel who litigate cases in good faith and receive no fees whatsoever are often the most diligent members of the plaintiffs' bar.  The fact that Defendants and their counsel know that the leading members of the plaintiffs' bar are able to, and will, go to trial even in high-risk cases like this one gives rise to

meaningful settlements in actions such as this.  The losses suffered by class counsel in other actions where insubstantial settlement offers were rejected, and where class counsel ultimately received little or no fee, should not be ignored.  Lead Counsel knows from personal experience that despite the most vigorous and competent of efforts, success in contingent litigation is never assured.

59.     Lawsuits such as this are expensive to litigate. Those unfamiliar with the efforts required to litigate class actions often focus on the aggregate fees awarded at the end but ignore the fact that those fees fund enormous overhead expenses incurred during the course of lengthy litigation, are taxed by federal and state authorities, are used to fund the expenses of other contingent cases prosecuted by class counsel and help pay the salaries of the firms' attorneys and staff.

## VIII.    LEAD PLAINTIFF'S REQUESTED AWARD PURSUANT TO 15 U.S.C. §78u-4(a)(4) IS REASONABLE

60.     The Private Securities Litigation Reform Act of 1995 limits a class representative's recovery to an amount "equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class," but also provides that "[n]othing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." 15 U.S.C. §78u-4(a)(4).

61.     Here, as explained in the accompanying Lead Plaintiff declaration, Lead Plaintiff requests an award of $5,000 to compensate for his time and expenses related to his active participation in the Litigation.  *See* Lead Plaintiff Declaration, ¶7.

62.     As detailed in the Fee Memorandum, many courts, including those in this Circuit, have approved reasonable payments to compensate class representatives for the time and effort devoted by them on behalf of a class.

63.     Lead Counsel believes that the amount sought here is reasonable based on Lead Plaintiff's active involvement in the Litigation, which included: reviewing and authorizing filing of the Amended Complaint; reviewing and evaluating status reports regarding the Litigation; reviewing and considering pleadings and briefs in the Litigation; consulting with Lead Counsel during the course of the Litigation regarding case strategy, developments, and efforts to negotiate the Settlement; and analyzing potential settlement amounts and providing settlement authority. *See* Lead Plaintiff Decl., ¶3.  As a result, Lead Counsel respectfully submits that this request should be granted in its entirety.

## IX.    CONCLUSION

For all the foregoing reasons, Lead Counsel respectfully requests that the Court: (i) approve the Settlement and Plan of Allocation, and (ii) approve Lead Counsel's application for attorneys' fees of 25% of the Settlement Amount and $15,902.41 in expenses, plus the interest earned on both amounts at the same rate and for the same period as that earned on the Settlement Fund until paid, plus an award to Lead Plaintiff of $5,000.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 3rd day of February 2023, at Boston Massachusetts.

*/s/ JACOB A. WALKER*
JACOB A. WALKER

**CERTIFICATE OF SERVICE**

I, Jacob A. Walker, hereby certify that on February 3, 2023, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ JACOB A. WALKER*

JACOB A. WALKER